UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br>v.<br><br>CLIVEN D. BUNDY<br><br>                          Defendant. | Case No. 2:16-cr-00046-GMN-PAL<br><br>**ORDER**<br>- AND -<br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot. Dismiss – ECF No. 892) |

Before the court is Defendant Cliven D. Bundy's ("Cliven Bundy") Motion to Dismiss Indictment for Lack of Subject Matter Jurisdiction and Under Rule 12(b)(5) for Failure to State an Offense (ECF No. 892), which was referred to the undersigned for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4 of the Local Rules of Practice. On December 9, 2016, the court held a hearing on this Motion. Present was counsel for Cliven Bundy, Brett Whipple, and counsel for the government, Steven Myhre, Nicholas Dickinson, Nadia Ahmed, and Erin Creegan. The court has considered the Motion, Defendants Steven Stewart, Ryan Payne, Melvin Bundy, and Ammon Bundy's Motions for Joinder (ECF Nos. 915, 980, 1095, 1117), the Government's Response (ECF No. 985), Cliven Bundy's Reply (ECF No. 1035), and the arguments of counsel at the hearing.

## BACKGROUND

**I.   THE INDICTMENT**

Defendant Cliven Bundy and 18 co-defendants are charged with 16 counts in a Superseding Indictment (ECF No. 27) returned March 2, 2016. The superseding indictment arises out of a series of events related to a Bureau of Land Management ("BLM") impoundment of Cliven Bundy's cattle following a two-decade-long battle with the federal government. Beginning in 1993, Cliven Bundy continued to graze cattle on land commonly referred to as the "Bunkerville

Allotment" without paying required grazing fees or obtaining required permits. The United States initiated civil litigation against Cliven Bundy in 1998 in the United States District Court for the District of Nevada. *See United States v. Bundy*, No. 2:98-cv-0531-JBR-RJJ ("*Bundy I*"), 1998 U.S. Dist. LEXIS 23835 (D. Nev. Nov. 3, 1998), Order (No. 19) (granting motion for summary judgment). The court found that Cliven Bundy had engaged in unauthorized and unlawful grazing of his livestock on property owned by the United States and administered by the Department of the Interior through the BLM. *Id*. The court permanently enjoined Cliven Bundy from grazing his livestock on the Bunkerville Allotment, ordered him to remove them, and authorized the BLM to impound any unauthorized cattle. *Id*. The Court of Appeals for the Ninth Circuit affirmed the district court's decision. *United States v. Bundy*, 178 F.3d 1301 (9th Cir. 1999).

Bundy did not remove his cattle or comply with the court's order and injunction. The United States went back to court. Subsequent orders were entered in 2013 by different judges in this district issuing a new injunction permanently enjoining Bundy from trespassing on additional federal lands administered by the National Park Service ("NPS") in the Lake Mead National Recreation Area,[1] ordering Bundy to remove his cattle, and explicitly authorizing the United States to seize, remove, and impound any of Bundy's cattle for future trespasses, provided that written notice was given to Bundy, and modifying and enforcing the 1998 permanent injunction from *Bundy I* addressing the Bunkerville Allotment. *United States v. Bundy*, No. 2:98-cv-0531-LRH-VCF (D. Nev. Oct. 9, 2013), Order (ECF No. 56) (granting motion to enforce injunction); *United States v. Bundy*, 2:12-cv-0804-LDG-GWF ("*Bundy II*"), 2013 WL 3463610 (D. Nev. July 9, 2013), Order (ECF No. 35) (granting motion for summary judgment and permanently enjoining trespass).

On February 17, 2014, the BLM entered into a contract with a civilian contractor in Utah to round up and gather Bundy's trespass cattle. BLM developed an impoundment plan to establish a base of operations on public lands near Bunkerville, Nevada, about 7 miles from the Bundy ranch in an area commonly referred to as the Toquop Wash. On March 20, 2014, BLM also entered into a contract with an auctioneer in Utah who was to sell impounded cattle at a public sale. Bundy

---

[1] By 2012, Bundy's cattle had multiplied and he also began grazing his cattle on land administered by the NPS in the Lake Mead National Recreation Area without obtaining grazing permits or paying grazing fees.

was formally notified that impoundment operations would take place on March 14, 2014. The following day, Bundy allegedly threatened to interfere with the impoundment operation by stating publicly that he was "ready to do battle" with the BLM, and would "do whatever it takes" to protect "his property." The superseding indictment alleges that after being notified that BLM intended to impound his cattle, Bundy began to threaten to interfere with the impoundment operation, and made public statements he intended to organize people to come to Nevada in a "range war" with BLM and would do whatever it took to protect his cattle and property.

The superseding indictment alleges that, beginning in March 2014, the 19 defendants charged in this case planned, organized, conspired, led and/or participated as followers and gunmen in a massive armed assault against federal law enforcement officers to threaten, intimidate, and extort the officers into abandoning approximately 400 head of cattle owned by Cliven Bundy. The removal and impoundment operation began on April 5, 2014. On April 12, 2014, defendants and hundreds of recruited "followers" executed a plan to recover the cattle by force, threats, and intimidation. Defendants and their followers demanded that officers leave and abandon the cattle and threatened to use force if the officers did not do so. The superseding indictment alleges armed gunmen took sniper positions behind concrete barriers and aimed their assault rifles at the officers. Defendants and their followers outnumbered the officers by more than 4 to 1, and the potential firefight posed a threat to the lives of the officers, as well as unarmed bystanders which included children. Thus, the officers were forced to leave and abandon the impounded cattle.

After the April 12, 2014 confrontation with federal officers, the superseding indictment alleges that the leaders and organizers of the conspiracy organized armed security patrols and check points in and around Cliven Bundy's Bunkerville ranch to deter and prevent any future law enforcement actions against Bundy or his co-conspirators, and to protect Bundy's cattle from future law enforcement actions.

## II. THE PARTIES' POSITIONS

### A. Cliven Bundy's Motion to Dismiss

In the current motion, Cliven Bundy seeks to dismiss the superseding indictment against him arguing the court lacks subject matter jurisdiction because the federal government does not

have any ownership interest in land within the State of Nevada. The motion argues that any activity of federal agents during the time period described within the indictment was illegal and consists of an aggressive trespass into lands owned by the people of Nevada. Certain counts of the superseding indictment require proof that Mr. Bundy interfered with lawful duties of federal agents. These counts are precluded as a matter of law and must be dismissed for failure to state a claim. Specifically, the court should dismiss Counts 1D, 1E, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15 because all of these counts involve proof that federal officers were engaged in lawful duties. The motion traces the history of the feudal land system dating back to the Norman conquest of 1066. It also cites statements of our founding fathers concerning the goals of the American Revolution which included abolishing the system of feudal land ownership and tenancy.

The motion argues that historically, the states allowed for federal and centralized allotment and disposition of western lands so that the federal government could parcel out land to new settlers and use the money to pay off debt. This system of centralized distribution of western lands was intended to be temporary. However, the United States Congress has held almost all of Nevada's lands either out of use entirely, or acting as a quasi-feudal landlord, and allowed heavily regulated and managed uses of local land while extracting fees from local producers. Bundy maintains Congress has, in this manner, allotted Nevada to itself in perpetuity and is now Nevada's largest landlord and "the functional lord of Nevada, its citizens, and its local politics."

The court should dismiss the superseding indictment as a matter of law for failure to state a claim under Rule 12(b) because it is a motion capable of determination before trial and involves a question of law rather than fact. The motion argues that the indictment must be dismissed because federal agents involved in this prosecution were engaged in unlawful acts, trespassing upon state and local property, and the chattel of Mr. Bundy. The motion contends that the United States federal government has never lawfully owned land in Nevada. The Nevada State Legislature has never consented to let the federal government own 85% of public land within Nevada's boundaries. Although the Territorial Legislature did consent, this does not bind the Nevada State Legislature which has expressly repudiated federal ownership in a series of statutes declaring state ownership, control, and jurisdiction over all "public lands" within Nevada.

       Bundy argues that although the federal government claims it acquired the land from the nation of Mexico following the Mexican-American War pursuant to the Treaty of Guadalupe Hildago, it is incorrect. The treaty as a whole merely defined the boundary between two nations and established rules of diplomatic relations and international relations between them. It explicitly reserved the rights in the land to the inhabitants to be "inviolably respected." It promised the inhabitants that they would, at the proper time, be admitted as a state and able to enjoy all rights of citizens of the United States. This indicates Congress was never the absolute owner of the lands at issue and never had plenary power.

       Alternatively, Bundy argues that even if the federal government originally owned the land, the federal government only owned the land conditionally as a matter of contract and title passed to the State of Nevada when that condition expired. He maintains that the conditional ownership of Nevada public lands by the federal government terminated as soon as the federal government violated the condition upon their ownership interest. Specifically, the federal government violated the condition of their ownership as soon as they demonstrated intent to permanently retain public lands. With this breach of compact, title to all of the public lands reverted to the State of Nevada and citizens of the state who were occupying and using those lands. Bundy is aware that the Ninth Circuit has rejected this argument in *United States v. Gardner*, 107 F.3d 1314, 1317–18 (9th Cir. 1997). However, he argues that *Gardner* was wrongly decided.

       The motion argues, in the alternative, that even if the federal government was at one point the absolute owner of the land at issue, it transferred the lands to the State of Nevada on May 5, 1866, without reserving to itself any public lands in the state. This occurred when Congress enacted "An Act Concerning the Boundaries of the State of Nevada." Bundy claims that in this Act, Congress absolutely disposed of the lands of Southern Nevada to the State of Nevada permanently and without reservation, in line with historical practice. Elsewhere in the Act, Congress imposed a condition that Nevada agree not to interfere with the possessory rights to mining claims in the Pahranagat and other districts in the State of Nevada. This shows Congress intended to dispose of the land and give up its plenary power over the lands in the Act.

       The motion also makes arguments that the United States' absolute ownership of the land

is unconstitutional and violates the equal footing doctrine, the equal sovereignty doctrine, is contrary to the fundamental principles of justice within a federation of states, violates the equal protection and the privileges and immunities of the citizens of Nevada.

The motion concludes that the superseding indictment alleges that Cliven Bundy conspired to interfere with, threaten and assault federal agents in the course of their allegedly lawful duties upon the Bundy ranch. However, as the federal government does not have any ownership interest in the Bundy ranch, the court is deprived of subject matter jurisdiction. The court should dismiss those counts that include as an element proof that Bundy interfered with lawful duties of federal agents.

### B. The Government's Response

The government opposes the motion arguing it should be denied as frivolous. The charging language of the superseding indictment contains the elements of the offenses charged and fairly informs Bundy of the charges against him enabling him to plead an acquittal or conviction to bar future prosecution. It is therefore sufficient under Rule 12. Bundy's arguments that the court lacks subject matter jurisdiction are false. However, the government maintains that ownership of the lands is irrelevant to the court's subject jurisdiction over the offense conduct charged in this case. Federal district courts have exclusive original jurisdiction over "all offenses against the laws of the United States under 18 U.S.C. § 3231. All of the counts in the superseding indictment involve offenses against the laws of the United States, and the court therefore has subject matter jurisdiction regardless of whether the offenses were committed on federal land, state land, or Bundy's land.

Bundy's claims that the court lacks jurisdiction because, according to him, court orders being enforced by BLM officers were unlawful because the State of Nevada owns public lands also lack merit. The Supreme Court has determined that the United States Constitution vests the federal government with power to own and regulate public lands. The Supreme Court has held that Congress has near "complete power" under the Property Clause of the Constitution over public land. This court has repeatedly found that the land where the BLM was conducting impoundment operations was owned by the United States and not the State of Nevada. While Bundy may

disagree with the court's findings, they were affirmed by the Ninth Circuit on appeal. His disagreement with the court's findings does not deprive the court of subject matter jurisdiction over the offenses charged, or make the BLM's actions unlawful or unconstitutional. The government cites *United States v. Willfong*, 274 F.3d 1297, 1300–01 (9th Cir. 2001), for the proposition that a federal law enforcement officer is engaged in his duties when on the job, even if executing an order that could later be found invalid.

The political question of whether the federal government can or should own land is irrelevant to whether the indictment properly alleges Bundy committed the offenses charged. The superseding indictment need only track the language of the statute comprising the offenses charged to comport with Rule 12. Additionally, Bundy's political views provide no defense to any of these offenses at trial.

**C. Cliven Bundy's Reply**

Bundy's reply reiterates argument that the charges against him are beyond the jurisdiction of this court and are barred on their face as a matter of law. The reply accuses the United States of failing to address the arguments raised in the motion. The government's opposition primarily relies on orders of this court in the collateral civil cases of *Bundy I* and *Bundy II*, and a catchall reference to the Supreme Court's interpretation of the Property Clause. However, the motion to dismiss addressed *Bundy I* and *Bundy II* and distinguished the Ninth Circuit's holding in *Gardner* and related Supreme Court cases. The United States fails entirely to address the arguments based on the Congressional Act of May 5, 1866.

Bundy disputes the United States' position that the legality or illegality of the federal activity described in the indictment is irrelevant. The United States must still prove that the actions of federal agents alleged in the superseding indictment were lawful. Bundy argues that the Ninth Circuit's holding in *Willfong* is contrary to fundamental principles of justice and the character of the American form of government. He argues that the American Revolution was an act of treason and a violation of law by the colonists. The United States is effectively arguing that people must, as a matter of law, submit to unlawful orders, or else be called a criminal which is alien and foreign to our shared history. The offenses charged in the superseding indictment require proof of lawful

official duties and lawful justice and are not satisfied by any type of good faith belief by the agents involved. Any other result "would be tantamount to a declaration that the United States is itself not subject to its laws, and that its people are subject not only to the laws of the United States, but the un-laws of the United States." Mr. Bundy is exercising his right to challenge the application of any such case law and is preserving those objections to higher courts if necessary.

## DISCUSSION

I.   APPLICABLE LEGAL STANDARD

Pursuant to Rule 12 of the Federal Rules of Criminal Procedure,[2] a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Rule 12(b)(3) specifies the motions which must be made before trial. Among them is a motion to dismiss for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(v). A pretrial motion to dismiss a criminal case is appropriate when it involves questions of law rather than fact. *United States v. Schulman*, 817 F.2d 1355, 1358 (9th Cir. 1987).

In ruling on a pretrial motion to dismiss, "the district court is bound by the four corners of the indictment." *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) ("On a motion to dismiss an indictment for failure to state an offense the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged."). The court should not consider evidence that does not appear on the face of the indictment. *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996)). Thus, a defendant is not entitled to a pre-trial evidentiary hearing to obtain a preview of the government's evidence and an opportunity to cross-examine its witnesses. *Id.* at 669 ("A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence.").

In determining whether a cognizable offense has been charged, the court does not consider whether the government can *prove* its case, only whether accepting the facts as alleged in the indictment as true, a crime has been alleged. *United States v. Milovanovic*, 678 F.3d 713, 717 (9th Cir. 2012). Rule 12 motions cannot be used to determine "general issues of guilt or innocence,"

---

[2] All references to a "Rule" or the "Rules" in this Order refer to the Federal Rules of Criminal Procedure.

8

which "helps ensure that the respective provinces of the judge and jury are respected." *Boren*, 278 F.3d at 914 (citation omitted). A defendant may not challenge a facially-sufficient indictment on the ground that the allegations are not supported by adequate evidence. *Jensen*, 93 F.3d at 669 (citation omitted). However, the court may dismiss an indictment if "it fails to recite an essential element of the charged offense." *United States v. Ezeta*, 752 F.3d 1182, 1184 (9th Cir. 2014) (citing *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005)).

## II. ANALYSIS AND DECISION

### A. The Land Described in the Motion

The Motion creates some confusion in defining the term "Bundy Ranch" as "land within the borders of the State of Nevada that is allegedly owned in fee simple by the Federal Government and controlled by the same with plenary power under Article IV of the United States Constitution." Mot. at 2:7–11. The Motion further states that 85% of Nevada's land is held by the federal government. Mot. at 5. Based on these statements, one could infer that Mr. Bundy asserts that 85% of Nevada is the "Bundy Ranch." The court doubts this is his claim as, the Motion also states that the land where the "Bundy Ranch" sits and where he grazed cattle was included in an 1866 congressional land grant to the State of Nevada. Mot. at 22. The Superseding Indictment (ECF No. 27) alleges only that Cliven Bundy is "the operator of a ranch referred to as 'Bundy Ranch' " and his "ranching operations included grazing cattle on federal public land." *Id*. at 6, ¶ 9. This Order does not address or decide the boundaries of the Bundy Ranch.

### B. Judicial Review

Article III of the United States Constitution outlines the powers of the judicial branch of the federal government. In the seminal decision, *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 177 (1803), Chief Justice John Marshall explained that Article III established a "judicial department" with the "province and duty . . . to say what the law is" in particular cases and controversies. In addition, *Marbury* established another fundamental function of Article III judicial power is "the duty to maintain the supremacy of federal law and, above all, the Constitution." *Crater v. Galaza*, 508 F.3d 1261, 1265 (9th Cir. 2007) (citation omitted).[3] Over

---

[3] Pursuant to the Supremacy Clause, federal law preempts any state law that conflicts with federal law. *See*

the past two centuries, many Supreme Court decisions have "unequivocally reaffirmed" *Marbury*'s holding establishing the power of judicial review. *See, e.g., United States v. Nixon*, 418 U.S. 683, 703 (1974). The Framers crafted Article III to give the federal judiciary "the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy." *Plaut v. Spendthrift Farm*, 514 U.S. 211, 217–19 (1995) (citation omitted). Accordingly, "[t]he federal judiciary has the ultimate authority to interpret the Constitution." *Crater*, 508 F.3d at 1267; *see also City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) ("the power to interpret the Constitution" is entrusted to the judiciary).

The American system of federal government is "one of enumerated powers," meaning that the Constitution lists, or enumerates, the federal government's powers, "rather than granting general authority to perform all the conceivable functions of government." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, --- U.S. ---, 132 S. Ct. 2566, 2577 (2012) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819)). The Constitution authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution" the enumerated powers, such as the power to tax and spend or to provide for the defense and general welfare. *See* U.S. Const. art. I, § 8. Exercising the power of judicial review, the Supreme Court has consistently interpreted Article I "to give Congress great latitude in exercising its powers: 'Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional'." *Nat'l Fed'n*, 132 S. Ct. at 2579 (quoting *McCulloch*, 4 Wheat. at 421).

Almost two centuries ago, Chief Justice Marshall observed that the question regarding the extent of the powers the Constitution actually granted to the federal government "is perpetually arising, and will probably continue to arise, as long as our system shall exist." *McCulloch*, 4 Wheat. at 405. If there is a principle in the Constitution "more sacred than another, it is that which separates the legislative, executive and judicial powers." *Myers v. United States*, 272 U.S. 52, 116

---

U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

(1926) (citation omitted). Thus, the courts may invalidate "an Act of Congress only if 'the lack of constitutional authority to pass the act in question is clearly demonstrated'." *Nat'l Fed'n*, 132 S. Ct. at 2579 (quoting *United States v. Harris*, 106 U.S. 629, 635 (1883)).

Federal courts "have developed a panoply of tools to guide them in the interpretive process, among them inferring rules from text or structure, reasoning from analogy, and applying rules from precedent." *Crater*, 508 F.3d at 1265 (citation omitted). "One tool in the judicial toolbox" is stare decisis, *id.*, which is a Latin term meaning to "to stand by things decided." Black's Law Dictionary (10th ed. 2014). Stare decisis is the "doctrine of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation," *id.*, and it "bears particular Article III significance":

> The central importance of stare decisis to the Article III 'judicial power' is well-founded; as the Supreme Court has explained, stare decisis is 'the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion,' a process that 'permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact'."

*Crater*, 508 F.3d at 1265–66 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 265–66 (1986)). Based on stare decisis, federal district courts "are bound by earlier published decisions" of the Supreme Court and the circuit court of appeals in which their district sits. *See Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 782 (9th Cir. 2008). Federal judges "may not respectfully (or disrespectfully) disagree" with their colleagues on their "own court of appeals who have ruled on a controlling legal issue, or with Supreme Court Justices writing for a majority of the Court." *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001). "Binding authority must be followed unless and until overruled by a body competent to do so." *Id*. Judges in this district must follow both Supreme Court and Ninth Circuit precedent.

### C. Bundy's Constitutional Arguments are Foreclosed by Prior Judicial Opinions

For more than two decades, Mr. Bundy has argued that the federal government does not have an ownership interest in any land in Nevada. However, this argument has been soundly and consistently rejected by every court to consider the issue. The court appreciates that Mr. Bundy is raising arguments that have been previously raised and rejected, believing prior cases were

11

wrongly decided, so that he may preserve the issues for later appeal if necessary. However, this court is bound by, and required to apply, controlling Supreme Court and Ninth Circuit precedent.

Following the Mexican American War, the United States and Mexico signed the Treaty of Guadalupe Hidalgo (the "Treaty") in 1848. *United States v. Gardner*, 107 F.3d 1314, 1317 (9th Cir. 1997); *United States v. Nye Cty., Nev.*, 920 F. Supp. 1108, 1110 (D. Nev. 1996). Pursuant to this Treaty, Mexico ceded lands to the United States, including the land comprising present day Nevada. *Id.*; *see also Sparrow v. Strong*, 70 U.S. 97, 104 (1865) ("The Territory, of which Nevada is part, was acquired by treaty.").[4] As the Ninth Circuit explained in *Gardner*, Supreme Court precedent "uniformly found that title to the land first passed to the United States through the Treaty." 107 F.3d at 1317 (citing *United States v. California*, 436 U.S. 32, 34 n.3 (1978) (stating that the Treaty "obligated the United States to respect private property rights derived from Mexican land grants, all nongranted lands previously held by the Government of Mexico passed into the federal public domain"); *Cappaert v. United States*, 426 U.S. 128, 131 (1976) (stating that a limestone cavern in Nevada is "situated on land owned by the United States since the Treaty of Guadalupe Hidalgo in 1848")). *Gardner* recognized that "the federal government was the initial owner of the land from which the state of Nevada was later carved" and definitively resolved the question of ownership regarding the federal public lands within Nevada. 107 F.3d at 1318.

On March 21, 1864, Congress enacted the Nevada Enabling Act, chp. 36, 13 Stat. 30,[5] "authorizing a convention to draft a state constitution for ratification by the residents of the Nevada Territory." *Nye Cty.*, 920 F. Supp. at 1110. "As a condition of statehood, the Nevada Enabling Act required that the convention adopt an ordinance agreeing and declaring that Nevada would 'forever disclaim all right and title to the unappropriated public lands lying within said territory, and that the same shall be and remain at the sole and entire disposition of the United States'." *Id.* In July 1864, the convention adopted the Nevada State Constitution and complied with Congress' directive in the Nevada Enabling Act by adopting an ordinance disclaiming all right and title to

---

[4] The word "cede" is a verb meaning, "1. To surrender or relinquish. 2. To assign or grant." Black's Law Dictionary (10th ed. 2014).

[5] The Nevada Enabling Act is available online through the state legislature's website at leg.state.nv.us/Division/Research/Library/Documents/HistDocs/1864Act (last visited Dec. 19, 2016).

unappropriated public lands. *Id*. On October 31, 1864, Nevada was admitted to the Union. *Id*. The United States has therefore held title to Nevada's federal public lands since before Nevada achieved statehood. *Gardner*, 107 F.3d at 1318 (finding that the United States has held title to such lands since the Treaty in 1848: "the land is the property of the United States").

Article IV of the Constitution states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." U.S. Const. art. IV, § 3, cl. 2. In case after case, the Supreme Court has recognized the expansiveness of this power, finding that the Constitution entrusted Congress with the "power over the public land" and this power "is without limitations." *See, e.g.*, *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976).[6] In addition, Congress may deal with public lands "precisely as an ordinary individual may deal with his farming property. It may sell or withhold them from sale." *Light v. United States*, 220 U.S. 523, 536 (1911) (internal quotation marks and citation omitted). Congress, through federal agencies, may also set rules and regulations for grazing livestock on federal public lands. *See Pub. Lands Council v. Babbitt*, 529 U.S. 728 (2000) (noting in a unanimous opinion that grazing is a privilege, not a right); *Omaechevarria v. Idaho*, 246 U.S. 343, 352 (1918); *Buford v. Houtz*, 133 U.S. 320, 326 (1890).

Although Cliven Bundy strongly disagrees, the courts have rejected his arguments concerning federal ownership of lands within Nevada. The United States may own land, and Congress may sell, withhold, regulate, and manage public lands. The Treaty passed title from Mexico to the United States for the land that includes more than 80% of present-day Nevada. When Nevada was admitted to the Union in 1864, the United States retained ownership of federal public lands within the state. Thus, the United States lawfully owns and administers the federal public lands in Nevada. Nevada permanently disclaimed all right and title to lands upon statehood. The United States' ownership of federal public lands does not violate equal protection or the

---

[6] *See also Alabama v. Texas*, 347 U.S. 272, 273 (1954); *Federal Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 21 (1952); *United States v. San Francisco*, 310 U.S. 16, 29 (1940); *Gibson v. Chouteau*, 80 U.S. (13 Wall.) 92, 99 (1871); *United States v. Gratiot*, 39 U.S. (14 Pet.) 526, 537 (1840); *United States v. Estate of Hage*, 810 F.3d 712, 716 (9th Cir.), *cert. denied*, 137 S. Ct. 332 (2016); *McFarland v. Kempthorne*, 545 F.3d 1106, 1112 (9th Cir. 2008) ("The Property Clause gives Congress plenary power to regulate the use of federal land.").

privileges and immunities of Nevada citizens. The equal footing doctrine and/or the equal sovereignty doctrine do not give Nevada superior title to all lands within its boundaries. *See, e.g.*, *Gardner*, 107 F.3d at 1318–19; *United States v. Medenbach*, 116 F.3d 487 (9th Cir. 1997) (unpublished); *Nye Cty.*, 920 F. Supp. at 1114–17.[7] The court is required to apply *Gardner*'s holdings, which remain binding precedent. Three different federal district judges in this district so held in *Bundy I* and *Bundy II*. *See Bundy I*, 1998 U.S. Dist. LEXIS 23835 (D. Nev. Nov. 3, 1998), *aff'd by* 178 F.3d 1301 (9th Cir. 1999); Oct. 9, 2013 Order (ECF No. 56); *Bundy II*, 2013 WL 3463610 (D. Nev. July 9, 2013), Order (ECF No. 35). Mr. Bundy's contentions that federal officers were acting unlawfully by enforcing federal court orders to remove trespass cattle as alleged in the superseding indictment lack support in binding case law.

Additionally, the court notes that the State of Nevada has agreed with judicial interpretations regarding federal public lands within its borders. In *Nye County*, county officials argued that the United States did not own public lands within Nevada and was entirely without jurisdiction to regulate Nevada's public lands. 920 F. Supp. 1108 (D. Nev. 1996), *appeal dismissed*, 133 F.3d 930 (9th Cir. 1997). The United States joined the State of Nevada in the action and sought a declaration stating that the United States owned and had authority to manage the federal public lands in Nye County. *Id*. at 1112. Nye County's position, similar to Cliven Bundy's, was based on Nevada statutes NRS 321.596–321.599, which declared ownership of and control

---

[7] The equal footing doctrine was designed to create parity regarding each state's political rights and sovereignty. *See, e.g.*, *Stearns v. Minnesota*, 179 U.S. 223, 245 (1900); *see also Puerto Rico v. Sanchez Valle*, --- U.S. ----, 136 S. Ct. 1863, 1871 n.4 (2016); *United States v. 32.42 Acres of Land, More or Less, Located in San Diego Cty., Cal.*, 683 F.3d 1030, 1035 (9th Cir. 2012) (discussing the doctrine's history). The doctrine confirms that each state shares "those attributes essential to its equality in dignity and power with other states." *Coyle v. Oklahoma*, 221 U.S. 559, 568 (1911); however, it does not address other important attributes such as economic status, which varies greatly due to factors such as "[a]rea, location, geology, and latitude." *United States v. Texas*, 339 U.S. 707, 716 (1950). Although political rights and sovereignty are seemingly broad concepts, the doctrine has limited application: to ensure that "each State takes title to the beds of all navigable waters in that State, as did the original thirteen States that formed the Union." *Nevada v. Watkins*, 914 F.2d 1545, 1554 (9th Cir. 1990) (citing *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 476 (1988) ("[T]he States, upon entry into the Union, received ownership of all lands under waters subject to the ebb and flow of the tide."); *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 228–29 (1845)). The Supreme Court has expressly held that the equal footing doctrine negates "any implied, special limitation of any of the paramount powers of the United States in favor of a State." *Texas*, 339 U.S. at 717. This includes Congress' exercise of its power under the Property Clause. *Watkins*, 914 F.2d at 1555.

and jurisdiction over all "public lands" within Nevada.[8] The Nevada legislature enacted these statutes in 1979, as a direct response to Congress' enactment of the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701, which "formally ended the policy of transferring federal lands to private ownership and adopted a policy of retention of these lands by the federal government." *Nye Cty.*, 920 F. Supp. at 1110. The FLPMA authorized the BLM to administer public lands that were not under the direction of other federal agencies. *Id.*

The State of Nevada conceded that its statutory claim to public lands within the state was "legally untenable." *Id.* at 1113. The court found this concession was essentially "a consent to judgment" but also concluded that Nevada's statutory claim was unconstitutional and failed as a matter of law. *Id.* at 1114. Furthermore, the State did "not dispute that, prior to statehood, the United States held title to the public lands within the territory that was to become Nevada." *Id.* Despite the broad language of NRS 321.596–321.599, the court found that "title did not pass to Nevada, but remains with the United States." *Id.* The court explicitly recognized that "the United States owns and has the power and authority to manage and administer the unappropriated public lands and National Forest System lands within Nye County, Nevada." *Id.* at 1120.

The *Nye County* decision clearly demonstrates the State of Nevada's legal position on this issue: the United States holds title to federal public lands in Nevada. The State of Nevada reaffirmed this position in *Gardner*, filing an amicus brief along with the states of New Mexico, Alaska, Maine, Montana, Oregon, and Vermont, supporting the United States' position. 107 F.3d at 1317 n.1. Mr. Bundy's position on the ownership and management of federal public lands in Nevada is not only contrary to binding federal case law but it is also at odds with the State of Nevada's position.

**D. The 1866 Act Did Not Transfer Federal Public Lands to the State of Nevada**

The Motion asserts that the land at issue in this case was not incorporated into the State of Nevada until after May 5, 1866, the date when Congress approved "An Act Concerning the

---

[8] Notably, NRS 321.5963 defined the term "public lands" to exclude, among other things, land located in congressionally authorized national parks and monuments, national forests, wildlife refuges, lands acquired by the consent of the legislature, and lands controlled by the Department of Defense, Department of Energy, or Bureau of Reclamation.

Boundaries of the State of Nevada" (the "1866 Act"). The 1866 Act states:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That, as provided for and consented to in the constitution of the State of Nevada, all that territory and tract of land adjoining the present eastern boundary of the State of Nevada, and lying between the thirty-seventh and the forty-second degrees of north latitude and west of the thirty-seventh degree of longitude west of Washington, is hereby added to and made a part of the State of Nevada.
>
> Sec. 2. *And be it further enacted*, That there is hereby added to and made a part of the State of Nevada all that extent of territory lying within the following boundaries, to wit: Commencing on the thirty-seventh degree of north latitude, at the thirty-seventh degree of longitude west from Washington; and running thence south on said degree of longitude to the middle of the river Colorado of the West ; thence down the middle of said river to the eastern boundary of the State of California; thence northwesterly along said boundary of California to the thirty-seventh degree of north latitude; and thence east along said degree of latitude to the point of beginning: *Provided*, That the territory mentioned in this section shall not become a part of the State of Nevada until said State shall, through its legislature, consent thereto: *And provided further*, That all possessory rights acquired by citizens of the United States to mining claims, discovered, located, and originally recorded in compliance with the rules and regulations adopted by miners in the Pah-Ranagat and other mining districts in the Territory incorporated by the provisions of this act into the State of Nevada shall remain as valid subsisting mining claims; but nothing herein contained shall be so construed as granting a title in fee to any mineral lands held by possessory titles in Title in fee not the mining States and Territories.

Ch. 39, 14 Stat. 43 (1866). The first section of the 1866 Act attached an additional portion of the Utah Territory along Nevada's eastern border, and did so automatically because the drafters of the Nevada Constitution anticipated the addition. *See* Dean Heller, Nevada Secretary of State, *Political History of Nevada* 112 (Renee Parker & Steve George, eds., 11th ed. 2006).[9] The second section added the northwestern portion of the Arizona Territory to Nevada's southern border. *Id*. at 114. This addition, however, required the Nevada legislature to pass a resolution accepting the addition, which occurred in early 1867. *Id*. The court will jointly refer to the land described in both sections of the 1866 Act as the "1866 Land" and individually as the "Utah addition" and "Arizona addition."

The Motion presents the novel argument that the 1866 Act transferred title to the 1866 Land to the State of Nevada because the transfer was conditioned on the state legislature's acceptance of the new land and a prohibition on interfering with certain possessory mining rights.

---

[9] *Political History of Nevada* is available online through the Nevada State Archives website at nsla.nv.gov/Archives/PoliticalHistoryOfNevada2006 (last visited Dec. 19, 2016).

Under this theory, the United States has no claim to the 1866 Land because the Congress absolutely and permanently disposed of such land pursuant to its expansive authority under the Property Clause. This result is purportedly apparent from the plain meaning of the text in the 1866 Act. Additionally, Mr. Bundy asserts that the prohibition on interference with possessory mining rights would be meaningless unless Congress intended to dispose of the 1866 Land to the State of Nevada in the 1866 Act. Mr. Bundy provides no legal authority for this interpretation, only argument, and his reasoning does not withstand scrutiny.

The plain language of the 1866 Act does not transfer title of the 1866 Land to the State of Nevada—it merely added the land to the state boundaries. Section 2 of the Nevada Enabling Act provided the initial boundaries of the new state:

> **Boundaries of state**. *And be it further enacted*, That the said state of Nevada shall consist of all the territory included within the following boundaries, to wit: Commencing at a point formed by the intersection of the thirty-eighth degree of longitude west from Washington with the thirty-seventh degree of north latitude; thence due west along said thirty-seventh degree of north latitude to the eastern boundary line of the state of California; thence in a northwesterly direction along the said eastern boundary line of the state of California to the forty-third degree of longitude west from Washington; thence north along said forty-third degree of west longitude and said eastern boundary line of the state of California to the forty-second degree of north latitude; thence due east along the said forty-second degree of north latitude to a point formed by its intersection with the aforesaid thirty-eighth degree of longitude west from Washington; thence due south down said thirty-eighth degree of west longitude to the place of beginning.

Chp. 36, 13 Stat. 30, § 2 (1864). Other sections provided specific land grants to the state for support of common schools, erecting public buildings, and erecting a state prison. *Id*. §§ 7–9. For example, Section 7 of the Nevada Enabling Act states:

> **Grant of public lands for support of common schools.** *And be it further enacted,* That sections numbers sixteen and thirty-six, in every township, and where such sections have been sold or otherwise disposed of by any act of congress, other lands equivalent thereto in legal subdivisions of not less than one quarter-section, and as contiguous as may be, <u>shall be, and are hereby, granted to said state for the support of common schools</u>.

*Id*. § 7 (underlined emphasis added). If Congress intended the Act to grant public land to the State of Nevada, it would have expressly said so, just as it did in Sections 7, 8, and 9 of the Nevada Enabling Act. Instead, the 1866 Act uses language very similar to Section 2 of the Nevada

Enabling Act, which merely established the state's boundaries. *United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) ("[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter.") (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987); *Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1973)). Thus, it is clear that Congress did not grant or otherwise dispose of the 1866 Land in the 1866 Act. The inclusion of language requiring acceptance of the Arizona addition and the possessory rights of certain mining claims does not demonstrate a federal land grant or alter Congress' clear but limited intent to expand Nevada's boundaries. Historical records indicate that legislative approval was required for the Arizona addition because it was not anticipated in the state constitution, unlike the Utah addition. *See Political History of Nevada* at 112–14. Thus, the condition of acceptance for the Arizona addition does not show that Congress granted title to the 1866 Land to the State of Nevada.

As explained, the State of Nevada has expressly disclaimed ownership or management of federal public lands within the state. Mr. Bundy's his personal interpretations of the Constitution or subsequent congressional actions, including the 1866 Act, are simply not supported by controlling law. His arguments are foreclosed by decisions of the United States Supreme Court, the ultimate authority on constitutional interpretation, and the Ninth Circuit.

### E.  18 U.S.C. Section 3231

Finally, the government correctly points out that the crimes charged in the superseding indictment are all offenses against the laws of the United States. 18 U.S.C. § 3231 provides in relevant part: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." Under this statute, Congress gave this court subject matter jurisdiction over the crimes charged in the superseding indictment.

For the reasons explained, the court will recommend denial of Mr. Bundy's Motion to Dismiss based on arguments the court lacks subject matter jurisdiction.

Accordingly,

/ / /

**IT IS ORDERED** that Defendants Steven Stewart, Ryan Payne, Mel Bundy, and Ammon Bundy's Motions for Joinder (ECF Nos. 915, 980, 1095, 1117) are **GRANTED**.

**IT IS FURTHER RECOMMENDED** that Cliven Bundy's Motion to Dismiss (ECF No. 892) be **DENIED**.

DATED this 20th day of December, 2016.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE