UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br>v.<br>RYAN W. PAYNE,<br>　　　　　　　　　　Defendant. | Case No. 2:16-cr-00046-GMN-PAL<br><br>REDACTED  ORDER<br>- and -<br>REPORT OF FINDINGS AND RECOMMENDATION<br><br>(Mot. Dismiss – ECF No. 1878) |

Before the court is Defendant Ryan Payne's ("Payne") Renewed Sealed Motion to Dismiss for Destruction of Evidence, or in the Alternative, for a Remedial Jury Instruction (ECF No. 1878), which is referred to the undersigned for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice.  The court has considered the Motion (ECF No. 1878), the Motions for Joinder (ECF Nos. 1896, 1900, 1909, 1910, 1915, 1919, 1963) by Defendants Dave Bundy, Ammon Bundy, Steven Stewart, Jason Woods, Mel Bundy, Cliven Bundy, and Micah McGuire, the Government's Sealed Response (ECF No. 1931), and Payne's Sealed Reply (ECF No. 1972).

## BACKGROUND

I.　**PROCEDURAL HISTORY**

Payne is charged in a Superseding Criminal Indictment (ECF No. 27) returned March 2, 2016, with 16 felony counts arising out of events that occurred in and around Bunkerville, Nevada, on April 12, 2014.[1]  The superseding indictment relates the history of Cliven Bundy's disputes

---

[1] Payne is charged with conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371; conspiracy to impede and injure a federal officer in violation of 18 U.S.C. § 372; assault on a federal officer in violation of 18 U.S.C. § 111(a)(1) and (b); threatening a federal law enforcement officer in violation 18 U.S.C. § 115(a)(1)(B); use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c); obstruction of the due administration of justice in violation of 18 U.S.C. § 1503; interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951; interstate travel in aid of extortion in violation of 18 U.S.C. § 1952; and aiding and abetting in violation of 18 U.S.C. § 2.

1

with the federal government concerning grazing his cattle on land managed by the Bureau of Land Management ("BLM") and the court orders which authorized removal of the cattle. Since 1998, Cliven Bundy was under a federal court order to move is trespassed cattle. A removal or "impoundment" operation began on April 5, 2014. The government alleges that Payne and his co-defendants planned, organized, led, and participated as gunmen in an assault on federal law enforcement officers in an effort to threaten, intimidate, and extort the officers into abandoning approximately 400 head of cattle that were in their lawful care and custody. One of the goals of the alleged conspiracy was to thwart the seizure and removal of Cliven Bundy's cattle from federal public lands.

## II. THE PARTIES' POSITIONS

### A. Payne's Motion to Dismiss

The current motion follows on the heels of a previous motion filed by defendant Ammon Bundy (ECF No. 833). After the motion was fully briefed, the court recommended that Ammon Bundy's motion be denied without prejudice to requesting an adverse inference instruction should further investigation, or evidence developed during trial, support one. *See* Dec. 30, 2016 Report of Findings & Recommendation (ECF No. 1216) (the "R&R") at 17–18. Ammon Bundy filed objections (ECF No. 1293). Chief District Judge Gloria M. Navarro overruled those objections. *See* Feb. 2, 2017 Order (ECF No. 1504).

In the current motion, Payne argues that in January 2017, the defense became aware that the BLM Supervisory Special Agent in charge of the impound operation, Daniel P. Love, was the subject of a 2015 investigation by the Office of Inspector General ("OIG") of the United States Department of Interior. The investigation generated a report centered on Love's misconduct related to complaints made against him concerning misuse of authority at the September 2015 Burning Man festival in Nevada, and improper influence in the BLM hiring process. The OIG report noted that Love had been subject to approximately eight anonymous complaints in the two years prior, and ultimately found that he "displayed a lack of candor when interviewed and tried to influence an employee's comments prior to an interview." The OIG's investigation has been forwarded to the Assistant Secretary for Land and Minerals Management for "any action deemed

1  appropriate." Judge Navarro ordered the government to disclose the unredacted OIG report
2  because it contained evidence of violations of several federal ethics regulations. *See* Feb. 8, 2017
3  Order (ECF No. 1556). The House of Representatives' Committee on Oversight and Government
4  Reform has requested further investigation regarding Love's involvement and the destruction of
5  federal records, witness tampering, and obstruction of a Congressional investigation. *See* Payne's
6  Sealed Mot. for Unredacted OIG Report (ECF No. 1807), Exhibit A.

7  The OIG investigation suggests that in April 2014, two of Love's subordinates xxxxx
8  and xxxxx, were involved in the impoundment operation. Payne argues that xxxxx was aware
9  Love ordered the flagging and deletion of documents subject to the Federal Records Act and did
10 not alert anyone. In light of Love's egregious misconduct in directing the destruction and
11 concealment of evidence "and how this misconduct permeates his relationship with and control
12 over his subordinate employees, Payne now renews the motion to dismiss for destruction of
13 evidence." Payne requests an evidentiary hearing and dismissal of all counts alleged in the
14 superseding indictment, or at the very least, a remedial instruction about the destroyed evidence.

15 Payne argues that because the OIG investigation demonstrates that Love engaged in
16 misconduct at the 2015 Burning Man festival, and directed BLM employees to destroy and conceal
17 incriminating evidence, this demonstrates Love was willing to engage in criminal obstructive
18 activity and to intimidate subordinate employees. Love was the supervisory agent in charge of the
19 2014 BLM impoundment operation and the misconduct identified in the OIG investigation
20 provides new evidence that demonstrates the need for the court to hold an evidentiary hearing to
21 address the circumstances surrounding the destruction of the evidence at the BLM's impoundment
22 site. At a minimum, it establishes the propriety of a remedial jury instruction as to the evidence
23 Love and his employees destroyed on April 11–12, 2014.

### B. The Government's Response

25 The Response (ECF No. 1931) argues that the court has already decided this issue in a
26 ruling on Ammon Bundy's motion. Payne raises nothing new and material. The court issued the
27 R&R (ECF No. 1216) recommending denial of that motion to dismiss. The district judge reviewed
28 the record de novo and issued an Order (ECF No. 1504) adopting the R&R and denying Bundy's

motion. Judge Navarro found, among other things, that "the limited shreds of paper that appear to have handwriting do not warrant an evidentiary hearing." She also found that the government's conduct was reasonably justified as part of a protocol to protect confidential information, that Bundy had failed to meet his burden of establishing prejudice, that the evidence is central to the case, important to establish the elements of the crime or his own motive, or that its absence presents a danger of unfounded speculation by the jury. Judge Navarro also found that Bundy's belief that he has irreparably lost impeachment evidence was speculative and without sufficient foundation.

The government argues that Payne's current motion attempts to resurrect this issue on equally speculative and frivolous ground offering no new or material information. The government accuses Payne of "playing fast and loose" with the OIG report and making a false statement that it contained allegations that Love ordered a BLM employee to flag and delete administrative records for a BLM authorized event. Nothing in the OIG report or its attachments support this statement. Nothing in the OIG report, or Payne's motion, shows that the shredded pieces of paper in a plastic bag found in a dumpster were documents that were or are material to anything. This was the same defect lacking in Bundy's original motion. The government notes that Toni Suminski, Interagency Communication Center Manager for the BLM, testified at trial that she followed the Nevada Criminal Justice Information System protocol and shredded documents that were law enforcement sensitive and/or contained personal identifying information.[2] Ms. Suminski's testimony is consistent with the declaration submitted in response to Ammon Bundy's previous motion, which explained the circumstances surrounding the shedding of law enforcement sensitive information. *See* Gov't Resp. Ex. A (ECF No. 948-1), Decl. of Assistant Special Agent in Charge Kent Kleman.

Payne's dissembling about the contents of the OIG report show that the motion was not brought in good faith. He does not argue that the OIG report shows that any of the shredded materials could possibly be material to any issue in this case. Instead, his arguments deal with unrelated events remote in time from the impound operation and rest on multiple contingencies and speculation. The court should therefore deny it.

---

[2] Ms. Suminski's testimony is found in the Day 9 Trial Transcript (ECF No. 1774) at 182–270.

4

### C. Payne's Reply

Payne replies (ECF No. 1972) that he sees a connection between the documents ordered to be destroyed in this case, and the documents ordered to be flagged and deleted in response to a Congressional investigation. The documents that were deleted in response to the OIG investigation were of import and the Committee on Oversight and Government Reform explained that such conduct, if substantiated, would constitute violations of at least two federal statutes. Payne cannot cite with certainty all types of documentation that was destroyed in this case. The government itself has never taken the position that none of the shredded documents contained information of evidentiary value. Rather, the government's prior response to Ammon Bundy's motion represented that the shredded material consisted almost entirely of law enforcement's non-discoverable personal information, and the confidential, non-discoverable operations planned for the impoundment operation. Only the government, which includes Love, knows the contents of the shredded documents. An evidentiary hearing is therefore warranted based on facts known and the serious questions raised by Love's misconduct as a result of the OIG investigation. Under the circumstances, "it would not be far-fetched to arrive at the conclusion that the documents shredded in this case had some evidentiary value." At a minimum, "the jury must be instructed in this regard."

## DISCUSSION

I. LEGAL STANDARDS

### A. Dismissal Based on Lost or Destroyed Evidence

The Supreme Court has held that the Due Process Clause requires the government to preserve evidence "that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). "The government violates a defendant's due process rights when it destroys potentially exculpatory evidence in bad faith." *United States v. Ubaldo*, 859 F.3d 690, 703 (9th Cir. 2017) (citing *United States v. Estrada*, 453 F.3d 1208, 1212–13 (9th Cir. 2006)). In order for destruction of evidence to rise to the level of a due process violation, a defendant must make two showings: (i) "the government acted in bad faith, the presence or absence of which turns on the government's knowledge of the apparent exculpatory

5

value of the evidence at the time it was lost or destroyed;" and (ii) "the missing evidence is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (internal quotation omitted) (citing *Arizona v. Youngblood*, 488 U.S. 51, 56–57 (1988); *Trombetta*, 467 U.S. at 489; *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993)). "Another configuration of this test requires the showing of bad faith where the evidence is only potentially useful and not materially exculpatory." *Sivilla*, 714 F.3d at 1172 (citing *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1149 (9th Cir. 2012). "For evidence to be materially exculpatory, its exculpatory nature must be apparent. *Id*. (citing *Del Toro-Barboza*, 673 F.3d at 1149).

The presence or absence of bad faith necessarily turns on the officers' "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.1; *Sivilla*, 714 F.3d at 1172. Bad faith requires a showing of malicious intent to withhold evidence that may have value to the defense. *See Estrada*, 453 F.3d at 1213. Negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and does not violate due process. *Grisby v. Blodgett*, 130 F.3d 365, 371–72 (9th Cir. 1997); *see also United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) ("Bad faith requires more than mere negligence or recklessness."); *Phillips v. Woodford*, 267 F.3d 966, 987 (9th Cir. 2001) (an officer's mere failure to "preserve evidence which could have been subjected to tests which might have exonerated the defendant does not constitute a due process violation") (quoting *United States v. Hernandez*, 109 F.3d 1450, 1455 (9th Cir. 1997)). To merit an evidentiary hearing, a defendant must make a colorable showing that the government destroyed evidence to prevent the disclosure of favorable evidence to the defense, or that the exculpatory value of the evidence was apparent prior to its destruction. *See Phillips*, 267 F.3d at 987. In determining whether there was a due process violation warranting dismissal of the indictment, the evidence must be viewed in the government's favor. *Ubaldo*, 859 F.3d at 703 (citing *United States v. Black*, 733 F.3d 294, 301 (9th Cir. 2013)).

### B. Remedial Jury Instruction

In determining whether a remedial jury instruction should be given, courts must balance "the quality of the Government's conduct" against "the degree of prejudice to the accused."

*Sivilla*, 714 F.3d at 1173 (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc)) (internal quotation marks omitted). The government bears the burden of justifying its conduct, and the defendant bears the burden of demonstrating prejudice. *Id.* In evaluating the government's conduct, the court should inquire whether: (1) the evidence was lost or destroyed while in the government's custody; (2) the government acted in disregard for the interests of the accused; (3) the government was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions; (4) if the acts were deliberate, whether they were taken in good faith or with reasonable justification; and (5) whether government attorneys prosecuting the case participated in the events leading to the loss or destruction of the evidence. *Sivilla*, 714 F.3d at 1173. In assessing the prejudice to the defendant, the Ninth Circuit directs trial courts to evaluate factors including: (1) the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; (2) the probative value and reliability of the secondary or substitute evidence; (3) the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; and (4) the probable effect on the jury from the absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence. *Id.* at 1173–74.

## II.     ANALYSIS

Payne argues that the late-November 2016 OIG investigation into Love's misconduct at Burning Man in 2015 and other misconduct outlined in the OIG report "provides new evidence that demonstrates the need for the court to hold an evidentiary hearing to address the circumstances surrounding the destruction of the evidence at the BLM's impoundment site." He claims that "Love's egregious misconduct calls into question everything surrounding the BLM's shredding of documents at the cattle impoundment site." The court finds Payne has not shown that: (i) the shredded documents contained exculpatory evidence; (ii) BLM agents knew the apparent exculpatory value of the shredded material at the time the documents were shredded; or (iii) that defendants are unable to obtain comparable evidence. Payne has also not shown that the material that was shredded was potentially useful to his defense, or that the government acted in bad faith.

7

Payne speculates that because Love was in charge of the April 2014 impoundment operation and he is under investigation by the OIG for deleting documents and other misconduct, Love may have ordered subordinates "to destroy and conceal incriminating evidence." The government provided the declaration of Special Agent Klemen in response to Ammon Bundy's initial motion to dismiss for destruction of evidence. Klemen attested that the vast majority of the shredded documents consisted of duplicate copies of the confidential operations plan and other confidential law enforcement sensitive information including the identity, phone numbers, and addresses of law enforcement personnel and contractors assisting in the impoundment operation. Klemen's declaration also averred that the shredded documents included a limited amount of hand-written material. Payne current motion points out that Klemen's declaration was based on his investigation of the circumstances surrounding the destruction of the shredded documents, and that Klemen was not present on April 11th and 12th when the documents were shredded.

The first trial in this case began after Ammon Bundy's motion to dismiss was denied. Toni Suminski, the Interagency Communication Center Manager for the BLM Federal Law Enforcement Communications Center testified at trial on February 28, 2017. *See* Day 9 Trial Transcript (ECF No. 1774) at 182–270. She testified she was in charge of the communications center and physically present during the impoundment operation. She was called by the government and was cross-examined by counsel for the defendants about what documents were shredded before BLM personnel evacuated the impoundment operation on April 12, 2014. She arrived on site March 26, 2014, and left on April 21 or 22, 2014. *Id*. at 207. She was in the communications trailer where the documents were shredded and she was personally involved in shredding the documents. She testified on direct and cross-examination that on the evening of April 11, 2014, she was told that the communications center should be cleaned up to prepare for evacuation. She described the protocols for the disposal of the Nevada Criminal Justice Information obtained during the course of the operation. *Id.* at 237. Specifically, she testified that the protocols called for disposal of information printed out from the Nevada Criminal Justice Information System. *Id.*

/ / /

1	The protocol is to destroy any personal identifiable information ("PII") on physical media. *Id.* She complied with that protocol during the operation by shredding documents. *Id.* at 238. On April 11, 2014, after learning that she might be leaving the communications center, she began following the protocol for the Nevada Criminal Justice Information System. *Id.* She testified that law enforcement sensitive information includes names and phone numbers of officers, locations, encrypted radio channels, contacts of people, or anything in an operation plan that could be considered law enforcement sensitive information. *Id.* Personal identification information would include the name, dates of birth, phone numbers, photos, and other information from the criminal justice information query that would be considered criminal justice information and personal identifiable information. *Id.* at 239. Ms. Suminski testified that on April 12, 2014, she learned that she would be evacuating the communications center within 30 minutes to an hour and would receive an escort from Metro. *Id.* She described how personnel took whatever equipment they could, but left other telecommunications equipment behind. *Id.* at 238-240.

She was cross-examined by Mr. Engel and counsel for the other five defendants about documents that were shredded at the communications center as she was getting ready to evacuate the site. She repeatedly testified that the documents that were shredded consisted of law enforcement sensitive documents and personal identifiable information. *See, e.g.*, *id.* at 248. There were no law enforcement reports in the communications center. *Id.* The kind of law enforcement sensitive information that was in the communications center was "related to law enforcement specific information that related to the operation, that related to encrypted communications, frequencies, locations of resources." *Id.* This would include the operations plan. *Id.* The operations plan included "encrypted frequencies, officers' names and phone numbers, their call signs, locations of resources. There is a com plan in there, there is a medical plan, who to call in case of a critical incident." *Id.* at 249.

Ms. Suminski was later cross-examined by counsel for defendant Lovelien about what occurred when the communications center was broken down in preparation for leaving the Bunkerville area. On April 11, 2014, two of the four communications consoles were taken down. *Id.* at 265. She was asked whether the word "sanitize" meant anything to her. *Id.* at 266. She

responded, "Sure. Sure. We took anything, like the org charts and stuff, down off the wall, that have the officers' name and call sign, we sanitized the com center of those documents, anything else with PII or law enforcement sensitive information." *Id.* This information was destroyed by shredding. *Id.* She did not know how many documents were shredded, but testified that she did it personally. *Id.* The shredding began on Friday night, April 11th when they took down the two stations and started cleaning up the communications center. *Id.* Shredding continued on April 12th. Anything that needed to be shredded was shredded "per the criminal justice policy." *Id.* at 267.

The record simply does not a support a finding that the shredded documents were exculpatory or potentially useful to the defense, or that their exculpatory or useful value was apparent to the persons who destroyed them. The person who was in charge of shredding the documents testified under oath and subject to cross examination exactly what documents were shredded and why. Her first-hand account is consistent with the declaration of Special Agent Klemen. The circumstances surrounding the destruction of documents at the impoundment site are now in the record and uncontroverted. Payne is not entitled to an evidentiary hearing because the supervisory agent in charge of the impoundment operation is under investigation for misconduct unrelated to this case.

For these reasons,

**IT IS ORDERED** that Defendants Dave Bundy, Ammon Bundy, Steven Stewart, Jason Woods, Mel Bundy, Cliven Bundy, and Micah McGuire's Motions for Joinder (ECF Nos. 1896, 1900, 1909, 1910, 1915, 1919, 1963), that is, the request to join in the substantive arguments, are **GRANTED**.

**IT IS RECOMMENDED** that Payne's Motion to Dismiss (ECF No. 1878) be **DENIED**.

DATED this 28th day of August, 2017.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE