DANIEL J. HILL, ESQ.
NV Bar # 12773
Hill Firm
J. MORGAN PHILPOT, ESQ.
Admitted *Pro Hac Vice*
JM Philpot Law, PLLC
228 South 4th Street, Third Floor
Las Vegas, Nevada 89101
Tel:   (702) 848-5000
dan@hillfirmlawyers.com
morgan@jmphilpot.com
*Attorneys for Defendant Ammon E. Bundy*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AMMON E. BUNDY, *et al.*,<br><br>Defendants. | CASE NO.: 2:16-CR-00046-GMN-PAL<br><br>**DEFENDANT AMMON E. BUNDY'S MOTION TO REVOKE DETENTION ORDER**<br><br>**Initial detention hearing: April 20, 2016** |

This is Ammon Bundy's motion to revoke his detention order under 18 U.S.C. § 3145(b). On Tuesday, November 7, 2017 the Court ruled that it would consider the release of the defendants currently in trial, and scheduled a hearing for November 9, 2017 at 9:30 AM.  For consideration with the scheduled hearing, defendant Ammon E. Bundy ("Ammon"), files and serves this motion and incorporated memorandum of law and authority, in support of his request that the Court order his release from detention, beginning immediately and continuing through the duration of the current trial.[1] The Court entered its original order of detention on April 21, 2016. *See* ECF No. 299.

---

[1] In partial response to Ammon's request for additional time to prepare for the initial Bail Reform Act hearing, the Court invited this motion.  *See* ECF No. 299 ("The order of detention is therefore without prejudice to Defendant's right to move to reopen the detention hearing based on material evidence or information that was not reasonably available to him at the time of the hearing.")

## OVERVIEW OF GROUNDS FOR RELEASE

Ammon has been in federal custody, first in Oregon and now in Nevada, since January 26, 2016. Of course, Ammon has been presumed innocent of all charged crimes for this entire time. In addition, while Ammon has been charged with similar and overlapping conspiracy charges in both Oregon and Nevada, he and those defendants who stood trial with him in Oregon were fully acquitted of all charges. Significantly, Ammon had been detained in Oregon under the provisions of the Bail Reform Act ("BRA"), and his detention order in Nevada relied significantly upon the fact that he was indicted and detained in Oregon based upon similar conspiracy charges and allegations. The fact that Ammon was acquitted of all counts in Oregon, coupled with two trials of co-defendants in Nevada with not a single guilty verdict for any co-defendant on conspiracy charges, and outright acquittal on others, genuinely raises the issue of fundamental fairness and justice related to his incarceration.

Further, while Ammon has been incarcerated, just a little over a month ago in open court, the assistant warden of Nevada Southern Detention Center, where Ammon is again detained, explained to the Court that the terms and conditions of his confinement were "no different" than convicted felons in the same facilities, and despite the fact that the BRA requires, where practicable (*see* 18 U.S.C. § 3142(i)(2)), that a detained defendant be held "separate" from convicted felons. Ammon has been held *with* and *under the same strict and austere conditions* as those already convicted. In fact, during the 652 days that he has been detained he has been held in administrative segregating or solitary confinement for approximately 25% of those days.

As the Court is aware, Ammon has firm convictions, and has refused to voluntarily submit to procedures such as strip searches, or submitting voluntarily to commands or orders that are punitive or vindictive (meaning non-essential commands, not required of similarly situated defendants). In this motion Ammon does not intend to argue the conditions, force, and punishment that have been inflicted upon him, but it is essential to point out that during the entire time of his detention, in Oregon and in Nevada, including the 377 days since he was fully acquitted in Oregon, Ammon has never been the aggressor or initiator of force against another person. This is consistent with the fact that he has no criminal history, and no record of violence whatsoever.

Finally, Ammon intends to take the witness stand during the scheduled hearing, and testify that he will obey the requirements of release, as ordered by this Court.  Below, Ammon argues that under each of the normal Bail Reform Act factors he should be released.  Further, under his current confinement, Ammon is almost entirely unable to meaningfully participate in his defense, in that he is not regularly allowed access to discovery, and has been deprived of contact visits with his legal team for the last four weeks, has not been allowed access to a pen, and is not allowed sufficient or timely access to computers and electronic discovery.  Thus, in the motion below, Ammon also argues **under the exceptional provision of 18 U.S.C. 3142(i)(4)** this Court has the authority and justification to release Ammon "in the custody of a United States marshal **or another appropriate person**, to the extent that the judicial officer determines such release to be necessary **for preparation of the person's defense** or for another compelling reason."

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Ammon was arraigned in this matter on April 15, 2016, over his objection as he was under simultaneous indictment and prosecution in the District of Oregon in *United States v. Ammon Bundy, et al.*, case no. 3:16-cr-00051-BR ("the Oregon case"). *See* Minutes of Proceedings, Doc. 248. Undersigned counsel was appointed on this case on the same day. *See* ECF No. 260. At his arraignment, Ammon requested the five-day extension allowed by the Bail Reform Act ("BRA") to prepare for his detention hearing. The Court declined to allow the five-day extension but ordered Ammon's detention hearing to occur three court days later, on April 20, 2016. *See* ECF No. 261. Ammon filed his Emergency Motion to Continue Detention Hearing (ECF No. 271) on April 19, 2016, requesting an additional five days to prepare for his detention hearing. The Court set the motion for hearing at the same time as Ammon's scheduled detention hearing. *See* ECF No. 273. The Court had previously only granted three days out of the five allowed without good cause under the BRA. Thus, at the hearing, Ammon further represented that the additional two days of the BRA's five-day extension, although insufficient, would allow at least some additional preparation.

The Court denied the motion, and the detention hearing proceeded on April 20, 2016. *See* ECF No. 289. At the hearing, the Court stated that Ammon's character, employment, and family

3

and community connections favored release. **The government's entire argument, as expected, came down to the circumstances of the allegations and the weight of the evidence**. The Magistrate Judge noted that it only considered those factors in detaining Ammon, because of his personal character and lack of criminal record.

Shortly thereafter, Ammon was transported back to Oregon for a September 2016 trial date in the Oregon case. For the following seven months, *until he was acquitted in Oregon*, Ammon was over 1,000 miles away from undersigned counsel, in detention in Portland. Ammon did not arrive back in Nevada until around November 14, 2016, a little over two months prior to his original trial date here. During his time away, Ammon had precious little meaningful contact with undersigned counsel, oftentimes monitored by hovering jail staff. Even more critically, Ammon has repeatedly and for long stretches of time, been unable to review any discovery or meaningfully meet and confer with his defense team; for example, while at Henderson Detention Facility, Ammon was not given access to unrecorded telephone contact to his legal team, and was not allowed contact visits to enable review of electronic discovery.

## II.    RELEVANT FACTUAL BACKGROUND

1.    Around the beginning of April of 2014, the BLM erected a base camp and took positions around Cliven Bundy's ranch, purportedly to execute a cattle impoundment order it had secured six months previously. The base camp included at least ten trailers, at least ten tents, dozens of vehicles, and radio towers. The positions taken by agents included, as we now know, FBI SWAT operators in the surrounding hills. The BLM also rented out an entire motel in nearby Mesquite.

2.    After the size, scope, and tone of the BLM operation became clear, Bunkerville community members began watching and recording the BLM's activities. On April 5, 2014, some community members, including Defendant Davey Bundy, stood on the side of Highway 170 and recorded BLM activities on iPads. Among the small crowd were women and children coming from church. Testimony will show that an agent had assumed what appeared to bystanders to be a prone position, with a gun aimed at the families and protestors. The Nevada Highway Patrol declined to arrest anyone after the BLM ordered the protestors to leave. But the BLM, in an aggressive and physical manner recorded on several devices, arrested Davey Bundy and took him away in custody.

Davey Bundy was kept in custody over night, but no charges were ever filed. This incident garnered significant local attention, and attracted more protestors.

3.      Ammon traveled to Bunkerville on April 6, 2014. The evidence will show that before he left**, he explained that he would not bring any guns with him**, because the Bunkerville community's protest was peaceful. He also implored others through various media not to bring any long guns.

4.      On April 9, 2014, various protestors spotted BLM vehicles escorting a dump truck down a distant mountain road, and determined the convoy was inconsistent with the BLM's stated purpose of merely impounding cattle. This suspicion was bolstered by prior instances of audible gunshots fired from BLM contractor helicopters around the allotment. The protestors moved to the side of the road on which the convoy was traveling. The convoy stopped to confront the protestors. During the ensuing confrontation, Margaret Houston, Ammon's 56-year-old aunt, was thrown to the ground. **Ammon was twice tased, and was attacked by a canine unit.** As a result of the confrontation, Ammon learned that the BLM was destroying Cliven Bundy's water infrastructure, which the operative order did not authorize.

5.      On April 12, 2014, Sheriff Doug Gillespie arrived at the main protest site outside Cliven Bundy's ranch. Sheriff Gillespie announced that the BLM was ceasing its operations and leaving Bunkerville. Cliven Bundy requested additional information of Sheriff Gillespie, who then left. After waiting for a little over an hour for the Sheriff's return, some protestors walked down to the Toquop wash to release the cattle. Upon arrival, the protestors discovered that BLM agents were not only still in the wash, but had positioned themselves with vehicles and weapons aimed at the area where the protestors entered. **Ammon approached the BLM's gate and told LVMPD Officer Tom Roberts that he intended to "sit there" until the BLM finished leaving. Officer Roberts instructed Ammon to "hang tight."** After the BLM left the area, the protestors released the cattle.

## III.   ARGUMENT

The Court is unquestionably aware of the unique nature of this case – and the overwhelming public interest all across the country.  What is so unique?  Besides the legal history, including two prior trials where not one co-defendant has been convicted of any conspiracy charge, and despite

1   the backdrop of the Oregon acquittals, the controversy here involves deep and meaningful politics,

2   clashing views of the law, the rights of citizens in protesting and in petitioning redress. The jury

3   currently empaneled here will be asked to decide whether Ammon, his father, his brother, and co-

4   defendant Ryan Payne, were in fact involved in illegal activity during an extremely visible and

5   significant political protest.  Thus, as an initial matter, the Court must be a broker of justice, and

6   despite the intensity and politics and strong – even visceral reactions – by so many differently

7   positioned people evaluating the events at Bunkerville in 2014, the law requires this detention

8   question to be handled with specific and particular regard to Ammon and his personal circumstance.

9   In other words, the law does not allow the Court to look to the generic language of the "charged

10  offenses" or the elements, nor does it allow the Court to justify continued detention based upon

11  general and conclusory statements about *all defendants*. Instead the only relevant inquiry now is

12  related to the specific allegations against Ammon, for specific personal conduct.  *See United States*

13  *v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990) ("Detention determinations must be made individually

14  and, in the final analysis, must be based on the evidence which is before the court regarding the

15  particular defendant.").

16          It is ***because prosecutors and government officials find the Bunkerville protest itself so***

17  ***upsetting and provocative*** that the law and the Constitution insist that the actions alleged to have

18  taken place in April 2014 at Bunkerville be given careful and deliberate treatment under the law –

19  and in this detention setting, Ammon's conduct has to be examined specifically and

20  dispassionately. When that is the approach, Ammon's conduct – throughout the evidence available

21  to the government – shows strong belief, passionate conviction, and determined political resistance

22  and public assembly, protest and petitioning for redress. But, this kind of conduct is not anything

23  that can be considered for a detention decision.  The heart of the issue is best characterized by

24  former Supreme Court Justice Potter Stewart:

25          A function of [the First Amendment] under our system of government is to invite
        dispute. It may indeed best serve its high purpose when it induces a condition of
26      unrest, creates dissatisfaction with conditions as they are, or even stirs people to
        anger. Speech is often provocative and challenging. It may strike at prejudices and

27

28

preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech * * * is * * * protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * * There is no room under our Constitution for a more restrictive view.

*Edwards v. S. Carolina*, 372 U.S. 229, 237-38 (1963). These principles are even more vulnerable in the present context:

Basically, what is at stake here is loss of an opportunity to express to Congress one's dissatisfaction with the laws and policies of the United States. Staged demonstrations—capable of attracting national or regional attention in the press and broadcast media—are for better or worse a major vehicle by which those who wish to express dissent can create a forum in which their views may be brought to the attention of a mass audience and, in turn, to the attention of a national legislature.... The demonstration, the picket line, and *the myriad other forms of protest which abound in our society* each offer peculiarly important opportunities in which speakers may at once persuade, accuse, and seek sympathy or political support, all in a manner likely to be noticed. Loss of such an opportunity is surely not insignificant.

*Hartley v. Wilfert*, 918 F. Supp. 2d 45, 50 (D.D.C. 2013) (emphasis added).

Thus, Ammon asks this Court, respectfully, to divorce its detention considerations from the inflamed rhetoric so often advanced in regard to what happened in Bunkerville and focus on the specific elements, context and proofs alleged against Ammon. The most serious specific accusation made against Ammon (Count 3) alleges that: "On or about April 12, 2014, in the State and Federal District of Nevada and elsewhere, CLIVEN D. BUNDY, RYAN C. BUNDY, AMMON E. BUNDY, RYAN W. PAYNE, and PETER T. SANTILLI, Jr., defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did knowingly use and carry firearms, which were brandished, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is conspiracy to impede and injure an officer." However, searching through all of the relevant discovery and the government's prior justifications, there is not one instance of Ammon carrying a firearm, and there is much evidence showing that Ammon repeatedly discouraged others from bringing "long guns" and as detailed below, the overwhelming amount of evidence shows that Ammon was protesting legally and lawfully, and,

when he was given instructions and commands by local law enforcement, he complied and used his influence to persuade others to do the same.

Based upon the above described circumstances, the Court should revoke Ammon's current detention order, and should order him released for the duration of the trial. *See* ECF No. 299 ("The order of detention is therefore without prejudice to Defendant's right to move to reopen the detention hearing based on material evidence or information that was not reasonably available to him at the time of the hearing.")

### A.   Ammon now has new and material information that was not reasonably available to him at the time of the original detention hearing

First, Ammon incorporates the exhibits he attached to his objections to the Magistrate Judge's denial of his extension of time to prepare for the bail hearing, ECF No. 365, Exh. Nos. 1-9. The unavailability of these materials at the original detention hearing was explained exhaustively at the original detention hearing, as was the reason for the Court's favorability to addressing them at a later date. The last month of detention has rendered Ammon's access to and communication with his legal team almost entirely unworkable and untenable, and now that trial has begun, he is asking that he be relieved from the almost two years of confinement and detention, and allowed to meaningfully participate in his defense, as a released defendant.

**Exhibit 1** is footage of the protest at the Toquop Wash on April 12, 2014. It shows a crowd of people gathering in front of the BLM compound barrier with signs and cameras. No raised guns can be seen on the protestors' side of the barrier. Men, women, and children stand and stroll. It shows Ammon, unarmed, approaching and calmly conversing with Agent Dan Love of the BLM and LVMPD Officer Roberts. Ammon explains his intent to "sit right [there]" until the cattle are released. Ammon is heard telling Officer Roberts that he will do "whatever [Roberts] says," and Officer Roberts responds, "hang tight." Ammon then asks if they should just remain in the wash. The footage then shows Officer Roberts explaining that local law enforcement had reached an agreement with the BLM, and that the wash should be emptied because the cattle were going be released and will likely run aggressively, having been penned up in the sun for so long.  This evidence directly rebuts the government's prior proffer and the Magistrate Judge's explicit reliance

on the characterization that the BLM "was forced to surrender the cattle and exit the area" in response to "militia members" allegedly "summonsed by the Bundy Family and who were armed with assault rifles and other firearms."  ECF No. 299 at 2.  Instead, the evidence is clear that Ammon was peaceful, and that the BLM left after communicating with local law enforcement, which local law enforcement was clearly an authority respected and responded to by Ammon and those around him.

**Exhibit 2** contains two videos. The first is additional footage of the Toquop Wash protest. It shows men, women, and children gathering and holding signs. Men can be seen approaching the BLM barrier slowly, with their hands completely raised. The second video shows a witness discovering a cow, shot in the head by the BLM and dragged hundreds of feet from a cattle enclosure.  This evidence directly rebuts the mischaracterization previously made by the government and explicitly relied upon by the court previously (ECF No. 299) to make its "risk of flight" and "dangerousness" findings justifying pretrial detention.

**Exhibit 3** is a group of photographs that shows the size and scope of the BLM operation, which was set up before any protestors arrived. The photographs show government agents positioned in multiple spots around the property. They also show government officers in military gear and formations around the property. This evidence directly rebuts the mischaracterization previously made by the government and explicitly relied upon by the Magistrate Judge previously (ECF No. 299) to make its "risk of flight" and "dangerousness" findings justifying pretrial detention.

**Exhibit 4** is a group of photographs that shows the government's helicopter and cattle killing activities leading up to the Toquop Wash protest. The photographs show low-flying helicopters above running cattle, and a number of cows that have been shot in the tops of their heads.

**Exhibit 5** is a group of photographs that shows Ammon after he was twice tased by government officers on or around April 9, 2014, leading up to the Toquop Wash protest.  This evidence directly rebuts the mischaracterization previously made by the government and explicitly relied upon by the Magistrate Judge previously (ECF No. 299) to make its "risk of flight" and "dangerousness" findings justifying pretrial detention.  Specifically, it shows that the government's characterization of events and circumstances are false and that even when confronted by law

enforcement, and even after unprovoked force is used upon him, Ammon neither retaliates with any force whatsoever, nor flees law enforcement.

**Exhibit 6** is a group of photographs that shows the government's mass cattle-killing activities. The photographs show the mass graves the government dug and the dead cattle that they filled them with.

**Exhibit 7** is a photograph showing that the government, before the Toquop Wash protest, dug up and destroyed 100-year old water infrastructure that serviced and maintained Cliven Bundy's water rights, which are deeded with the state of Nevada. The order the government was purportedly executing that week did not allow for such destruction.

**Exhibit 8** is the order the government was purportedly executing that week, six months after the order was entered.

**Exhibit 9** is a group of handwritten letters from Ammon's children.

**B.     Ammon is neither a flight risk nor a danger to the community**

Pretrial detention should be ordered "[o]nly in rare cases," and "[d]oubts regarding the propriety of release are to be resolved in favor of defendants." *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). To support an order of detention, the government must prove a "serious" flight risk by a preponderance of the evidence and/or a danger to the community by clear and convincing evidence. *United States v. Gebro*, 948 F.3d 1118, 1121 (9th Cir. 1991). **If the government argues "danger," danger cannot justify pretrial detention by itself.** *See United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003) ("We are not persuaded that the Bail Reform Act authorizes pretrial detention without bail based solely on a finding of dangerousness.").

In weighing the evidence to determine whether the government met its burden of proof, courts consider four factors: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's character; and (4) the nature and seriousness of the danger to any person or the community that the defendant's release would pose. *Id.* The Court has already determined that Ammon's character leading up to this case, and therefore factor three, favors release. *See* Order of Detention, ECF No. 299.  The Court based its detention order on "the charges in the Superseding Indictment, and the weight of the evidence against Defendant, as well as

his alleged involvement in the subsequent events in Oregon[.]" *Id.* Ammon will therefore only address the first, second, and fourth factors.

### 1. The nature and seriousness of the offense charged

In addition to merely reviewing the indictment to assess the seriousness of the charges, courts must also analyze "the circumstances of the offense charged." *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985). In this case, such an analysis requires the Court to look at Ammon's role in the subject protest, and why the protest took the form it did.

As proffered above, the evidence shows that the "conspiracy" alleged by the government was actually a disorganized, organically and periodically growing group of protestors. Each use of force by the government—and the government agents were the only ones to use physical force during the entire protest—was met with increasing news coverage, and therefore more protestors traveling to Bunkerville of their own accord. Dave Bundy's beating and arrest, the takedown of Margaret Houston, the tasing of Ammon, the killing of cattle, the roughing-up of youths from around the area—each was met with increased outrage and concern and a growing protest over which Ammon had no control.

Furthermore, the evidence shows that **Ammon was never armed**. More than this, Ammon specifically directed that no one who decides to travel to the ranch bring long guns. Ammon stated repeatedly, on the news, on the internet, and by way of other protestors, that the protest was to be a peaceful affair, the only aim of which was to bring attention to the government's misdeeds. Ammon underscored this intention by telling LVMPD Officer Roberts at the Toquop Wash gate on April 12, 2014 that he would cooperate with all police orders, and by telling BLM agents that he intended merely to stay in the wash until they had finished leaving the area.

### 2. The weight of the evidence

The weight of the evidence is the least important factor, and the BRA "neither requires nor permits a pretrial determination of guilt." *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). "The evidence of guilt is relevant only in terms of the likelihood that the defendant will fail to appear." *United States v. Chen*, 820 F.Supp. 1205, 1207-08 (N.D. Cal. 1992) (citing *Winsor*, 785 F.2d at 757).

This case is not really about the weight of the evidence. No one disputes what physically happened during the protest in question. Certainly, Ammon disputes the government's *characterization* of what happened as something organized and orchestrated. There is a lot of footage of the protest activities. So, too, does the evidence contain hours of audio and video of highly inflammatory and threatening language, posturing, and aggression from the BLM agents. **Nothing in the evidence, however, shows that Ammon carried arms, asked anyone to bring arms, or directed any of the protestors carrying arms to any prominent position.** Instead, the video evidence shows Ammon telling participants who could be mistaken as aggressive to move *away* from the protest. When Ammon arrived at the BLM gate in the Toquop Wash on Aril 12, 2014, surprised to discover the BLM was still there and after kneeling in prayer with women and children, all he told the agents was that he intended to "stay there" until they finished leaving. Never did he state or imply any ultimatum.

What this case comes down to, then, is Ammon's intentions. Key to why Ammon attended the protest at his father's ranch is Ammon's history as a land rights activist, who frequently speaks regarding the plights and rights of ranchers in the Western states. His involvement in the protest arose not only out of the BLM's wholly excessive and aggressive behavior—from stationing FBI SWAT operators around his father's ranch to tackling his brother and aunt—but out of Ammon's good-faith belief in his father's right to graze cattle on that allotment. Ammon is eager to present all of this to the jury and the public. Accordingly, the weight of the evidence does not indicate that Ammon will fail to reappear. To say that Ammon is invested in this case would be an understatement.

> **3.    The nature and seriousness of the danger to any person or the community that the defendant's release would pose**

Given Ammon's presumption of innocence, and his overt and stated intention to present an innocence defense to the pending charges, the Court cannot rely solely on the allegations in the indictment to find Ammon poses a "serious" danger. Instead, it must find by "clear and convincing evidence" that there are no conditions of release that would reasonable assure that any risk is mitigated. *See, e.g., United States v. Karper*, 847 F.Supp.2d 350, 354 (N.D.N.Y. 2011). And, even

on this point, potential dangerousness by itself is not a sufficient legal basis to deny release. Alleged dangerousness or the theoretical "threat" of danger, by itself, cannot justify pretrial detention." *See, e.g., United states v. Byrd*, 969 F.2d 106, 109-110 (5th Cir. 1992) ("we find ourselves in agreement with the First and Third Circuits: a defendant's threat to the safety of other persons or to the community, standing alone, will not justify pretrial detention."); *see also Twine*, 344 F.3d at 987 ("We are not persuaded that the Bail Reform Act authorizes pretrial detention without bail based solely on a finding of dangerousness") (citing *Byrd, supra*). Neither are the allegations in the indictment alone valid grounds to determine future dangerousness for the purposes of detention. As the First Circuit has explained, "Until a defendant has been convicted, the nature of the offense, as well as the evidence of guilt, is to be considered only in terms of the likelihood of his making himself unavailable for trial." *United States v. Edson*, 487 F.2d 370, 372 (1st Cir. 1973).

The Magistrate Judge stated two reasons under this factor for Ammon's detention: "the charges in the Superseding Indictment," and "his alleged involvement in the subsequent events in Oregon." *See* Detention Order, ECF No. 299. Ammon was acquitted of all charges in Oregon. As the Magistrate Judge found previously, this case represents the first significant interaction with law enforcement in Ammon's life. The only basis left for a finding of dangerousness, then, is the indictment itself, which is insufficient. At this stage of the proceedings, the charges in the indictment are presumptively false. Ammon has never done anything previously to suggest any violent tendency. Ammon is eager to put on a defense that shows his innocence, explains his good-faith belief regarding the propriety of ranching on the subject allotment, and generally clears his and his family's name. Ammon does not pose any danger to the community, and will be in Court. The government has not shown and cannot show that there are *no* conditions that guarantee both.

### 4.      Ammon's continued detention is punitive

Pretrial detention can only serve the very limited regulatory purposes of the BRA. When pretrial detention becomes punishment before conviction, the detainee's due process rights are violated. *See United States v. Salerno*, 481 U.S. 739, 747-48 (1987). Ammon has no history of violence or crime. He was acquitted of all charges in Oregon. He has a strong defense in this case, and a demonstrated interest in proclaiming his innocence in court. The unproven charges against

him in this case—or worse still, his political beliefs—are all that keep him in jail. Ammon can't help but point out, for example, that a defendant caught firing a gun on camera in the Hell's Angels River Run Riot case, involving the murders of three people, was released pending trial. *See United States v. Calvin Schaefer, et al.*, case no. 2:3-cr-00542-JCM-PAL, ECF No. 199. With no gang affiliation, no prior convictions, and unproven allegations that do not include a single shot fired, Ammon's continued detention is punishment before trial.

5. **Any Presumption of Detention Created by the Indictment Is Rebutted by the Evidence Actually Available and Presented to the Defense in Relation to Ammon Bundy.**

The prosecution unilaterally decides how charges in an indictment are brought, and what those charges ultimately are. *See e.g. United States v. Williams*, 504 U.S. 36, 52 (1992). Thus, in this case, if there is a presumption of detention under the Bail Reform Act, it is only because of the charged crimes – largely determined by the same prosecution that seeks to imprison Ammon. Thus, although Congress has provided that in circumstances where there may be a presumption – it may be rebutted.  And, the law in the Ninth Circuit is that such a rebuttal does not mean eviscerated, eliminated, or entirely overcome – but simply that it is met with sufficient evidence, when weighed in line with the required factors, that the Court can be reasonably assured of Ammon's appearance and the general safety of others upon his release. In short, once Ammon has (as he is doing here) taken up the opportunity to present rebutting evidence, detention cannot be based upon mere allegation – the government has a high burden.  *See e.g. United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985):

> We turn now to the effect this presumption has on the court's analysis. We join the rest of the circuits which have considered this issue in concluding that the presumption shifts the burden of production but not the burden of persuasion to the defendants… This approach is consistent with the presumption of innocence enjoyed by a criminal defendant. Under the *Jessup* approach, the court may factor the presumption into its determination of whether the government has established that no condition or combination of conditions would reasonably assure appearance and ensure the safety of the community. As this court has noted in *United States v. Dominiguez*, 783 F.2d 702, 707 (7th Cir.1986), the presumptions contained in section 3142(e), including this presumption: do not disappear when rebutted, like a "bursting bubble" presumption, nor do they actually shift the burden of persuasion to the defendant. They are "rebutted" when the defendant meets a "burden of production" by coming forward

14

with some evidence that he will not flee or endanger the community if released. Once this burden of production is met, the presumption is "rebutted[.]"

With these principles in mind, the Court should place Ammon Bundy's situation in comparison to other federal cases where release was justified under the BRA in much more grave, stark, and potentially violent circumstances. Consider for example, *United States v. Persico*, 376 Fed.Appx. 155 (2d Cir.2010), where the Second Circuit reversed and remanded a detention order in a racketeering conspiracy involving the defendant's "ability to use violence" in relation to a high profile crime family because the defendant "had no criminal record" and there was "no direct evidence" of the defendant "either using violence or directing others to use violence" and some evidence that he "used any influence he had in order to discourage violence." The Court should also consider the recent case of *United States v. Enix*, 209 F. Supp. 3d 557, 573 (W.D.N.Y. 2016) where the defendant was one of sixteen named co-defendants in a RICO and firearms case under 18 U.S.C. § 924(c) pertaining to the Kingsmen Motorcycle Club. The defendant there was the president of one of the club charters, and was charged with a firearms related "crime of violence" in furtherance of drug trafficking. *Id.* In granting release with conditions, the court accurately described that while the indictment itself created a presumption, once the defendant presented evidence, the government's burden meant that its evidence must "support a conclusion of danger to the community 'with a high degree of certainty.'" *Id.* at 563. In evaluating the weight of evidence, the court in *Enix* acknowledged that there was a lot of evidence, but cast doubt on some based upon how it was characterized and finding "a dispute as to the quality of that evidence, specifically as it relates to whether Mr. Enix engaged in violent acts or directed violent acts." *Id.* at 566.

Here there is no evidence that Ammon engaged in violent acts himself or directed violent acts – and there is no gang, no history of gang affiliation, and no relationship to drug dealing or a history of organized violence – and no pending allegations of murder. Finally, in *Enix*, the defendant took the witness stand and promised he would obey the conditions placed upon him and upon release "would not jeopardize being able to be with his family if allowed." *Id.* at 575.

As illustrated above, the evidence against Ammon is far less than the circumstances in either *Enix* or *Persico* and the circumstances in Bunkville – even if the government's theory is believed—

1   is far less severe than the crimes of drugs, violence, murder, and leadership of organized crime

2   alleged in those cases where release with conditions was granted.  The evidence provided by Ammon,

3   and the testimony he expects to provide at the hearing, all indicate that he is no flight risk, and there

4   is no substantial danger to anyone.  It is true that Ammon has resisted some of the harsh prison

5   conditions he has faced over the last 652 days. But, he is presumed innocent in Nevada and was

6   acquitted in Oregon of charges that the Magistrate Judge previously used to justify detention here.

7   Given the totality of the circumstances, the lack of any criminal history whatsoever, the prior

8   acquittal, the personal characteristics and ties to the community, and the lack of any specific evidence

9   showing that release cannot be conditioned so as to ensure to the Court's satisfaction both appearance

10  and safety, release is appropriate.

11          As a final matter, Ammon hereby renews the joint motion for release on due process grounds

12  originally filed as ECF No. 2066, and incorporates all of the points and authorities therein. Renewal

13  of that motion is appropriate here because two key additional factors now exist. First, Ammon has

14  been detained for an additional five months since that motion was filed. Second, a re-trial of

15  Ammon's co-defendants since the initial filing resulted in acquittals on almost all counts, including

16  all conspiracy counts, and deadlock on all other counts.

17  **IV.   CONCLUSION**

18          The life Ammon Bundy has lived, along with the circumstances described above, justify his

19  release – particularly in light of the purposes and history of the BRA and how it is meant to apply.

20  Furthermore, the Oregon case (where the Nevada charged conduct was presented to the jury in

21  detail), one of the initial justifications for Ammon's Nevada detention, has been thoroughly

22  discredited in the most legitimate and legal form possible, a unanimous not-guilty jury verdict.

23          This Court cannot now ignore the Oregon acquittal and its consequences, along with the

24  significant evidence presented above which presents a much different story than that relied upon by

25  the Magistrate Judge previously in ordering detention.  The BRA "does not seek ironclad guarantees,

26  and the requirement that the conditions of release 'reasonably assure' a defendant's appearance

27  cannot be read to require guarantees." *United States v. Portes*, 786 F.2d 758, 764 n. 7 (7th Cir.1985);

28  *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir.1985); *United States v. Orta*, 760 F.2d 887,

890–92 (8th Cir.1985). *See also United States v. Tortora*, 922 F.2d 880, 884 (1st Cir.1990) (even where the issue is the safety of the community, Congress did not require guarantees in enacting the Bail Reform Act).

On March 22, 2016, President Barack Obama proclaimed, in an historic speech given in Havana, Cuba: "[C]itizens should be free to speak their minds without fear – to organize, and to criticize their government, and to protest peacefully, and that the rule of law should not include arbitrary detentions of people who exercise those rights."[2] This principle, more than any other issue, is here presented to the Court. The circumstances surrounding the charged conduct do not indicate Ammon is a danger to the community or flight risk.

Finally, without any criminal history and his acquittal in Oregon, only the unproven allegations in the Nevada indictment remain to justify the previous finding of dangerousness, and these allegations alone cannot support detention. Ammon Bundy should, therefore, be released.

Respectfully submitted this 9th day of November 2017.


By: */s/ Daniel Hill*
_____
DANIEL J. HILL, ESQ.
Nevada Bar No. 12773
228 South 4t Street, Third Floor
Las Vegas, Nevada 89101
*Attorney for Defendant Ammon Bundy*

---

[2] The White House, Office of the Press Secretary, http://www.whitehouse.gov/the-press-office/2016/03/22remarks-president-obama-people-cuba (Last accessed Apr. 4, 2016).

1

## **<u>CERTIFICATE OF SERVICE</u>**

2      I hereby certify that on this 9th day of November 2017, a true and correct copy of

3  **DEFENDANT AMMON E. BUNDY'S MOTION FOR RELEASE** was served via the United

4  States District Court CM/ECF system on all parties or persons requiring notice

5

6

7                                              By   */s/ Daniel Hill*

8                                                   DANIEL J. HILL, ESQ.
                                                    Nevada Bar No. 12773

9                                                   228 South 4t Street, Third Floor
                                                    Las Vegas, Nevada 89101

10                                                  *Attorney for Defendant Ammon Bundy*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28