——2:16-cr-46-GMN-PAL——

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,      )   CASE NO. 2:16-CR-46-GMN-PAL
                                   )
4                  Plaintiff,      )   LAS VEGAS, NEVADA
                                   )   NOVEMBER 1, 2017
5          vs.                     )   8:54 A.M.
                                   )   COURTROOM 7C
6   CLIVEN D. BUNDY (1),           )
    RYAN C. BUNDY (2),             )   JURY TRIAL, DAY 3
7   AMMON E. BUNDY (3),            )
    RYAN W. PAYNE (4),             )
8                                  )
                   DEFENDANTS.     )
9   _____)
                                   )
10                                 )

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13          BEFORE THE HONORABLE GLORIA M. NAVARRO,
                UNITED STATES DISTRICT CHIEF JUDGE

14

15  APPEARANCES:
    FOR THE PLAINTIFF:

16
            **STEVEN W. MYHRE, AUSA**
17          **DANIEL SCHIESS, AUSA**
            **NADIA JANJUA AHMED, AUSA**
18          **ERIN M. CREEGAN, SAUSA**
            United States Attorney's Office
19          501 Las Vegas Boulevard South, Suite 1100
            Las Vegas, Nevada 89101
20          (702) 388-6336
    (continued next page)
21
    Court Reporter:        Patricia L. Ganci, RMR, CRR, CCR 937
22                         United States District Court
                           333 Las Vegas Boulevard South, Room 1334
23                         Las Vegas, Nevada 89101
                           PG@nvd.uscourts.gov
24
    Proceedings reported by machine shorthand.  Transcript produced
25  by computer-aided transcription.

2:16-cr-46-GMN-PAL

1  APPEARANCES CONTINUED:

2  For Defendant Cliven D. Bundy:

3          **BRET O. WHIPPLE, ESQ.**
           **JUSTICE LAW CENTER**
4          1100 S. 10th Street
           Las Vegas, Nevada 89104
5          (702) 257-9500

6  For Defendant Ryan C. Bundy:

7          **RYAN C. BUNDY**
           **PRO SE**
8          2190 East Mesquite Ave.
           Pahrump, Nevada 89060

9
           **MAYSOUN FLETCHER, ESQ.**
10         **THE FLETCHER LAW FIRM**
           5510 South Fort Apache, Suite 5
11         Las Vegas, Nevada 89104
           (702) 835-1542

12
   For Defendant Ammon E. Bundy:

13
           **DANIEL HILL, ESQ.**
14         **HILL LAW FIRM**
           228 S. 4th Street, 3rd Floor
15         Las Vegas, Nevada 89101
           (702) 848-5000

16
           **J. MORGAN PHILPOT, ESQ.**
17         **JM PHILPOT LAW**
           1063 E. Alpine Drive
18         Alpine, Utah 84004
           (801) 891-4499

19
   For Defendant Ryan W. Payne:

20
           **BRENDA WEKSLER, ESQ.**
21         **RYAN NORWOOD, ESQ.**
           **FEDERAL PUBLIC DEFENDER'S OFFICE**
22         411 E. Bonneville Avenue, Suite 250
           Las Vegas, Nevada 89101
23         (702) 388-6577

24

25

—2:16-cr-46-GMN-PAL—

 1      LAS VEGAS, NEVADA; WEDNESDAY, NOVEMBER 1, 2017; 8:54 A.M.

 2                          --oOo--

 3              P R O C E E D I N G S

 4          COURTROOM ADMINISTRATOR:  All rise.

 5          THE COURT:  Thank you.  You may be seated.

 6          COURTROOM ADMINISTRATOR:  This is the time set for jury

 7  trial, day 3, in Case No. 2:16-cr-46-GMN-PAL, United States of

 8  America versus Cliven Bundy, Ryan Bundy, Ammon Bundy, and Ryan

 9  Payne.

10          Counsel, please make your appearance for the record.

11          MR. MYHRE:  Good morning, Your Honor.  Steve Myhre, Dan

12  Schiess, Nadia Ahmed, and Erin Creegan on behalf of the United

13  States.  We're also joined this morning by Laura Dominic.

14          THE COURT:  Good morning.

15          MR. WHIPPLE:  Good morning, Your Honor.  Bret Whipple

16  on behalf of Mr. Cliven Bundy.

17          THE COURT:  Good morning.

18          MR. RYAN BUNDY:  Ryan C. of the Bundy family here.  By

19  special appearance, Maysoun Fletcher.

20          THE COURT:  Good morning.

21          MR. HILL:  Good morning, Your Honor.  Dan Hill along

22  with Morgan Philpot and Karen Ginn on behalf of Ammon Bundy.

23          THE COURT:  Good morning.

24          MS. WEKSLER:  I'm sorry.  Brenda Weksler and Ryan

25  Norwood with Nikki Seubert and Lois Heaney on behalf of

PATRICIA L. GANCI, RMR, CRR, CCR 937    (702) 385-0670

—— 2:16-cr-46-GMN-PAL ——

1   Mr. Payne.

2          THE COURT:   Good morning.

3          All right.   Well, this morning before we begin just a

4   few preliminary remarks.   Please remember that this is a

5   courtroom.   It is not a sporting event, so it's never

6   appropriate to have any expression of your opinion whether

7   verbally or through body language.   It is distracting.   And no

8   matter how much you disagree or agree with something that is

9   being said, such body language or verbal expressions of opinions

10  are not permitted.

11         Please do not speak out of turn and please do not

12  interrupt each other.   It is very difficult to have the

13  recordings of the day's events when there are two people

14  speaking at the same time.   So please be respectful of each

15  other and not interrupt each other.

16         The individuals, as I said, will speak only during

17  their turn and not out of turn and you -- it's helpful if you do

18  identify yourselves when you speak so that we're sure that the

19  transcript is accurate as to who said what.

20         We need to be careful also not to have any outbursts or

21  any inappropriate language from the defendants as well, nothing

22  that is disrespectful or distracting.   There are rules of

23  decorum here for the court.   There are also security protocols

24  and procedural rules.   If any one of the defendants disregards

25  these rules, then they will need to be placed in the holding

— 2:16-cr-46-GMN-PAL —

 1  cell where they can listen to the remainder of the hearing

 2  through the audio speakers, but will not be permitted to remain

 3  in the courtroom if they cannot comply with the rules.

 4      There is no electronic devices permitted in the

 5  courtroom, no cell phones, iPads, things of that nature.  If you

 6  do have them, please make sure that you leave them outside.

 7  They need to be either -- turned off outside.  They can't be in

 8  the vibrate mode.  Sometimes we have problems also with the

 9  interference with the devices.

10      Now, the attorneys, the court security officers, the

11  marshals, court staff, they're permitted to have their

12  electronic devices.  They're essential for them to be able to

13  perform their duties during court, whether it is to review and

14  prepare for the case or for security purposes to keep contact

15  with each other.  So they have electronic devices, but no one

16  else should have electronic devices.

17      No audio recording or video recording is ever permitted

18  in the courtroom.  And they are not allowed in Federal Courts.

19      We do have microphones at all of the tables for

20  everyone to use if you'd like.  I know you have a lot of papers

21  and binders and things, but we also have the podium set up

22  facing the jury.  So you're welcome to use the podium with the

23  tables there and the buttons that move it up and down.

24      Oh.  And please remember that there are times when the

25  public is permitted or the defendants are permitted to say hello

—2:16-cr-46-GMN-PAL—

1  or good-bye or -- but not others.  And so please be careful and

2  be aware and follow the instructions of the marshals as to when

3  that is or is not appropriate so you don't inadvertently get

4  yourself in trouble.  The marshals do have the authority to

5  remove anyone from the courtroom who is not following the rules.

6       All right.  So we've got the jury I think from

7  yesterday ready to come in, but I was told that counsel wanted

8  to call one person out of turn.

9       MS. WEKSLER:  Before we do that, a couple of things.  I

10  think that there is some sort of agreement regarding hardship,

11  and if the Government can check me on these numbers.  I have an

12  agreement as to 89, 93, 141, and I think 81.  Is that correct?

13       MR. SCHIESS:  Yes, Your Honor.

14       THE COURT:  All right.  So would you read those again?

15       MS. WEKSLER:  So it would be 81, 89, 93, and 141.

16       THE COURT:  All right.  So 141, 93, 89, and 81 will be

17  excused.

18       MS. WEKSLER:  And, Your Honor, the jury is here from

19  yesterday.  I know that there was some individual follow-up

20  questions.  If we could have the opportunity -- going over the

21  supplementary questionnaires, there were a few individuals who

22  actually noted that they would not have the ability to be fair

23  and impartial as a result of the events at Route 91.  So if we

24  could have the ability to question these individuals.

25       THE COURT:  To whom are you referring to?

—2:16-cr-46-GMN-PAL—

1          MS. WEKSLER:  I'll give you the numbers.

2          COURTROOM ADMINISTRATOR:  Ms. Weksler, can you just

3   adjust your microphone?

4          MS. WEKSLER:  Oh.  So specifically the ones who

5   mentioned could not be fair and impartial.  My notes indicate it

6   would be 120, 126, 132, 135.  No. 129 notes she or he was

7   affected by this event.  It's not clear how, does not indicate

8   how.

9          THE COURT:  Affected by what event?

10          MS. WEKSLER:  Group 91.

11          THE COURT:  Oh.

12          MS. WEKSLER:  And No. 117 actually noted emotions were

13   hard to control as a result of the events of Route 91 and that

14   his views changed regarding gun ownership as a result of those

15   events.

16          THE COURT:  All right.  So 117 we've already questioned

17   about that because I have notes about that from information

18   provided in court.

19          MS. WEKSLER:  Okay.

20          THE COURT:  120.  So what is it that 120 has on there?

21          MS. WEKSLER:  My notes indicate questions on fair and

22   impartial.

23          THE COURT:  Which question number?

24          MS. WEKSLER:  This is question -- I want to say it's

25   question No. 19 -- 15.  15 and 19.

1          MR. SCHIESS:  Your Honor, I think she's mistaken.  Your

2   Honor, I'm looking at the questionnaire for -- is it 120 that

3   you're referring to?  No. 120?

4          MS. WEKSLER:  Supplementary questionnaire.

5          MR. SCHIESS:  Yeah, but for -- Your Honor, Dan Schiess.

6   If I may answer the question.

7          The question for 15 was:  Has the event impacted you in

8   such a way that it will make it difficult for you to be fair and

9   impartial in this case?  She circled the answer no.

10         MS. WEKSLER:  Okay.

11         MR. SCHIESS:  And then ...

12         MS. WEKSLER:  And it could be that my notes at this

13  point are completely jumbled up, so I appreciate this.  If you

14  could check me on this.  I also have 126, 132, and 135.  So if

15  you could check me on this.

16         THE COURT:  All right.  So 126, what is the concern

17  there?

18         MS. WEKSLER:  Can somebody pull out the supplementary

19  questionnaire for 126?

20         So going back to No. 126, I have question 14 in the

21  supplementary questionnaire.  Has the Route 91 Festival affected

22  you emotionally, psychologically, physically, and economically?

23  Yes.  And then I cannot make out --

24         MR. SCHIESS:  Your Honor, may I interrupt, please?

25         Would you please repeat the question number so I can

————— 2:16-cr-46-GMN-PAL —————

 1  find it?

 2          MS. WEKSLER:  Yes.  So I'm on juror No. 126, question

 3  14, which is page 3 of 5.

 4          MR. SCHIESS:  Thank you.

 5          MS. WEKSLER:  So I have 132 as indicating the same

 6  thing.

 7          THE COURT:  Well, let's go back to 126 and confirm

 8  whether we need to call him in or not.  So what question number?

 9          MS. WEKSLER:  So this is question 14:  Has the Route 91

10  Festival affected you emotionally, psychologically, physically,

11  or economically?  The answer is yes.  It says:  If yes, explain.

12          I do not know what that explanation says.  Maybe

13  somebody can read the handwriting.  I certainly cannot.

14          MR. SCHIESS:  Your Honor, I'm trying to keep up with

15  Ms. Weksler by grabbing the supplemental questions and so I

16  missed the last question you're referring to on No. 126.  Would

17  you ...

18          MS. WEKSLER:  No. 126.

19          MR. SCHIESS:  Question?

20          MS. WEKSLER:  So it's page 3 of 5.  So there's -- page

21  3 of 5, question 14.  Has been affected by Route 91.  Not clear

22  how.  Has it impacted you -- No. 15:  Has it impacted you in

23  such a way that it would make it difficult for you to be fair

24  and impartial?  Yes.

25          THE COURT:  Many lives lost and wounded?  Because of a

—2:16-cr-46-GMN-PAL—

1  lone gunman.  I'm not sure if the word after -- is many lives

2  lost and, and then the next word looks like it's wound?  Could

3  be a different word.  Because of a lone gunman.

4      MS. WEKSLER:  And this same juror says -- so question

5  19, page 4 of 5:  Has the Route 91 shooting affected your views

6  about gun ownership?  Yes.  If yes, explain.  And I'm not -- I

7  can't make that out.  Something about --

8      THE COURT:  How can one man own so much guns.

9      MS. WEKSLER:  So, Judge, I think this is clearly an

10 issue that we brought up that was of great concern to the

11 Defense.  We asked for a continuance based on this.  So I think

12 that it's only fair that we be allowed to probe into this a

13 little bit further.  We did not get a lot of information on this

14 particular issue.

15      On these particular jurors -- I'm not asking that every

16 single juror be questioned, but at least to those who have

17 indicating a change of view with regards to gun ownership as a

18 result of this event, those who have been affected by this

19 event, those who have indicated that it would be difficult to be

20 fair and impartial.  I think it's only fair that we be able to

21 question those jurors and identify what -- what the concern is

22 and how it is that they've been impacted.

23      THE COURT:  You had the opportunity yesterday to do

24 that.

25      MS. WEKSLER:  Well, Judge, we really didn't have the

—2:16-cr-46-GMN-PAL—

1  opportunity.

2       THE COURT:  I don't see that this is something that

3  needs to be taken care of outside the presence of the other

4  jurors in regards to No. 126.  So what about 129?

5       MS. WEKSLER:  Well, and just for the record, Judge, I

6  do not believe we had the opportunity to do that.

7       129.  So I have 1 -- 129 as having been affected by

8  Route 91.  So this would be No. 14, page 3 of 5:  Has Route 91

9  affected you emotionally, psychologically, physically?  Yes.  I

10  never expected it to happen.

11       That's all we have.  So I would ask the ability to

12  question this individual as well.  This individual also notes

13  with regards to whether his views changed regarding guns after

14  this event:  Yes.  He indicates his views have changed.  The

15  laws should be more tougher, I think he says.

16       MR. SCHIESS:  Again, Your Honor, I note that for this

17  juror the juror answered question No. 15 on page 3 of 5.

18  Questioning being:  Has that event impacted you in such a way

19  that it will make it difficult for you to fair and impartial in

20  this case?  And the juror circled the answer no.  And then with

21  respect to 19 of while a person may have an opinion about gun

22  ownership, that does not go to being fair and impartial.

23       MS. WEKSLER:  Well, it certainly impacted his views on

24  gun ownership, which was one of the concerns that we've raised,

25  right.  So I think that we should be able to probe that a little

—2:16-cr-46-GMN-PAL—

1  bit.

2          THE COURT:  And the issue of gun ownership was explored

3  yesterday in front of all of the other jurors.

4          MS. WEKSLER:  But it wasn't --

5          THE COURT:  It's not an issue that we need to take out

6  of the presence, and the parties have had an opportunity to ask

7  questions.

8          MS. WEKSLER:  Well, Judge, we --

9          THE COURT:  Not Mr. Ryan Bundy.  He still hasn't had an

10  opportunity yet, but the others have.

11          MS. WEKSLER:  And, Judge, I understand there's been an

12  opportunity for a group voir dire.  We did not have the

13  opportunity to do individual questioning with this juror and

14  it's certainly not --

15          THE COURT:  And I just said that individual juror

16  doesn't need to be questioned outside the presence in regards to

17  these responses.  Those are issues that were discussed by

18  counsel and questions posed to the entire panel.

19          What about juror No. 132?

20          MS. WEKSLER:  132 notes as to question 14, page 3 of 5,

21  in the supplementary questionnaire:  Has Route 91 affected you

22  in any way emotionally, psychologically, etc.?  Yes.  It says

23  he's sad for everyone who got hurt.  I would like the

24  opportunity to probe that a little bit.

25          THE COURT:  What is that answer?

1              MS. WEKSLER:  Sad for everyone who got hurt.

2              THE COURT:  Oh.  Sad for everyone who got hurt?

3              MS. WEKSLER:  Question 15:  Has that event impacted you

4    in such a way that it would be difficult for you to be fair and

5    impartial in this case?  Yes.  Explain how.  Not sure why.

6              THE COURT:  All right.  So we'll question 132.

7              What about 135?

8              MS. WEKSLER:  135, question 14:  Has the event affected

9    you emotionally, psychologically, etc.?  Yes.  I work on the

10   Strip.  Guests and coworkers talk about it daily.  The paper,

11   news media, talk and what about it daily.  It is extremely

12   emotionally upsetting.  My feelings -- my 15-year-old dog died

13   in my arms -- I think she was questioned yesterday with regard

14   to a different issue, Your Honor, if I'm not mistaken.

15             I think she's the one that indicated she had some

16   concerns regarding -- or the Government had some concerns

17   regarding her views on BLM, if I'm not mistaken.  So I think she

18   was questioned individually with regards to that.

19             MR. SCHIESS:  Your Honor, if I may just save us some

20   time.  We'll agree to stipulate to the removal of No. 135 from

21   the panel.

22             MS. WEKSLER:  Well, Judge, I don't know that we want to

23   remove her at this point.  We just want to question her and see

24   whether she's able to be fair.

25             MR. SCHIESS:  I believe yesterday we established more

 1  than enough basis for cause for No. 135, and that will be a

 2  motion we'll raise with the Court.

 3          THE COURT:  All right.  So what is your motion to

 4  excuse her for cause, 135?

 5          MS. WEKSLER:  I'm not moving for cause to strike her.

 6  I just wanted the opportunity to question her on this particular

 7  issue.  The Government I think is moving to strike her on the

 8  basis of cause.  I am not.  So, I mean, if -- I'm not ready at

 9  this point to address cause challenges, Judge.  I'm just asking

10  for the opportunity or to know which jurors are going to be --

11  which jurors we're going to be able to question individually.

12          THE COURT:  All right.  Well, so far we've got juror

13  No. 132.  Go ahead and bring in 132 so that person can be

14  questioned.

15          COURTROOM ADMINISTRATOR:  Your Honor, while I go out

16  there, may I also tell the four jurors that were excused that

17  they can go home?

18          THE COURT:  Yes, please.

19          COURTROOM ADMINISTRATOR:  Thank you.

20          THE COURT:  Thank you.

21          MR. PHILPOT:  Your Honor, if I may?

22          THE COURT:  No, we have to wait for the court deputy.

23          MR. PHILPOT:  All right.

24          COURTROOM ADMINISTRATOR:  All rise.

25          (Whereupon prospective juror enters the courtroom.)

—2:16-cr-46-GMN-PAL—

1          THE COURT:  Good morning.  Come on in and have a seat

2     there.  Go ahead and sit down.  Everyone else may be seated.

3          What is your jury number, sir?

4          A PROSPECTIVE JUROR:  132.

5          THE COURT:  Great.  I want to make sure we have the

6     correct information here.

7          So there is a response that you provided that the

8     attorneys would like to follow-up on outside the presence of the

9     other jurors so that you can feel comfortable providing a

10    response fully and thoroughly without any concern or reluctance

11    about saying anything in front of the other jurors.  So we'll go

12    ahead and begin.

13         Ms. Weksler?

14         MS. WEKSLER:  I know you were not excited to be here

15    yesterday.  Are you excited to be here today?

16         A PROSPECTIVE JUROR:  No.

17         MS. WEKSLER:  Still not excited.  All right.

18         So I just wanted to ask you some follow-up questions

19    regarding the supplementary questionnaire that you filled out in

20    the morning.  And you indicated that obviously the events of

21    October 1st, Route 91 Festival, affected you, as it did to all

22    of us.  Can you tell me how it is that it affected you?  You

23    indicated that it affected you emotionally, psychologically,

24    physically, or emotionally.  How is it that it affected you?

25         A PROSPECTIVE JUROR:  Just the way that it happened.

───── 2:16-cr-46-GMN-PAL ─────

```
 1            MS. WEKSLER:  Okay.

 2            A PROSPECTIVE JUROR:  Just I don't like guns.

 3            MS. WEKSLER:  I'm sorry?

 4            A PROSPECTIVE JUROR:  I don't like guns.

 5            MS. WEKSLER:  You don't like guns?

 6            A PROSPECTIVE JUROR:  No, I don't own guns, but I play

 7 the games that shoot -- that shoot, the games, but that's it.

 8            MS. WEKSLER:  Okay.  Do you believe that these events

 9 changed your position on gun ownership somewhat?

10            A PROSPECTIVE JUROR:  Yes.

11            MS. WEKSLER:  How so?

12            A PROSPECTIVE JUROR:  I don't think anybody should have

13 them.

14            MS. WEKSLER:  People should not have them?

15            A PROSPECTIVE JUROR:  No.

16            MS. WEKSLER:  So no kinds of guns?

17            A PROSPECTIVE JUROR:  No.

18            MS. WEKSLER:  Doesn't matter --

19            A PROSPECTIVE JUROR:  Just for police officers, you

20 know.

21            MS. WEKSLER:  So only police officers should be able to

22 have them?

23            A PROSPECTIVE JUROR:  Right.

24            MS. WEKSLER:  What about the notion that you can buy --

25 you know, we have the Second Amendment right to have guns.  What
```

─ 2:16-cr-46-GMN-PAL ─

 1  about the notion of --

 2          MR. SCHIESS:  Your Honor, this is beyond the scope of

 3  her request to bring this juror in individually.

 4          THE COURT:  I didn't hear the full question.

 5          MS. WEKSLER:  So I was going to go -- he indicated --

 6  in response to one of the questions that I asked him which was

 7  within the scope, he indicated that his position had changed

 8  with regard to gun ownership as a result of those events.  I was

 9  following up on that.  If the Court does not want me to go into

10  that area, that's fine.  But I think that given his answer, it's

11  only proper that I be allowed to go into how it affected his

12  views.  They changed since the events of Route 91.  So he had a

13  certain position before --

14          THE COURT:  So what was the question that you wanted to

15  ask?

16          MS. WEKSLER:  So the question that I wanted to ask him

17  is:  How is the -- how did it change?  So I was asking for

18  specifics.

19          THE COURT:  That's fine.  She can ask that question.

20          MS. WEKSLER:  Okay.  So do you believe an individual

21  should not have more -- I know you said that you're against

22  guns, but how do you feel about the ability of individuals

23  having several firearms?

24          A PROSPECTIVE JUROR:  That's fine.

25          MS. WEKSLER:  I'm sorry?

—2:16-cr-46-GMN-PAL—

1          A PROSPECTIVE JUROR:  That's fine.

2          MS. WEKSLER:  How do you feel about the ability to buy

3    high-powered rifles?  Do you think anybody should have the

4    ability to buy them?

5          A PROSPECTIVE JUROR:  Just hunters.

6          MS. WEKSLER:  I'm sorry?

7          A PROSPECTIVE JUROR:  Just hunters.

8          MS. WEKSLER:  Just hunters.  What about regular

9    individuals; not just hunters?

10          A PROSPECTIVE JUROR:  I got no idea.  If they need one.

11          MS. WEKSLER:  I'm sorry?

12          A PROSPECTIVE JUROR:  If they need it.

13          MS. WEKSLER:  Okay.  Do you think that people would

14    need high-powered rifles?

15          A PROSPECTIVE JUROR:  Excuse me?

16          MS. WEKSLER:  Do you think an individual would usually

17    need a high-powered rifle?

18          A PROSPECTIVE JUROR:  No.

19          MS. WEKSLER:  So if -- how do you feel like about those

20    individuals who have high-powered rifles and are not hunters?

21          A PROSPECTIVE JUROR:  I really don't care about them.

22          MS. WEKSLER:  You don't care about them.

23          You said that the events in question, so going back to

24    Route 91, affected you in such a way that it would be difficult

25    for you to be fair and impartial.  Your answer to that question

—2:16-cr-46-GMN-PAL—

1   was:  Yes, it would be difficult to be fair and impartial.  Is

2   that correct?

3            A PROSPECTIVE JUROR:  Right.

4            MS. WEKSLER:  Okay.  Do you feel strongly about that?

5            A PROSPECTIVE JUROR:  Yeah.

6            MS. WEKSLER:  Okay.  How strongly do you feel about

7   that?

8            A PROSPECTIVE JUROR:  I don't know if it would

9   affect -- dang phone.

10           MS. WEKSLER:  I'm sorry?

11           A PROSPECTIVE JUROR:  I don't know if it would -- I

12   don't know.  I just don't know.  I just ...

13           MS. WEKSLER:  Okay.  Do you think that it would color

14   the way in which you look at this case?

15           A PROSPECTIVE JUROR:  Probably so.

16           MS. WEKSLER:  Okay.  If this case were to present

17   evidence with a lot of individuals having lots of firearms, is

18   that something that you would look at negatively?

19           A PROSPECTIVE JUROR:  Might.  Might not.

20           MS. WEKSLER:  Might or it might not.

21           I guess I'm trying to figure out exactly why -- I mean,

22   you answered that it would be hard for you to be fair and

23   impartial in this case.  So I'm just trying to -- if you could

24   tell me in your words why you think that the events of Route 91

25   would not allow you to be fair and impartial in this case.  I'm

2:16-cr-46-GMN-PAL

1   just trying to understand why.

2           A PROSPECTIVE JUROR:  The guns on TV.

3           MS. WEKSLER:  I'm sorry?

4           A PROSPECTIVE JUROR:  All them guns that they showed on

5   TV --

6           MS. WEKSLER:  Regarding this case?

7           A PROSPECTIVE JUROR:  Yeah.  Well, not this case.

8   October 1st.

9           MS. WEKSLER:  Okay.  So you saw the number of guns

10  regarding October 1st?

11          A PROSPECTIVE JUROR:  Right.

12          MS. WEKSLER:  Okay.  And that bothered you?

13          A PROSPECTIVE JUROR:  Yes.

14          MS. WEKSLER:  Okay.  And what is it that it bothered

15  you about?

16          A PROSPECTIVE JUROR:  How did he get those guns up

17  there?

18          MS. WEKSLER:  Okay.  So it bothered you that he had

19  access to all of those guns?

20          A PROSPECTIVE JUROR:  Right.

21          MS. WEKSLER:  Did it bother you that he -- that one

22  individual could have the ability to have all of those guns?

23          A PROSPECTIVE JUROR:  Yeah.

24          MS. WEKSLER:  And that bothered you even though he has

25  the right to have all of those firearms?

2:16-cr-46-GMN-PAL

1           A PROSPECTIVE JUROR:  Must have had some help.

2           MS. WEKSLER:  I'm sorry?

3           A PROSPECTIVE JUROR:  I said, he must have had some

4   help getting it up there, I mean.  Yeah, that bothered me.  It

5   bothers me.

6           MS. WEKSLER:  It bothers you.

7           Now, if this case were to present evidence that there

8   are a lot of firearms involved, would you -- would that be a

9   situation where you would link both events?

10          A PROSPECTIVE JUROR:  I might.

11          MS. WEKSLER:  Okay.  Tell me about that.  Why do you

12   think that you might link both of them?

13          A PROSPECTIVE JUROR:  Because they're similar.

14          MS. WEKSLER:  Okay.  How ...

15          A PROSPECTIVE JUROR:  Guns are guns.

16          MS. WEKSLER:  Okay.  So you do not distinguish

17   between -- if you have -- both individuals may have the ability

18   to have these firearms, but you just disagree with the notion

19   that they have access to so many of them?

20          A PROSPECTIVE JUROR:  Right.

21          MS. WEKSLER:  Okay.  And it bothers you that these

22   firearms can be high-powered firearms?

23          A PROSPECTIVE JUROR:  Yes.

24          MS. WEKSLER:  And that would color your ability to

25   listen to the evidence in this case?

—2:16-cr-46-GMN-PAL—

1          A PROSPECTIVE JUROR:  Maybe.

2          MS. WEKSLER:  Maybe.  So you're not entirely sure?

3          A PROSPECTIVE JUROR:  No.

4          MS. WEKSLER:  Okay.  Now, do you think that the Defense

5    would be sort of at a disadvantage in this case given your

6    position?

7          A PROSPECTIVE JUROR:  Maybe.  Maybe not.

8          MS. WEKSLER:  Maybe.  Okay.  And I'm asking you to be

9    honest here.  Okay.  So I guess my question to you is, do you

10   think that we are sort of starting out one step behind, right,

11   because of the views that you hold regarding Route 91, your

12   views about guns, your views about high-powered firearms?

13         A PROSPECTIVE JUROR:  Yeah.

14         MS. WEKSLER:  Okay.  So you think that the Defense

15   would be one step behind?

16         A PROSPECTIVE JUROR:  Might be, yeah.

17         MS. WEKSLER:  And we would have to overcome that?

18         A PROSPECTIVE JUROR:  Right.

19         MS. WEKSLER:  All right.  Well, I really appreciate

20   your honesty.

21         THE COURT:  Mr. Schiess?

22         MR. SCHIESS:  Sir, thank you for your time.

23         You answered a number of questions of maybe, might be.

24   Looks like you're thinking very carefully about your answers.

25   We appreciate that very much.

—2:16-cr-46-GMN-PAL—

1              Now, you recognize that the law permits people to have

2  guns?

3              A PROSPECTIVE JUROR:  Yes.

4              MR. SCHIESS:  And you don't have a problem with the law

5  at this point permitting them to have guns?

6              A PROSPECTIVE JUROR:  No.

7              MR. SCHIESS:  As I understand what you were expressing,

8  your deep views, which I'm sure everybody here feels, is that

9  that event that occurred was just terrible?

10              A PROSPECTIVE JUROR:  Yeah.

11              MR. SCHIESS:  And that, you know, it's mind-boggling to

12  think how that person could get so many guns up into the room?

13              A PROSPECTIVE JUROR:  Right.  And so many people got

14  hurt.

15              MR. SCHIESS:  And so many people got hurt.  Now, you --

16  I mean, it's fair to say that this case that we're talking about

17  here that you're being considered for a juror is a completely

18  separate case?

19              A PROSPECTIVE JUROR:  Right.

20              MR. SCHIESS:  And even though there will be guns in

21  this case, do you recognize that it's a completely different

22  circumstance?

23              A PROSPECTIVE JUROR:  Yeah.

24              MR. SCHIESS:  Okay.  Considering that they're both

25  different circumstances, would you be able to listen to the

1   evidence in this case?

2          A PROSPECTIVE JUROR:  Yeah.

3          MR. SCHIESS:  With an open mind?

4          A PROSPECTIVE JUROR:  Yeah.

5          MR. SCHIESS:  Okay.  Now, you've expressed that you do

6   have a -- you know, very strong feelings about what happened --

7          A PROSPECTIVE JUROR:  Right.

8          MR. SCHIESS:  -- in October the 1st?

9          A PROSPECTIVE JUROR:  Right.

10         MR. SCHIESS:  And it's probably normal to feel those

11  feelings at any time in our lives.  Would you be able to take

12  those feelings about October 1st and put them aside and focus

13  solely on the facts that you hear from the witness stand or that

14  you see as documents or photographs?

15         A PROSPECTIVE JUROR:  Oh, yeah.

16         MR. SCHIESS:  Okay.  Now -- so, even though you've

17  expressed that the events of October the 1st has an impact on

18  you, would we have your assurance that you could do your very

19  best to put those aside and decide the case solely upon the

20  evidence that would be presented?

21         A PROSPECTIVE JUROR:  Yeah.

22         MR. SCHIESS:  Do you see -- even though the October 1st

23  is an emotional event, do you see any problem with being able to

24  separate those two events?

25         A PROSPECTIVE JUROR:  No problem.

—2:16-cr-46-GMN-PAL—

1          MR. SCHIESS:  You've also expressed views about the gun

2    laws and that you feel that -- you have a different view at this

3    point or opinion than what the law currently is on who can have

4    guns and how many guns?

5          A PROSPECTIVE JUROR:  Right.

6          MR. SCHIESS:  Okay.  Now, understanding that that's

7    your opinion, could you put that aside and listen to the

8    instructions of the Court as the Court gives you those

9    instructions and with your fellow jurors do your very best to

10   apply those to the law?

11         A PROSPECTIVE JUROR:  Yeah.

12         MR. SCHIESS:  I mean, to the facts that you hear.

13         A PROSPECTIVE JUROR:  Yep.

14         MR. SCHIESS:  Okay.  So, you could be able to do your

15   very best to separate everything?

16         A PROSPECTIVE JUROR:  Yeah.

17         MR. SCHIESS:  Okay.  Sir, thank you very much for your

18   time.

19         THE COURT:  All right.  So juror No. 132, I know it's

20   been a long day yesterday, but at the beginning of the day I

21   explained to all of the jurors that the defendants start off

22   this case with a clean slate and that they are presumed

23   innocent.

24         A PROSPECTIVE JUROR:  Right.

25         THE COURT:  Ms. Weksler asked you if they might be

 1  starting a step behind.  So I need to be sure that you

 2  understand that the defendants have no proof in this case.  They

 3  are presumed to be innocent.

 4          A PROSPECTIVE JUROR:  Yeah, I understand.

 5          THE COURT:  And that the Government has the burden to

 6  prove beyond a reasonable doubt that a crime was committed by

 7  them.

 8          A PROSPECTIVE JUROR:  Yeah, I understand that.

 9          THE COURT:  So you say you understand it, but can you

10  apply that concept?

11          A PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  All right.  Thank you very much for coming

13  in.  I appreciate your time.  You can go ahead and join the

14  other jurors.

15          (Whereupon prospective juror leaves the courtroom.)

16          THE COURT:  All right.  So is it 135 or 133 --

17          MR. SCHIESS:  Oh, 133, Your Honor.

18          THE COURT:  -- that you all wanted to question.

19          MR. SCHIESS:  133, please.

20          THE COURT:  133.  So you're right, Aaron.  133 is next.

21          (Whereupon prospective juror enters the courtroom.)

22          THE COURT:  Good morning.  We're going to have you sit

23  down right there in that chair.

24          Everyone else may be seated.  And just to make sure we

25  have the right person, what is your jury number?

```
               2:16-cr-46-GMN-PAL
```

 1          A PROSPECTIVE JUROR:  No. 133.

 2          THE COURT:  133.  Thank you.  So you did have a

 3   response in the written questionnaire that raised a need to

 4   follow-up, and we wanted to do that outside the presence of the

 5   other jurors.  I want you to be truthful and, you know,

 6   thoroughly explain anything that you need to so that we're

 7   comfortable that we understand what you meant by the -- you

 8   know, the responses in the questionnaire.  And we don't want you

 9   to be reluctant to say anything in front of the other jurors, so

10   that's why they're not here.

11          So I think -- was it Mr. Schiess?  Go ahead, sir.

12          MR. SCHIESS:  Hey.  Good morning.

13          A PROSPECTIVE JUROR:  Good morning.

14          MR. SCHIESS:  I see while the judge was talking, you

15   were kind of raising your hand to speak.  Is that correct?

16          A PROSPECTIVE JUROR:  Yes.

17          MR. SCHIESS:  Could you go ahead and express yourself.

18          A PROSPECTIVE JUROR:  I just -- I didn't know if I have

19   a conflict of interest with the case because I -- this is my

20   first time ever doing anything like this.  And so yesterday I

21   was kind of waiting to see if a question got asked, you know,

22   that would -- I could say something.  So I didn't know if I

23   could just say something.

24          But, anyway, I have a friend that works in this

25   building, and I didn't know if that is a conflict of interest

—2:16-cr-46-GMN-PAL—

 1  because prior to the case we kind of were talking about it a

 2  little bit and she knows some of the prosecution.  So I didn't

 3  know if that was -- if that was a conflict or not, so ...

 4          THE COURT:  Okay.  Well, it might be depending on where

 5  she works in the building because we have a lot of different --

 6          A PROSPECTIVE JUROR:  She's on the fifth floor with the

 7  EEOC.

 8          THE COURT:  Is that --

 9          A PROSPECTIVE JUROR:  Even when I was walking in the

10  hall with her yesterday, everyone was like, Hey.  Hey.  I was

11  like -- so some of the people even in here might know her.

12          THE COURT:  So she works for the State of Nevada?

13          A PROSPECTIVE JUROR:  She works for the EEOC, so ...

14          THE COURT:  The EEOC?

15          COURTROOM ADMINISTRATOR:  It's on eighth, Your Honor.

16          MR. SCHIESS:  It just moved to the fifth.  It's

17  federal, and it just moved to the fifth floor.

18          THE COURT:  Oh, okay.

19          MR. SCHIESS:  She's correct on that.

20          THE COURT:  All right.

21          A PROSPECTIVE JUROR:  Yeah.  So I didn't know and I was

22  kind of like racking my brain last night, you know, because I'm

23  not very good with names.  And so when we were having all of the

24  names and the lawyers and this, I was like, Uh, do I know

25  somebody?  So all night long I'm trying to think what was the

—2:16-cr-46-GMN-PAL—

1  name of the people.

2        And so she -- my -- she's my good friend.  I've known

3  her for over 20 years.  And then she knows Silva, Cristina

4  Silva.

5        MR. SCHIESS:  Yes.

6        A PROSPECTIVE JUROR:  So I just didn't want it to be

7  any problem with any of the ...

8        THE COURT:  All right.  So this friend of yours that

9  you've known for over 20 years, did you say that you and she had

10 spoken about this case before you received the summons?

11       A PROSPECTIVE JUROR:  Yes, and even on the -- even on

12 the inquiry, I did not see a spot to put all of the info.  So I

13 was like, Uh, maybe when I get there, I'll have something.  So

14 every time I've been trying to kind of wait to see where I can

15 put it because I've never been part of a jury.  So, that's why

16 it's kind of like the eleventh hour.

17       THE COURT:  All right.  You want to follow-up,

18 Mr. Schiess?

19       MR. SCHIESS:  I would, please.  Thank you.

20       And thank you for raising that and sharing it.  Those

21 are questions that we do like to address.  Your friend, have --

22 has she talked with you at all about the work of the U.S.

23 Attorney's Office?

24       A PROSPECTIVE JUROR:  Well, she had told me about that

25 one of her friends was going to be on this case.  So that's how

—2:16-cr-46-GMN-PAL—

1  I knew, and we had -- I kind of pick on her a little bit because

2  we've been friends for a long time.  So I pick on her a little

3  bit about whenever big cases come up.

4       MR. SCHIESS:  Okay.  And did you pick on her about this

5  case a little bit?

6       A PROSPECTIVE JUROR:  A little bit, yeah.

7       MR. SCHIESS:  And did you ask her about the case?

8       A PROSPECTIVE JUROR:  I -- this is the one comment I'll

9  say.  I -- whenever I was talking to her a little bit before all

10  of this happened -- I haven't talked to her about it since, but

11  I said -- the only thing I knew about this case -- I didn't

12  really know a whole lot, but one thing that came up was I was

13  like I had heard when OJ got released and --

14       MR. SCHIESS:  I'm sorry?

15       A PROSPECTIVE JUROR:  When OJ Simpson got released, you

16  know, and she had known about the case and things like that.

17  And so I said, How did they let OJ out, but they -- they that

18  day sentenced somebody from this case for a long time?  And so

19  that was the only thing that I knew about it, but that was kind

20  of our little jokes back and forth, so ...

21       MR. SCHIESS:  Okay.  So tell me -- let's start with the

22  last part of your answer.

23       THE COURT:  Well, I want to make sure -- so this was a

24  comment after the summons was received?

25       A PROSPECTIVE JUROR:  No, prior.  This has been going

—2:16-cr-46-GMN-PAL—

 1  on for a long time in the news and things, and she was -- she

 2  would tell me, Oh, there's protestors down there and things like

 3  that.  Because I've known her forever.

 4          THE COURT:  But OJ was only recently released.

 5          A PROSPECTIVE JUROR:  Yes.  On the day that he was

 6  released, though, someone was sentenced I think it was like

 7  60-something years in this case.  And I thought, What kind of

 8  craziness is that?

 9          MR. SCHIESS:  What kind of what?

10          A PROSPECTIVE JUROR:  Craziness is that.  That's what I

11  said to her.  So -- and we were good friends, so we were going

12  to pick with each other, you know.

13          MR. SCHIESS:  Hey, can you -- Your Honor, may I cover

14  this?

15          THE COURT:  Yes.

16          MR. SCHIESS:  Your reaction of, "What kind of craziness

17  is that," can you explain that to what your feelings at the time

18  the time were?

19          A PROSPECTIVE JUROR:  Well, I don't know much about the

20  case, but I just thought, you know, that was more of a severe

21  thing.  It was a very short time.  Where this is to me -- I

22  mean, I'm not from the West.  I'm from the South.  And I don't

23  know much about fighting over lands and things like that.  Okay.

24  So to me that was kind of like, What is this, you know.

25          MR. SCHIESS:  Yeah.

1          A PROSPECTIVE JUROR:  That's just how I felt.

2          MR. SCHIESS:  So were you comparing the sentence of the

3   person -- the long sentence of the person you heard about --

4          A PROSPECTIVE JUROR:  Yes.

5          MR. SCHIESS:  -- with OJ's sentence?

6          A PROSPECTIVE JUROR:  Yes.

7          MR. SCHIESS:  And did you --

8          A PROSPECTIVE JUROR:  Because I thought that was to me

9   -- what I had heard -- because I don't know all of the facts.  I

10  haven't been listening, right.

11         MR. SCHIESS:  Right.

12         A PROSPECTIVE JUROR:  Especially since I got the thing,

13  but I just thought, That is so crazy.

14         MR. SCHIESS:  Yeah.  Did you feel that there's --

15         A PROSPECTIVE JUROR:  Who cares about land that much

16  whenever it's, you know, other things.

17         MR. SCHIESS:  Okay.  I appreciate that.  Did you feel

18  then that comparing the OJ sentence to what you had heard about

19  this other person had a sense of unfairness to you?

20         A PROSPECTIVE JUROR:  Yeah, I did.

21         MR. SCHIESS:  And that bothered you?

22         A PROSPECTIVE JUROR:  Yeah, it did.

23         MR. SCHIESS:  You know, when you sit --

24         A PROSPECTIVE JUROR:  And I don't want -- I don't want

25  to be biassed in any way, but I do -- that's how I feel, you

———— 2:16-cr-46-GMN-PAL ————

1 know.

2         MR. SCHIESS:  Yeah, and that sounds like it's a fairly

3 strong feeling that you have.  Is that correct?

4         A PROSPECTIVE JUROR:  Yes.  Correct.

5         MR. SCHIESS:  Would you be able to change that feeling

6 in the next couple of days?

7         A PROSPECTIVE JUROR:  I don't know that I could.  I

8 mean, I'm an honest person and I believe in the way that things

9 go, but I just -- I do feel like, uh, you know.

10         MR. SCHIESS:  Yeah.  Well, let me just go right to the,

11 you know, an end question I would normally ask.  Given the way

12 you feel about the unfairness of the sentence that that person

13 had, do you think it would be better if you were -- received a

14 jury instruction -- I mean, a jury invitation to sit on a

15 different jury than this one?

16         A PROSPECTIVE JUROR:  Most likely.

17         MR. SCHIESS:  Okay.  So -- well, let me --

18         A PROSPECTIVE JUROR:  Because I don't want to taint

19 anything that's going on.  I want everybody to have a fair

20 trial.

21         MR. SCHIESS:  Is it fair for me to conclude then that

22 you would feel like it would really be hard to put that feeling

23 of unfairness aside?

24         A PROSPECTIVE JUROR:  Probably so.

25         MR. SCHIESS:  And --

—2:16-cr-46-GMN-PAL—

1          A PROSPECTIVE JUROR:  I've been dwelling on it the last

2     couple of days.

3          MR. SCHIESS:  Well, I appreciate very much so honestly.

4     So maybe that leads into a couple of other questions that I

5     have, and that is when you wrote down your answers ...

6          (Prosecuting conferring.)

7          MR. SCHIESS:  Okay.  Getting help.  Let me stay with

8     their help since I'm going to stay on the same topic.  Okay?

9          A PROSPECTIVE JUROR:  No problem.

10         MR. SCHIESS:  It's nice to have help.

11         You know, if you were to be selected to the jury and

12    have to listen to the evidence and follow the law, would you be

13    concerned that the verdict that you may render of guilty, if

14    that were your verdict, that you'd have -- you'd be thinking

15    about the punishment that would be the consequence of the

16    verdict?

17         A PROSPECTIVE JUROR:  Maybe.

18         MR. WHIPPLE:  Judge, I'm going to object.  That's not

19    what would happen --

20         MR. SCHIESS:  I'm sorry.  I can't hear you, please.

21         MR. WHIPPLE:  Objection, issue of punishment is not

22    within the ambit of any juror.

23         THE COURT:  That's what the question is because she

24    says she's already had negative thoughts about the sentence on a

25    codefendant.  So it's an appropriate question to ask.

─ 2:16-cr-46-GMN-PAL ─

1              MR. WHIPPLE:  Thank you, Your Honor.

2              MR. SCHIESS:  Did you say appropriate or inappropriate?

3              THE COURT:  Is appropriate.

4              MR. SCHIESS:  So I want to just -- let me back up a

5     little bit and be very clear.  You know, the role of jurors is

6     to listen to the facts and take the law from the Court as the

7     Court instructs you and then apply those in consideration with

8     your jurors and then decide whether the Government has proven

9     its case beyond a reasonable doubt, that is, whether the

10    defendant is guilty or not guilty.  The role of punishment is

11    the role for the Court to decide.

12             But understanding, though, that the verdict may lead to

13    punishment, that is -- is it -- is it fair for me to conclude

14    that's something that still may be in the back of your mind in

15    the sense of unfairness?

16             A PROSPECTIVE JUROR:  I think so.  It's just I -- I'm

17    not -- I don't know.  This type of case, it's -- it -- I don't

18    know.  I just don't feel like it's sometimes fair, you know.

19    Yesterday I know that we got asked those questions and things,

20    but I was very nervous yesterday.  I was nervous to even come

21    here, you know.  I've never even gotten a traffic ticket.  So

22    I'm a little nervous, but ...

23             MR. SCHIESS:  Well --

24             A PROSPECTIVE JUROR:  That is in the back of my mind,

25    you know.

─────── 2:16-cr-46-GMN-PAL ───────

1          MR. SCHIESS:  Okay.  Well, thank you.  You should be

2    nervous because we're all nervous at times for new situations.

3          A PROSPECTIVE JUROR:  Yeah, it's serious.  It's

4    serious.

5          MR. SCHIESS:  Nothing wrong with that.  So let me kind

6    of delve into it a little bit more.

7          In your questionnaire that you filled out you made some

8    comment that you thought that what you heard about this case and

9    the case was silly.  Do you remember that?

10          A PROSPECTIVE JUROR:  Yeah.

11          MR. SCHIESS:  And that who cares if they let cattle

12    graze.  Can you share with me your feelings about that or your

13    thoughts a little more?

14          A PROSPECTIVE JUROR:  I don't -- like I said, I don't

15    know a whole lot about this type of thing, but I don't know if

16    you know the movie Open Range?

17          MR. SCHIESS:  Okay.

18          A PROSPECTIVE JUROR:  And it's one of my favorite

19    movies, and in there is, you know, cattle grazing, right.  And

20    so with this case, like, I feel -- even though I've moved here

21    and I've been here a while, like I said, I'm from the South, and

22    I feel like this whole state, there's so much land.  And how

23    many cattle people are there?  There's not really that many, I

24    wouldn't say.  And so I feel like this -- there's only two

25    really big towns.  And who cares?  You know, that's my feeling.

2:16-cr-46-GMN-PAL

1          MR. SCHIESS:  Okay.  Have you had that feeling for a

2  long time?

3          A PROSPECTIVE JUROR:  Uh-hmm.  Yeah.

4          MR. SCHIESS:  And is that in part based upon your --

5  how much you like the movie Open Range and you see what's going

6  on through that?  Do I get that correct?

7          A PROSPECTIVE JUROR:  Well, it's both things.  Like, I

8  just -- I do feel for the little man, you know, and -- but I

9  also want the law upheld.  So I'm kind of torn between the two.

10          MR. SCHIESS:  Uh-huh.  Your feelings about who cares if

11  you let the cattle out on the open range, that sounds if I'm not

12  mistaken, and tell me if I am, that that's something that you

13  seem to have a fairly strong feeling about?

14          A PROSPECTIVE JUROR:  Yeah, it's pretty strong because,

15  you know, there's not a lot of people in Nevada, you know.  And

16  I know that the Government has a lot of the land, you know, and

17  I understand that, but I do understand that maybe there should

18  be a little leniency.

19          MR. SCHIESS:  Okay.  And it sounds like you have a

20  fairly strong opinion about that?

21          A PROSPECTIVE JUROR:  Yeah.

22          MR. SCHIESS:  And that -- and so let me ask you the

23  same type of questions before that strong -- strong feeling

24  about leniency and cattle out on the open land.  Is that a

25  feeling or a view that you would be able to put aside in the

—2:16-cr-46-GMN-PAL—

1  next couple of days and change your view on that in the next

2  couple of days?

3          A PROSPECTIVE JUROR:  I don't think so because it's

4  just something that I've felt, you know.  My grandfather, I -- I

5  didn't grow up in the country, but my grandfather and my father

6  were both country.

7          MR. SCHIESS:  Okay.

8          A PROSPECTIVE JUROR:  And so my heart is for country

9  people, you know.

10          MR. SCHIESS:  Yes.

11          A PROSPECTIVE JUROR:  And they had cattle --

12          MR. SCHIESS:  Yes.

13          A PROSPECTIVE JUROR:  -- and sheep and things so I

14  feel, you know, a little bit biassed.

15          MR. SCHIESS:  Yeah.  So given those strong views that

16  you have, if we, you know, look at starting off with an even

17  playing field or an even table, given those strong views, would

18  you feel like, and your concern for the little man, that that

19  maybe tilts the table a little bit in favor of the Defense?

20          A PROSPECTIVE JUROR:  Yeah.  I wouldn't be honest if I

21  didn't say it did.

22          MR. SCHIESS:  Okay.

23          A PROSPECTIVE JUROR:  So I want to be honest here.

24          MR. SCHIESS:  I appreciate that.  I appreciate that.

25          May I take a moment, Your Honor, and talk with the

—2:16-cr-46-GMN-PAL—

 1   folks here?

 2           THE COURT:  Yes.

 3           (Prosecution conferring.)

 4           MR. SCHIESS:  Let me kind of -- it's so nice to have a

 5   team to help me remember.

 6           Let me pick up where I left off, and that is, you know,

 7   the table's already leaning unevenly towards the Defense.  Is it

 8   fair for me to say that your thoughts about this case being

 9   silly or the issues being silly also tilt that table now to

10   weigh in favor of the Defense and kind of makes it even more

11   uneven?

12           A PROSPECTIVE JUROR:  Yeah.

13           MR. SCHIESS:  Okay.  Hey, thank you very much for your

14   honesty.  We appreciate that.  It's so important for us just to

15   hear your thoughts through that.

16           A PROSPECTIVE JUROR:  Thank you.

17           MR. SCHIESS:  So thank you.

18           THE COURT:  Anyone from the Defense?  Mr. Whipple, did

19   you want to --

20           MR. WHIPPLE:  Yes.

21           Good morning, ma'am.  Thanks so much for being here.

22   We appreciate it.  How is your morning going?

23           A PROSPECTIVE JUROR:  Good.  I'm awake this morning.

24           MR. WHIPPLE:  What's that?

25           A PROSPECTIVE JUROR:  I'm awake this morning.  A little

———— 2:16-cr-46-GMN-PAL ————

1   early yesterday.

2           MR. WHIPPLE:  That's always the first step, right?

3           A PROSPECTIVE JUROR:  Yeah.

4           MR. WHIPPLE:  So it seems to be the first issue is you

5   had some concerns because of some friendly ties that you have to

6   this building?

7           A PROSPECTIVE JUROR:  Yeah.

8           MR. WHIPPLE:  And if I can, let me just kind of get a

9   feel for how long have you been here in Las Vegas?

10          A PROSPECTIVE JUROR:  I think about 14 years.

11          MR. WHIPPLE:  This particular friend, I didn't quite

12  understand.  It's a she, correct?

13          A PROSPECTIVE JUROR:  Yes, it's a she.

14          MR. WHIPPLE:  And she works on the fifth floor here at

15  this building?

16          A PROSPECTIVE JUROR:  Yes.

17          MR. WHIPPLE:  And what's her position, if you ...

18          A PROSPECTIVE JUROR:  She's the front reception at the

19  EEOC.

20          MR. WHIPPLE:  Oh, okay.

21          A PROSPECTIVE JUROR:  So she knows like a lot of the

22  people.  Like, I didn't really know how many people she did know

23  until I was walking around with her yesterday and everybody is

24  saying hello to her.

25          MR. WHIPPLE:  Okay.  Okay.  And she's friends with

1  Cristina Silva?

2          A PROSPECTIVE JUROR:  Uh-hmm.

3          MR. WHIPPLE:  And you know Cristina Silva's a peer,

4  works with Mr. Schiess, the gentleman who was just asking you

5  questions?

6          A PROSPECTIVE JUROR:  Yeah, I don't know her, but know

7  the person who does know her.

8          MR. WHIPPLE:  Okay.  So I think, you know, if

9  anybody -- if -- you know, myself because I represent Cliven

10  Bundy I'd be worried about you having ties to the U.S.

11  Attorney's Office and trying to like tilt them --

12          A PROSPECTIVE JUROR:  Exactly.

13          MR. WHIPPLE:  -- because it's a friend of a friend.

14          A PROSPECTIVE JUROR:  That's why I was tossing last

15  night because I was like, Oh, my gosh.  I don't want to leave

16  that out, you know.  And I didn't get a chance to, so, say

17  anything, and I want to make that sure everyone knows.

18          MR. WHIPPLE:  So as you sit here today, do you think

19  you -- do you think I should be worried about you trying to help

20  a friend of a friend?

21          A PROSPECTIVE JUROR:  No.  Not in that respect, no.

22  No, because I -- because I believe in the truth.

23          MR. WHIPPLE:  What else do you believe in?

24          A PROSPECTIVE JUROR:  I believe in justice, but I

25  just -- I have -- that's why I say I'm a little bit on both

1  sides, you know.

2          MR. WHIPPLE:  And you also, I know by just hearing from

3  you, you believe to be fair?

4          A PROSPECTIVE JUROR:  Yes.

5          MR. WHIPPLE:  And that's why you're here is just

6  telling everybody how you feel?

7          A PROSPECTIVE JUROR:  Yeah, because I didn't want

8  anything to taint this -- this trial.  I want it to be fair.

9          MR. WHIPPLE:  And so I know, you know, your natural

10  inclination is to want to try to help a friend of a friend, but

11  you're going to put that to the side and really concentrate on

12  being fair?

13          A PROSPECTIVE JUROR:  Definitely.  I mean, I don't know

14  her.  So I just wanted to make sure everybody knew what was

15  going on.

16          MR. WHIPPLE:  And so here's my response to that.  Thank

17  you and we accept that.

18          A PROSPECTIVE JUROR:  Thank you.

19          MR. WHIPPLE:  So now I want to ask you questions about

20  this other issue of you, like myself and many other people,

21  really believe in the environment, open range.  And I never saw

22  the movie, but I'll have to go look it up.

23          A PROSPECTIVE JUROR:  It's good.

24          MR. WHIPPLE:  It sounds like something interesting to

25  see.

—2:16-cr-46-GMN-PAL—

1           A PROSPECTIVE JUROR:  It's good.  Robert Duvall.

2           MR. WHIPPLE:  Now, that's not part of your life, right?

3           A PROSPECTIVE JUROR:  No, I'm what you call a city

4   slicker, I guess.  I've always been a suburbanite.

5           MR. WHIPPLE:  You also sound kind of a romantic to me

6   kind of like -- right?  I mean that --

7           A PROSPECTIVE JUROR:  Well, my mom was a city person.

8   My dad was a country person.  So I have a little bit of both

9   sides.  So I can appreciate what they're going through.

10           MR. WHIPPLE:  So my question to you is, it's just like

11   your -- the friend -- just like the folks here in this table are

12   kind of a friend of a friend, but you're willing to put that to

13   the side.  Are you willing to put to the side any of these

14   romantic, you know, beliefs or this belief of Open Range and

15   some of your opinions regarding, you know, range and cattle?

16   Can you put that to the side and be fair to all of us with

17   regard to the evidence that comes in in this case?

18           A PROSPECTIVE JUROR:  I just -- I think that because I

19   had already kind of formed an opinion before we got here, I

20   don't know that I can is what I'm saying.

21           MR. WHIPPLE:  Okay.

22           A PROSPECTIVE JUROR:  I -- I -- just to be very honest

23   with you, I don't know that I can because I didn't think it was

24   right.

25           MR. WHIPPLE:  Okay.  Are you willing to follow the

———— 2:16-cr-46-GMN-PAL ————

1  instructions of the Court?

2          A PROSPECTIVE JUROR:  Yes.

3          MR. WHIPPLE:  And the Court's instructions are that you

4  be -- that you treat all of the evidence that comes in in the

5  case fair and objectively?

6          A PROSPECTIVE JUROR:  Yes.

7          MR. WHIPPLE:  You're willing to do that, right?

8          A PROSPECTIVE JUROR:  Yes.

9          MR. WHIPPLE:  And these -- these issues that you may

10  have -- these opinions that you have, they kind of stop at the

11  front door?

12          A PROSPECTIVE JUROR:  I can try, you know.  I'm only

13  human.

14          MR. WHIPPLE:  That's all we're asking.  The same thing

15  with the friend of a friend.

16          A PROSPECTIVE JUROR:  Yeah.

17          MR. WHIPPLE:  That kind of has to stop at the front

18  door.  Are you willing to -- are you willing to put your best

19  effort into leaving all of those emotions outside and being a

20  fair juror to all the parties?

21          A PROSPECTIVE JUROR:  Well, anything I do I try to put

22  my best effort in.

23          MR. WHIPPLE:  What's that?

24          A PROSPECTIVE JUROR:  Anything I do I try to put my

25  best effort in, so yeah.

—2:16-cr-46-GMN-PAL—

1          MR. WHIPPLE:  Okay.  You know, I've often heard about a

2    juror's kind of having to step into a box, you know, not only a

3    jury box, but it's kind of a box with regard to the information

4    and the evidence.  You're going to -- if you were to be selected

5    as a juror, you'd have a couple months worth of information come

6    to you through witnesses and evidence and exhibits.  And we want

7    folks that can be fair and just concentrate on that evidence.

8          Now, punishment's something that only goes to the

9    judge.  That's not something that you -- that's not even

10   something you can consider.

11         A PROSPECTIVE JUROR:  Yeah.

12         MR. WHIPPLE:  Are you willing to follow the

13   instructions of the Court and look at all of the evidence and

14   the exhibits fair and neutral?

15         A PROSPECTIVE JUROR:  I can try.  That's all I can say

16   is I can try.

17         MR. WHIPPLE:  All right.  We do appreciate your time.

18   Thank you so much.

19         A PROSPECTIVE JUROR:  Thank you.

20         THE COURT:  All right.  Thank you very much, juror No.

21   130 --

22         MR. SCHIESS:  Can I just ask two quick questions as a

23   follow-up?

24         THE COURT:  Yes.  Go ahead.

25         MR. SCHIESS:  Thank you.

—2:16-cr-46-GMN-PAL—

1          You were just asked if you could leave your opinions at

2  the front door, and you said you would try to do your best.  How

3  would you do that?

4          A PROSPECTIVE JUROR:  I don't know.  I've never did

5  this process.  So it will be a real, I guess, a stretch.

6          MR. SCHIESS:  Okay.

7          A PROSPECTIVE JUROR:  You know, I'm going to try, but I

8  don't know -- you know, once you already kind of have a little

9  bit of an opinion, it's kind of hard, isn't it?

10          MR. SCHIESS:  Yeah.  And so is there any possible way

11  for the Court to be sure that you even left it at the front

12  door?

13          A PROSPECTIVE JUROR:  I -- I don't know, you know.  All

14  I can say is I don't know.  I guess I have to come to it when it

15  comes.

16          MR. SCHIESS:  Thank you so much.

17          THE COURT:  All right.  Thank you very much.  You may

18  go ahead and join the rest of the jury.

19          (Whereupon prospective juror leaves the courtroom.)

20          THE COURT:  And then I believe it was -- was it 135 or

21  did I just have that mixed up with 133?  Ms. Weksler, did you

22  also want to --

23          MS. WEKSLER:  135, yes.

24          THE COURT:  Yes.  All right.  So if we could have 135.

25          MS. WEKSLER:  Your Honor, I'm sorry.  I gave the wrong

───── 2:16-cr-46-GMN-PAL ─────

1  number.  It was 1 -- I have 130 ...

2          (Court reporter interruption.)

3          MR. SCHIESS:  I'm sorry.  Which number are we seeking?

4          THE COURT:  Well, 135 is coming in.  Do we not need to

5  question them?

6          MS. WEKSLER:  Yeah.  No, we don't, Judge.  It's 130.

7          MR. SCHIESS:  Your Honor, 130 was not on the list of

8  numbers that she discussed with you this morning.

9          MS. WEKSLER:  And then I think I asked for 129 and 126.

10         THE COURT:  Yeah, I already ruled on 126 and 129.  I

11 haven't heard any information about 130.

12         MS. WEKSLER:  So 130 I believe mentions that his -- he

13 is the one who says on question 14 that Route 91 affected him

14 emotionally.  He says:  People as young as -- as young and

15 younger than my 22-year-old oldest son died for no reason.  They

16 didn't even start an adult life.

17         And with regards to question 19:  Has it affected your

18 views on gun ownership?  Yes.  Explain.  And it says:

19 High-powered rifles should be with law enforcement only.  The

20 general public should not either have those or who ... or those

21 who have them should strictly be monitored.  That's my personal

22 view.

23         MR. SCHIESS:  Your Honor, in reading those questions,

24 she skipped No. 15 which the question was:  Has that event,

25 referring to the Route 91 Harvest Music Festival shooting,

2:16-cr-46-GMN-PAL

1  impacted you in such a way that it will make it difficult for

2  you to be fair and impartial in this case?  And the juror

3  circled no and left it there.

4          THE COURT:  All right.  So you may be seated.  It

5  doesn't look like we have anyone else that we need to question

6  outside the presence.  Let's go ahead and bring all of them back

7  in.

8          Actually, no, I need to make sure that Mr. Ryan Bundy's

9  leg shackles are off.  They are.  You are nodding yes that they

10  are.  Okay.  Yes, then let's go ahead and bring everyone in and

11  he can ask his questions.

12          MR. PHILPOT:  Your Honor, I also really need some time

13  to deal with that staff issue when you are able.

14          THE COURT:  I'm sorry.  Time to what?

15          MR. PHILPOT:  Deal with that staff issue we discussed

16  yesterday.

17          THE COURT:  I thought we already did deal with it.

18          MR. PHILPOT:  We did not.  You had committed to dealing

19  with it at the end of the day yesterday, and we left.

20          THE COURT:  All right.  I thought I already dealt with

21  it since you do have a jury consultant with you and there's no

22  right to have a paralegal in the well with you.  And I already

23  had concerns about this individual before I even knew he would

24  be working with you.  And you said you didn't think he was going

25  to be work -- you said at the hearing he wasn't going to be

PATRICIA L. GANCI, RMR, CRR, CCR 937    (702) 385-0670

1  working with you, but that if he was, you would get Mr. Bundy's

2  authorization to permit him to work with you.

3          So, I don't want to go into the details.  I think that

4  you know that I know that there's a concern that's been raised

5  by other folks in the paperwork that I reviewed in your pro hac

6  vice, and for that reason he is not permitted to be in the well.

7  So is it a question of whether or not -- something else?

8          MR. PHILPOT:  Be permitted to have --

9          THE COURT:  He can work on Mr. Bundy's case.  I don't

10 have any problem with that so long as Mr. Ammon Bundy says he's

11 aware and is comfortable having him.

12         MR. PHILPOT:  He is aware.

13         THE COURT:  Then that's fine with me.

14         MR. PHILPOT:  Is he allowed to have tools to work with

15 such as a computer, phone?

16         THE COURT:  That will be another issue we need to

17 address.  I don't know what you're talking about.

18         MR. PHILPOT:  I need him to be able to function as a

19 member of my team.  And he cannot do that just by sitting in the

20 back.  He's a third of our workforce.

21         THE COURT:  All right.  So we can address that later.

22         MS. WEKSLER:  Judge, before the jury comes in --

23         THE COURT:  It's already coming in.

24         MS. WEKSLER:  Well, Judge, I need to be -- I need to be

25 able to know whether -- can we have a sidebar, Judge?

1          THE COURT:  No, we're going to go ahead and get

2    started.  We will probably take another break, though, before

3    lunch.

4          MS. WEKSLER:  Judge, they're still outside.  I just

5    need to know whether we're going to be permitted to do rebuttal.

6          A MARSHAL:  No, we got one in here.

7          THE COURT:  No, they're not outside.  They're filing

8    in.

9          (Whereupon jury panel enters the courtroom at

10   9:56 a.m.)

11         THE COURT:  Jury may go ahead and be seated.  Everyone

12   else may be seated as well.

13         Good morning.  Welcome back, everybody.  I'm going to

14   go ahead and state your numbers and please raise your hand so

15   that we're sure that we have everyone back that we needed to

16   come back, to return.

17         A SECURITY OFFICER:  Your Honor, there's one more.

18         THE COURT:  Oh, there's one more coming in.  Thank you.

19   All right.

20         And we've got a jacket that was left outside.  Does

21   this belong to anyone?

22         A SECURITY OFFICER:  It may be the person ...

23         THE COURT:  Maybe it is.  All right.  So are they in

24   the restroom?

25         A SECURITY OFFICER:  Yes, Your Honor.

—2:16-cr-46-GMN-PAL—

 1          THE COURT:  Okay.  Well, I'm just going to say your

 2   names -- I mean, your numbers.  So please raise your hands so

 3   that we know you're here.  No. 25?  Thank you.  61?  Thank you.

 4   82?  Thank you.  88?  Thank you.  92?  Thank you.  93?  Okay.

 5   So that's the person that we're missing.

 6          COURTROOM ADMINISTRATOR:  Your Honor --

 7          THE COURT:  Or that person was excused.

 8          COURTROOM ADMINISTRATOR:  -- 93 was excused.

 9          THE COURT:  All right.  Thank you.  You're right.

10          95?  Thank you, sir.  97?  Thank you.  103?  Thank you.

11   108?  Thank you.  111?  Thank you.  112?  Thank you, sir.  113?

12   Thank you.  117?  Thank you.  118?

13          All right.  So maybe 118 is the one that we're missing.

14   All right.  Well, how about 120?  Thank you.  121?  Thank you.

15   122?  124?  126?  Thank you.  129?

16          I'm sorry.  129?  Are we supposed to have 129?

17          COURTROOM ADMINISTRATOR:  Yes, I saw him earlier, Your

18   Honor.

19          THE COURT:  129, initials A.B.?  Oh, there you are.

20   Okay.  I didn't see your hand.  Thank you.

21          And I think that the person we were waiting for just

22   came back.  Is your jury number 118?  All right.  Will you

23   please raise your hand?  Thank you.  Okay.

24          MR. SCHIESS:  Your Honor, I think you did not call out

25   juror 105.

 1          THE COURT:  Oh.  Juror No. 105?  Thank you.  You're

 2   right.  He's at the top of my page.

 3          130?  Thank you.  131?  132?  133?  135?  139?  145?

 4   And 146?  All right.  Is there anyone here whose number I did

 5   not call?

 6          (No response.)

 7          THE COURT:  All right.  So it looks like everybody's

 8   here.  All right.  So we have Mr. Ryan Bundy who's representing

 9   himself.  So he is going to be posing questions to you.

10          Go ahead, Mr. Bundy.

11          MR. RYAN BUNDY:  Question, madam.  Would it be

12   appropriate if I reserve five minutes to pass to someone else?

13          THE COURT:  No.

14          MR. RYAN BUNDY:  Members of the potential jury, I

15   appreciate you coming and I'm glad you are here today.  Thank

16   you for your service.  It's an important duty.

17          I wanted to start out this morning with talking about

18   myself just a little bit, my -- my face.  I don't know if you've

19   noticed, but there's a facial paralysis there.  I just wanted to

20   briefly explain that.  That when I was seven years old, I was

21   hit by a car, run over my head, cracked my skull, did some nerve

22   damage.  And so that facial paralysis doesn't -- my left side of

23   my face doesn't work.

24          And the reason I bring that up is because many times in

25   my life I have been misjudged because of that, because people

 1   misinterpret my expressions and they oftentimes think I'm angry

 2   or upset when I am not.  And I don't want that to be an issue

 3   here.

 4           So is there anyone that would take issue with my

 5   appearance on videos or photographs that we see in trials?  Is

 6   that an issue for anybody?

 7           (No response.)

 8           MR. RYAN BUNDY:  Thank you.  I appreciate that.

 9           By show of hands, if you had to decide right now with

10   what you've -- with what you know, who of you would lean towards

11   that I'm guilty today?  By show of hands.

12           (No response.)

13           MR. RYAN BUNDY:  Okay.  I appreciate that also.

14           Who of you, again by show of hands, believes that if a

15   man is arrested, that arrest alone is an indication of guilt?

16           (No response.)

17           MR. RYAN BUNDY:  Anybody?

18           (No response.)

19           MR. RYAN BUNDY:  Okay.  Appreciate that.

20           Who of you believe that Government sometimes makes

21   mistakes?

22           Okay.  Many of you.  Who of you believe that Government

23   does not make mistakes, that they're always right?  Is there

24   anyone who believes the Government doesn't make mistakes?

25           Okay.  Can ... Can you give us your number to begin

—2:16-cr-46-GMN-PAL—

1  with?

2          A PROSPECTIVE JUROR:  No. 129.

3          MR. RYAN BUNDY:  Say again.

4          (Court reporter interruption.)

5          A PROSPECTIVE JUROR:  129 ...

6          THE COURT:  It's still not working.  We might need

7  another battery.

8          MR. RYAN BUNDY:  Just make note of the time.  We're

9  losing some because of this?

10          THE COURT:  Yes.

11          A PROSPECTIVE JUROR:  129.  I just want to express that

12  every now and then I have observed that the Government

13  oversteps.  And sometimes they abuse the power and they don't

14  understand the lower arresting or whatever's going on.

15          MR. RYAN BUNDY:  Okay.  All right.  Well, thank you.

16  So I didn't fully understand your answer there, but correct me

17  if I'm wrong.  But you believe that the Government's not wrong

18  or cannot be wrong because people don't understand what they're

19  doing.  Is that correct?

20          A PROSPECTIVE JUROR:  Yes.  Because I see it with my

21  eyes and I seen it on television.  And sometimes they just

22  proceed too fast and they don't take the time to understand

23  what's going on.

24          MR. RYAN BUNDY:  Okay.  The Government doesn't or the

25  people don't?

2:16-cr-46-GMN-PAL

1          A PROSPECTIVE JUROR:  They just -- they just -- because

2     they are on power and they just go ahead with what they do.  And

3     they don't give the opportunity to the arrestee or other people

4     what they're doing.

5          MR. RYAN BUNDY:  Okay.  Thank you.  Thank you.

6          THE COURT:  So you're saying -- I'm not clear.  Were

7     you saying it's the Government or the person who's arrested who

8     doesn't understand what they're doing?

9          A PROSPECTIVE JUROR:  Well, you know, in my life I

10    experience that my nephew was arrested with a group of people,

11    and they rob.  And the guy that had the gun hand it over to my

12    nephew, and my nephew is arrested.  He's been in jail for over

13    20 years, and he was only 15 years old.  And I believe that he

14    is in jail unjustably [sic] because they did not investigate and

15    they arrested him.  And they did not proceed with the

16    investigation to find out who had the gun.  And only because

17    they found him with a gun, they -- they assumed that he was

18    responsible.

19         MR. RYAN BUNDY:  Okay.  Thank you, sir.  I appreciate

20    it.

21         So I want to ask about rights a little bit.  Who of

22    you -- or do you believe that Government sometimes violates

23    men's rights?  And I don't need to ask in hands on that.  Let me

24    go onto the next one.

25         Who of you believe that if the Government or an

2:16-cr-46-GMN-PAL

 1  employee of the Government were to violate a man's rights,

 2  should that man not defend his right?  Does anyone believe that

 3  if a man's rights are violated, they should not defend them?

 4          (No response.)

 5          MR. RYAN BUNDY:  Okay.  If Government or an employee

 6  thereof were to violate a man's rights, who here believes that

 7  the neighbor has no right to help that man defend his rights?

 8          (No response.)

 9          MR. RYAN BUNDY:  Okay.  Thank you.

10          This case involves men who, myself included, who truly

11  believe in God.  Who of you or if there are any of you who find

12  such belief in God foolish or would be annoyed if such a belief

13  was brought forth in trial?

14          Okay.

15          A PROSPECTIVE JUROR:  No. 120.

16          MR. RYAN BUNDY:  Can you explain yourself a little bit?

17          A PROSPECTIVE JUROR:  It's just to me personally it's a

18  logical fallacy.  I think that there is no God.  If there was a

19  God, I don't think he's worth worshipping.

20          MR. RYAN BUNDY:  Okay.  And so if the defendants were

21  to talk about a belief in God, would that affect your ability to

22  be favorable towards them?

23          A PROSPECTIVE JUROR:  I don't think it would affect my

24  ability to be favorable, but I do think it would annoy me

25  slightly.

2:16-cr-46-GMN-PAL

1              MR. RYAN BUNDY:  Okay.  Thank you.

2         And following up with that, we believe that men's

3   rights come from God.  Are there any of you who believe

4   differently?

5         Obviously, you do.  Is there anyone else besides him

6   that would believe differently?

7              (No response.)

8              MR. RYAN BUNDY:  And the question next would be is who

9   do you --

10             THE COURT:  Just a minute.  I think -- was there

11  someone with their hand up?

12             MR. RYAN BUNDY:  Oh, I'm sorry.  I missed it.

13             A PROSPECTIVE JUROR:  Thank you.  Juror No. 139.  Just

14  my feeling is that one's rights should not be derived from a

15  religious perspective.  They should be derived from a

16  people-driven perspective, coming from multiple backgrounds,

17  both religiously and ethnicity and from every walk of life.

18             MR. RYAN BUNDY:  Okay.  Do you believe that rights come

19  from the Government?

20             MR. SCHIESS:  Your Honor, I would suggest that these

21  are now inappropriate questions that do not appropriately test

22  the jurors for purposes of jury selection.

23             THE COURT:  Mr. Ryan Bundy, perhaps, you can rephrase

24  the question without referencing -- well, if you -- I think what

25  you're trying to find out is whether or not this person can be

 1  fair if he believes that people's rights are not derived from

 2  religion.  Maybe if you just keep to that area.

 3          MR. RYAN BUNDY:  True.  Okay.

 4          This case does deal with rights a lot.  So, if you do

 5  not believe that the rights come from God and say the defendants

 6  do, would that affect your ability in judging fairly?

 7          A PROSPECTIVE JUROR:  As long as the rights that you've

 8  derived for your own self, which that's where I derive my rights

 9  from, are in general parallelism with the rights set out by the

10  United States Government, then -- then, yes, it would -- I would

11  deem that to be -- I would be able to be partial and -- or

12  impartial.  I'm sorry.

13          MR. RYAN BUNDY:  All right.  Thank you.  Thank you.

14          The founding -- founding fathers of our country were

15  very adamant about protecting the rights of individuals

16  regardless of who we decide they come from.  And these are

17  expressed in the Bill of Rights, the first 10 amendments to the

18  Constitution.  Who of you have heard of the right to redress of

19  grievances?  Anyone heard of that right?

20          You have.  Okay.  Thank you.  I don't need a comment on

21  that.  I just wanted a show of hands.  So thank you.

22          The next one I do want a show of hands is, who here

23  does not fully understand what redress of grievance means?

24          Okay.  Pretty much everybody.  Okay.  And if you had an

25  opportunity to learn what redress of grievances truly means, who

1   here would not take that opportunity?

2          (No response.)

3          MR. RYAN BUNDY:  Okay.  On the same note, another one

4   of those rights the founding fathers protected is the right to

5   keep and to bear arms emphatically, stating that this right

6   shall not be infringed.  Who here has a full understanding of

7   why our founding fathers so explicitly protected that right?

8          MR. SCHIESS:  Your Honor, Your Honor, I respectfully --

9   and I appreciate that Mr. Bundy needs his time, but I believe

10  that we need to confine questions that go to fairness and

11  impartiality as opposed to constitutional doctrine.

12         THE COURT:  Well, I think that these questions do

13  address issues that Mr. Ryan Bundy has a need to find out more

14  about, whether it's perhaps not phrased as artfully as it could

15  be.  And I think that these are questions, but I think if you're

16  asking questions for people to raise their hands and that's not

17  recorded in the record, it's not making much of a record.

18         So if we can go back to the question about addressing

19  grievances, and I think the question was whether the jury was

20  aware of that phrase or the meaning and the definition of the

21  phrase.  And he had jurors raise their hand if they did not know

22  what that meant, and it looked like almost everyone raised their

23  hand, except for juror No. 105 did not raise his hand.  So I'm

24  assuming that means he does know what that means or did I just

25  not see his hand raised?  So that's why I think we need to be

PATRICIA L. GANCI, RMR, CRR, CCR 937    (702) 385-0670

 1  careful and ...

 2          MR. RYAN BUNDY:  Okay.  So back to the question then.

 3          THE COURT: ... who is raising a hand and who's not.

 4          MR. RYAN BUNDY:  Okay.  Let's do that.  I'll reask the

 5  question then.  Who does not fully understand what the term

 6  redress of grievance means?

 7          And can we get a recorder?  How do we want to record

 8  this?  Just --

 9          THE COURT:  Maybe do the opposite.  Who believes they

10  are -- understand what redress of grievance means?

11          MR. RYAN BUNDY:  Okay.  Who believes they understand

12  what redress of grievance does mean?  Does anybody?

13          (No response.)

14          MR. RYAN BUNDY:  So then continuing on now with the

15  Second Amendment question, the right to keep and to bear arms.

16  Again, who feels that they have a full understanding of the

17  purpose and reason our founding fathers explicitly protected

18  that right?  Okay.  Can we give them ...

19          A PROSPECTIVE JUROR:  122.

20          (Court reporter interruption.)

21          MR. RYAN BUNDY:  Pass the mic to them and just state

22  your numbers.  I don't want a comment.

23          A PROSPECTIVE JUROR:  135.

24          A PROSPECTIVE JUROR:  131.

25          A PROSPECTIVE JUROR:  120.

1           A PROSPECTIVE JUROR:  122.

2           MR. RYAN BUNDY:  Okay.  And so for the rest of you who

3    do not fully understand that, if you had an opportunity to learn

4    about that right and why our founding fathers protected it, who

5    would not take that opportunity?

6           (No response.)

7           MR. RYAN BUNDY:  So if you had an opportunity to learn

8    why our founding fathers truly put the Second Amendment in

9    there, you would all be interested in learning about that.  Is

10   that correct?

11          Okay.  Thank you.  In Article 6 of the Constitution it

12   states that this Constitution is the supreme law of the land.

13   Who here would find fault with that statement?

14          (No response.)

15          MR. RYAN BUNDY:  No one.  Who here would believe that

16   the Constitution is out of date or obsolete?

17          Okay.  Pass the mic to them, please.  State your

18   number.

19          A PROSPECTIVE JUROR:  Juror 139.  I just don't feel

20   that the pace at which the Constitution and Government agencies

21   can keep up with the changing world that we live in is -- is a

22   quick enough process.  So I don't think that it is necessarily

23   in date or that it ever could be.  So I think there's always

24   some gray area that -- that's why we're here.

25          MR. RYAN BUNDY:  All right.  So a lot of this case is

 1   going to be based upon constitutional rights.  If the Defense

 2   were making a stand based upon a constitutional right, would

 3   that make it -- you unable to rule in their favor, judge

 4   favorably towards them?

 5         A PROSPECTIVE JUROR:  I don't think so.  I -- I mean, I

 6   just think that those constitutional rights aren't necessarily

 7   100 percent black and white.  Like, there's definitely some

 8   nuanced gray area in there where the argument is probably most

 9   likely in this case.

10         (Defense conferring.)

11         MR. RYAN BUNDY:  Okay.  Well, thank you.  Can you pass

12   that onto the next ...

13         A PROSPECTIVE JUROR:  Yes.

14         A PROSPECTIVE JUROR:  135.  I don't think when our

15   founding fathers gave us the right to bear arms that they had

16   AK-47s or semiautomatic or automatic weapons in mind.  They were

17   using muskets and pistols, so I think it's kind of out of date.

18         MR. RYAN BUNDY:  On just that issue or on other issues?

19         A PROSPECTIVE JUROR:  That one in particular.

20         MR. RYAN BUNDY:  In particular.  And so do you believe

21   that your opinion there would hinder in your ability to judge

22   this case?

23         A PROSPECTIVE JUROR:  No, I still think I would try to

24   be fair.  If it's something you've never done, I'll -- the best

25   you can do is try.

—2:16-cr-46-GMN-PAL—

1          MR. RYAN BUNDY:  Okay.  All right.  Thank you.  Pass

2    that on down to the other one.

3          A PROSPECTIVE JUROR:  Jury 131.  I share the same

4    opinion as the other juror on the Second Amendment.  I don't

5    believe that our founding fathers believed that the average

6    civilian can gain a weapon of terror and mass hysteria that can

7    cause such damage and think it would be okay.  I understand the

8    Second Amendment was so we could defend ourselves from domestic

9    and abroad, but I don't think that they had any mind what would

10   happen in the next 100, 200 years in a sense.

11         MR. RYAN BUNDY:  Okay.  So my previous question was

12   concerning the supremacy where the Constitution states that it

13   is the supreme law of the land.  So then do you believe that the

14   Second Amendment, which is the right to keep and bear arms, is

15   improper?

16         A PROSPECTIVE JUROR:  No.  I believe in that right, but

17   I also believe that times have changed and amendments have been

18   added.  And I think that more should be added onto previous

19   ones.

20         MR. RYAN BUNDY:  Okay.  All right.

21         And so your neighbor there is also shaking his head.

22         A PROSPECTIVE JUROR:  Yeah, they seek fundamental

23   rights that has been defined in the Constitution.  That has not

24   changed.

25         THE COURT:  What jury number are you, sir?

1          A PROSPECTIVE JUROR:  130.

2          THE COURT:  Thank you.  130.

3          MR. RYAN BUNDY:  So --

4          THE COURT:  Can you repeat your answer?

5          A PROSPECTIVE JUROR:  Yes, let me rephrase it.  The

6    basic fundamental rights, that includes -- which includes right

7    to bear arms has not changed.

8          MR. RYAN BUNDY:  Okay.  Thank you.

9          A PROSPECTIVE JUROR:  But there are amendments which

10   have been made after that and probably will be made in the

11   future because of time has changed, the situation has changed,

12   the environment has changed.  So that may be the problem, but

13   coming back to the fundamental rights, the right to bear arms

14   has not changed.

15         MR. RYAN BUNDY:  Okay.  And then there's one more man.

16   Did you make -- was there one more that wanted to comment?  No.

17   Okay.

18         All right.  So moving on --

19         THE COURT:  Few more minutes, Mr. Bundy.

20         MR. RYAN BUNDY:  Say again?

21         THE COURT:  Two more minutes.  I'm giving you three

22   extra because of the battery on the ...

23         MR. RYAN BUNDY:  All right.  I want to ask -- I do want

24   to make a point that the redress of grievance that we spoke

25   about earlier comes from the First Amendment.  It's part of the

—2:16-cr-46-GMN-PAL—

 1  freedom of speech and so it refers to that, so ...

 2         I want to ask about who here would believe that a man's

 3  thoughts alone could convict him?  Anyone believe that just a

 4  man's thoughts?

 5         (No response.)

 6         MR. RYAN BUNDY:  Okay.  Who here believes that a man

 7  must actually commit some act to be a crime?

 8         Okay.  Thank you.  And I want to explore that just a

 9  little bit farther.  Even if a man -- let's say he was upset.

10  He was angry.  He had a bad day, you know.  He said something

11  that, you know, maybe he thought or even said something, you

12  know, Dang, I wish I just like grind those people into the

13  ground.  Would a -- would a comment like that that's attached to

14  his thought be enough to convict him of a crime?  Who here would

15  believe that?

16         You kind of raised your hand a little bit?

17         A PROSPECTIVE JUROR:  Jury 95.  Yeah, sometimes when

18  you're in the heat of the moment, you say stuff that you really

19  don't mean and ...

20         THE COURT:  Can you speak into the microphone a little

21  more?

22         A PROSPECTIVE JUROR:  Yeah, jury 95.

23         THE COURT:  Thank you.

24         A PROSPECTIVE JUROR:  Sometimes you get into the heat

25  of the moment.  Your emotions can take -- you know, can overtake

1   what your thoughts are.  And sometimes you overact on stuff that

2   sometimes you -- common sense you don't use.

3           MR. RYAN BUNDY:  Okay.  So, in other words, the answer

4   to my question then would be, no, something like that is not

5   enough to convict a man?

6           A PROSPECTIVE JUROR:  Right.

7           MR. RYAN BUNDY:  Okay.  Thank you.

8           Does anyone here believe different than that?

9           (No response.)

10          MR. RYAN BUNDY:  Appreciate it, so ...

11          THE COURT:  Time's up, Mr. Ryan Bundy.

12          MR. RYAN BUNDY:  Okay.  Thank you for your service.

13  Thank you for coming.  And hope to see you again soon.

14          THE COURT:  Thank you.  Mr. Schiess?

15          MR. SCHIESS:  Thank you, Your Honor.

16          Folks, you've heard a number of questions from

17  Mr. Bundy, and you've read the questionnaire, and you've been

18  here now for a little over a day.  So you kind of get some idea,

19  although limited, what the message that is being offered here.

20  Does anybody, by show of hands, support the message that you've

21  heard from the Defense?

22          MR. WHIPPLE:  Judge, I'm going to object.  I don't know

23  what my message is.  It's varied every time I ask a different

24  question.  So I think ambiguous and inappropriate.

25          THE COURT:  Rephrase the question, Mr. Schiess?

———— 2:16-cr-46-GMN-PAL ————

1           MR. SCHIESS:  Sure.

2           Does any -- based on what you've heard so far, does

3  anybody feel sympathy towards the Defense?

4           (No response.)

5           MR. SCHIESS:  I see no hands going up.

6           I see one hand going up in the back.  And is that based

7  upon the conversations that we've had earlier outside the

8  presence of the rest of the jury?

9           A PROSPECTIVE JUROR:  Yes.

10          MR. SCHIESS:  Okay.  Thank you.  And that would be

11  juror No. 133.

12          A PROSPECTIVE JUROR:  133.

13          MR. SCHIESS:  Okay.  Thank you.

14          All right.  You were asked a couple of questions

15  about -- I'm sorry -- about the Constitution.  Does anybody

16  think that the Constitution gives you a right to raise a gun to

17  defend your personal beliefs?

18          (No response.)

19          MR. SCHIESS:  I see no hand -- one hand, please.  Sir,

20  number please.

21          A PROSPECTIVE JUROR:  122.

22          MR. SCHIESS:  Okay.  I'm taking about your personal

23  beliefs now.

24          A PROSPECTIVE JUROR:  No, I believe the Constitution

25  gives you the advantage to be able to protect your rights.  In

—2:16-cr-46-GMN-PAL—

 1   other words, if you're on the street or somewhere and you're

 2   accosted by someone that's going to violate your rights, you

 3   can't wait for the Government to come and help you sometimes.

 4   You understand what I mean?

 5            MR. SCHIESS:  Okay.  I do.  Thank you.  Thank you.

 6   That's where the -- that's where someone's acting unlawfully

 7   towards you.  Is that correct?

 8            MS. WEKSLER:  Objection calls for a legal conclusion,

 9   Judge.

10            (Court reporter interruption.)

11            MR. SCHIESS:  Would you please -- for the purposes of

12   the court reporter, would you please repeat your answer?

13            A PROSPECTIVE JUROR:  Okay.  I believe that if someone

14   is coming towards you to violate your rights --

15            MS. WEKSLER:  Your Honor, I'm going to object to this.

16   There was an objection pending that was not ruled upon.

17   Perhaps, this is a matter that could be taken up at sidebar?

18            THE COURT:  Objection is overruled.  He may answer the

19   question.

20            MR. SCHIESS:  Please.

21            A PROSPECTIVE JUROR:  Okay.  If someone is coming to

22   violate your rights in some way, personally or by force or

23   something, you have a right to protect yourself and stop that

24   person.  You can't wait always for the Government to come and do

25   it for you.  I mean, every situation is different of course;

1  but, yeah, you have the right to do that.  You have the right to

2  protect yourself and your rights.

3          MR. SCHIESS:  Thank you for your answer.  Let me move

4  on.  My clock is ticking a little bit, and I want a lot to

5  cover.

6          When outside of this courthouse down by the steps, the

7  front steps, there are a number of people who have signs up that

8  are advocating their views of this case.  Did anybody see those

9  signs?

10          Sounds like -- well, let me do it the other way.

11  Everybody put your hands down.  Anybody not see those signs?

12  Would you please give your two numbers, please?

13          A PROSPECTIVE JUROR:  113.

14          A PROSPECTIVE JUROR:  103.

15          MR. SCHIESS:  Okay.  Does -- with seeing those people

16  advocating their position, would that -- for those of you who

17  said that you saw those, would that affect your ability to be

18  fair and impartial in this case?  If you think that will affect

19  you, please put your hand up.

20          (No response.)

21          MR. SCHIESS:  Do you think that you could ignore what

22  you saw and appreciate that those people are simply exercising

23  their First Amendment rights and listen to the evidence and

24  decide the evidence on the case?  Is that correct?

25          Anybody who can't do that will be easier.  If you can't

—2:16-cr-46-GMN-PAL—

1  do that, please raise your hand.

2          (No response.)

3          MR. SCHIESS:  Anybody not understand my question?

4          (No response.)

5          MR. SCHIESS:  Okay.  Thank you.

6          Juror No. 61, you made or answered one of the questions

7  that you may be dissatisfied with how law enforcement officers

8  have conducted themselves at protests.  Do you remember giving

9  that answer?

10          A PROSPECTIVE JUROR:  No.

11          MR. SCHIESS:  Have you had any experiences where you

12  were dissatisfied with how police officers handled protests?

13  Okay.

14          A PROSPECTIVE JUROR:  Every situation is different.

15  You know, most of the time when you see something and the

16  officer is in trouble, you don't see what went on 10 minutes

17  before.  So -- so you really don't know.  You have to be there

18  and see what's going on before you can make an informed opinion.

19  You know, different things, different times.

20          MR. SCHIESS:  Thank you.  Now, juror No. 81, was he --

21  sir.  He's the one gone.  Thank you.

22          How about juror No. 120?  I think you also answered the

23  question that you may be dissatisfied with how police officers

24  have handled themselves at protests.  Can you elaborate, please?

25          A PROSPECTIVE JUROR:  120.  It's just what I've seen in

1   the media.  I don't pay attention to the news that much, and I

2   know they blow those things out of proportion big time.  I think

3   that the police here are great.  I think the police in

4   Henderson, my home city, suck because they stop me all the time

5   for no reason.

6           MR. SCHIESS:  Okay.  Well, can you put that experience

7   out of your mind and listen to the facts of this case?

8           A PROSPECTIVE JUROR:  Yeah.  When it comes to police,

9   I've got family -- like, well, distant family that are police

10  officers.  I don't think any of them are bad.  It really does

11  depend on the situation they're in.  It's just I've been stopped

12  by police that said they were doing it just because they were

13  bored.

14          MR. SCHIESS:  All right.  Thank you for that.  I'm

15  going to move on with this.

16          A number of you answered -- there was about four

17  questions in the questionnaire, the long one, that asked if any

18  of you had reservations or felt like you could not pass judgment

19  upon a number -- or upon people.  Do you remember that

20  questions?

21          Okay.  I'm just going to go real quick.  Now, let me

22  just make sure we're really clear on this.  You know, it's one

23  thing to just say we can't and shouldn't judge others, which I

24  think we all agree with is a human nature.  It's a different

25  setting to be within a courtroom where we have to listen to the

1  facts and apply the law and then decide guilt or innocence.

2        Does anybody feel that in the latter context that I

3  just gave that you cannot sit in the courtroom, listen to the

4  evidence, and decide guilt or innocence?  If you feel that way,

5  could you raise your hand?

6        (No response.)

7        MR. SCHIESS:  I see no hands going up.

8        So let me rephrase it just to make sure we're all on

9  the same page.  Does anybody have a deeply held religious view

10 or personal view that would prevent you from being a juror and

11 deciding whether the Government has met its burden of proof?

12 Raise your hand if you feel that that applies to you.

13        (No response.)

14        MR. SCHIESS:  Okay.  No hands.  Thank you.

15        You will be instructed that it is only for the Court to

16 decide the punishment.  That when you're deciding whether the

17 Government's met its burden, whether Defense is guilty or

18 innocent, you are not to consider punishment.  Does anybody, by

19 a show of hands, feel like that they may consider punishment or

20 punishment may creep into their thoughts?  At all.

21        (No response.)

22        MR. SCHIESS:  So by no hands, so we're on the same

23 page, that nobody will consider punishment in deciding the facts

24 of the case.  Is that correct?

25        Okay.  Juror No. 95, sir, you were asked a couple of

2:16-cr-46-GMN-PAL

1  questions yesterday about the shooting that occurred on 10/1 and

2  that emotions may creep into your feelings as you hear the

3  events.

4         A PROSPECTIVE JUROR:  That is correct, yeah.

5         MR. SCHIESS:  Do you appreciate that the case that you

6  are asking or we're questioning you about is completely

7  separate --

8         A PROSPECTIVE JUROR:  Yes, it is.

9         MR. SCHIESS:  -- from that?

10        A PROSPECTIVE JUROR:  Yes.

11        MR. SCHIESS:  And do you appreciate that as tragic as

12 those events are of 10/1 that they relate to a different matter

13 and not this one?

14        A PROSPECTIVE JUROR:  Right.

15        MR. SCHIESS:  Okay.  With that in mind, knowing that we

16 all still feel the emotion of 10/1, when those feelings come,

17 can you separate those from this case?

18        A PROSPECTIVE JUROR:  Yes, I could.

19        MR. SCHIESS:  Okay.  So can you give the Court your

20 assurance if those emotions come, you will just focus solely on

21 the evidence that comes in?

22        A PROSPECTIVE JUROR:  Yes.

23        MR. SCHIESS:  And the law as the Court gives it to you?

24        A PROSPECTIVE JUROR:  Right.

25        MR. SCHIESS:  Okay.  Thank you.

—2:16-cr-46-GMN-PAL—

1            You're a surveillance operator?

2            A PROSPECTIVE JUROR:  Yes.

3            MR. SCHIESS:  Is that what's your employment?

4            A PROSPECTIVE JUROR:  Yes.

5            MR. SCHIESS:  Where do you work?

6            A PROSPECTIVE JUROR:  New York New York.

7            MR. SCHIESS:  Okay.  Is that a -- for the hotel casino?

8            A PROSPECTIVE JUROR:  Yeah.

9            MR. SCHIESS:  Okay.  Thank you.

10            No. 121, you were asked questions about guns.  And it

11   sounds like you've been the victim of a couple of bank robberies

12   with your work?

13            A PROSPECTIVE JUROR:  Yes, that's correct.

14            MR. SCHIESS:  Where guns may have been pointed at you?

15            A PROSPECTIVE JUROR:  Yes.

16            MR. SCHIESS:  How did that make you feel?

17            A PROSPECTIVE JUROR:  Quite scared.

18            MR. SCHIESS:  And so you appreciate the feeling that

19   comes from guns being pointed?

20            A PROSPECTIVE JUROR:  Of course.

21            MR. SCHIESS:  Okay.  Thank you.

22            No. 124, sir.  Thank you.  You indicated that you get

23   your news from Michael Savage, among other sources?

24            A PROSPECTIVE JUROR:  Yes, sir.

25            MR. SCHIESS:  What do you think about Michael Savage?

—2:16-cr-46-GMN-PAL—

 1          A PROSPECTIVE JUROR:  I think he's an interesting guy,

 2  kind of a conspiracy theorist which I don't really agree with,

 3  but I kind of like seeing all different points or all different

 4  views.  So, I don't know.  He's entertaining, let's say that.

 5          MR. SCHIESS:  Okay.  Has anybody ever accused you of

 6  being a conspiracy theorist?

 7          A PROSPECTIVE JUROR:  Yeah, you can say that.  Yeah.

 8          MR. SCHIESS:  Okay.  Do you agree with them or not?

 9          A PROSPECTIVE JUROR:  No, no.  Just because I look at,

10  you know, both sides.  I don't look at just one.

11          MR. SCHIESS:  Okay.  Thank you.

12          A PROSPECTIVE JUROR:  So, no, I don't have any -- you

13  know, my own theories on what actually happened.  I try to look

14  at facts.

15          MR. SCHIESS:  Okay.  Thank you very much.

16          126.  Right there.  Thank you.  Hey, we haven't heard

17  much from you at all during this.  I don't know if you've ever

18  answered a question.  Can you tell us what your feelings are

19  about having sat here now for a little over a day?

20          A PROSPECTIVE JUROR:  Say again, sir.

21          MR. SCHIESS:  What are your feelings about this --

22  about being considered to be a juror for the -- this case?

23          A PROSPECTIVE JUROR:  Well, I'm excited.

24          MR. SCHIESS:  You're excited about it.  Why are you

25  excited?

2:16-cr-46-GMN-PAL

1            A PROSPECTIVE JUROR:  Well, it's my duty to be here,

2    so ... and ...

3            MR. SCHIESS:  Is there anything about your experience

4    that makes you lean to one side, the Defense or the Government?

5            A PROSPECTIVE JUROR:  Past experience for me or ...

6            MR. SCHIESS:  Yes, for you.

7            A PROSPECTIVE JUROR:  For me, no.

8            MR. SCHIESS:  Anything that you've heard so far that

9    you think you would favor one party or the other party at the

10   very beginning of this trial as you sit here?

11           A PROSPECTIVE JUROR:  No.

12           MR. SCHIESS:  Okay.  Thank you.

13           No. 118.  There we go.  Okay.  On the supplemental

14   questionnaire, the one you filled out yesterday morning, you

15   were asked what you -- you were asked if you thought that if

16   someone pointed a gun at somebody else that they could do it in

17   a nonthreatening way.  Okay.  I'm getting the signals not to go

18   there.  I'm running out of time so let me just move on.  So

19   thank you in that part.

20           No. 25, are you -- real quick question for you.  You've

21   indicated that your wife works as a worker's compensation --

22   handling some of Metro's claims.  Is that correct?

23           A PROSPECTIVE JUROR:  Yes.

24           MR. SCHIESS:  A number of the witnesses in this case

25   will be with Metro.  I think you've recognized some of their

———— 2:16-cr-46-GMN-PAL ————

 1  names?

 2          A PROSPECTIVE JUROR:  She has.

 3          MR. SCHIESS:  Oh, she has.  Did you show her the list?

 4          A PROSPECTIVE JUROR:  Yes, we went through the list

 5  together.

 6          MR. SCHIESS:  Did you discuss this case at all with

 7  her?

 8          A PROSPECTIVE JUROR:  She's helping me fill out the

 9  form.

10          MR. SCHIESS:  Oh, was she?

11          A PROSPECTIVE JUROR:  And I put that I marked --

12  because I didn't -- I wanted to be totally honest that some of

13  those police officers were in her caseload.

14          MR. SCHIESS:  Uh-huh.  And did she help you fill out

15  the entire form with you?

16          A PROSPECTIVE JUROR:  No.  Just the witnesses because

17  we're connected, obviously.

18          MR. SCHIESS:  Yeah.  Now, part of that connection with

19  her, is that going to influence you one way or the other?

20          A PROSPECTIVE JUROR:  No.  We -- we are kind of split

21  on political beliefs and all kinds of, but I still love her.

22          MR. SCHIESS:  Okay.  Well, let me ask you about a

23  couple of beliefs that you've indicated or views or opinions.

24  You said that you have very -- in so many words.  And I'm not

25  trying to put words in your mouth, correct me if I'm wrong, that

PATRICIA L. GANCI, RMR, CRR, CCR 937    (702) 385-0670

1   you have some very strong negative feelings about Eric Holder's

2   conduct as the Attorney General under President Obama?

3          A PROSPECTIVE JUROR:  Yes.

4          MR. SCHIESS:  And that you have some very strong

5   feelings about -- that Jim Comey's conduct as the Director of

6   the FBI has brought discredit to the FBI?

7          A PROSPECTIVE JUROR:  Yes.

8          MR. SCHIESS:  And that you feel some bias against the

9   FBI?  Did I read that or am I reading too much into that?

10         A PROSPECTIVE JUROR:  I think you went a step further.

11  I have bias towards Comey and Eric Holder.

12         MR. SCHIESS:  Okay.  So let me ask you this question.

13  This -- when this conduct occurred, President Obama was the

14  President, Eric Holder was the AG, Attorney General --

15         A PROSPECTIVE JUROR:  Correct.

16         MR. SCHIESS:  -- and Comey was the Director of the FBI.

17  And some of the witnesses who will come from the FBI worked for

18  them.  Will any -- and, you know, obviously being Department of

19  Justice, we used to work for Eric Holder.  Does any of that --

20  would any of that -- does that give you any pause to be

21  concerned about us?

22         A PROSPECTIVE JUROR:  No.

23         MR. SCHIESS:  You know, we've heard the analogy that we

24  have to start off on a level playing field.  Makes sense, right?

25         A PROSPECTIVE JUROR:  Right.

—2:16-cr-46-GMN-PAL—

1          MR. SCHIESS:  Would any of your -- do you have strong

2    enough views to say that maybe the Government's -- the table's

3    tipping downhill against the Government; we have to start by

4    digging ourselves out of a hole a little because of your views

5    about Comey and Holder and --

6          MS. WEKSLER:  Judge, you know, I object.  That's not

7    the standard.  The standard is proof beyond a reasonable doubt

8    in this case.  We start at -- we start out where the defendant

9    is not guilty --

10         THE COURT:  And that's what Mr. Schiess said.

11         MS. WEKSLER:  Well --

12         THE COURT:  It's an even playing field.  So his

13   question was whether or not the Government would be starting off

14   behind that level playing field, a step below.

15         MS. WEKSLER:  And my objection is that it's not an even

16   playing field, Your Honor.  That's my objection.  I object to

17   the way in which he characterizes the system.

18         MR. RYAN BUNDY:  I join that objection.

19         MR. SCHIESS:  All right.  Let me ask this.

20         THE COURT:  Objection is overruled.

21         MR. SCHIESS:  You understand that the Government has

22   the burden of proof, right?

23         A PROSPECTIVE JUROR:  Absolutely.

24         MR. SCHIESS:  Everybody understands we have the burden

25   of proof and we welcome it.  With that having been said, though,

─ 2:16-cr-46-GMN-PAL ─

1  do you feel like we're going to have to prove more than,

2  perhaps, the burden of proof to be able to --

3           A PROSPECTIVE JUROR:  Because of my beliefs towards

4  Comey?

5           MR. SCHIESS:  Yes, sir.  You've got it right on.

6           A PROSPECTIVE JUROR:  No.

7           MR. SCHIESS:  Okay.  Thank you.

8           Juror No. 129.  129.  Yeah, all the way in the back,

9  please.

10           I'd like to follow-up on your concerns that you have

11  about your nephew being in jail unjustly and for a very long

12  time, and my understanding goes with you to that.  Is there

13  anything about that circumstance that makes you also feel like

14  the Government in this case will have to prove more than what

15  the law requires us to prove?

16           A PROSPECTIVE JUROR:  Well, I need to explain that at

17  the same time I believe that my nephew broke the law for being

18  together with the wrong people.

19           MR. SCHIESS:  Okay.

20           A PROSPECTIVE JUROR:  But at the same time I don't

21  believe that he is in jail and the guy that was holding the

22  ball -- the gun is running around free.

23           MR. SCHIESS:  Oh, I see.  Okay.  Now, that's a very

24  painful situation for you, right?

25           A PROSPECTIVE JUROR:  Well ...

1           MR. SCHIESS:  Of course.

2           A PROSPECTIVE JUROR:  You know, first of all, you don't

3  break the law.

4           MR. SCHIESS:  Okay.

5           A PROSPECTIVE JUROR:  Secondly, I understand the

6  situation he was in, but he shouldn't be there.  But at the same

7  time he -- there are consequences when you break the law, and I

8  agree with the law.

9           MR. SCHIESS:  Okay.  So with your agreement with the

10  law you feel like the Government will start on an even playing

11  field or we're going to have to dig ourselves out of a hole on

12  that?

13           A PROSPECTIVE JUROR:  Well, what bothers me in my mind

14  is that there should have been a more thorough investigation and

15  they should have found out exactly who was holding the gun, but

16  they believe my nephew was guilty because he was holding the

17  gun.

18           MR. SCHIESS:  Okay.  Thank you.  Oh, I'm sorry.

19           A PROSPECTIVE JUROR:  He didn't know what to do with

20  the gun.  He was just holding it, and they arrested him.  They

21  didn't give him a chance to explain, and when he said, It was

22  not me holding it, they give it to me.

23           MR. SCHIESS:  So you want to make sure people have the

24  opportunity to explain everything fully and the investigations

25  are complete?

————— 2:16-cr-46-GMN-PAL —————

1           A PROSPECTIVE JUROR:  No, that's fine.

2           MR. SCHIESS:  Okay.  Thank you.  Thank you so much for

3    your answer.

4           A PROSPECTIVE JUROR:  I'm trying to explain that he

5    broke the law, too.

6           MR. SCHIESS:  Okay.  Thank you.

7           Along that line, how many of you would say, by a show

8    of hands, that you have any negative feelings about federal

9    prosecutors?  We're federal prosecutors.  We work for the United

10   States.  Anybody have any negative feelings?  Does anybody feel

11   like the Federal Government over -- or the prosecutors overreach

12   when we bring charges?  By a show of hands.

13          (No response.)

14          MR. SCHIESS:  Along this line of the Federal

15   Government, does anybody feel like, by show of hands, that the

16   Federal Government is too involved in our lives?

17          (No response.)

18          MR. SCHIESS:  I see no hands going up there.

19          THE COURT:  Last question, Mr. Schiess.

20          MR. SCHIESS:  What's that?

21          THE COURT:  Last question.

22          MR. SCHIESS:  Okay.  Thank you, Your Honor.

23          Well, let me just ask it this way.  Is there anything

24   else we should know about you or is there anything that we've

25   missed so that we can make a decision of whether we feel like

1  you could be really fair in this case?  Sir.

2          A PROSPECTIVE JUROR:  122.

3          MR. SCHIESS:  122.

4          A PROSPECTIVE JUROR:  When I was looking at that list

5  yesterday and they had the sheriff as one of the possible

6  witnesses, ex, former sheriff, Doug Gillespie.

7          MR. SCHIESS:  Doug Gillespie, yes, sir.

8          A PROSPECTIVE JUROR:  And I've probably run across him

9  maybe a half a dozen times over 30 years.  We would know each

10  other, but I don't know him.  I don't know if he's married, has

11  kids, or whatever.  It's just by chance.  I figured I'd just say

12  that.  When I went home last night, it kind of bothered me.

13  Well, yeah, I know him, but I don't know him.

14          MR. SCHIESS:  So was it more in the professional

15  context where he was the sheriff?

16          A PROSPECTIVE JUROR:  Yes, yes, yes.

17          MR. SCHIESS:  Was there anything about the way his

18  professionalism, his conduct, the way he handled himself, that

19  would make you want to question him as a witness more or think

20  about whether he's being truthful?

21          A PROSPECTIVE JUROR:  You mean during this -- during

22  the dispute?

23          MR. SCHIESS:  Yes.

24          A PROSPECTIVE JUROR:  During that time I was in Iraq

25  and Afghanistan advising the Corp over there, so I really

─── 2:16-cr-46-GMN-PAL ───

 1  didn't -- except some snippets, I really didn't know what was

 2  going on.  So I couldn't answer that question.

 3          MR. SCHIESS:  Okay.  Okay.  And so what was your role

 4  in -- overseas?

 5          A PROSPECTIVE JUROR:  I was -- I was a Metro detective

 6  years ago.  I retired many years ago.  And although we never

 7  interacted, he was always some place else, but probably half a

 8  dozen times I probably bumped in him.  I couldn't tell you where

 9  he was assigned or anything during that time.  He became sheriff

10  long after I retired.

11          MR. SCHIESS:  So let me follow-up on that.  Is there

12  anything about your experience as a Metro detective that -- can

13  you be -- keep it as a level playing field as a Metro detective?

14          A PROSPECTIVE JUROR:  You have to.  I mean, my specific

15  thing was child sexual abuse.  You can't just -- it's -- you

16  know, it's complex cases.  So you have to have an open mind.

17  You always do.

18          MR. SCHIESS:  Okay.  Is there -- as a Metro detective,

19  do you feel that you would judge this case harsher or more

20  lenient than you would if you were not a police officer?

21          A PROSPECTIVE JUROR:  What?  This case?

22          MR. SCHIESS:  Yes.

23          A PROSPECTIVE JUROR:  Oh, no.  Like I said, I know

24  nothing about this case.  But, no, I'll look at the evidence.

25  That's what I -- that's what I did.

1          MR. SCHIESS:  Okay.  And does everybody agree with the

2    juror that you will just look at the evidence and apply it

3    fairly?

4          Okay.  Thank you very much.  And, Your Honor, thank

5    you.

6          THE COURT:  I have a question for -- thank you,

7    Mr. Schiess.  I have a question for juror No. 122.  Did I hear

8    correctly that you are a retired Las Vegas Metropolitan

9    detective?

10          A PROSPECTIVE JUROR:  Yes.

11          THE COURT:  So how many years did you work in Las Vegas

12    with the police department?

13          A PROSPECTIVE JUROR:  I'm sorry.  How many what?

14          THE COURT:  How many years?

15          A PROSPECTIVE JUROR:  Well, actually I went 18 and a

16    half years, and I was 10 years in New York City before that.

17          THE COURT:  All right.  So in the 18 -- so you were

18    here 18?

19          A PROSPECTIVE JUROR:  18 and a half while I was here,

20    and I retired in 1998.

21          THE COURT:  All right.  And during that time, did you

22    know any of the individuals listed on the witness list --

23          A PROSPECTIVE JUROR:  Oh.  No, ma'am.

24          THE COURT:  -- who are police officers?

25          A PROSPECTIVE JUROR:  No, I looked at all of those

— 2:16-cr-46-GMN-PAL —

1    names.  I'm not familiar with any of them.

2              THE COURT:  So which -- which detail or department were

3    you assigned to?

4              A PROSPECTIVE JUROR:  I'm sorry, ma'am?

5              THE COURT:  Which area or what was your assignment as a

6    Metro detective?

7              A PROSPECTIVE JUROR:  Oh.  What my assignments were?

8              THE COURT:  Yes.  Did you say something about child

9    abuse?

10             A PROSPECTIVE JUROR:  Northeast end of town.  I used to

11   do patrol a little bit on the west end of town.  Let me see

12   where else did I go.  I did a little stint in Moapa until they

13   got a fill-in over there.  Then I was back in the northeast end

14   of town.  That's where I spent probably most of my career there.

15   Then I went to the detective bureau which was -- of course

16   covered the whole area.  I guess on -- out in the boonies I did

17   handle some of the sexual assault cases in Logandale and Moapa.

18   I'd have to go out there occasionally, but I never had a name --

19   I never recognized any of the names that were on there, on that

20   list.

21             THE COURT:  Thank you.

22             All right.  We're going to go ahead and let the jury

23   take a bathroom break, about 15, 20 minutes.  There's not that

24   many of you so it might not take the full 20, but we'll give you

25   some time to stretch and use the restroom.

1          Please remember that during this time you are not to
2  discuss this case with anyone nor permit anyone to discuss it
3  with you.  You can speak to your fellow jurors about other
4  things, but not about this case.  Please do not listen to, read,
5  or view anything that touches upon this case nor attempt to
6  perform any research or any independent investigation.  And do
7  not form any opinion.  You haven't heard any evidence yet.
8          We will go ahead and excuse you and welcome you back in
9  about 20 minutes.  So it's 10:45.  We'll welcome you back about
10 11:05.
11         (Whereupon jury panel leaves the courtroom at
12 10:45 a.m.)
13         THE COURT:  All right.  Everyone else may take their
14 break, too, and then when we return, please be prepared to
15 address if there are any further motions for cause that you
16 would like me to address.
17         MS. WEKSLER:  Your Honor, before the Court -- there was
18 an opportunity for the Government to do rebuttal.  I requested
19 time for rebuttal.  I was not allowed the ability to do that.
20 Mr. Ryan Bundy was willing to give me part of his time to do
21 some of this type of rehabilitating questioning that the
22 Government just did.  And so I would like that same opportunity
23 as well.
24         THE COURT:  No, the Government has the burden in this
25 case.  That's the only reason why they have the rebuttal time.

1          MS. WEKSLER:  Thank you, Judge.

2          MR. PHILPOT:  I also need that time for staff, Your

3     Honor.

4          THE COURT:  All right.  We will.

5          MR. PHILPOT:  Thank you.

6          (Recess taken at 10:47 a.m.)

7          (Resumed at 11:06 a.m.)

8          THE COURT:  Thank you.  You may be seated.

9          All right.  Well, so long as -- it looks like the

10    public's not back yet, right?  Can we not have the public come

11    in so we can address Mr. Philpot's concern?

12          (Mr. Philpot conferring with Mr. Ammon Bundy.)

13          MR. PHILPOT:  Your Honor, would you like me to proceed?

14          THE COURT:  Yes, go ahead.

15          MR. PHILPOT:  Thank you, Your Honor.

16          When I was admitted pro hac vice, Your Honor, the

17    conditions upon participating staff was that Mr. Bundy be

18    knowing about that participation.  And he was and is to this

19    day.  And that individual, who is Rick Koerber, has worked with

20    us as a team for the entirety of this year.  He has been

21    integral to discovery review to trial strategy to communication

22    with clients and -- with the client and other defendants and

23    witnesses.  And to not allow him to participate meaningfully

24    would be enough for us to request a motion to sever and to

25    continue at this point in time.

1          And so I need him to be able to participate.  And I

2    understand that there may be concerns about his indictment,

3    which I think is probably what the Court has referred to, but he

4    is a free man without any convictions upon his release at this

5    time.  He participated fully in the Oregon trial with us as

6    well.  So he's known Mr. Bundy since that time, and we need him.

7          THE COURT:  All right.  Mr. Myhre.

8          MR. MYHRE:  Yes, Your Honor.  I think Your Honor's

9    already been at least aware of the postings that Mr. -- is it

10   Koerber?  Am I pronouncing that correctly?

11         MR. PHILPOT:  Yes.

12         MR. MYHRE:  That Mr. Koerber has posted on Facebook and

13   so forth concerning this case in an advocacy manner.  He has --

14   as a matter of record -- I can make this a matter of record, but

15   I know as of last week, Tuesday, he posted a very long post

16   about events that occurred in this courtroom that we understood

17   that it was a sealed proceeding, but even if it wasn't a sealed

18   proceeding, it was still essentially trying to put out a

19   message, an advocacy message, to the general public, which is --

20   you know, if he's a member of the Defense team, he's acting as

21   an agent for the attorneys.  It's an extrajudicial communication

22   that's prohibited under the Professional Rules of

23   Responsibility.

24         My understanding is is that Defense wants Mr. Koerber

25   in the courtroom with media or with the ability to communicate

1  using electronic devices and so forth.  We believe, given his

2  history and the conduct that he's displayed in this case, that

3  that should be prohibited under all circumstances.  If he works

4  for them, he works for them, but he's still bound by the same

5  Rules of Professional Responsibility as every other attorney is

6  in this courtroom.

7         So based on his dealings -- excuse me -- his postings

8  and his public communications, which are clearly advocacy

9  pieces, we believe he shouldn't be allowed.  Also, my

10  understanding is is that he does have an outstanding warrant for

11  failure to appear, NHP.  It looks like it's a traffic citation,

12  but my understanding is is that he has an outstanding warrant as

13  well.

14         THE COURT:  What about the outstanding warrant,

15  Mr. Philpot?

16         MR. PHILPOT:  Your Honor, I'm guessing that they

17  obtained this information from the FBI.  They -- probably just

18  recently.  I would like to be provided with that information if

19  they're talking about a speeding ticket that happened recently

20  because he's been presently here in Nevada.  I have no

21  information on this.  So I'd be curious to know what they're

22  talking about.  He is -- I would assume that if such an

23  outstanding warrant existed, it would be of great concern to his

24  court proceedings and something would have come up in this

25  regard.  So I need more information in that regard.

—2:16-cr-46-GMN-PAL—

1           As to the other statements that have been made by

2    Mr. Myhre, I think they are misrepresentations.  It is not

3    clearly advocacy.  It is not an extrajudicial communication.

4    And to say that it is I think indicates he probably hasn't

5    watched the alleged broadcast, which I believe was one single

6    broadcast.

7           As Your Honor knows, there is a fairly active

8    community, and I think if anything the communication he made via

9    Facebook was one that advocated for the integrity of the court

10   and the process and had nothing to do with advocating for a

11   particular position for our client or could constitute an

12   extrajudicial communication.  And I would actually encourage

13   Your Honor to watch it.

14          However, even if it were an extrajudicial

15   communication, which I do not believe it is, I immediately, once

16   I found out about it, asked him to take it down and not to do it

17   anymore.  And he has agreed to that.

18          I've communicated that to the Government.  They know

19   that.  So I think their concerns are both unfounded,

20   misrepresented, and do not accurately reflect the communication.

21          MR. MYHRE:  Well, if I may add for the record, Your

22   Honor.  The reference that I'm making to the Facebook posting,

23   I'll just read certain segments of it.  And this is in reference

24   to the hearing that we had last -- last week I believe it was,

25   Tuesday:  I'll provide an update on how Ammon Bundy and Ryan

—2:16-cr-46-GMN-PAL—

 1  Bundy were abused and bloodied by federal marshals over the last

 2  24 hours, how their father was fully shackled and punished for

 3  not remaining silent after being forced to witness the physical

 4  abuse of his sons.  I'll also describe how Federal District of

 5  Nevada Judge Gloria Navarro refused the request of these

 6  defendants standing bloodied and beatened in open court to take

 7  the names of the marshals identified as being involved.

 8          And that's just a portion, Your Honor.  I can make this

 9  all a part of the record, but that's clearly making statements

10  out of court about proceedings in the court, clearly intended to

11  sway the public, sway any casual reader of this or other readers

12  who may be friends on his Facebook page.

13          And so, therefore, Your Honor, I don't see how counsel

14  can reasonably stand here and say that's not an extrajudicial

15  communication or that the Government is misrepresenting it as an

16  extrajudicial communication.

17          THE COURT:  Mr. Philpot, bloodied and beatened and

18  punished?

19          MR. PHILPOT:  First of all, Your Honor, that is

20  relative to the civil suit which we are working on, and we do

21  allege that that has occurred.  And we will be pursuing a civil

22  suit in that regard.  It was an open court hearing.

23          Again, I can actually go through each one.  Mr. Bundy

24  was shackled for simply making a comment.  We do believe that

25  did occur.  We don't believe these statements are untrue.  My

 1   client was bloodied.  Mr. Ryan Bundy was bloodied.  So we may

 2   disagree with how the Government perceives the treatment of

 3   these individuals.  That's why we filed civil suit.

 4          THE COURT:  Where was the blood?  Because I did not see

 5   any blood.

 6          MR. PHILPOT:  It was on my client's left arm.  It was

 7   on Mr. Bundy's left arm.  And his arm was, in fact, more

 8   significantly disrupted and abraised and bleeding than was

 9   Mr. Bundy's who was abraised.  The skin was removed in areas and

10   was bleeding, which is why Mr. Whipple asked this Court to make

11   a record of the marshals that were involved.  And we asked to

12   have a hearing on the conditions of detention, which we didn't

13   get.  However -- and we do have pictures.  Now --

14          THE COURT:  When you say on the arm, what part of the

15   arm?

16          MR. PHILPOT:  Your Honor, it was right -- sorry.  It

17   was his right arm.  It was right here.

18          THE COURT:  I can't see "right here" because there's a

19   monitor in between us.

20          MR. RYAN BUNDY:  I still have a scab on my right wrist.

21   It's small, but I do.

22          THE COURT:  All right.  So they're both indicating on

23   the right wrist.

24          MR. PHILPOT:  Now, again, even in spite of our claims

25   in that regard and the upcoming civil suit in that regard, I

—2:16-cr-46-GMN-PAL—

1  immediately -- the courthouse was scoured for my paralegal, and

2  particularly by one marshal --

3           THE COURT:  But this is the event where they were in

4  the elevator and refused to turn around so they had to be

5  forcibly turned around.

6           MR. PHILPOT:  Yeah.

7           THE COURT:  And they were wearing handcuffs.

8           MR. PHILPOT:  I would agree with the rendition of those

9  facts Your Honor; but, yes, this is that incident.

10           THE COURT:  And so they had scratches on their wrists

11  that were bleeding.  Is that what you're telling me?  And that's

12  bloodied and beatened in the courtroom?

13           MR. PHILPOT:  Your Honor, given --

14           MR. RYAN BUNDY:  It was more than that.

15           MR. PHILPOT:  We actually believe the beating, the

16  mistreatment, occurred prior to coming into the courtroom.  We

17  believe that the prejudice and punishment geared towards

18  Mr. Cliven Bundy in relation to that was due to no behavior of

19  his own, but was simply for agreeing that they had been

20  mistreated.  Even in spite --

21           THE COURT:  You said it was because he made comments.

22           MR. PHILPOT:  Yes, Your Honor.

23           Even in spite of all of this, which Your Honor I think

24  indicated and we agreed to take this up civilly, I immediately

25  had him remove that post.  I communicated with him the

—2:16-cr-46-GMN-PAL—

1  inappropriateness that I felt of letting your name be used

2  publicly rather the honorific reference to the Court.  Asked him

3  to never do that again out of an abundance of caution.

4        So I'm not saying that I agree that these things are

5  not true.  I'm saying that I want to be abundantly cautious with

6  anything anybody who works for me says, particularly in the

7  naming of this Court.  And that post came down after I

8  discovered it.  It was not made inside this building.  It came

9  down as quickly as I knew about it.

10       THE COURT:  And so why did you have him take it down?

11       MR. PHILPOT:  Just out of an abundance of caution, Your

12  Honor.  I didn't appreciate that he used your name.  I don't

13  think that's appropriate.  I think that any time anybody makes a

14  reference outside of this proceeding, it should be to the Court;

15  not to a named individual.

16       THE COURT:  Well, my concern is not about my name.

17  It's about if there is an exaggerated recounting of what is

18  occurring in order to incite or provoke some kind of violence.

19  If there is some reporting that is false and misleading that is

20  going to put other individuals, including everyone here, equally

21  I'm concerned for everyone, at some kind of a risk of injury,

22  then that is a concern to the Court.

23       As far as the broadcast, I'm not familiar with the

24  broadcast either.  So I think I'm at a loss there as well.  So

25  you're saying there was also a broadcast.  What do you mean by

—— 2:16-cr-46-GMN-PAL ——

 1  broadcast?  He was interviewed by somebody on like a local TV

 2  station or something?

 3         MR. MYHRE:  My understanding, Your Honor, is he did

 4  what's been referred to as a podcast.  In other words, he did

 5  his own sort of a broadcast of his views on video that would be

 6  then, you know, communicated over the Internet, concerning --

 7  and I have not viewed the podcast.  Others have and have told me

 8  that it was up.  I have not.  I think it's been since taken

 9  down, but it was essentially on the same topic as he advertises

10  in his Facebook posting, that he would talk more about it in his

11  later podcast.

12         And then my understanding is he posted, recently he

13  said:  Primarily due to Internet complications, there will be no

14  broadcasts tonight, October 31st, 2017.  Happy Halloween.  We'll

15  see you tomorrow, November 1st, 2017.  Invite your friends.

16  This is Rick Koerber, the Free Capitalist.

17         So that's on his Facebook page.  I'm not certain what

18  broadcast it's going to continue on, but since this topic or

19  these court proceedings have been addressed in previous

20  broadcasts, one can only assume it's going to concern these

21  proceedings.

22         THE COURT:  And did you say he calls himself The Free

23  Capitalist?  Or is that the name of the podcast?

24         (Prosecution conferring.)

25         MR. MYHRE:  His Facebook page name, Your Honor, is Rick

1    Koerber, K-O-E-R-B-E-R, The Free Capitalist.

2           MR. PHILPOT:  Your Honor, if I may.  My client

3    frequently exercises his First Amendment rights to speak on his

4    Facebook page.  However, since the broadcast that they are

5    alleging occurred relative to communications wherein my

6    paralegal defended the integrity of the court process and this

7    court to a community that is very active, and the last time

8    something like this occurred staged a two-week long protest at

9    the Nevada Southern Detention Center, there was no such protest

10   that occurred.  There were no further communications by my

11   paralegal relative to this case, but he does frequently exercise

12   his First Amendment rights to conduct a Facebook broadcast under

13   the moniker The Free Capitalist.  There's nothing to see behind

14   that curtain, Your Honor.

15          THE COURT:  So in this podcast, is it just audio or

16   video?

17          MR. PHILPOT:  It's a Facebook live feed.  I don't do

18   them.

19          THE COURT:  So it's both video and audio.

20          MR. PHILPOT:  Yes.

21          THE COURT:  Okay.  And is he using the same inciteful,

22   provocative adjectives to --

23          MR. PHILPOT:  No.

24          THE COURT:  -- draw viewers or listeners?

25          MR. PHILPOT:  In fact, Your Honor, he's the opposite.

━ 2:16-cr-46-GMN-PAL ━

 1  He is very deliberative.  He is -- he discusses -- I think.  You

 2  know, I actually have a hard time sitting through them sometimes

 3  because they can be fairly lengthy, but I've tried to watch them

 4  since the FBI has decided to tell the Court on him for

 5  exercising his First Amendment rights.  And I don't -- I can't

 6  imagine anything that they could be concerned about, honestly.

 7          I would be interested to know if they actually watched

 8  them in good faith after tattling to the Court for his exercise

 9  of his First Amendment rights; because that's what's ludicrous

10  is the fact that they tattle to the Court for somebody

11  exercising their First Amendment right and then tell us that we

12  could get in trouble for simply trying to manage communication

13  with clients in representing a community to the best degree we

14  can to settle down a little bit so that we can have a

15  deliberative process here.  That's what has taken place.

16          THE COURT:  Okay.  Well, the Government hasn't provided

17  me any of this information.  So it hasn't been a tattling from

18  the Government, but if it is a security concern, then it's a

19  concern to me.  But if -- I don't have any problem with someone

20  stating their views so long as it's not going to be causing an

21  inciteful or provocative environment even more so than it

22  already is.

23          MR. PHILPOT:  Agreed, Your Honor.

24          THE COURT:  I mean, the tensions are high in and

25  outside of the courtroom.

                        ─ 2:16-cr-46-GMN-PAL ─

1          MR. PHILPOT:  Right.

2          THE COURT:  And we certainly don't need someone to be

3    creating -- what do you call it -- stirring the pot, you know,

4    making it even worse.

5          MR. MYHRE:  Yes, Your Honor.  There's that concern

6    and -- from the Government.  As counsel well knows, the First

7    Amendment does not protect violations of Professional Rules of

8    Responsibility.  And the Professional Rules of Responsibility

9    provide that counsel and whoever works for counsel as their

10   agents may not go outside on the courthouse steps and then

11   characterize the proceedings, advocate on behalf of their

12   client, to try to taint the jury pool and the public with public

13   statements.  Just like Government counsel cannot go out on the

14   steps of the courthouse and talk about today's proceedings and

15   their views and their -- and their inferences and their

16   arguments that they want to make.

17          And those are the types of comments that are not only

18   in that Facebook post, but were in the subsequent podcast.  And

19   if counsel is representing that he -- his paralegal has a First

20   Amendment right to talk about these proceedings, then we clearly

21   object.  And counsel should not be allowed to have this

22   individual work as the -- his paralegal because he clearly

23   doesn't understand the Rules of Professional Responsibility.

24          MR. PHILPOT:  And if I may.  Here we go again with the

25   implication of threat of a bar complaint for advocacy and a

—2:16-cr-46-GMN-PAL—

1 misrepresentation of what the Rules of Professional Conduct are.

2 And the Supreme Court case, which actually came from the Nevada

3 Supreme Court to the U.S. Supreme Court, on what extrajudicial

4 statements are:  And extrajudicial statements cannot be

5 extrajudicial statements if they are mitigated and removed and

6 if I don't know about them.

7       I did not know about them.  When I found out about

8 them, I mitigated them.  They know that, and they're still

9 implying a potential bar threat in the midst of a case that is

10 one of the biggest cases in this state to try and chill us from

11 doing our job.  And that is against the Rules of Professional

12 Conduct.

13       MR. MYHRE:  Counsel, if I'm going to -- if I'm going to

14 threaten a bar complaint, I'll say so directly.  What I am

15 saying, Your Honor --

16       MR. PHILPOT:  You did so say directly.

17       MR. MYHRE:  I did not say so.

18       MR. PHILPOT:  You said it to him.

19       MR. MYHRE:  Counsel, I'm speaking.  Thank you.

20       THE COURT:  Please address the Court; not each other.

21       MR. MYHRE:  Our position is is that if his -- if their

22 position is that this individual can go out on the courthouse

23 steps and under the guise of the First Amendment talk about

24 these proceedings, describe them, discuss what their arguments

25 are, discuss how the Government is making erroneous arguments or

2:16-cr-46-GMN-PAL

1  that their arguments are correct, those clearly are not covered

2  by the First Amendment.  They're in violation of the Rules of

3  Professional Responsibility.

4       Our concern is if -- if that is not the understanding

5  of the Defense, then we're going to have problems down the road.

6       MR. PHILPOT:  Your Honor, I respect the integrity of

7  this Court.  I respect the position Your Honor holds.  I put an

8  end to that thing as soon as I knew about it.  I don't think it

9  was intentional.  I don't think it was wrong.  I think it's

10  defensible, but, Your Honor, I will not allow that to happen

11  again; not because I agree with the Government.  It's just

12  simply out of an abundance of caution, my care for my client, my

13  respect for this Court.

14       THE COURT:  All right.  Well, is there anything else

15  anybody wants to add about this matter?

16       MR. HILL:  Can I just weigh in for a second, Your

17  Honor?

18       THE COURT:  Yes, Mr. Hill.  Go ahead.

19       MR. HILL:  Just for the purposes of the record, I'll

20  incorporate certain representations that I made before the Court

21  previously and I'll just add two items.  Number one, since

22  Mr. Philpot's entry by pro hac vice, I have found Mr. Koerber to

23  be extraordinarily helpful in communicating and sometimes

24  translating to one another legal theories between Ammon and I.

25  And I would just finally add that I've been advised by Ammon

1  that without Mr. Koerber's assistance he would move to dismiss

2  me as counsel.

3         THE COURT:  All right.  Well, I don't have any issue

4  with him, again, for like the fourth time, with him working with

5  Mr. Ammon Bundy so long as Mr. Bundy was aware of the past

6  because at the time that this issue came up was during the pro

7  hac vice hearing.  And I asked Mr. Philpot if this individual,

8  Koerber, was still going to be working with him.  And that's

9  when he clarified that, no, he had never been his employee, that

10  he was an independent contractor, merely was on some other case,

11  but -- and the reason why that came up is because I had a copy

12  of the bar file for Mr. Philpot that included different things,

13  and one of them was a complaint from an individual about

14  Mr. Koerber in another case.  And there were some concerns

15  raised by that other client about funds being used or misused, I

16  should say.

17         And then she attached to her letter information about

18  Mr. Koerber having a -- I want to say -- please correct me if

19  I'm wrong, a Ponzi scheme?  Like a fraud.  It had to do with

20  money and with false statements.  I don't remember if it was a

21  federal Ponzi scheme allegation.

22         MR. PHILPOT:  Yes, Your Honor.

23         THE COURT:  Not a conviction.  But in this client's

24  mind, I remember it was a woman, maybe it had to do with a

25  divorce case, custody case, something like that.

─────────── 2:16-cr-46-GMN-PAL ───────────

1        MR. PHILPOT:  It was dismissed.  The complaint was

2  looked at by the bar and absolutely dismissed.

3        THE COURT:  But it was a custody claim or a divorce

4  claim or something like that.

5        MR. PHILPOT:  Yeah.

6        THE COURT:  Not a criminal case.

7        MR. PHILPOT:  It's actually a case that went beyond

8  that into patterns of unlawful activity and other such things,

9  but generally that's where it began.

10        THE COURT:  Right.  But she had some concerns about the

11  funds, and so that's why I asked Mr. Philpot if this individual

12  was going to be working with Mr. Bundy because we were already

13  aware at that time that there had been a defense fund set up.

14  And Judge Leen had raised the question, and I don't remember now

15  if it was Mr. Whipple, but I think it was, to make sure that

16  there was an understanding among everybody who was going to be

17  sharing this, you know, these funds if any were raised who was

18  getting what because we didn't want any issues on the day before

19  trial that, The money was promised to me.  No, the money was

20  promised to me, you know, those kinds of things.

21        So we just wanted to make sure everyone was aware that

22  there might be funds and who was going to be having access to

23  them and, you know, nobody was misled in any way, or robbed,

24  which was the other thing that I think that this person

25  complaining was also bringing to our concern.  Not

—2:16-cr-46-GMN-PAL—

 1   intentionally.  She was bringing it to the concern of the bar in

 2   her state; not here.  But in reviewing this, it was just another

 3   thing we want to make sure is that if he is going to be

 4   participating in any money that might be raised, that Mr. Bundy

 5   be aware so that he's not deprived of anything because he

 6   thought that he had money that he didn't because it was stolen

 7   and so forth.

 8        So I didn't get into the details.  I just asked

 9   Mr. Philpot to make sure that if this paralegal was going to be

10   working with him in the future that Mr. Ammon Bundy be aware and

11   sign off on it so that we didn't have any problems later.

12        So this is all new as far as a Facebook posting, using

13   words punished and bloodied and beatened, and then the podcast.

14   I don't have any information about what was broadcast in that

15   video podcast.

16        So the Government has made its representations about

17   what it believes the rules of conduct are that apply, and I

18   think Mr. Philpot was referring to the Dominic Gentile case

19   which was back in the '90s because I remember it when I first

20   started practicing.  So let's be clear here as to what the

21   standard is for counsel and whether or not there are any

22   limitations, and that would include to the Defense team.

23        But before we get to that, I need more information

24   about what kind of devices, Mr. Philpot, are you asking that he

25   be -- that Mr. Koeber be able to use in the courtroom?  Because

1   we're not allowing anyone to have any access to any devices

2   except for the attorneys, the defendant who's pro per, and the

3   security detail.

4          MR. PHILPOT:  So by device do you mean phone?

5          THE COURT:  I don't know.  That's what I want to know

6   is what kind of devices are you requesting that he be able to

7   use.

8          MR. PHILPOT:  I need him to have his laptop and access

9   to a hard drive for discovery and exhibits and the ability to

10  freely communicate with me in relation to that device.  So, for

11  example, if he's got to be pulling up exhibits for us or

12  accessing discovery during trial, I need him to have that laptop

13  and that hard drive.

14         I would like him to be able to have what any other

15  paralegal would have who sits passed the bar.  And I would like

16  him to at least be able to sit on that back bench so that I

17  don't have to go back passed the bar, and Mr. Hill doesn't have

18  to go back, and we can have him communicate with Mr. Bundy.  It

19  will be -- and I don't think that requires anything more than

20  this laptop.  Honestly, I'd like him to have anything any other

21  paralegal would be able to have in this courtroom, but if we're

22  going to have to restrict him, I need him to at least have that

23  computer and that hard drive.

24         THE COURT:  All right.  Well, the only paralegals that

25  we have in the courtroom now are both federal employees that

 1  have undergone a background check by the FBI that are -- that

 2  have access to electronic devices.  That's my understanding, as

 3  far as a laptop and hard drive for exhibits and discovery.  So

 4  it doesn't sound like you need any access to WiFi or a data

 5  plan.  It's a matter of being able to access information that

 6  already exists.

 7            MR. PHILPOT:  I would like him to have access to WiFi.

 8            THE COURT:  Okay.  What would be the purpose of having

 9  access to WiFi?

10            MR. PHILPOT:  All of our -- we have many Google drives.

11  What is the other one?  I don't use it as much.  Dropbox,

12  Westlaw, you know, communication with me so that he doesn't have

13  to walk up here every single time and say, Don't forget this

14  exhibit.  Just everything we would enjoy from working with a

15  normal legal staff member.

16            THE COURT:  All right.  Well, let me take this under

17  submission.  I'll let you know after lunch.  I'll take a look

18  at --

19            MR. MYHRE:  Your Honor, we could -- if the Court would

20  prefer, I can e-mail to the Court, obviously cc'ing all counsel,

21  of the Facebook posting itself.  And I think I can retrieve the

22  podcast as well and forward that to the Court if the Court cares

23  to see what it was in addition to my representations on the

24  record.

25            THE COURT:  All right.  Well, instead of e-mail, how

———— 2:16-cr-46-GMN-PAL ————

 1  about we just print it?  Is it a very long Facebook post?

 2       MR. MYHRE:  I can probably print it, Your Honor, as

 3  well.  That would take some time.

 4       (Prosecution conferring.)

 5       MR. MYHRE:  Well, we have the video.  That's right.  We

 6  couldn't print out the video, but --

 7       THE COURT:  Right.  Okay.  Excuse me.  Why don't we

 8  print out the post.  We'll go ahead and mark it as an exhibit to

 9  the hearing today so it's available on the record.  Let me think

10  about the video, what's the best way to put that on the record.

11  Probably just a manual filing, but I'll check with the clerk's

12  office and see, because I don't think that we're able to docket

13  links because we can't guarantee that those links will work in

14  the future.  So I think it has to be -- if I'm up to date, I

15  think it still has to be the actual -- you know, a disc or

16  something or a PDF file, something that is ordinarily accessible

17  or that we hope will still be accessible in the future.

18       All right.  So aside from that, Mr. Ryan Bundy, was

19  there something you wanted to add?

20       MR. RYAN BUNDY:  Yeah, I just wanted to add that

21  considering the events that took place in the elevator, there

22  was more that went on that I believe it was brought forth here

23  in open record that was -- I believe was abusive and

24  non-necessary for the security needs.  And so if he made

25  reference to those things, I wanted to just make sure that my

—2:16-cr-46-GMN-PAL—

1   point was brought forth that what was brought in court was not a

2   full representation of what took place and nor did it have our

3   opinion on the matter.

4          THE COURT:  All right.  And I'm not ruling on that as I

5   said before, but I will note that I have been advised by the

6   marshals that they are in agreement that you can remain without

7   your leg shackles, which were taken off so that you were able to

8   question the jury.  And that you have been cooperating today,

9   and so long as that continues to be the case, that you will not

10  need to have the shackles put back on.  So I'm happy to hear

11  that.  So even though it sounds like sometimes not everyone gets

12  along, sometimes they do.

13         MR. RYAN BUNDY:  Thank you.

14         THE COURT:  So I appreciate if everyone tries to keep

15  in mind everyone else's need to keep the safety level as high as

16  possible.

17         Let's go ahead and hear if there are any other motions

18  for excusing jurors for cause.

19         COURTROOM ADMINISTRATOR:  Your Honor, at this point can

20  we allow the public in?

21         THE COURT:  Yes.  You're right.  We can now.

22         So we're going to have the first group that was here on

23  Monday -- we're going to let them go to lunch because we're

24  obviously not even going to get to that group.  The first group

25  that was here on Monday, right, they were told to report today?

—2:16-cr-46-GMN-PAL—

1  So they can go have lunch.  We'll see if we can finalize -- oh,

2  go ahead and have the jury -- oh, no, not the jury; just the

3  public come back in.  The public can come back in.

4       But we only have 20 minutes so I wanted to see if we

5  could finish up at least with this panel before we start up with

6  the third.

7       So does the Defense have any other jurors on this

8  panel?  Mr. Whipple?

9       MR. WHIPPLE:  Your Honor, we had an opportunity to meet

10  last night and kind of break up the different for cause

11  requests.  I specifically have two, but I've never been able

12  to -- I'm not sure if -- when you ask if we have any more, I'm

13  not sure where that list ends and where it begins or where it

14  begins and where it ends because there are obviously different

15  people that we had concerns about their answers.  I know I have

16  two that I want to address.

17       THE COURT:  If it's something I've already addressed

18  before, then that ruling stands, but many of the jurors that we

19  had here this morning provided more information that you may or

20  may not have known about before.  So is there any new

21  information, any new basis for a motion for cause, that has not

22  yet been addressed?

23       MR. NORWOOD:  Your Honor, the answer is yes.

24       THE COURT:  Okay.  Let's go ahead and hear that.

25       MR. NORWOOD:  Based on what happened yesterday and what

 1   happened this morning and some other issues, it's going to take

 2   more than 20 minutes.

 3            THE COURT:  Okay.  So give me a number.  Who's the

 4   first person you want me to consider?

 5            MR. NORWOOD:  Start with yours, Bret.

 6            MR. WHIPPLE:  Your Honor, I'll start with mine.  I have

 7   juror No. 95.

 8            THE COURT:  What's the basis for the motion for cause

 9   on No. 95?

10            MR. WHIPPLE:  Your Honor, he is this gentleman who is a

11   surveillance officer, and I don't know if I can point to -- he's

12   the one right down here in the left front.  He in his jury

13   questionnaire was asked if he had -- I think it's the same one.

14   I want to make sure I'm talking ...

15            Okay.  So I actually I have two, 95 and 97.  So 95 is

16   actually the gentleman who is sitting right down here at the

17   bottom.  He was -- if you recall, during my questioning

18   yesterday, I had asked folks if the October 1st shooting had

19   caused a problem for them and had been an issue.  And he's the

20   one that raised his hand, and he responded.  And we had some

21   notes here:  Now is not the time.  In other words, I asked him

22   if he could be -- set aside the issues of October 1st and be

23   fair and objective and pay attention to the evidence that was

24   going to come in in this trial.  And he said -- the inference is

25   no.  He said:  Now is not the time.

2:16-cr-46-GMN-PAL

1       He doesn't think he should be in this case.  What he

2  just experienced in this event, he doesn't want to think about a

3  gun and he couldn't pay attention to the evidence right now.

4  That was the individual on the bottom left, juror No. 95.

5       So in my mind I didn't go beyond that because it was

6  very clear that he was not in a position where he could, you

7  know, be an objective juror.  Since that time, he was one of the

8  last ones that Mr. Schiess was able to talk to and get maybe

9  some information that was a little different than that, but at

10  the end of the day it's very clear to me that he's preoccupied

11  with the October 1st incident and he, you know, really doesn't

12  have the opportunity to pay attention to the evidence because

13  he's so preoccupied.

14       MR. NORWOOD:  Your Honor, if I could follow-up on that.

15  I have a transcript right in front of me from when Mr. Whipple

16  was questioning this person.  I mean, it's sort of starting with

17  the discussion with how he was affected by the shooting.

18  Obviously everyone was affected by the shooting to some degree,

19  but he was actually there.  I mean, he saw -- he described the

20  people screaming and running away and the scene of chaos.

21       So Mr. Whipple followed up with him, you know:  Would

22  it be appropriate for you to be in a jury trial that's going to

23  be two or three months and this is something that's directly

24  affected you just recently?  In other words, can you pay

25  attention to the evidence?

1          His answer is:  Probably not.  And then he asks him

2    why.  And he describes the devastation and, you know, people

3    pulling guns on people for no reason.  Mr. Whipple asked him:

4    Maybe six months from now you will be in a better mind set, but

5    right now you will agree?  And his answer was:  Maybe, but I

6    can't say yes or no to that.  So not even sure he can do this

7    six months from now.

8          And there's some questioning about, you know, if you

9    were sitting where Cliven Bundy is sitting.  He says:  That's a

10   different issue.  But then the question is:  I'm asking could

11   you be fair also to the sides and pay attention to the evidence

12   and if you are so preoccupied by this horrible mess --

13   massacre -- it's a rough draft transcript.  His answer again is:

14   Probably not.

15         So I understand that this morning he was asked a few

16   questions by the prosecution, some leading-type questions, that

17   he, you know, said yes or sure to.  But this is cause here, Your

18   Honor.  He says he probably can't listen to the evidence.  He

19   probably can't serve as a juror.  This isn't the right jury

20   trial -- I'm sorry.  The first two.  When he says he probably

21   can't listen to the evidence and he probably can't serve as a

22   fair juror, frankly, it doesn't matter what else he says in

23   rehabilitation.

24         At the very least, if there isn't a cause strike, we

25   would ask for the opportunity to bring this juror back in

—2:16-cr-46-GMN-PAL—

1  because again, you know, a lot of this has to do with how you

2  ask the questions.  And when you want to rehabilitate a juror,

3  you can ask the questions in a way that someone can say yes,

4  sure to.  But what we have right here is a very clear issue of

5  cause, and this juror should be struck.

6       THE COURT:  All right.  Any other defendants want to

7  speak onto -- about juror No. 95?

8       MR. RYAN BUNDY:  Yeah, I just mention the same thing.

9  As he -- as he spoke, he clearly biassed himself.  He did say of

10  himself that he would not be a good juror in this -- in this

11  situation.  So I also believe that it's a clear -- clear case of

12  being removed for cause.

13       THE COURT:  All right.  Anyone else?

14       All right.  What's the Government's position on juror

15  No. 95?

16       MR. SCHIESS:  Your Honor, the Court should not dismiss

17  juror No. 95 for cause.  It's clear even from the defendants'

18  arguments today that what they were trying to do is muddle the

19  10/1 shooting with this case.  They're trying to lump it

20  together to try and make the emotions there.

21       My purpose of my questions this morning was -- is to

22  have him thoughtfully consider whether he could keep the events

23  separated.  I asked him that question on several different

24  directions and angles to be able to assure that we were getting

25  an answer that was not a leading-question-type answer, but a

1  genuine question.

2         So I took the approach of, which is similar to the

3  Court's instructions, consider only the evidence in this case.

4  And he did so.  And I believe that if the Court considers the

5  sincerity of his answer today, his understanding of unmuddling

6  what the Defense was trying to do yesterday, you have a very

7  fair-minded juror who will keep it apart.  And he also said to

8  the Court that if it is -- the emotions come over, he certainly

9  can take the energy to separate them.  So I don't believe that

10  there's a sufficient showing.

11         MR. NORWOOD:  Your Honor, we didn't muddle anything

12  when we were asking the questions.

13         THE COURT:  All right.  I've already heard arguments

14  from both counsel on juror No. 95.  And he did state that this

15  case was different and that he could be fair.

16         What is the next juror, Mr. Whipple, that you wanted to

17  move for cause?

18         MR. WHIPPLE:  Your Honor, so you denied my motion?

19         THE COURT:  I haven't ruled yet.

20         MR. WHIPPLE:  Okay.  Your Honor, the next one would be

21  No. 97.  97 is the corrections officer that you were kind enough

22  to allow me to bring in and talk to individually.  The reason we

23  did that is because -- I believe originally it's because of the

24  campaign literature, but then also we were able to ask him some

25  questions regarding bias because of the fact that he is a

—2:16-cr-46-GMN-PAL—

1  correction officer and we weren't sure where.

2         If you go to his original jury questionnaire, Your

3  Honor, it asks on page 7:  Have you heard anything about the

4  defendants listed?  His answer was yes.  The next question is:

5  If yes, please identify which defendants you have heard or read

6  about.  And his response:  All, just of the defendants on news

7  coverage.  The next question on 4 is:  Have you already formed

8  an opinion about the guilt of the charges of the defendants?

9  His answer:  Yes.

10         The next question is:  If yes, please explain.  When

11  the defendants drew their guns against the officers of the law,

12  this is what he responds.  This gentleman has already made up

13  his mind.  That's why we questioned him.

14         And when you gave me the opportunity to talk to him

15  separately, he said he would lean towards officers.  He said, If

16  a person pulls a gun against an officer, that person is guilty.

17  You had the opportunity to hear him as well as I did, and in my

18  opinion, from what I heard, there's no exceptions to that.  He

19  leans heavily towards law enforcement testimony.  He said he

20  would make a bad juror in this case because of the fact that he

21  was leaning towards law enforcement and leaning towards the

22  Government.

23         And I think the last question is:  Even if you were --

24  even if the other person -- even if the officers were acting

25  unlawful, if you pull a gun on them, they would still be guilty.

 1  So he's already made up his mind.  He cannot be fair.  He's

 2  biassed towards the prosecution, and he should be struck for

 3  cause.

 4          MR. NORWOOD:  Your Honor, I have that transcript right

 5  in front of me, too.  This is on the rough draft transcript I

 6  have, starting on page 8 of the p.m. session on 10/31.  And for

 7  starters, this person is a -- is a retired correctional officer

 8  who bowls regularly with the Pahrump correctional officers which

 9  is where he lives.  And of course our clients have been the

10  highest-profiled detainees in the Pahrump facility in the past

11  two years.

12          So the specific line of questioning that Mr. Whipple

13  was referring to was -- you know, he was asked if he had any

14  leaning, you know, in a case involving officers and other

15  people.  And the juror said:  Well, I would lean towards the

16  officers more than I would anyone else, yes.  He's asked why,

17  and he says:  Well, I'm -- because they are officers and I was

18  an officer.  And I would lean more for them, yeah.

19          So if he heard information that there are weapons that

20  are pointed at officers, in that situation would you lean in one

21  direction more than the other?  He answers:  Yes.  In what way

22  would you lean?  To the officers.  Then he's asked, you know, if

23  there's any justification that you're aware of.  And he sort

24  of -- the juror sort of cuts him off and says:  Well, I feel at

25  any time anybody puts a weapon on an officer they are at fault,

1   period.  Mr. Whipple says:  Every time?  The juror says:  Every

2   time.

3         Mr. Whipple is asking him if he's already made a

4   determination.  The juror says:  I wouldn't say I've made a

5   determination, but I will lean heavily towards that, yes.

6   Heavily towards law enforcement?  The answer is:  Right.  And

7   again he says that's because he spent 25 years as a corrections

8   officer.

9         So Mr. Whipple then asks him a question that both sides

10  have asked jurors, these sort of inquiries about whether or

11  not -- you know, whether this was the right trial for him or

12  whether he would be better off in a different type of trial, and

13  he agreed that he would be.  He's asked:  Why is that?  And he

14  says:  Because there were weapons involved.

15        MR. SCHIESS:  Your Honor, may I save the Court time?

16  We're not going to object to 97.

17        THE COURT:  All right.  Thank you.

18        Are those the only two, Mr. Whipple?

19        MR. WHIPPLE:  Those -- for me personally, yes.

20        THE COURT:  All right.  Who wants to go next?

21        MS. WEKSLER:  Judge, I have No. 108 coming up next

22  numerically.  This is the individual who, first of all, seems to

23  have a hardship issue regarding school that I would like the

24  Court to address to see whether this is something that we can

25  take care of on the matter of hardship before we go into bias.

 1  This is the law school student who has class this semester, I

 2  believe it was Tuesdays to Thursdays, starting at 4:30.

 3          THE COURT:  That's right.  I did write that down.  I

 4  remember her saying that.

 5          MS. WEKSLER:  I'm just not sure whether -- is the Court

 6  denying a hardship challenge at this point based on -- those are

 7  presentations based on the Court's calendar and the fact that

 8  she's not going to be able to make it to class by that time?

 9          MR. SCHIESS:  Your Honor, I can address the hardship

10  issue as well.

11          THE COURT:  I remember something about her saying that

12  her classes began at 6, but honestly now I'm trying to remember,

13  recollect what --

14          MS. WEKSLER:  It was next semester, Judge.

15          THE COURT:  Oh, next semester.

16          MR. SCHIESS:  She said that her classes from now until

17  the end of this semester, two days a week, Tuesday and Thursday,

18  begin at 4:40.  That it will take her about 25 minutes to get

19  there.  And if we look at the Court's calendar with the first

20  week of December blank, Thanksgiving, we're only looking at

21  accommodating her on two days a week by leaving -- ending maybe

22  20 minutes early for maybe four weeks, or maybe eight days out

23  of a several-month trial, and her next semester will be at 6.

24          MS. WEKSLER:  And, Judge, I know that the Government

25  questioned her as to how much time it was going to take her.  I

—2:16-cr-46-GMN-PAL—

1  don't know whether this is something that the Court wants to

2  take now or maybe later on at a sealed proceeding, but I think

3  there's some extra concerns here that need to be at play as to

4  how much time it's going to take her to actually get to school.

5  So that needs to be taken into account as well.

6          THE COURT:  All right.  Any other concerns for juror

7  No. 108?

8          MS. WEKSLER:  So I was going to ask the Court if the

9  Court is not going to rule on hardship, does the Court want to

10  hear bias at this point in time?

11          THE COURT:  Yeah, I'm going to hear as much as I can

12  before lunch.

13          MS. WEKSLER:  All right.  So as the Court knows, this

14  is an individual that we questioned individually.  She

15  represented that she worked for Harry Reid during the period in

16  time where this event took place, during the period of time in

17  which Senator Reid referred to our clients as domestic

18  terrorists.  This is something that according to her

19  questionnaire, I'm quoting from her questionnaire, a common

20  topic of conversation while she worked for Senator Reid.  She

21  states in her questionnaire and she actually said this again in

22  court that she generally disagrees in which -- in the way in

23  which Bundy and this Court has conducted themselves.

24          So even though she said that it was -- at one point she

25  said that she was not supposed to have an opinion about matters,

1  which was a little bit confusing to me since she was actually

2  working for Senator Reid, she actually does say that she

3  generally disagrees, in her questionnaire, with the position

4  that the Bundys took.

5        Now, when questioned specifically as to how, how she

6  viewed this case and whether there was a hurdle that we needed

7  to overcome, and I used those precise words, she actually said

8  that, yes, to be honest, she said we would have to overcome that

9  hurdle.  That she had an overall negative opinion about the

10  case.  That she wants to see some evidence to overcome that

11  negative opinion.  I actually specifically asked her if the

12  Defense was at a disadvantage and she said yes.

13        Now, I understand that Mr. Schiess did go back up, do

14  some rehabilitation work with her, but the reality is that she

15  expressed -- when she was writing about this, she expressed some

16  general feelings about the case.  She confirmed those feelings

17  when I was talking to her, and then when Mr. Schiess went up

18  there, she said something different.  So I'm really not sure

19  that we can trust what she's saying in court.  I think that this

20  is a case where we have a very true indication of implicit bias

21  here.

22        And I think that this is a case that you can really

23  equate to what I'm sure the Government's going to bring up,

24  juror 133, that I'm sure they're going to rely on the fact that

25  juror No. 133 said something along the lines that she was

—2:16-cr-46-GMN-PAL—

1   willing to be sympathetic towards our clients.  This is the

2   other side of this coin, right.  So I think that the Court

3   should keep in mind that this is the type of implicit bias that

4   the -- that needs to be considered and that is very much at play

5   with this particular juror.

6         THE COURT:  All right.  Anyone else wish to be heard on

7   juror No. 108?  Mr. Philpot, you look like you --

8         MR. PHILPOT:  Yeah, I would just like to back this up

9   with a little Ninth Circuit case law that I think is very

10  relevant to this.  There -- you're probably familiar with the

11  Fields v. Brown case where the facts show a bias, but the juror

12  makes a declaration that he or she can listen to the evidence

13  and be governed by it.  And it specifically says:  But the law

14  will not trust him.  And I think this is a case where the

15  objective facts of this questionnaire and statements show that

16  there's implied bias, and in this case I think the Ninth

17  Circuit's clear that this juror needs to be dismissed for cause.

18        THE COURT:  All right.  Anyone else?  Mr. Ryan Bundy or

19  Mr. Whipple, did you want to speak on juror No. 108?

20        MR. RYAN BUNDY:  Not 108, but I have a couple others

21  myself that I would like to bring up.

22        MR. WHIPPLE:  No, Your Honor.  Thank you.

23        THE COURT:  All right.  Government's position on juror

24  No. 108?

25        MR. SCHIESS:  Your Honor, that she should not be

2:16-cr-46-GMN-PAL

1   dismissed for cause.  The Defense has failed to establish a

2   sufficient basis for the Court to do so.  Look, we all know that

3   jurors and their comments, as all evidence, needs to be looked

4   at as a whole.  And while 108 made those statements that are

5   represented by counsel, we don't dispute that, when she had the

6   opportunity to really express her viewpoint, she said that the

7   information that she had through Senator Reid's office was very

8   limited, that her role and her responsibility there was to

9   remain disinterest, and that she said she had too little

10  information to make the decision.  She said that she wants to be

11  careful, that she can listen with an open mind, and then when I

12  pushed her on that and I pushed her on the point about the

13  truth, she's the one who said:  Well, isn't that the whole

14  purpose of a jury trial is to get all of the information and to

15  make that decision?

16       And then she punctuated that towards the end by saying

17  that she will be as fair as any other juror and that her

18  impressions of the Bundy case was only general impressions.

19       So when you look at her statement about the general

20  impressions that she had and then her determination and her

21  understanding of the whole point of a trial, the specifics that

22  she's willing to delve into, the Defense has not established a

23  basis for cause.  I believe the Court can have confidence in

24  her.

25            THE COURT:  All right.  What's the next one,

1  Ms. Weksler?

2       MS. WEKSLER:  Well, I believe Mr. Hill was going to

3  address No. 117?

4       MR. SCHIESS:  Sorry.  I didn't hear the number, please.

5       MS. WEKSLER:  117.

6       MR. SCHIESS:  Thank you.

7       MR. HILL:  And, Your Honor, she's also -- although I do

8  have an argument for cause for juror No. 117, she's in a group

9  also of a few other folks that have travel that interfered with

10 this court in the hardship context.  And I just wanted to put it

11 on the record that 117 has travel, and the Defense has no

12 objection for a hardship dismissal.

13      Similarly, 111 had a cruise with his folks.  145 --

14      THE COURT:  Wait.  118 has traveled?  What does that

15 mean?  She's got ...

16      MR. HILL:  117 has a trip from December 5th to December

17 12th, and I think Your Honor may be still considering the

18 hardship issues brought forth by the potential jurors.  I was

19 just going to advise those who had indicated they had travel

20 that the Defense has no issue having -- making these folks work

21 around their travel or making the court go dark certain days.

22 117 would be one of those.  111 would be another.

23      THE COURT:  Well, let's just stick to 117.  All right.

24 So she's traveling December 5th through 12th to New York.

25      MR. HILL:  Correct, Your Honor.

1          THE COURT:  What else about No. 117 do you want me to

2     consider?

3          MR. HILL:  And, Your Honor, in terms of cause, this was

4     the young lady that I talked to yesterday where she answered in

5     her questionnaire and reiterated here in open court that her

6     emotions regarding the Route 91 tragedy were very difficult to

7     control.  She said difficult emotions and feelings overcome her,

8     come and go at times.  She's not exactly sure when.  She said

9     maybe there would be certain things that would trigger it.  And

10    at the end of the day she indicated she did not feel she would

11    be an appropriate member of this juror [sic].

12          And I don't believe that we got any other indication of

13    her ability to separate those.  I think where she left us was, I

14    would not be an appropriate member of this juror [sic] because

15    my emotions were difficult to control as regards that tragedy.

16          THE COURT:  All right.  Anyone else want to speak as to

17    117?  Mr. Whipple?

18          MR. WHIPPLE:  No, Your Honor.  Thank you.

19          THE COURT:  Ryan Bundy?

20          MR. RYAN BUNDY:  Not on 117.

21          THE COURT:  And, Mr. Norwood or Ms. Weksler, on

22    No. 117?  All right.  So -- oh, I see her standing.  Mr. Norwood

23    is nodding no, but Ms. Weksler is standing up.  So I want to

24    make sure I give you an opportunity.

25          MS. WEKSLER:  We need to work on communication.

1        I have a note here that she was the owner of a -- or

2   worked at a restaurant and was the owner of a restaurant.  I'm

3   not quite sure.  She knows a lot of individuals who were injured

4   and that she also noted that more gun control is needed.  And

5   from my notes I can't quite decipher whether this was as a

6   result of Route 91 or not, but she certainly did indicate that.

7        THE COURT:  All right.  And what's the Government's

8   position on juror No. 117?

9        MR. SCHIESS:  Your Honor, there's two issues that came

10  up with respect to travel.  There's a number of people who have

11  some travel plans which will only affect the Court for a day or

12  two at a time.  While this juror has plans for the 5th to the

13  12th, most of that is covered by the Court's dark week in

14  December.  So this would only affect it sounds like Monday or

15  Tuesday.

16        The Defense has argued that the juror has views on gun

17  control.  Well, jurors are entitled to have their views on gun

18  control.  The question is can they be fair and impartial.  We do

19  not expect uniformity on people's views about what the social

20  issues are of the day, and she's indicated that she knows some

21  people on 10/1.  I take into that and the matters, we just

22  simply submit to the Court.

23        THE COURT:  So, Mr. Schiess, you're right.  We're dark

24  that first week of December, and our first day back would have

25  been December 11th and 12th if she's not on the jury, but if she

————— 2:16-cr-46-GMN-PAL —————

1  is on the jury, then 11 and 12 would have to be dark unless she

2  can cancel that trip or some other arrangements are made.  So it

3  is two days, but, still, take a day off here, day off there,

4  pretty soon there's a lot of days gone.  So it's still a

5  concern.

6          All right.  And excuse me.  Mr. Hill, who else did you

7  have?

8          MR. HILL:  I'm assuming the Court doesn't -- would just

9  leave the hardships alone for now and address the cause or ...

10          THE COURT:  Tell me everything you want to tell me

11  about the jurors on this panel that you want me to excuse

12  because we're not revisiting that.

13          MR. HILL:  Very well, Your Honor.

14          No. 111 also has travels.  He's the one who's going on

15  a cruise with his folks for five days in a couple of weeks, and

16  the Defense has no issue with excusing juror 111.

17          No. 145 --

18          THE COURT:  Is that all you have on juror No. 111?

19          MR. HILL:  Oh, yeah.  No -- just hardship concerns on

20  juror No. 111, Your Honor.

21          THE COURT:  Okay.  He said it was his parents who had

22  purchased the trip and that he would not be able to go with

23  them, but it didn't sound like he was out any money.

24          MR. HILL:  Juror No. 145, Your Honor, has a wedding

25  from November 8th to 12th.  Again, no cause.  I guess I can't

 1  speak for all of the other counsel, but no cause at this time

 2  from Mr. Bundy.  But he did have that travel to the wedding.

 3  Just put it on the record that we have no objection to him being

 4  able to attend that wedding.

 5         And then finally juror No. 92 has a trip -- I don't

 6  think he went into details, at least not in my notes -- from

 7  November 10 to November the 13th.  And the last hardship concern

 8  would be juror No. 118 who advised on voir dire yesterday --

 9         THE COURT:  So juror No. 92 would be missing one day,

10  would be missing Monday.  So we would have to be dark Monday if

11  that person ends up on the jury.

12         MR. HILL:  Right, Your Honor.

13         THE COURT:  Okay.

14         MR. HILL:  And juror No. 118 advised during voir dire

15  yesterday that she only understood about half of what had

16  transpired yesterday, so for a language hardship.  And those are

17  all --

18         THE COURT:  What number was that last one?

19         MR. HILL:  118, Your Honor.

20         THE COURT:  All right.  All right.  So any other

21  defendant wish to be heard on juror No. 111?

22         MR. RYAN BUNDY:  Not 111, but 118.

23         THE COURT:  All right.  Anyone else want to be heard on

24  111?

25         Mr. Whipple, did you wish to be heard on juror No. 111?

2:16-cr-46-GMN-PAL

1          MR. WHIPPLE:  Other than what's been spoken, no, Your

2     Honor.

3          THE COURT:  All right.  What about 145?  Anyone else

4     wish to be heard on juror No. 145?

5          MR. WHIPPLE:  Those are simply time hardships that I

6     submit with Mr. Hill, Your Honor.

7          THE COURT:  All right.  How about juror No. 92, anybody

8     else wish to be heard on juror No. 92?

9          MR. WHIPPLE:  Same.

10          THE COURT:  And juror No. 118, I think Mr. Ryan Bundy.

11          MR. RYAN BUNDY:  Yes.  No. 118 I want to reiterate the

12     language barrier.  She states that she was only understanding

13     about 50 percent, but also the first day she had forgot to take

14     her blood pressure medication.  She wasn't feeling well.  She

15     wanted to go home.  Now, that may never happen again, but it may

16     again.  In other words, she's got an issue there with a medical

17     issue that she had forgotten to take care of.  And so we -- I

18     don't have an objection with letting her go for that cause; the

19     language barrier mostly.

20          THE COURT:  All right.  Anyone else wish to be heard on

21     118?

22          MS. WEKSLER:  Yes, Your Honor.  Mr. Payne also joins

23     with regards to the English barrier.  And I want to note that

24     the Court had a conversation with her one-on-one that was a

25     little bit truncated.  Not really clear that there was quite a

 1  conversation going on there.  I asked a question myself during

 2  my group voir dire.  There was clear miscommunication there as

 3  well.  So I just wanted to note that for the record.

 4        THE COURT:  All right.  Mr. Hill, anyone -- oh, you

 5  already brought up 118.  So anyone else from the Defense want to

 6  address 118?

 7        MR. WHIPPLE:  Submit it, Your Honor.

 8        MR. HILL:  And I do have one more for cause.  I'm sorry

 9  to interrupt Your Honor, but if you want the Government to

10  address the hardships before I do one more for cause, that's

11  fine.

12        MR. WHIPPLE:  I have one other hardship, Your Honor.  I

13  apologize.  It's juror No. 132.  I have not checked our

14  particular calendar, but my memory shows that she -- that this

15  individual will be unavailable or on a trip from January 13th

16  through January 17th.

17        THE COURT:  132?

18        MR. WHIPPLE:  Yes, Your Honor.

19        MR. SCHIESS:  I believe that's 133; not 132.  It's 133

20  that has that --

21        THE COURT:  Yeah, 133 has a work conference.

22        MR. SCHIESS:  January.

23        THE COURT:  January 13th through 17.

24        MR. SCHIESS:  Yeah, I think counsel's just confusing

25  the two.

1          THE COURT:  Is that who you're referring to?

2          MR. WHIPPLE:  Your Honor, I am just looking at my

3   notes.  I have 132 instead of 133.  So I'll stand corrected if

4   that's, in fact, correct.  But, again, trying to track when

5   different individuals had different trips is what I'm trying to

6   refresh and bring to the Court.

7          THE COURT:  All right.  So any other jurors,

8   Mr. Whipple, you want me to consider?

9          MR. WHIPPLE:  No, Your Honor, not at this time.

10         THE COURT:  All right.  And, Mr. Hill, was there anyone

11  else that you want me to consider?

12         MR. HILL:  Just one more for cause if I may, Judge.

13         THE COURT:  Yes.

14         MR. HILL:  And that would be juror No. 131.  And this

15  would be the gentleman that we brought in for individual voir

16  dire regarding Mr. Cliven Bundy's mailer -- not Mr. Cliven

17  Bundy's mailer, but the Democratic Party's mailer regarding

18  Mr. Cliven Bundy.

19         He kind of circuitously bounced around the issue.  But

20  what we gleaned and Mr. Norwood might on the tail end of my

21  representations be able to help with the transcript a bit, but

22  he advised that he had an interaction with his uncle who

23  presented him with a copy of a mailer.  He represented that he

24  understood his uncle's position that the Bundys were not guilty,

25  and he represented that he strongly disagreed with what his

1  uncle's position was.  The inference there of course being that

2  he had the opposite opinion regarding the guilt of the Bundys

3  which would be coming into the proceedings with a preconceived

4  notion of defendants' guilt.

5       I think he left it at, I can look at the facts, but I'm

6  not sure that he took it any further than that other than, I can

7  look at the facts.  That doesn't necessarily indicate in which

8  way he would look at the facts coming into this proceeding with

9  a notion of the Bundys' guilty.

10       THE COURT:  All right.  Do you have any other jurors,

11  Mr. Hill, that you want me to consider for cause?

12       MR. HILL:  Those are the only two that I had identified

13  that I'm covering, Your Honor.

14       THE COURT:  All right.  And anyone else want to speak

15  on those jurors?

16       MS. WEKSLER:  I have a different juror, Your Honor, so

17  I don't know if ...

18       MR. RYAN BUNDY:  I have a different one also.

19       THE COURT:  All right.  So no one else wants to speak

20  on jurors No. 133 or 131 it sounds like?

21       All right.  So, Mr. Ryan Bundy, which jurors did you

22  want me to consider excusing for cause?

23       MR. RYAN BUNDY:  It's No. 132, madam.  132 in the

24  supplemental questionnaire on question 15 stated that they

25  would -- that he would have difficulty to being fair and

 1   impartial in this case and he couldn't ask -- answer why.  He

 2   was brought in and individually questioned.  He emphatically

 3   stated that he does not like guns and he doesn't believe anyone

 4   should have them.  He feels strongly that he cannot be fair or

 5   impartial after the Route 91 event.

 6          He stated that only maybe he would be able to -- he

 7   said -- he said that the Defense would be disadvantaged in his

 8   mind, maybe.  The Defense might be one step behind and he needs

 9   to ...

10          (Conferring with Ms. Fletcher.)

11          MR. RYAN BUNDY:  Oh, yeah.  That the Defense would need

12   to overcome.  He would be -- that the Defense would be behind,

13   in other words, not starting on equal ground at the beginning of

14   the trial.  So I believe that he is biassed.  He's already made

15   a decision.

16          Also, in the supplemental questionnaire, question

17   No. 14, he changed his answer from the written answer in the

18   questionnaire to the -- to his verbal answer when we questioned

19   him.  Anyway, I just think that he's already got an opinion made

20   and that there's a bias there.

21          THE COURT:  All right.  Anyone else want to be heard as

22   to juror 132?

23          MR. PHILPOT:  If I may just briefly, Your Honor.

24          I've got a little bit of concern after hearing juror

25   132 even after the Government did some remediation that there

1  may be a propensity for or a lack of clarity of thought that

2  might make him unable to really serve on the jury.  His

3  statements, for example, that it would be hard to serve.  People

4  should not be able to have guns.  Two absolutely contradictory

5  statements.  Forgetting what he had said.  Inability to express

6  what he had said.  And some research that we have done indicates

7  there may be a use of a particular herb in this person's life

8  that may make his ability to think clearly difficult in this

9  case.

10          And I think it's --

11          THE COURT:  Did you say there may be a herb in his

12 life?

13          MR. PHILPOT:  Yes, Your Honor.  I don't -- given his --

14 I think he may either be on prescription medications or use a

15 substance which he probably should not, and I think that

16 explains his inability to think clearly.  I think if the parties

17 were to explore his postings online, they would see that he

18 might have an inclination towards using certain substances in

19 his life that are not helpful to deliberation.

20          THE COURT:  All right.  Anyone else want to speak

21 regarding juror No. 132?

22          All right.  Do any of the Defense members have any

23 other jurors that you would like the Court to consider removing

24 for cause?

25          MS. WEKSLER:  Yes, Your Honor.  I have No. 139.  This

 1   is an individual who indicated in his written questionnaire, the

 2   original questionnaire, on page 29 he indicated regarding the

 3   question about the Second Amendment and taking up arms, it says:

 4   Yes, not sure.  I think it means you can form a militia.  Not

 5   sure about firearms, ellipses, but good luck.

 6           Today's characterization of the Constitution and Second

 7   Amendment in particular, he seemed to think that it was quite

 8   obsolete.  He said that he was not really sure about firearms.

 9   He may have not actually said -- these are my notes.  So I see

10   the Government giving me a face like I'm crazy.  So this may

11   just be my notes.  He may have not said that it was obsolete.

12   These are my notes saying that he -- I believe that his views of

13   the Constitution are obsolete, but he did say his

14   characterization of the Constitution was something to the effect

15   that it just did not -- it did not have the same application as

16   it once did.

17           THE COURT:  It was not up to date.

18           MS. WEKSLER:  It was not up to date.

19           Specifically, he talked about how it might apply

20   regarding firearms.  My concern is his comment about good luck.

21   It seems to me that that's a little bit of a sarcastic comment

22   that he is making.  Especially, it indicates to me that he may

23   actually have a lot more knowledge about this case than he's

24   letting on because it's really kind of interesting that he's

25   linking this case to militias and firearms and in that same

1  sentence saying good luck.

2          So that together with the views that he expressed today

3  I think indicate that there's clearly implicit bias here at

4  play.

5          THE COURT:  All right.  I have juror 95, juror 108,

6  juror 117, juror 111, juror 145, juror 92, juror 118, juror 133,

7  juror 131, juror 132, and juror 139.  Any others?

8          And the parties have already agreed to excuse juror 97.

9  So juror 97 will be excused.  Did I miss any?  Anybody else?

10          MR. RYAN BUNDY:  I'd just like to speak to 139 just

11  briefly.

12          THE COURT:  All right.  Go ahead.

13          MR. RYAN BUNDY:  His views of feeling that the

14  Constitution was out of date to me shows forth that he's --

15  there's a lack of willingness to recognize it as the supreme

16  law, which it is.  It has not been rescinded or anything.  So I

17  worry that he will not be able to judge when the Court explains

18  the law on that matter.

19          MS. WEKSLER:  Judge, I just wanted to clarify

20  something.  Juror No. 133 is not our challenge.  I think it's

21  the Government is challenging 133 for cause and the Government

22  can correct me if I'm wrong, but that's what I thought I heard

23  the Government say.  So I just want to make that very clear.

24          THE COURT:  I thought Mr. Whipple brought up juror

25  No. 133 because she has a trip from January 13th to the 17th

 1  which is a work conference.

 2         MS. WEKSLER:  And I think -- I don't know whether he

 3  was addressing hardship or not.  Again, Mr. Payne is not

 4  requesting a cause challenge on 133 based on bias.

 5         MR. RYAN BUNDY:  Your Honor, I'll oppose 133 being

 6  removed also.

 7         MR. WHIPPLE:  Your Honor, if you recall, I had

 8  transposed 132 and 133.  In my notes it was 132 that had the

 9  trip.  So I will withdraw that request if that, in fact, fell on

10  133 instead of 132.

11         THE COURT:  All right.  But 133 is the one who had the

12  work conference trip from January 13th through the 17th, right?

13         MR. WHIPPLE:  I withdraw my hardship challenge then,

14  Your Honor.

15         THE COURT:  I understand that, but I want to make sure

16  that I have the right number.  So is it 133 who has the work

17  conference trip in January from January 13th through 17th?  Am I

18  incorrect?

19         MS. WEKSLER:  I believe she's the one that said that

20  she could go twice a year when asked specifically, but I could

21  be mistaken, so if somebody could check me on that.  I'm getting

22  some nods on the Defense side.

23         MR. RYAN BUNDY:  Yes, she did state that she could go

24  six months later.  That one could be rescheduled.

25         THE COURT:  I think that was someone else.

────── 2:16-cr-46-GMN-PAL ──────

1          MR. SCHIESS:  Your Honor, with respect to 133, we're
2    just confirming that's the individual with the time from
3    January -- for the week or so in January.
4          MR. RYAN BUNDY:  Also have some more on 133.
5          THE COURT:  All right.  Go ahead.
6          MR. RYAN BUNDY:  She did state that that work
7    conference which is in January is not mandatory.  It was just
8    preferred that she go and, again, that she could do that the
9    next time, the next scheduled time, which was in six months.
10         MR. SCHIESS:  Your Honor, with due respect, I believe
11   that was juror 103 who said that it wasn't mandatory.  She can
12   go the next time which is six months later.
13         THE COURT:  Yes, it was juror 103.  California class
14   for employees, Monday through Friday of this next week, but not
15   required and can take it again, but not for six more months.
16         All right.  So that was not 133.  All right.  So any
17   other jurors, Mr. Norwood?
18         MR. NORWOOD:  No other jurors I don't think, but I just
19   want to clarify one other issue here, Your Honor.  We are not
20   going to be ready to do peremptories this afternoon.  We need
21   time to discuss this matter with each other.  We have 10
22   peremptories and possibly some others, but, you know, this is
23   going to have to be a consensus.  There's four people here.  I
24   know already there are some differing issues.  And of course
25   Your Honor is going to resolve, I take it, all of these cause

1    issues by examining the record and so forth.

2          So, you know, it's additionally complicated by the fact

3    that one of our -- you know, Mr. Bundy is pro se.  We don't have

4    an easy way to talk with him right now.  We haven't had an easy

5    way to talk with him over the past two days except sort of

6    during these proceedings and right before and right after.

7          We really need time to meet and have a meaningful

8    discussion about this so that we can be adequately prepared to

9    decide based on the Court's final cause rulings which

10   peremptories we want to exercise.  So what I'm asking the Court

11   to do is obviously to take the time to review all of these cause

12   challenges that are before it.  The Court can make a ruling on

13   that this afternoon, and we can invite the remaining jurors to

14   come back on Thursday morning, and we'll be ready to go.

15         THE COURT:  All right.  So what is the Government's

16   position on juror --

17         MS. WEKSLER:  Your Honor, I am so sorry.  Is the Court

18   just taking cause challenges based on yesterday's jurors?

19   Because I have a list on Monday's jurors as well.  So if --

20   however the Court wants to handle it, I'm happy to.  I just want

21   to flag that there are cause issues from Monday as well.

22         THE COURT:  All right.  So juror number, I think, 108

23   you already addressed, but 117 you did not.  Is that right?

24         MR. SCHIESS:  Oh, you're looking at the Government?

25         THE COURT:  Yes.

1          MR. SCHIESS:  We addressed 95, 97, and 108.  We have

2     not addressed the rest.

3          THE COURT:  All right.  So juror 117, what's your

4     position?

5          (Prosecution conferring.)

6          MR. SCHIESS:  Your Honor, with respect to the -- there

7     were two separate subject matters.  Here was the hardship for

8     the timing.  On that this juror is only going to miss -- cause

9     the Court to be dark for two days.  And then with respect to the

10    cause challenge, the issue was raised on 9 -- on the October the

11    1st shooting.  She raised -- she just simply stated of course

12    that there would be the feelings that she had.  It would be

13    difficult for her as if -- you know, and those feelings are

14    present with anybody, but she certainly seemed like she could

15    overcome that as, you know, a separate event.

16         She also commented on gun control, but our position

17    clear goes back.  No one's entitled to have the ideal juror with

18    their philosophies that they want -- that the defendants want.

19    There is nothing wrong with having a view of gun control that it

20    either should be strict or it should be liberal.  The question

21    is does that cause you to be unfair or impartial.  And there was

22    no questions, there was nothing about gun control, that went to

23    the subject of her being unfair or impartial.

24         So we would object to 117.

25         THE COURT:  111?

—2:16-cr-46-GMN-PAL—

1      MR. SCHIESS:  111 was, my recollection, my notes are

2  solely the hardship.  And this is the individual that would be

3  gone for the five days with his parents, and it sounded as if

4  he, although not preferable, could miss that with his parents.

5  It's a longer time, but I understand it's a longer time.  If the

6  Court were to accommodate that, certainly, you know, we don't

7  want to be trying this case in March and April.  So if you were

8  going to draw the line, we would submit -- suggest to the Court

9  that we could go dark for a day or two, but, you know, if it's

10 going to be five days and you want to accommodate five days, we

11 would, you know, want to get through with this trial before we

12 have our next birthdays or next Thanksgiving.

13      THE COURT:  All right.  Juror No. 145?

14      MR. SCHIESS:  I think we -- oh, in terms of -- she's

15 only going to be gone or he was only going to be gone -- he or

16 she.  I apologize.  I don't remember the gender -- two days to

17 attend the wedding or be going to only miss it would seem to be

18 two days to attend the wedding.  And that just depends on where

19 the Court draws the line.

20      THE COURT:  Juror 92?

21      MR. SCHIESS:  92, this juror is only one day.  And

22 certainly with -- one day is very reasonable to accommodate

23 given the number of dark days we have, the number of events.

24 And certainly the potential for more days to come that we

25 certainly can accommodate one day.  And we feel that's

```
                    ─ 2:16-cr-46-GMN-PAL ─
```

 1   appropriate.

 2         THE COURT:  All right.  Juror 118?

 3         MR. SCHIESS:  The language barrier, 50 percent language

 4   barrier, we have no objection to that juror being dismissed.

 5         THE COURT:  So juror No. 118 will be excused.

 6         And then juror No. 133 is the one with the work

 7   conference, but not the one who can take it again in six months.

 8         MR. SCHIESS:  Would you like me to be heard on that one

 9   at this time, Your Honor?

10         THE COURT:  Yes.

11         MR. SCHIESS:  Juror 133 is on -- as the Defense has

12   raised the basis for the length of time.  This is certainly the

13   long one in January.  In our view, five days -- an additional

14   five days of being dark is just too long.  We're concerned that

15   if this case stretches out into February/March, how much is the

16   jury going to remember from November/December.  And so based on

17   the length of that, for 133 we would ask that and anybody else

18   more than a day be dismissed.

19         And then I certainly --

20         THE COURT:  So for juror No. 133 we're actually dark on

21   January 15th for Martin Luther King day so she would only be

22   missing two days, Tuesday and Wednesday.  So we would be dark

23   two days if she was on the jury.

24         MR. WHIPPLE:  And, Your Honor, just to clarify, I was

25   the person who mentioned that and I was the one that transferred

—2:16-cr-46-GMN-PAL—

 1   the number from 133 to 132.  So I withdraw my request on that

 2   particular individual and, in fact, do not join the Government

 3   on that and believe that 133 should stay.

 4        MR. RYAN BUNDY:  I'm in concurrence with that as well.

 5   I believe 133 should stay.

 6        THE COURT:  All right.  Well, I realize that you have

 7   your own reasons for wanting or not wanting me to consider 133,

 8   but if I'm going to consider the travel hardships, I need to

 9   consider all of them and be consistent and not be looking at

10   whether or not you think that person is more sympathetic or less

11   sympathetic to your cause.  So I'm just trying to make sure

12   we've got all of the travel people.

13        MR. WHIPPLE:  Well, I think we need to double check

14   because I'm not sure that I'm incorrect.  So I am just taking

15   the word of the Government on that.  And I could, in fact, be

16   correct.  It could be 132.  I do not know that 133 is on a trip.

17   I think we need to clarify it with that individual before we

18   make a determination.

19        THE COURT:  So 133 who has the trip January 13 through

20   17th for a work conference.

21        All right.  I'm sorry.  I think I cut you off,

22   Mr. Schiess, on juror No. 133.  I'm just looking at the calendar

23   to see what -- because usually there's a weekend in there and

24   we're dark on Fridays and Saturdays and Sundays.

25        MR. SCHIESS:  I think at least with respect to the

————— 2:16-cr-46-GMN-PAL —————

 1   hardship I made my point.  When it comes to my turn for cause,

 2   I'll be raising that one for cause.

 3           THE COURT:  All right.  And juror No. 131?

 4           MR. SCHIESS:  The Defense challenged Mr. -- juror 131

 5   for cause.  I, with all due respect to counsel, have a

 6   completely different recollection of his testimony.  The --

 7   sorry, his testimony.  Excuse me.  His statements to the Court.

 8   He said that his step uncle he sees about four times a year.

 9   That his uncle likes to talk about his -- the uncle's views and

10   opinions.  That he did not say that -- it's my recollection that

11   he did not say that he thought the Bundys were not guilty, but

12   that he had a strong view about their case.  He didn't want to

13   hear about it.  He wasn't interested in hearing about it.  And

14   that the only information he had was just something very general

15   and there was no specific information given to him, and that

16   he -- if anybody, this is the person who said that he disagrees

17   with his uncle's views, but he is totally open to the evidence.

18           And that he would stand alone on his own views and not

19   from his uncle.  So there's no basis to believe that his uncle

20   gave him that information.  There's absolutely no basis to

21   believe that he could not be fair or impartial or that he is

22   biassed.

23           THE COURT:  All right.  132?

24           MR. SCHIESS:  No. 132, like a number of other

25   witnesses -- jurors -- I apologize.  I keep saying that, Your

————— 2:16-cr-46-GMN-PAL —————

1   Honor.  No. 132 has his own views about guns, whether they
2   should be used, whether they should not.  As they -- the Defense
3   questioned him, they were not able to establish at all that his
4   views would cause him to be biassed in this case.  Again, no
5   party is entitled to an ideal juror that agrees with solely
6   their viewpoint.

7        The question of course is for open minded, and this
8   individual said that he can listen -- I mean, he can be open
9   minded.  He can listen to the evidence.  He recognizes this is a
10  different case.  He can separate this case from October the 1st,
11  that he will follow the law, follow the instructions, and will
12  apply the judge's instructions.  You couldn't ask more from a
13  juror, potential juror, than that.

14       Now, with respect to the comments that counsel made an
15  assessment of whether this juror were using prescription drugs
16  or marijuana, there's no basis to believe -- to rely upon that.
17  That he's using it to a degree -- using it, first of all.
18  Second, that it has any ability to affect his perception or
19  ability to participate fairly.

20       THE COURT:  And what about juror 139?

21       MR. SCHIESS:  Okay.  First of all, I want to note that
22  my records -- information reflects that he was not questioned by
23  counsel; that they're relying upon the answers that he gave.  So
24  no one tested him.

25       MS. WEKSLER:  Your Honor, I think he's correct, Your

 1  Honor.  That was in regards to Mr. Schiess's questioning, so I
 2  may have misspoken on that.
 3          MR. SCHIESS:  I'm not suggesting either way, but I'm
 4  just making the point clearer.  So thank you.
 5          Oh, I'm sorry.  I'm being corrected.
 6          THE COURT:  I thought Mr. Ryan Bundy was the one who
 7  asked him questions, yes.
 8          MR. SCHIESS:  Thank you.  He did express views about
 9  that he had thought about the Second Amendment.  He's not sure
10  how he felt about firearms, but numerous times he said that
11  while he was not sure how he felt about firearms, numerous times
12  he felt that he could be fair.  And that there's been nothing to
13  establish this person's bias.  Again, I know I'm sounding like a
14  broken record, but people can have differing views on the gun
15  laws or whether people can use firearms.  But the question is
16  can you follow the law as the Court gives it.  And there's
17  nothing to establish, the words from his mouth, to even suggest
18  otherwise and nothing on paper to suggest otherwise.
19          THE COURT:  All right.  And then which of the jurors,
20  if any, does the Government wish the Court to consider excusing
21  for cause?  I think you said you had one or is it more than one?
22          MR. SCHIESS:  I have more than one, Your Honor.
23          THE COURT:  All right.  Go ahead.
24          MR. SCHIESS:  Okay.  I have -- my list is where I have
25  from yesterday as well as today.  Where would like me to focus

—2:16-cr-46-GMN-PAL—

1  on for --

2          THE COURT:  Just for today.

3          MR. SCHIESS:  Excuse me, please?

4          THE COURT:  Just from today.

5          MR. SCHIESS:  Okay.  A number -- okay.  No. 25, I

6  questioned No. 25 this morning about a couple of subject

7  matters.  In particular to my argument here, one is about his --

8  just to kind of orient the Court, this is the individual whose

9  wife works for worker's comp and handles the Metro -- some of

10 the Metro officers and that she helped him fill out at least to

11 that portion so that he could be careful.

12          But what's very challenging about him that I submit to

13 the Court definitely establishes unfairness is that he -- when

14 he asked about the Department of Justice -- or excuse me.  In

15 particular Eric Holder, he said he's read the information and

16 that he believes that Eric Holder only went after people that

17 Obama wanted him to.  And with respect to his opinion to the

18 FBI, he said that Comey made the FBI look stupid, which

19 certainly relates in part to any time the FBI I think would

20 appear in a case, and they're appearing as -- this is their

21 investigation and they'll be -- agents will be testifying as

22 witnesses.

23          Now, certainly he test -- or he stated that he could

24 look at the evidence, but I think the Court needs to, as

25 counsel, Mr. Philpot, pointed out, look at both the written

—2:16-cr-46-GMN-PAL—

1  statement as well as the oral statement.  And when you look at

2  the direct strength of his written statement, I would submit

3  that overcomes his oral representations to the Court and the

4  Court should find for cause.

5          THE COURT:  What in particular is in the written

6  statement that you're referring to?

7          MR. SCHIESS:  Page 20, question 2, to the original.

8  The question -- the heart of the question goes to whether he's

9  read or heard anything about DOJ, and he said:  I read that Eric

10 Holder only went after people Obama wanted him to, end quote.

11 With respect to his opinion of the FBI, he said, quote or

12 partially:  Comey made the FBI look stupid.

13          This case was investigated under the time that

14 Mr. Comey was the Director of the FBI and charged when Mr. Comey

15 was the Director.  And it was investigated while Mr. Holder was

16 the Attorney General and President Obama was the President.

17          Excuse me.  May I ...

18          (Prosecution conferring.)

19          THE COURT:  All right.  Anything else on juror 25?

20          MR. SCHIESS:  No, let me -- I have one more on that,

21 please, if I may.

22          So Section 1, page -- page 20, question 2, the question

23 was:  Have you read or heard anything about the United States

24 Attorney's Office or the U.S. Department of Justice that could

25 affect your ability to be fair and impartial to either the

———— 2:16-cr-46-GMN-PAL ————

 1  Prosecution or the Defense?  And his answer was:  Yes.  The

 2  subquestion was:  If so, please describe the nature of what you

 3  have read or heard.  And that's when he said -- or wrote:  I

 4  read that Eric Holder only went after people Obama wanted him

 5  to.

 6          THE COURT:  All right.  Anything else?

 7          MR. SCHIESS:  Yes.

 8          THE COURT:  Okay.

 9          MR. SCHIESS:  No. 105.  105 is the juror who we

10  interviewed yesterday outside the presence of the rest of the

11  jury, and he said that he had read about both trials, followed

12  them closely.  He read about -- he had to go to an unusual

13  website on his Internet or location on his Internet.  He said he

14  read about the Malheur incident, that he thought that the matter

15  was all over the Uranium 1 deal, and that he received his

16  information from propaganda site -- he didn't say this, but it's

17  clear he received his information from propaganda sites that

18  support the Bundys.  He said that he thought this matter was

19  caused by staff incompetence.

20          So that's one solid basis, Your Honor, a different one

21  that gives great concern, and I believe is an appropriate reason

22  for cause is that during the questioning that I asked of him

23  it's apparent that he felt badgered, not only by me, by the

24  Court, by the way he looked and rolled his eyes when we tried to

25  ask him questions again.  He said, I've answered that question.

———— 2:16-cr-46-GMN-PAL ————

1  I made it very clear.

2         And with all due respect, I know that I don't always

3  ask every question clearly, but I'm very confident that when I

4  addressed those questions with him about his opinion, his views,

5  whether they were strong, that I was very, very clear about my

6  questions.  He did not answer them before, and he was very

7  argumentative and combative.  And I believe that his attitude --

8  and I would say, too, if you were watching his facial

9  expressions and his body language not only with me, but those

10  are the same facial and body expressions that he had when you

11  were asking him some of those questions.

12         So on top of that, it certainly appears that not only

13  does he have difficulty dealing with the Court and the parties

14  and the counsel, but he would be very disruptive to a jury if he

15  were to be back in there.

16         Oh.  I'm being pointed out that I misspoke.  That he

17  said he followed all of the trials closely so -- in his notes.

18  That's 105.  I have two more, Your Honor.  Three more.

19         THE COURT:  All right.

20         MR. SCHIESS:  I'm pointing out that at least back on

21  the subject of hardship, 103.  This is the individual that

22  talked about her class, being able to have to take the class

23  some time later, and be gone for a while next week when trial

24  starts.  So we don't want to be -- if you are going to

25  accommodate her class schedule, I don't think you want to delay

 1 | trial for -- to begin, another week of delay.

 2 |       THE COURT:  What's your position on juror No. 103?

 3 |       MR. SCHIESS:  133.

 4 |       THE COURT:  Oh, 133.

 5 |       MR. SCHIESS:  103.  So 103 because of her hardship it

 6 | would be -- and her desire to go to the class offered once every

 7 | six months would be to let her go.

 8 |       So I can turn to 133 if you would like.

 9 |       THE COURT:  Yes.

10 |       MR. SCHIESS:  Okay.  This is the juror that we brought

11 | in this morning.  Very clear that she said that the Government

12 | would start with an uneven playing field.  That she has thought

13 | the case was silly.  That she had -- her favorite movie was Open

14 | Range.  That she feels like the cattle should be out on the

15 | range.  That -- in her questions and answers that she wrote the

16 | comments on page 19, question 9, about the opinion of the

17 | parties:  I only know part of this case, but what I heard I

18 | thought was silly.  Who cares if they let their cattle graze?

19 |       She also said that she feels like she's on the side of

20 | the little guy and that would add more weight, tipping the

21 | scales against the Government, even when she said that she

22 | understood that -- of the burden of proof.  And this is also the

23 | person who feels like -- who's disclosed that she has a friend

24 | in the EEOC and she's talked briefly with that person about this

25 | case.

1         But she was questioned by Defense counsel and she was

2    asked about her opinion.  And she said she formed her opinion

3    before she got here and she does not think that she can put her

4    opinion aside.  She said she'll try to leave it at the front

5    door, but she cannot give the Court any assurances and she

6    doesn't know how she could even do that.  And she said that --

7    that hearing the evidence will not change her mind.  That she --

8    her heart is with the country folks.  That she's already formed

9    an opinion and she can't be sure that she'll set her opinion

10   aside.  And she can't give the Court assurances about how she

11   would even do that.  She also added that she was torn between

12   sympathy for the defendants and upholding the law.

13        So I -- oh, one more point.  I'm sure the Court also

14   has your notes that to -- she's the one who felt that it was --

15   a long sentence would be unfair.  She has already heard about

16   the individual who was sentenced on the same day that OJ was

17   released from or into parole.  And she felt very -- had very

18   strong negative views about the length of sentence.

19        THE COURT:  And for the record that date was October

20   1st that OJ was released, which was after the summons was

21   issued.  She represented that this conversation to her

22   recollection was prior to her receiving the summons, but it was

23   after.  And she said --

24        MR. SCHIESS:  And she may have been misrecollecting the

25   date, but, you know, sometimes when we look back --

—2:16-cr-46-GMN-PAL—

1          THE COURT:  She said the friend -- a friend of 20 years

2   and talks to her all the time.  So --

3          MR. SCHIESS:  -- our memories conflate --

4          THE COURT:  -- easy to mistake that.

5          MR. SCHIESS:  Okay.

6          No. 135, Your Honor, it's very clear that juror 135 has

7   already formed a very strong opinion for the Bundys based upon

8   her love of animals and her perception that BLM treats animals

9   cruelly and that she has a negative opinion and a view of BLM.

10  On page 8, question 4, her answer was:  I only care that the

11  animals are fed and treated properly.  Nevada has a lot of

12  unused land, and if animals can have a good life, that matters

13  to me more than the BLM -- the Bureau of Land Management

14  property.

15         Page 20, question 3, she said:  I cannot -- I can't

16  stand to watch the BLM round up wild horses with their

17  helicopters.  It's cruelty to animals.  And you may remember

18  that I asked her if she would feel the same way if she learned

19  that the evidence in this case showed that the BLM was rounding

20  up cattle with helicopters and that one or more cattle died

21  during the entire impoundment process.  And she indicated that

22  she would be of course affected by that information.

23         On page 20, question 4, her answer was -- about where

24  the information was:  TV and newspaper.  Cliven Bundy was

25  willing to pay grazing rights.  Then everyone came out with guns

1  drawn.  It went too far.

2           Page 21, question 3A -- and I should interject here as

3  I go on, counsel can stop me at any time if they're going to

4  agree to this motion for cause, and if not, I'll continue.  3A:

5  We have so much unused land.  Horses and cattle should be able

6  to sustain their lives off this land.  The BLM can make their

7  money elsewhere.

8           More evidence of bias in the overall view about law

9  enforcement, page 26, question 7.  Her experience was that

10 extremely rude police officers at new red signal gave ticket to

11 a 67-year-old man who never has had a ticket in his life.  The

12 cop said, quote, We need to teach you people how to drive, end

13 quote.  Law enforcement officers need to back it down.  If they

14 want to respect -- if they want respect, they need to be

15 respectful.  I think we pay their salaries.

16          And of course the Defense in this case is going to be

17 contesting that the BLM officers were acting disrespectfully,

18 inappropriately.  And so we draw significant concerns about her

19 experience with one officer to the defense that will be raised

20 in this case.

21          Page 27, question 7 -- excuse me.  Yes.  Page 27,

22 question 7, she continued on.  She goes:  I believe that the

23 animals, Bundy's cattle, or wild horses or burrows have the

24 right to graze on all our open land.

25          So when we're looking at the -- excuse me.  So page 27,

1   question 7, she went onto say:  I don't like how they treat

2   animals.  In this case there are pictures of dead cows.  Those I

3   have no doubt will sought to be brought into evidence.  There

4   will be testimony about BLM having had to shoot dangerous

5   cattles and cattles under other circumstances that trained

6   cowboys will explain, but it will be there.  And that certainly

7   would trigger an emotional reaction with her.

8           And then finally on page 28, question 6, her answer

9   was:  The state should be in charge of their land, parks, and

10  monuments.  The Federal Government should have more important

11  things to do:  the Middle East, the North Korea, the budget, et

12  cetera.  And that's certainly what the beliefs that Mr. Bundy

13  and his sons and apparently Mr. Payne have, and that will be

14  certainly part of the evidence in this case.  She has too strong

15  of a views with respect to that.

16          And finally -- or a couple of things, too.  When we

17  were talking about animals and she explained it, she began

18  crying when she was talking about her dog, which is certainly an

19  emotional situation for many, many people that should be

20  respected.  And finally, though, she was asked the question if

21  this trial would be difficult, and she said that she would be

22  better on another trial.

23          Your Honor, I submit that we have -- there's more than

24  enough evidence to dismiss her for cause and that she must be

25  given her apparent and obvious bias.

1          THE COURT:  All right.  What is the Defense position as

2     to juror No. 25?

3          MR. NORWOOD:  Your Honor, we object to No. 25, if I can

4     go through it for a moment.  I think sort of the primary

5     point -- the concern was a question that was asked on one of the

6     questionnaires:  Have you read or heard anything that could

7     influence your opinion on this case?  Lots of people answered

8     that question, and if we were going to boot everybody who gave

9     an answer to a question saying that there was something that

10    could influence them, then we'd have to boot a lot of jurors.

11         Saying that you read or heard something, first of all,

12    isn't the same thing as saying that you agree with that and

13    saying that you have an opinion on something isn't the same

14    thing as saying that you can't put that opinion aside.  This

15    witness, like many other people, may have some opinions about

16    the former President or the former Attorney General or the

17    former FBI Director, but again we can't -- lots of people have

18    opinions and that doesn't mean that they can't set them aside.

19         During the voir dire this morning, Mr. Schiess had a

20    full and fair opportunity to question this juror about these

21    very issues.  And this juror unequivocally said that they would

22    not affect him, that he could be fair and impartial, and that he

23    could put aside any views he had and serve as a fair juror.  So

24    that's not a basis for cause.

25         And so far as there is an issue about the Metro list,

—2:16-cr-46-GMN-PAL—

1  that's a non-issue, too.  To the extent that's a Government

2  concern at all, the witness was very clear that that's not going

3  to affect him.  Again, if this -- if a witness who has opinions

4  who clearly says that he can put those opinions aside, which is

5  the standard for striking someone for cause, then there's lots

6  of other people who we are going to have to strike, too.

7          As for juror No. 105, I think part of that is the same

8  issue --

9          MR. SCHIESS:  Your Honor, may I just add a comment on

10  one, No. 125?  In his supplemental response to the jury

11  questionnaire on page 3 of 5 when he was asked about:  Has Route

12  91 Harvest Music Festival shooting affected you emotionally,

13  psychologically, physically, or economically, his answer was:

14  Yes.  We said:  Please explain.  And he wrote:  Triggered PTSD.

15  And you recall this is the person who served in the military.

16          So if the Defense is arguing that the 10/1 shooting has

17  affected everybody or certain people and they should be

18  dismissed, this guy has given a concrete specific reason that is

19  more compelling than any other juror who's been questioned on

20  that subject and that they've argued for.  So, again, that's on

21  page 3, question 14, and the subquestion:  Triggered PTSD.

22          MR. NORWOOD:  If I could finish my thought, Your Honor.

23  Again, Mr. Schiess had the last chance to go through the

24  questioning here.  We had this whole issue about reserving time

25  and so forth and made a point of doing this and --

1        THE COURT:  Is this the gentleman whose wife handles

2  the Las Vegas Metropolitan Police Department workmen's comp and

3  she helped him to fill out the paperwork, the questionnaire for

4  this case?

5        MR. SCHIESS:  Yes, Your Honor.

6        MR. NORWOOD:  He was asked about that.  He explained

7  that he wanted to make double sure that there wasn't going to be

8  any issue that, you know, he wasn't going to say that he didn't

9  know somebody that he did.  So he had the wife help him with

10  that part, and he very clearly said that there was no issue.

11  And, again, there was no issue that came up anywhere in the voir

12  dire about his inability to serve.

13        There are lots of people who are affected by the Route

14  91 tragedy.  If we want to go through all of the questionnaires,

15  we can find lots of people who gave answers that gave us some

16  degree of concern.  We brought up some with our cause

17  challenges.  The Government basically objected to all of them.

18        So, again, if we're going to go down that route of, you

19  know, picking out people who were affected in some way or

20  another by the incident -- I mean, that's the incident.  I mean,

21  you know, as the Government has pointed out when this comment

22  has come up in other instances, this is a different case.  So I

23  don't doubt that this juror like many other people was affected

24  by Route 91, but that doesn't mean that anything is going to

25  happen in this case.  And he certainly never expressed that

-2:16-cr-46-GMN-PAL-

1  concern in court.

2          I'm also prepared to address 105, too, Your Honor, if

3  you would like.

4          THE COURT:  So did you have nothing else on juror

5  No. 25?

6          MR. RYAN BUNDY:  I have something.

7          THE COURT:  All right, Mr. Ryan Bundy.

8          MR. RYAN BUNDY:  Yes, back to his supplemental

9  questionnaire.  When questioned about the -- whether that event

10 of Route 91 would affect his -- make it difficult for him to be

11 fair and impartial, he said no.  And also concerning the -- his

12 wife helping him on the questionnaire was only that part with

13 the witnesses.  She only helped to see if they recognized any

14 witnesses and she did not help on any other part of the

15 questionnaire.

16         Also his position on the opinions of, say, Eric Holder

17 and so forth, you know, do not -- they are not part of this

18 case.  Those are his personal opinions.  He said he could set

19 those aside and judge fairly upon the facts.  And so I think

20 it's stretch to say that he has a bias.

21         THE COURT:  All right.  Anyone else wish to be heard on

22 juror No. 25?  Mr. Whipple?  Mr. Hill?

23         All right.  So let's move on then.  Juror No. 105.

24         MR. NORWOOD:  Yes, Your Honor.  So I think this sort of

25 starts with the same issue.  I think the prosecution's initial

———— 2:16-cr-46-GMN-PAL ————

1  concern was how he answered that question about reading or

2  hearing things that could affect your view of the case.  And he

3  mentioned something about some uranium issue.  And I think as

4  this came up in the individual voir dire I think that sort of

5  proceeded on -- first of all, on a misunderstanding that what

6  this person read or heard someplace is necessarily his opinion.

7  Again, that's not true.

8          You know, there's some speculation here about what this

9  person's political leanings might be.  I mean, again, the

10  prosecution doesn't have a right to a jury consisting solely of

11  people one political view or another.  There's a diversity of

12  political views here.  Those people are allowed to serve on a

13  jury as long as they can be fair and impartial.  And probably

14  more so than any other witness we've had here, this witness was

15  extensively examined by the Prosecution about his potential

16  bias.  And this witness unequivocally stated that he could serve

17  as a fair and impartial juror.

18          One of the arguments made was for cause for Mr. Schiess

19  was that the juror might have felt badgered by the questioning

20  and, therefore, that's a basis for cause.  I mean, with all due

21  respect, I think the Court should reject the idea that a lawyer

22  can sort of create his own cause challenge by the way he

23  questions a witness.  If that were the case, then we could pick

24  out the jurors we don't like and question them in a certain way

25  and then say that we had alienated them through the way that we

1 were questioning them.

2          I think the problem was with the questioning.  It was

3 proceeding on an assumption that the person adhered to views

4 that he didn't necessarily have, and there was an assumption

5 that he would -- you know, in the questioning that there was an

6 issue with the juror's integrity which he understandably took

7 issue with.

8          As far as his case knowledge --

9          THE COURT:  Mr. Schiess's questions were not any

10 different to juror No. 105 than they were to anyone else.  I was

11 surprised in all the years that I've been doing this at his --

12 at juror No. 105's reaction.  He was very evasive.  Did not want

13 to answer the questions.  He was very agitated.  I even

14 questioned whether I should tell him to calm down or not because

15 I didn't know if that would make him worse.  He was grabbing at

16 the front of the jury box with the wood there with his hand, and

17 he was very defensive, critical of the questions that were being

18 asked.

19          I actually had him written down as the only one that I

20 was considering excusing.  So I am surprised that there's a

21 whole list of other folks, too, but I'm willing to listen.  I

22 just wanted to let you know that's actually the only one that I

23 thought needed to be excused, but obviously I'll consider all of

24 them.  But --

25          MR. NORWOOD:  I would respectfully disagree.

—2:16-cr-46-GMN-PAL—

1           THE COURT:  That was really bizarre.  He just had the

2   most bizarre response.

3           MR. NORWOOD:  It's difficult to be a juror here.

4   You've got to come into a court.  You've got to answer all of

5   these questions --

6           THE COURT:  You are not going to convince me otherwise

7   on that one.  So if you want to make your record, go ahead,

8   but --

9           MR. NORWOOD:  Right.  I think -- I think he felt like

10  he was being singled out because of, perhaps, some things he

11  said in his questionnaire.

12          THE COURT:  We singled out a lot of jurors and had them

13  come in outside the presence, and I explained to all of them

14  exactly why we were doing it.  So his reaction was very out of

15  the ordinary.

16          MR. NORWOOD:  I think the nature of that singling out

17  was different.  And, again, what he said in response to the

18  questions was he unequivocally said he could be fair.  Frankly,

19  he was much more unequivocal on that than a lot of other people

20  were who were up for sort of cause discussion here.  So I think

21  the issue was with the questioning.  It was not with the juror.

22          THE COURT:  All right.  Anyone else want to speak as to

23  juror No. 25?

24          MS. WEKSLER:  Juror No. 105, Your Honor, for the

25  record.

─2:16-cr-46-GMN-PAL─

1          THE COURT:  105 is next.

2          MS. WEKSLER:  No, that was No. 105 that was being

3    discussed.

4          THE COURT:  Oh, I'm sorry.  Yes.  That was 105.  How

5    about juror No. 103?

6          MS. WEKSLER:  So, Your Honor, the only thing I would

7    ask the Court to do is, as the Court noted, if the Court's going

8    to be taking hardship into account and travel, if the Court's

9    going to be excusing lengths of periods of time, then I think

10   that that should apply equally to all of the hardship requests

11   and not just the ones that the Government wants to have excused.

12         MR. SCHIESS:  Your Honor, that's not quite a fair

13   statement because when they've argued the times of who should be

14   excused, they did not talk about 133 because of their own

15   reasons.  And that one's going to be gone.  They didn't talk

16   about 103 either.  So if they're going to be talking about

17   what's good for one party, they need to talk about their own

18   failure to raise individuals.

19         THE COURT:  All right.  So my understanding is that you

20   do not want juror No. 103 to be excused despite -- I'm sorry --

21   that you do want -- you do or do not want 103 to be excused?

22         MS. WEKSLER:  No, Your Honor.  I'm just asking -- I

23   mean, my position is that the Court take into account 103's

24   hardship request just like it would with any other request that

25   has been made with regards to hardship.  That's it.

1           THE COURT:  All right.  So just stay consistent.

2    Either they all go or none of them go or some of them go if the

3    length they are going to be gone is more than others and then

4    draw that line consistently.

5           MS. WEKSLER:  Thank you, Judge.  Yes.

6           THE COURT:  Okay.  Anyone else wish to be heard on

7    juror No. 103?

8           MR. PHILPOT:  If I may, Your Honor.  This 105 actually

9    indicated that she -- 103, I'm sorry, indicated that she wanted

10   to serve and could reschedule.

11          THE COURT:  Could reschedule what?

12          MR. PHILPOT:  That she could schedule out six months

13   the appointment that she had in January, I believe.  Yeah, work

14   class in California and that she could reschedule it out for six

15   months from now, or six months from the time of the class in

16   January, if I remember right on the dates.

17          THE COURT:  Right.  This would be from Monday, Tuesday,

18   and Wednesday of next week.  And I think -- was it Monday,

19   Aaron, that we were going to be dark because Mr. Marchese had

20   asked to be dark, but then his client pled guilty so he's not

21   here.  So then we were going to meet on Monday and have opening

22   statement.

23          COURTROOM ADMINISTRATOR:  That's correct, Your Honor.

24          MR. SCHIESS:  And, Your Honor, we've asked the Court if

25   you'd consider having Monday dark given the hearing that's going

—2:16-cr-46-GMN-PAL—

 1   to be this Friday and the need that we have to continue getting

 2   everything ready.  Friday's taking up time for us.

 3           THE COURT:  Well, opening statements, we could do it in

 4   the afternoon if you need more time in the morning to prepare

 5   past the weekend.  All right.  So we'll see.  I thought we were

 6   going to be -- I thought we were back on on Monday because

 7   Mr. Marchese was gone.  But, Aaron, you said there was a letter

 8   that already went out to counsel before Mr. Marchese pled that

 9   included that as a dark day or didn't include that as a day that

10   the ...

11           COURTROOM ADMINISTRATOR:  The calendar initially did

12   include that as a dark day.  It was amended after the plea was

13   accepted by the Court to include that day as an actual day of

14   trial.

15           THE COURT:  Right.  But the letter that I signed for

16   counsel to provide?

17           COURTROOM ADMINISTRATOR:  That doesn't include dates.

18   It just has the calendar with it.  I just sent the calendar with

19   the letter.

20           THE COURT:  All right.  Does anyone else wish to be

21   heard on juror No. 103?

22           All right.  So how about juror No. 133?

23           MS. WEKSLER:  Your Honor, this is one that I flagged I

24   think at the beginning.  I think that this is one -- if I can

25   just have one moment to just gather my notes here.

—2:16-cr-46-GMN-PAL—

 1          THE COURT:  Yes.

 2          MS. WEKSLER:  And if somebody else could go while I

 3   confirm something.

 4          THE COURT:  Someone else want to speak on juror

 5   No. 133?

 6          MS. WEKSLER:  Your Honor, we have no objection to 133.

 7          THE COURT:  All right.  So 133 will be excused.

 8          How about 135?

 9          MS. WEKSLER:  So 135 is the lady who talked extensively

10   about the horses, and this is the one that I flagged earlier.

11   And I would like the Court to consider the fact that she is one

12   of the ones who said that she would be better for another case,

13   just like No. 97 did, right.  So even though No. 97 answered in

14   the questionnaire to page 8, 32 -- is 97 struck?  Excuse me one

15   second.

16          MR. SCHIESS:  Your Honor, I point out that we

17   stipulated to 97.  So is she stipulating to 135?

18          THE COURT:  Yes, juror No. 97 everyone agreed should be

19   excused.  So 97 has already been excused.

20          MS. WEKSLER:  I just need one moment.  I have massive

21   confusion of notes here.  If I may just have one second.

22          So, Your Honor, I think 135 is somebody who actually

23   did state that she would try to follow instructions.  That she

24   would not intentionally not follow instructions, those are my

25   notes on her.  And this is one that I would like to sort of

1  compare side-by-side with No. 108, because she was one that I
2  think was sort of in the same type of category.  When she's
3  questioned one way, she says that she is willing to be open
4  minded and follow the instructions.  On the other hand, that she
5  says that we, the Defense, is starting at a disadvantage.
6       So I think that these two individuals are very
7  similarly situated, and I would ask the Court to look at those
8  side-by-side.
9       MR. SCHIESS:  Your Honor, I would ...
10      THE COURT:  Anyone else wish to be heard on 135?
11      All right.  So that's all of the for cause challenges
12 that we have for this group.  That was the Tuesday group, we'll
13 call them.
14      MR. PHILPOT:  Your Honor, I'm sorry.  One more.  95 was
15 under similar circumstances to the two mentioned by Ms. Weksler
16 who indicated that he would be better served on another jury,
17 but nonetheless made similar affirmations.
18      MR. SCHIESS:  Your Honor, may I just ...
19      THE COURT:  Nope.  I've given everybody an opportunity
20 to speak on --
21      MR. SCHIESS:  Thank you.
22      THE COURT:  -- all of the jurors that you've asked me
23 to consider, which include juror 95, 108, 117, 111, 145, 92,
24 133, 131, 132, 139, 25, 105, 103, and 135.  And the parties have
25 agreed to excuse juror No. 97, No. 18, and No. 133.  So those

—2:16-cr-46-GMN-PAL—

 1  three have been excused.

 2        COURTROOM ADMINISTRATOR:  Your Honor, that was 118; not

 3  18, correct?

 4        THE COURT:  118 is the person with the English language

 5  barrier and medical issue.  I'm sorry.  What did you hear me

 6  say?

 7        COURTROOM ADMINISTRATOR:  I heard 18, Your Honor.

 8        THE COURT:  Oh, no.  We don't even have -- well, I

 9  don't even know if we have a juror 18, but not in this pool.  I

10  think we did on Monday, but not here.  Yes.  So it's 118.

11  You're right.

12        All right.  So everyone go ahead and take a lunch

13  break.  What time, Aaron, do we come back?

14        COURTROOM ADMINISTRATOR:  2:15, Your Honor?

15        THE COURT:  All right.  We'll be back here at 2:15.

16        MR. NORWOOD:  Your Honor, can we just clarify the

17  agenda for this afternoon?

18        THE COURT:  I will be ruling on paralegal, Mr. Koerber,

19  and a ruling on the for cause challenges, and then we have 30

20  jurors coming in today for voir dire.  I can't imagine that

21  we'll get very far, but at least -- if you all have already gone

22  through those 30 to decide if there's anyone that you already

23  agree with, then that's helpful.  But, otherwise, I think we'll

24  just go through the screen shots with them.

25        MR. NORWOOD:  So we're going to start with the next

1  panel?

2          MR. SCHIESS:  Your Honor, do anticipate when we'll be

3  able to argue the for cause for Monday's jurors?

4          THE COURT:  If we get -- I guess -- I just don't want

5  to have these folks come in today.  We'll at least get started

6  with the -- probably not until tomorrow.

7          MR. SCHIESS:  Thank you.

8          THE COURT:  Because we had these folks come in today

9  and we haven't even brought them into court yet.  So I don't see

10 that that's ...

11         Maybe during one of the -- maybe the afternoon bathroom

12 break if it's not very many people.  Here, we had like 20.  So

13 that took quite a while.  So I suppose it depends on how many

14 people you all want me to consider excusing off the first panel.

15 All right.  So we'll take a lunch break.  What did you say,

16 Aaron, 2:15?

17         COURTROOM ADMINISTRATOR:  2:15, Your Honor.

18         THE COURT:  All right.  2:15 we'll be back here.

19         (Recess taken at 1:12 p.m.)

20         (Resumed at 2:50 p.m.)

21         COURTROOM ADMINISTRATOR:  All rise.

22         THE COURT:  Thank you.  You may be seated.

23         All right.  We're back on the record.  And Aaron has

24 convinced me that we should go ahead and hear counsels'

25 objections to the panel on day 1 before we bring in the panel

 1  that we were going to question today because we know we're not

 2  going to get done with the panel we were going to question today

 3  anyway.  So we can have them come back tomorrow.  They're going

 4  to be coming back tomorrow anyway.

 5          So, as far as, let's see, the ...

 6          All right.  So as far as the objections or motions by

 7  the attorneys regarding the jurors that were in the second

 8  panel, call them the Tuesday panel, the Court is going to excuse

 9  jurors No. 25, 105, 108, 132, and 135.

10          And then in regards to the paralegal's access to

11  devices, I am reluctantly going to permit him to have devices to

12  enable him to be able to review and pull up exhibits and

13  discovery as well as research on legal websites and communicate

14  with counsel, but we need to make sure -- and I'll leave that up

15  to you, Mr. Philpot, if you can come up with a better way to

16  handle this.  I need to make sure that he's not going to be

17  broadcasting from the courtroom, no audio recording, no video

18  recording, and that he is not going to be providing any

19  information about anything that happens while we're in a sealed

20  proceeding nor to make any statements that would -- well, I've

21  got here the model rule of professional conduct as well as the

22  ABA's criminal justice standards for defense functions.

23          So I'm mostly concerned with any inciteful or

24  provocative false information being provided that is going to

25  raise the security risks for everyone involved in the

1  courthouse; not just in the courtroom, but also people in other

2  areas.  So we don't want and don't need, quite frankly, to have

3  any more security present than we already have.  So if he's

4  online saying things that is going to raise a red flag for law

5  enforcement, I can't tell them to stand down if they -- they

6  have their own discretion when they think there is a problem or

7  not and what to do about it.  So take that into consideration.

8  It's not helpful for anyone.

9          So one thought was if you cover up, perhaps, the

10  speaker or -- and the -- it's not a projector, but the -- what

11  is the ...

12          COURTROOM ADMINISTRATOR:  Camera.

13          THE COURT:  I guess it's the camera, but I don't mean

14  like the camera that he's looking through.  So like, for

15  example, if you're Skyping someone, they can see you.  Whatever

16  that little lens is, cover that up with a piece of tape, like a

17  yellow tape.  Like something very obvious that we can all see

18  and everyone can say, Oh, yeah.  It's covered with the tape and

19  nobody has any concerns.  Not black or silver because that's

20  probably the color of the laptop.  And then I just want to avoid

21  anyone else from saying, I think I saw his laptop and it didn't

22  have tape on it today or something like that.  So if it's bright

23  yellow or orange, you know, something that is easily

24  distinguishable on both the speaker and the lens.

25          And obviously if there's any recording found on the

1    Internet, he's probably going to be suspect No. 1.  And, again,

2    I don't have any control over that.  As far as his placement in

3    the courtroom, we had set aside the first -- the front row of --

4    behind defendants for family.  And so far, as far as I can

5    recall, it hasn't been completely full.  So if there's room

6    there, I don't have a problem with it, but I don't want to

7    really push out the family.  You know, that's something that we

8    made available for them so they could be up front.  So if other

9    people from the public want to come in, of course they're

10   welcome, but we don't want them to block the view of family.

11         I'm being told -- what, is there two rows for family?

12   Is that what you're saying?  Well, the very front row that is on

13   this side of the well is where the marshals sit and come and go

14   because we've got so many tables in the well to accommodate all

15   of the defendants.  Two of the defendants have two attorneys,

16   and then we've got the Federal Public Defender's Office

17   paralegal and the -- not forensic, but the person who is running

18   the computer that's pulling up the exhibits and such.  So we

19   can't remove any of the tables as far as I can see to make any

20   more room for the marshals, but we certainly could have your

21   paralegal sitting in the front row if that's not a concern with

22   the family as long as they have room; just because that's always

23   been our intent is to permit the family to have the front row.

24         MR. PHILPOT:  I appreciate that, Your Honor.  The only

25   thing I don't want to do is be disruptive.  If I'm going through

1   here and having to go sit on that back bench regularly, I'm

2   afraid that that could become quite disruptive.

3         THE COURT:  You and Mr. Hill could trade places if

4   that's a problem.  That way you are on the end, and then you can

5   quickly go back just one row behind you there as opposed to

6   being in the middle of the row.

7         All right.  So, now, let's hear from counsel.

8   Ms. Weksler, if you want to start, you said you had the list of

9   jurors in the first panel, we'll call it the Monday panel, the

10  first panel.

11        COURTROOM ADMINISTRATOR:  Your Honor, before we do

12  that, one thing for the record.  The Government did provide to

13  me the Facebook post and the CD that they mentioned earlier.

14  And I've marked them JS-1 and JS-2.  JS for jury selection so

15  they're not confused with trial exhibits.

16        THE COURT:  All right.  Can I take a look at those?

17        COURTROOM ADMINISTRATOR:  Yes, Your Honor.

18        THE COURT:  All right.  I have not reviewed -- so I

19  have reviewed the Facebook post which is marked Exhibit JS-1.  I

20  have not reviewed the disc which is marked as Exhibit JS-2.  So

21  I'll review that as soon as I get a chance.  If I change my

22  mind, I'll let you know.

23        And obviously if there's any other information that

24  comes up, we might need to revisit it, but I'm hopeful,

25  Mr. Philpot, that you will keep a close eye to make sure that

2:16-cr-46-GMN-PAL

 1    there isn't any appearance of anything going on that is going to

 2    cause us to have to readdress the situation.

 3              MR. PHILPOT:  I will, Your Honor.

 4              COURTROOM ADMINISTRATOR:  Your Honor, additionally, I

 5    recommend that we allow the jurors from Tuesday's group to

 6    return at some point tomorrow given that we're going to start

 7    talking about Monday and possibly going into the group for today

 8    that was called in?

 9              THE COURT:  That's fair.

10              COURTROOM ADMINISTRATOR:  Also, the group from Monday

11    is also here.  So I recommend having both the group from Monday

12    and Tuesday come back at some point tomorrow.  So we would have

13    today's group, which is the Wednesday group, available this

14    afternoon.

15              THE COURT:  All right.  Any objections to that?  Did

16    you understand?

17              So the jurors that came back from Monday, we never got

18    to them.  The jurors that we had come back from Tuesday, we

19    talked to them this morning.  If all we're going to have time

20    for this afternoon, because it's already 3 o'clock, is to go

21    through the for cause challenges on the group 2, the Tuesday

22    group, then we can just have Groups 1 and 2, Monday and

23    Tuesday's group, come back tomorrow because we know we're not

24    going to be able to go forward with the exercise of peremptory

25    challenges until tomorrow.

—2:16-cr-46-GMN-PAL—

1           So anyone have an objection to that?

2           MR. NORWOOD:  I want some clarification then on the

3  plan.  So the two panels that we've already gone through will

4  come back tomorrow.

5           THE COURT:  Yes.

6           MR. NORWOOD:  And then we have this third panel.  Are

7  we going to begin with them today?  But if not, we would begin

8  with them tomorrow.

9           THE COURT:  We will if we have time.  How's that?

10           MR. NORWOOD:  Okay.

11           THE COURT:  I'd love to, if we have time.

12           MR. NORWOOD:  But the concern I have, I just want to

13  see where this sort of fits in with the scheduling here because

14  I had expressed that concern before about needing time to sort

15  of work out our peremptories.  And we need to know who's going

16  to be on that final list of -- that the Court's vetted for the

17  cause challenges and so forth.  And I don't want to be stuck in

18  the situation where we're not going to be -- have the time we

19  need to sort of confer and work that out.

20           I guess my concern would be if we're going to be

21  spending much of tomorrow, you know, doing these other things

22  that we need to do, then we're going to be in a time crunch for

23  the peremptories.  And we're not going to be able to reach the

24  consensus we need to do before we do that before we get to the

25  peremptories.

1          THE COURT:  So I don't have a crystal ball.  I can't

2   answer your question.  I can tell you that if we have time

3   today, we will start with the third panel.  If not, then we

4   won't, and maybe I can give you a better idea by the end of

5   today where it looks like we stand with that.

6          MR. NORWOOD:  Thank you.  If we could address that at

7   the end of the day, I would appreciate that once we have a

8   better picture of where we are at.

9          THE COURT:  All right.  Let's go forward now with the

10  motions for cause by the Defense as to the first panel, Monday's

11  panel.

12         Ms. Weksler?

13         MS. WEKSLER:  Thank you, Your Honor.  So the first note

14  that I have for the first panel is No. 4.  I think that the

15  Court had a question for No. 4 regarding hardship and

16  employment, and I don't know if we have an answer to that.  So I

17  just wanted to flag that.

18         THE COURT:  Anyone else want to address juror No. 4,

19  the request to excuse juror No. 4?  Any of the other Defense?

20         As before, we're presuming that you would join unless

21  you say otherwise.  But are there any other -- any other

22  information you want to provide to me?

23         MR. RYAN BUNDY:  Give me one more moment.  We're just

24  trying to ...

25         Let's go ahead and move forward, and I might get back

————— 2:16-cr-46-GMN-PAL —————

 1  to you anyway.  I'm not going to challenge at this time.

 2          MS. WEKSLER:  My notes indicate that she thought she

 3  was covered for two weeks by Best Buy.  So she was going to get

 4  back to the Court as to whether Best Buy's paid beyond two weeks

 5  of jury duty.

 6          THE COURT:  So anyone else have anything to add?

 7          Nope.  All right.  And Government have any other

 8  concerns?

 9          MR. SCHIESS:  Yes, Your Honor.  We join in wanting to

10  be able to hear from her, her answer whether the employer will

11  cover, to determine whether there's a hardship.

12          THE COURT:  All right.  Next one?

13          MS. WEKSLER:  The next one for purpose of cause, Your

14  Honor, is No. 6.  This is the individual who mentioned Alex

15  Jones who is on the witness list and also is noted, I believe --

16  and the Government can correct me if I'm wrong.  I believe that

17  there are some exhibits that the Government intends to introduce

18  that will be showing parts of his broadcasting.  She was

19  questioned at length about this.  And she actually did state

20  that this gentleman was quite extraordinary and that he made

21  extraordinary claims and that extraordinary claims need

22  extraordinary proof.  I think that in and of itself is something

23  that the Court should be considering in terms of cause.

24          She also has the issue with her assessor -- working for

25  the assessor.  And while somewhat related to this case in that

1   this is a case involving fines and involving land, and while

2   this is not a tax case necessarily, it's still somewhat along

3   those same lines.  So I think that that's something that the

4   Court should be taking into account as well.

5           My main concern with regards to her -- I think my main

6   concerns with regards to her employer is the fact that ...

7           (Defense conferring.)

8           MS. WEKSLER:  I was just told and I could be corrected

9   that the assessor's also on the witness list?  So I just wanted

10  to mention that with regards to her employment.

11          So I think that based on the questioning that I did of

12  her in court this is one of those jurors that has enough reasons

13  to be stricken for cause.

14          THE COURT:  All right.  Anyone else on the Defense?

15          MS. WEKSLER:  No. 13 is a juror that indicated she had

16  some concerns regarding repercussions to her family.

17          THE COURT:  No, I'm sorry.  Anyone else have something

18  to add regarding juror No. 6?

19          MS. WEKSLER:  Oh, I'm sorry.

20          THE COURT:  Any of the other defendants want to add

21  information?

22          And what's the Government's position on juror No. 6?

23          MR. SCHIESS:  Your Honor, we do not believe that the

24  Defense has established enough basis for cause, and we strongly

25  oppose it.  Let me start with the area where the Defense spent

1  most time during the examination with this juror, and that was

2  on the Alex Jones matter.  First of all, that seems to me to be

3  a moot issue because based on our review of the case, it appears

4  that Pete Santilli put that name on the list.  He's not here to

5  defend it.  And I cannot see any reasonable basis for anybody to

6  call Alex Jones.  He was not there.  Alex Jones was a speaker on

7  infomercial -- or Infowars, excuse me.

8       But, second -- so really it is a moot issue about any

9  challenge for Alex Jones, her familiarity with him and her

10  opinion about him.  Second, though, when you look at the

11  questioning that was had of her regarding her views of

12  Mr. Jones, the question that Defense counsel posed to her was a

13  hypothetical.  If that person is the only person who testifies

14  for the Government or the only evidence that there is, would you

15  have a hard time relying upon him?  And she certainly said yes.

16  But when she talked about hearing all of the evidence, taking

17  everything into consideration, she said that she could listen to

18  the evidence, that she could be fair, that she could be

19  impartial, and she strongly stood by her views that looking at

20  all of the evidence, to which she did not have sufficient

21  familiarity to be able to form an opinion.

22       The next is -- and also when we look at the answers to

23  her questions.  For instance, on this topic of familiarity, for

24  instance, on page 8, question 3, when she was asked if she read

25  about the case, she said she read about it, but in question 4

—2:16-cr-46-GMN-PAL—

1   she's indicated that she has not formed an opinion.  On page 20,

2   question 1, her answer was:  I read about the Bundy family

3   standoff when it occurred, but didn't delve deeply into the

4   issues involved at the time and haven't heard about it in recent

5   years.

6         With respect to her employer, Ms. Shafe, if I ever

7   heard of a person who gave an answer that said that she's going

8   to stand by her views and not worry about what someone else

9   would think of her or do to her, it was this person.  She said

10  she would not be concerned at all about retaliation, that she

11  would not feel pressure to agree with her boss, and that she

12  would go back to work the next day.  And if she had to, she

13  would just find another job.

14        Besides that, I really don't expect that anybody would

15  be reasonably calling Ms. Shafe as a witness because, as you may

16  recall from the first two trials, the only involvement that the

17  state government had in this matter is where Mr. Bundy as part

18  of his effort to promote his viewpoints sent a grazing fee to

19  the county or to the state.  And they didn't cash it, just sent

20  it back as this is the wrong agency or entity for it.  So

21  there's no likelihood that anybody could reasonably call

22  Ms. Shafe.

23        So there's everything about this juror to indicate that

24  she could be fair and impartial.  The line of questioning about

25  Alex Jones was simply a red herring, that it will not even be

————— 2:16-cr-46-GMN-PAL —————

1  applicable in this case.

2          THE COURT:  So does the Government intend to call

3  Ms. Shafe or is it a custodian of records --

4          MR. SCHIESS:  No, we didn't put her on the list.

5          THE COURT:  All right.  You didn't put her on the list

6  either?

7          MR. SCHIESS:  No.

8          THE COURT:  So the Government didn't put Alex Jones nor

9  the County Assessor, Michele Shafe, on the list?

10          MR. SCHIESS:  That's correct.

11          THE COURT:  Do we know who put Michele Shafe?  You said

12  Alex Jones was placed by Mr. Santilli.

13          MR. SCHIESS:  I'm doing my best guess that based upon

14  the patterning -- I haven't looked at exactly everybody's

15  witness list, but that's something that would be more consistent

16  with what Pete Santilli would have done.

17          As you may recall from the list is he's the one --

18  principally the one who flooded the witness list with names.

19          THE COURT:  All right.

20          MS. WEKSLER:  And, Your Honor, I think while this

21  individual may not be a witness, we still have the issue of the

22  exhibits.  And I could be mistaken and the Government can

23  correct me, but I am pretty sure that there are exhibits that

24  the Government intends to introduce that do have broadcasts of

25  Alex Jones.  And of course, part of what the Defense is going to

—2:16-cr-46-GMN-PAL—

 1  be relying on is relying on this type of information.  And she's

 2  already told us very clearly that this individual cannot be

 3  trusted.  Her exact words are:  I would have a hard time finding

 4  him to be a credible witness as I believe he is a conspiracy

 5  theorist who has no grasp on facts, and that's straight from her

 6  questionnaire on page 20.

 7          MR. SCHIESS:  I can address that.

 8          THE COURT:  And so how does that even come up?  Why is

 9  she mentioning him?

10          MS. WEKSLER:  Why is she mentioning him?

11          THE COURT:  In response to which question?

12          MS. WEKSLER:  You know what, if I could have the actual

13  question?  Do we have the actual question to No. 20?

14          I believe that it's probably in regards to have you

15  heard anything about the potential witnesses in this case.  That

16  would be my best guess.  I don't have her exact questioning in

17  front of me right now, but that would make sense given that he

18  was on the witness list and this is what it is that she

19  responds.

20          MR. SCHIESS:  Your Honor, to answer some of your

21  questions.

22          THE COURT:  Yes.

23          MR. SCHIESS:  I'm sorry.  I didn't mean to jump in

24  there.

25          THE COURT:  No, go ahead.

1          MR. SCHIESS:  With respect to whether we're going to

2   play any audio -- I shouldn't say yours.  Maybe even Defense

3   counsel's comments -- we are not playing any audios with Alex

4   Jones on there.  We do have one image with the word Infowars

5   there, but his image is not there and it's only the title of

6   Infowars.  So there's no voice, nothing for her to judge of this

7   witness -- for this juror to judge credibility.

8          MS. WEKSLER:  My memory could be faulty, but I think I

9   specifically mentioned Infowars to her during my questioning and

10  I think that she did make that connection between Alex Jones and

11  Infowars.

12          MR. SCHIESS:  Well ...

13          THE COURT:  So she didn't mention in her questionnaire

14  that -- anything about Alex Jones?

15          MR. SCHIESS:  Yes, she did, Your Honor.  Can I read the

16  answer to you?

17          THE COURT:  Yes.

18          MR. SCHIESS:  She said that:  If Jones -- if the Alex

19  Jones on the witness list is from Infowars, she would have a

20  hard time finding him credible to be a witness as she believes

21  he's a conspiracy theorist, has no grasp on the facts.  And,

22  again, he's not going to be a witness in this case.  His image

23  isn't going to show up in this case.  She will have no

24  opportunity to judge his credibility.

25          THE COURT:  Okay.  Anything else as to juror No. 6?

1          MS. WEKSLER:  No.

2          THE COURT:  Okay.  Next juror?

3          MS. WEKSLER:  The next one, Your Honor, is No. 13.

4   This is an individual who represented had concerns about passing

5   judgment as it related to having repercussions to her family.

6   And I think that that in and of itself is something that allows

7   for a cause challenge.  I'm not sure why she would automatically

8   assume that this is the kind of case that she would have some

9   sort of -- would suffer any kind of repercussions.  So that

10  makes me question whether there's some sort of information that

11  she's relying upon, but, I mean, we have an individual who is

12  concerned about her ability to pass judgment based on

13  repercussions to her family.  So I think at the very least this

14  is an individual that needs to be followed up with individually.

15         And I mentioned this before, Judge, and I'm happy to do

16  it at any point in time, but again there are certain

17  transportation issues that are only going to heighten this

18  concern for this particular juror.  So this is something that

19  concerns the Defense.

20         THE COURT:  What's the Government -- or anyone else

21  from the Defense want to add some information for the Court to

22  consider?

23         All right.  And what's the Government's position on

24  juror No. 13?

25         MR. SCHIESS:  Your Honor, she should not be dismissed

—2:16-cr-46-GMN-PAL—

 1   for cause.  First of all, with respect to passing judgment on

 2   that point that Ms. Weksler raised, I asked that question on day

 3   1 several times from several different angles, and nobody raised

 4   their hand to indicate that was a problem.  Certainly this juror

 5   did not.  Any comment that she had about repercussions would

 6   come to her family, said that it was a mild reservation, and

 7   nobody questioned her on whether there was any concern that

 8   would give rise to her not being able to decide this case fairly

 9   or distract her from being able to pay attention.  There's just

10   the absence of evidence to support that argument.

11        MS. WEKSLER:  And, Your Honor, as we've noted, there's

12   many individuals that don't really say anything unless we do

13   individual voir dire on them, and this is sort of the perfect

14   example.  This is an individual who actually when she was able

15   to fill out a questionnaire and spend some time with this and

16   really tell us what she thinks she said, and I'm quoting from

17   page 30:  I would have mild reservation depending on the nature

18   of the case if repercussions could come to my family.  And then

19   she says on page 3:  Concern about repercussions to family

20   depending on case.

21        So she may not have actually put her hand up when she

22   was questioned in the group setting, but this is somebody who

23   actually told us what she thought regarding the ability to pass

24   judgment and her concerns about repercussions in writing before

25   she was questioned by anybody in this case.

—2:16-cr-46-GMN-PAL—

1           MR. SCHIESS:  Your Honor, if there's -- we submit

2  there's not a genuine concern, but if there is, we would invite

3  the Court simply to bring that person back on Thursday or the

4  next time and let us finish that questioning then.

5           THE COURT:  All right.  Who do you have next after 13?

6           MS. WEKSLER:  So I think the next one we have is

7  number -- I think there's -- there was a request earlier, I

8  believe by Mr. Whipple.  This was on the first day.  He wanted

9  some individual questioning on No. 65.  This is the individual

10 who made mention of Sandy Hook in response to Route 91

11 questions.  So this is -- I'm making the request on behalf of

12 Mr. Whipple since I'm the one up here, but this is something

13 that he had requested, I believe it was Monday.

14           And No. 44, Your Honor, is an individual who actually

15 was --

16           THE COURT:  Wait.  Can we go back?

17           MS. WEKSLER:  Yes.

18           THE COURT:  I'm not sure that I see that on my notes.

19 What was the juror number?  Maybe I got the one wrong.  The

20 Sandy Hook you said?

21           MR. SCHIESS:  Your Honor, I'm having a hard time

22 hearing the jury numbers when she's speaking.  If we could just

23 make sure it's very clear.

24           THE COURT:  Is that microphone ...

25           MS. WEKSLER:  Yes.  It's probably just me.

PATRICIA L. GANCI, RMR, CRR, CCR 937    (702) 385-0670

1          THE COURT:  Yes.  Okay.

2          All right.  So what was that jury number?

3          MS. WEKSLER:  So the number was 65.

4          MR. SCHIESS:  Thank you.

5          THE COURT:  I thought you said 35.  I'm so lost.  Thank

6    you.  65.  Yes, I do have written down Sandy Hook.  Okay.

7          MS. WEKSLER:  And then the other one that I have is

8    No. 44.  This is an individual who noted -- she or he.  I don't

9    have the --

10          THE COURT:  Well, hold on before we go to 44.  So juror

11   65 responded Sandy Hook, and this is a concern.  Can you

12   articulate the concern there?

13          MS. WEKSLER:  This is actually Mr. Whipple's request,

14   Judge.

15          THE COURT:  Oh, okay.  We can let Mr. Whipple then if

16   you don't -- whoever wants to address me, that's fine, on juror

17   No. 65.

18          MR. WHIPPLE:  Your Honor, obviously if I recall, I had

19   actually approached or spoke to this Court about this particular

20   concern.  And that was this was a juror that came from Upstate

21   New York and she was close to the Sandy Hook shooting.  And it

22   was something that traumatized her at the time.  And I don't

23   want to -- I don't want to misrepresent something I don't recall

24   because I don't have that jury questionnaire in front of me, but

25   my memory is that she had referenced the October 1st massacre in

─ 2:16-cr-46-GMN-PAL ─

1  similarity to what had occurred in New York when she was there

2  in that Sandy Hook massacre and that she was traumatized in the

3  same and similar manner.

4       And so I felt it would be appropriate to be able to ask

5  her to what level and what depth.  Obviously if we have an

6  individual who's had this happen to them personally on two

7  different occasions, I can only imagine having suffered through

8  it once how difficult it is.  And I thought it would be

9  appropriate to bring it up outside the presence of the jury.

10      THE COURT:  All right.  Anyone else have a concern with

11  juror No. 65 that you want to add any information that's not

12  already been provided to the Court?  Mr. Hill?

13      MR. HILL:  Yes, Your Honor.  Just wanted to add that my

14  notes reflect that she's actually from Connecticut which is

15  where Newtown is, of course.

16      THE COURT:  All right.  And what's the Government's

17  response to juror No. 65?

18      MR. SCHIESS:  Your Honor, we oppose that.  I have the

19  supplemental questionnaire in my hand.  And the question was:

20  Did the -- question 14, page 3 of 5, the question was:  Has the

21  Route 91 Harvest Music Festival shooting affected you

22  emotionally, psychologically, physically, or economically?  And

23  her answer was:  Yes.  She gave a lengthy explanation which I

24  intend to read, but I want to read question 15 first.  The

25  question was:  Has that event impacted you in such a way that it

—2:16-cr-46-GMN-PAL—

 1  will make it difficult for you to be fair and impartial in this

 2  case?  Her answer was:  No.

 3          So her explanation of -- to the question 14 was the

 4  following:  It made me deeply sad.  The first thing that I

 5  thought about were the dear parents that lost their children in

 6  the Sandy Hook, Connecticut.  The parents worked so hard for gun

 7  control to try and have a bit of something meaningful come from

 8  the deaths of those sweet children.  Also, I feel so sad for the

 9  Las Vegas folks killed and injured.  We moved here from Newtown,

10  Connecticut, and my son attended Sandy Hook Elementary from

11  third grade on.  He is of course grown now.  However, the

12  shooter was raised in our neighborhood.  Sandy Hook's strong.

13  Strong is now Las Vegas Strong.  So very, very sad.

14          You know, it's -- if there's anybody who is in this

15  community who is not sad about the 10/1 shooting, I'd be

16  surprised.  If there's anyone who's not sad about the Sandy Hook

17  shooting, I would be surprised.  If there's anyone who's not sad

18  about the people killed in New York City yesterday, I would be

19  surprised.  This is a different case, different situation.  And

20  when she was asked would it be difficult for you to be fair and

21  impartial in this case, her answer was no.

22          She is a normal human being with normal emotions, but

23  she has -- is able to, by her own answer, fairly evaluate this

24  case as a fair and impartial juror.  And the Defense has not

25  established a basis.  Thank you, Your Honor.

—— 2:16-cr-46-GMN-PAL ——

1          THE COURT:  All right.  And so after juror 65, is there

2     anyone else?  Any other jurors?

3          MR. RYAN BUNDY:  Yes, No. 40, madam.

4          When the Government was questioning her particularly or

5     they asked her a question, No. 40 answered an opinion -- that

6     she has an opinion about grazing on federal land and that it's

7     against the law.  She thinks that we should follow the law.

8     That to me indicates that she has made up her mind on the issue

9     already.

10          Later when Mr. Hill was questioning her, she again

11     stated that she has strong feelings about the grazing going on.

12     It's obvious that she has an opinion already made up.

13          She had some strong feelings about the Route 91, too,

14     but I'm not too concerned about those.  It's mostly that I feel

15     that she's biassedly [sic] made a decision already on the

16     grazing issue.

17          THE COURT:  All right.  Anyone else want to address

18     juror No. 40 for the Court?  Anything else you want to bring to

19     my attention about juror No. 40?

20          And what's the Government's position on juror No. 40?

21          MR. SCHIESS:  Your Honor, we oppose dismissal for

22     cause.  First of all, she -- although she stated she can follow

23     the law, I think it's a very far stretch and an improper

24     argument to then infer that she has made up her mind.  We want

25     people to follow the law.  We want people to follow the Court's

—2:16-cr-46-GMN-PAL—

 1  instructions.  We want people to do what they're asked to do.

 2          And so, if anything, her statement that she can follow

 3  the law is what we're looking for and we should count that as a

 4  positive factor for her.  While she said she has strong feelings

 5  about grazing, she certainly like anybody else can have feelings

 6  or impressions, but the question is whether those feelings are

 7  so strong it tilts the table so that someone has to dig out of

 8  the hole or be unfair in any other way.  I'm just using that

 9  analogy to make the point.

10          There was no evidence that she would be that way.  In

11  fact, when she was questioned, she said she would need to hear

12  the case before she decided what it's about.  And nowhere on her

13  questionnaire did she indicate an opinion on this case or

14  anything about the defendants.

15          So this ...

16          So it -- based upon those circumstances and the

17  totality of it, Your Honor, here is a juror who can think, who

18  can listen to or have opinions, but who can be fair which we

19  expect of people.

20          MR. RYAN BUNDY:  I'd like to say a little more on that

21  as well.  I agree that the law's important to follow.  What

22  concerns me is that it seems that she has already determined

23  what the law is without actually hearing the law and hasn't

24  considered that there are grazing laws that she hasn't

25  considered.  She's made up her mind -- it appears to me that

────── 2:16-cr-46-GMN-PAL ──────

1   she's made up her mind that we are breaking the law when, in

2   fact, we state that we are not breaking the law.  And so she

3   hasn't taken the time to look at that.  It just appears to me

4   that she's made up her mind.

5        I would, you know, like to bring her in for further

6   questioning if there's a possibility of that.

7        THE COURT:  All right.  Thank you.

8        MR. SCHIESS:  Your Honor, would you entertain any more

9   argument on that or are we done on that particular one?

10       THE COURT:  If you want to add something else.

11       MR. SCHIESS:  You know what, I'll stand by my argument.

12  It's clear that when she talked about following the law and

13  making up her mind on grazing fees, that is the law.  They have

14  to pay fees.  So with that it's a question of what did they do

15  after the Court's decided, and she's going to listen to all of

16  the evidence.  Thank you.

17       MR. RYAN BUNDY:  And I object to that.  He's coming to

18  a conclusion of law without considering all of the laws.

19       THE COURT:  All right.  So I have juror No. 4, 6, 13,

20  65, and 40.  Any other jurors from Monday's panel that you want

21  me to consider excusing for cause?

22       MS. WEKSLER:  The only one, Your Honor, that I note

23  here is also one of -- I made a note that says Mr. Whipple

24  requested individual questioning on No. 44.  This is an

25  individual that was locked down at the Mandalay Bay as a result

———— 2:16-cr-46-GMN-PAL ————

1   of Route 91.  So we're not asking for cause challenge at this

2   time.  It's just individual questioning that was being requested

3   by Mr. Whipple.

4         THE COURT:  And he was escorted out.  He's an employee

5   at Mandalay Bay and he was escorted out.  That's what I wrote

6   down.

7         MS. WEKSLER:  And I trust the Court's notes much better

8   than I do mine at this point.

9         THE COURT:  Anyone else want to address juror No. 44

10  and whether or not that person should be excused for cause?

11        All right.  And what is the Government's position about

12  juror No. 44?

13        MR. SCHIESS:  May I have the Court's indulgence for a

14  moment, please?

15        THE COURT:  Yes.

16        (Prosecution conferring.)

17        MR. SCHIESS:  Your Honor, we'll defer to the Court on

18  44.  I haven't heard sufficient basis.  We'll defer to the

19  Court.

20        THE COURT:  All right.  And does Defense have any other

21  jurors that you want me to consider?

22        (Defense counsel conferring.)

23        MR. PHILPOT:  Your Honor, sorry.  I'm trying to pull

24  up -- No. 66.  I'm trying to pull up the actual questionnaire,

25  just to confirm my notes.

1          Your Honor, I have here -- and, again, my computer's

2    running really slow so I apologize -- that she has made an

3    expression, basically a moral judgment, relative to these

4    defendants that it was wrong to use Government land.  And that

5    expression of bias which is -- indicates that she's already

6    prejudged them in a kind of a moral sense and legal sense that

7    they have done something that is wrong in using Government land

8    I think indicates at least not only an actual bias, but an

9    implied bias that would require her to be excused.

10          MS. WEKSLER:  And, Your Honor, if I may be heard on 66

11   as well?

12          THE COURT:  Yes.

13          MS. WEKSLER:  This is the individual that I -- I

14   questioned her.  I can't remember whether it was like one-on-one

15   or in a group setting.  She's the one that works for the RJ or

16   her husband works for the RJ.

17          THE COURT:  Her husband works for the RJ, yes.

18          MS. WEKSLER:  And -- I'm sorry?

19          THE COURT:  It was her husband that works for the RJ.

20          MS. WEKSLER:  Her husband.

21          THE COURT:  Yes.

22          MS. WEKSLER:  And on her questionnaire she actually

23   notes that she has formed an opinion on guilt on page 8, that it

24   affected her ability to be impartial, and she says she's read or

25   heard about potential witnesses, yes.  I believe it was wrong to

———— 2:16-cr-46-GMN-PAL ————

1  use the land that belonged to the Government and not pay for

2  that use if it's required by law.  And she said that she knew

3  about the case on page 21:  The standoff coverage in the Las

4  Vegas Review Journal and Fox 5 News.  And she says that she does

5  not recall the details.  But when I was in court and asking her

6  and questioning her, she actually mentioned that she did not

7  have any time to actually look at those articles, even though

8  she works at the RJ and her husband works at the RJ, which is a

9  little bit incredible.  So I just wanted to add that for the

10  record.

11          I'm being told that she specifically works for the RJ

12  as well, Judge.

13          THE COURT:  So she and her husband or just her; not her

14  husband?

15          MS. WEKSLER:  Both of them work at the RJ.

16          THE COURT:  Okay.

17          Yes, Mr. Ryan Bundy?

18          MR. RYAN BUNDY:  Yes, No. 60 also on her supplemental

19  questionnaire indicates on question 12 that her son is a

20  correction officer at the Southern Desert Indian Springs.  Now,

21  that may not have a direct effect on her, but it may, it may

22  also.  So it's just something to consider.

23          MR. SCHIESS:  Your Honor, I ...

24          MR. RYAN BUNDY:  Correction.  That's 66, ma'am.

25          MS. WEKSLER:  And, Your Honor, I had the chance to go

─ 2:16-cr-46-GMN-PAL ─

1  back on 44 to look at the supplemental questionnaire provided.

2  It does say that this individual was -- it says he was inside

3  Mandalay on lockdown.  And this is in response to question 16,

4  page 4 of 5.

5          THE COURT:  Question No. 4 did you say?

6          MS. WEKSLER:  It's question 16 on page 4 of 5.

7          THE COURT:  All right.  So any other defendant want to

8  add any information for the Court to consider regarding juror

9  No. 66?

10          All right.  And what's the Government's position -- did

11  you give me a position on juror No. 44?

12          MR. SCHIESS:  No, I haven't.

13          THE COURT:  I think we skipped you.  Sorry.  Juror

14  No. 44, what is your position?

15          MR. SCHIESS:  Your Honor, we're jumping around so much.

16  Can I stay on 66 for a second?

17          THE COURT:  Yes.

18          MR. SCHIESS:  Since that was the last one.

19          (Prosecution conferring.)

20          MR. SCHIESS:  Your Honor, with respect to juror 66 who

21  with her husband is employed at the RJ, she said that:  Have you

22  read or heard about anything of the conduct of the law

23  enforcement officers during an impoundment action conducted by

24  BLM against cattle belonging to other defendants, Cliven Bundy?

25  Answer:  Yes.  Question 1 on page 21 says:  If so, please

 1  describe the source and substance of what you've read or heard.

 2  She said:  Standoff coverage in the Las Vegas Review Journal and

 3  on Fox News.  However, I don't recall the details.

 4       We don't disqualify people simply for reading the

 5  newspaper and gaining some information about it.  We disqualify

 6  them if there's a bias that keeps them from being fair and

 7  impartial.  There's nothing that's been asked of her to

 8  demonstrate a bias at all.  It's just simply that she has some

 9  familiarity with the case.

10       (Prosecution conferring.)

11       MR. SCHIESS:  So that alone basis they've made is

12  insufficient.  With respect --

13       MS. WEKSLER:  And I agree -- I'm sorry.

14       MR. SCHIESS:  No.  Go ahead, please.

15       MS. WEKSLER:  No.  Go ahead.

16       MR. RYAN BUNDY:  I -- if I may.

17       THE COURT:  Yes.

18       MR. RYAN BUNDY:  She works for the Review Journal.  Her

19  husband works for the Review Journal.  The Review Journal has

20  numerous times put out negative articles concerning us, and

21  whether or not she personally has any involvement, certainly her

22  company does.  And there is a conflict of interest there which

23  does kind of lend to this bias.

24       MR. SCHIESS:  I suppose if we follow that logic,

25  anybody who subscribes to the RJ should then be disqualified

—2:16-cr-46-GMN-PAL—

1  because they read it.  With respect to her answer about if she's

2  formed an opinion about the guilt, although she said yes, she

3  said:  If you're using federal land, you should be responsible

4  for paying.

5       This is not a case about whether they paid or not paid.

6  It's about what they did after the Court issued the orders.  And

7  so the issue that she's talking -- that the juror's talking

8  about is not one that is even relevant to this case, and she

9  can -- there's nothing to indicate that she won't listen to the

10  evidence that's presented.

11       MS. WEKSLER:  Your Honor, my concern is really her

12  credibility, right, because she -- while she indicates -- I

13  agree with Mr. Schiess.  I mean, reading the newspaper alone is

14  not enough, but she was specifically questioned as to the depth

15  of those readings and she denied that she had any kind of time

16  to do those kinds of reading.  But she actually expressed an

17  opinion about this.  So it's clear that she has read the

18  newspaper or has listened to enough that's out there to form an

19  opinion on the case.

20       So my question at this point is whether we can

21  believe -- whether we can trust this juror to have actually

22  spoken up and told us the truth.  That's really the concern

23  here.  I think that there's more than what's being told.

24       MR. SCHIESS:  Your Honor --

25       THE COURT:  Well, I don't think it's unbelievable that

1  someone who works at a newspaper the last thing they want to do

2  when they get home to relax is read the newspaper any more than

3  I go home and read the orders written by the other judges in

4  this court.  I really don't want -- you know, I need to unwind

5  and do something totally different.  So that wouldn't be

6  unusual, but the fact that she's familiar with it because it's a

7  case that has been covered by the newspaper that she works for

8  makes sense.

9        This was an issue that came up -- regarding where she

10 works was disclosed in her original questionnaire.  So this was

11 not new information that came up later in the day that no one

12 had an opportunity to ask her about.

13       MR. PHILPOT:  Your Honor, if I may.

14       THE COURT:  Yes, go ahead.

15       MR. PHILPOT:  In addition to and something the

16 Government did not cover, it's not just the concern that she

17 says she's expressed an opinion as to their guilt.  She follows

18 up with that question on page 27 and says -- it says:  Have you

19 formulated any opinions about this case based on anything that

20 you have read, seen, or heard in the media?  She says:  Yes.

21 And if yes, what is your opinion?  I believe it was wrong.

22       And so she follows up to her previous statement of

23 already having formed an opinion as to guilt with having formed

24 an opinion based on what she's read, seen, or heard.  And so she

25 tries to have it both ways.  And I go back to the standard

 1  expressed in the appellate case that I mentioned earlier that

 2  when a juror says, Hey, I formed an opinion as to guilt, I think

 3  they're wrong, and then she says, But I haven't really read that

 4  much, and she works at the very paper that's printing the

 5  information, I think she becomes, one, both a case for actual

 6  bias -- excuse me -- and a case for implied bias where the

 7  standard says at that point we can't believe her later

 8  expression of saying, But I can be impartial.

 9          MR. SCHIESS:  Your Honor, Mr. Philpot only read the

10  first five words of her answer.  She goes -- she says in full

11  answer:  What is your opinion?  I believe it was wrong to use

12  land that belonged to the Government and not pay for that use if

13  it's required by law.  That just means I'm going to follow the

14  law or if that's the law, pay for the -- do what the law

15  requires.

16          MR. PHILPOT:  Agree to what it says.  But, nonetheless,

17  two expressions in her very questionnaire saying, Yes, I formed

18  an opinion as to guilt.

19          MR. SCHIESS:  Your Honor, with respect to 44, do you

20  still want to hear -- I would like to be heard on that.

21          THE COURT:  Yes.

22          MR. SCHIESS:  Okay.  44, the argument that the Defense

23  make is that this juror was inside Mandalay Bay on lockdown.  On

24  the supplemental questionnaire on page 4, there was several

25  questions about that.  And after this witness said that -- I

—2:16-cr-46-GMN-PAL—

1  mean, this juror said he was inside the Mandalay Bay.  Answer

2  the next question:  Have you attended any memorial or

3  gatherings?  No.  If you have children, there was no relevant

4  answer there.  But 19:  Has the Route 91 Harvest Music Festival

5  shooting affected your views about gun ownership in any way?

6  No.

7        While being on lockdown, while having to go through

8  that experience, there's the -- the person on page 15 said:  Has

9  the event impacted you in such a way that it would make it

10  difficult for you to be fair and impartial in this case?  Did

11  not circle yes or no, but just said:  I don't know.  And this is

12  another person where there's no sufficient information that the

13  person's going to conflate two separate events.  Like everybody

14  else in this community, these are a tough situation and tough

15  times.

16        THE COURT:  All right.  So we have juror No. 4, 6, 13,

17  65, 40, 44, and 66.  Anyone else that the Defense would like me

18  to consider?

19        MS. WEKSLER:  No, Your Honor.

20        THE COURT:  All right.  Thank you.

21        How about the Government?  Anyone that you would like

22  me to consider?

23        MR. SCHIESS:  Yes, Your Honor.  Your Honor, we would

24  like you to consider juror No. 3.  Juror No. 3, answers that are

25  very clear and unequivocal on bias.  Showed clear bias against

─2:16-cr-46-GMN-PAL─

1  the Department of Justice and the FBI, although on questioning

2  said they can put those feelings aside.  The strength and the

3  clarity of this person's answer shows a clear preformed opinion.

4         For instance, on page 27, question 2, when the question

5  was about the opinions about the Department of Justice, the

6  answer was, quote, Unfavorable to DOJ in regards to obstruction

7  of -- or obstruction justice, the Constitution, during the Obama

8  presidency.  Of course, obstruction of justice could be

9  interpreted a lot of ways depending on who the offender is, but,

10  first of all, we are the Department of Justice sitting at this

11  table.  And so we represent the Department and the United

12  States, and there is a bias against us.

13         No. 2, the defendants are charged with obstruction of

14  justice.  So while the juror had a strong feeling against the

15  Department's obstruction of justice, it's still the same type of

16  crime, and it would be very unfortunate to have a person with a

17  bias thinking that there could be a tit for tat or if the

18  Government obstructs justice, then it's okay for a defendant to

19  do the same.

20         Question No. 2 -- or excuse me.  Question 2 on page 27

21  also went on to talk about the opinions of the FBI.  Quote,

22  Unfavorable, very selective in evaluating cases and bringing

23  charges against certain individuals, end quote.

24         Page 29, question 2, further questions about bias about

25  the FBI.  Quote, biases by the FBI, in response to the question

—2:16-cr-46-GMN-PAL—

 1  of can they be fair, can this person be fair.  And then page 28,

 2  question 14:  I believe agencies often act based on political

 3  gain or political philosophy rather than any valid

 4  interpretation of the Constitution.  And that is in response to

 5  Government overreach, which is part of the defendants' claims or

 6  defense here.  So we have a person showing a clear bias in -- or

 7  bias or view that is on a sensitive issue that is right to the

 8  heart of what this -- the defense is going to be.

 9          And then with respect to the questions in the

10  supplemental questionnaire, with respect to question 14:  Has

11  the Route 91 Harvest Music Festival affected you emotionally and

12  so on, the answer was -- did not circle yes or no, but if yes,

13  please explain:  I work for the MGM Corporation, looks like, at

14  Bellagio.  Then 15:  Has this impacted you in such a way?

15  Circled yes:  Working for the MGM has affected my

16  decision-makings in regards to security.

17          Of course, you know, I take a consistent position here

18  that these are separate cases.  The answers on that doesn't

19  affect this case because there's nothing strong, but I did want

20  to be complete with the Court so that you could see the answers

21  to all of the issues.

22          But our position is clear.  There's nothing to indicate

23  that this person couldn't keep that portion of it separate, but

24  certainly the strong biases that juror No. -- that juror No. 3

25  has stated cannot be undone by any statements.  And I am going

1   to quote Mr. Philpot on that as he's quoted three or four times

2   today the Ninth Circuit decision.  I think when you apply the

3   Ninth Circuit decision, you have to look at the clarity of what

4   the person writes.  You have to look at whether the answers are

5   on to questions that go right to the heart of the matter.  And,

6   here, the answers go right to the heart of the FBI biases.  The

7   person said clearly:  Biassed about the FBI.  Clearly

8   unfavorable view about the FBI because of selective.  And

9   clearly unfavorable to the Department of Justice, one, and, two,

10  in the obstruction area.

11           And No. 3 at one point during the ...

12           (Prosecution conferring.)

13      MR. SCHIESS:  May I have your indulgence for a moment,

14  please, Your Honor?

15      THE COURT:  Yes.

16      MR. SCHIESS:  So I can give you exact information.

17           (Prosecution conferring.)

18      MR. SCHIESS:  Thank you, Your Honor.

19      THE COURT:  All right.  And so my recollection, and

20  tell me if I'm wrong, is that Mandalay Bay and the Bellagio --

21  are they both now owned by the MGM?  So is that what she was

22  referring to when she says working at the MGM security has

23  affected?

24           Does anyone remember who owns what hotel anymore?  All

25  right.  So I won't make that assumption then if nobody feels

—2:16-cr-46-GMN-PAL—

1  confident that that's the case.

2       All right.  And so who wants to respond as to the

3  Government's challenge of juror No. 3, Mr. Ryan Bundy?

4       MR. RYAN BUNDY:  Sure, I'll go.

5       He's ...  He stated several times that he can still

6  listen to the facts, still listen to the evidence.  He can still

7  listen, and even to the FBI, and consider them fairly.  He's

8  made -- he's put in his statement in the questionnaire that he

9  has no opinion about BLM, and his statements concerning the

10 Constitution again are in alignment with the, again, supreme law

11 of the land.  He's not willing to go outside of the law.  I

12 believe that he will consider things fairly.  And I don't

13 believe that there's a bias there that should eliminate him.

14      THE COURT:  Mr. Norwood?

15      MR. NORWOOD:  I think that's a fair summary of it, but

16 let me go into a little more detail starting with these

17 questionnaire answers.  He's asked if he has an opinion about

18 the DOJ.  Lots of people have opinions about the DOJ.  The

19 specific answer was:  Unfavorable against DOJ in regards to

20 obstructing justice, the Constitution, during the Obama

21 presidency.  So this is a concern that is linked to certain

22 cases in a prior administration.

23      I want to emphasize that this person does not claim any

24 knowledge whatsoever of this case.  He doesn't say anything in

25 his questionnaire or at any other point that indicates he has

—2:16-cr-46-GMN-PAL—

1  any particular bias or prejudgment regarding this case or the

2  DOJ's handling of this case.

3       Again, the FBI, the DOJ, do lots of things that are

4  controversial; not just one political side or the other.  There

5  are inevitably going to be cases that are prosecuted that are

6  going to create some controversy and people are going to have

7  opinions on that, but there's absolutely nothing in this juror's

8  questionnaire that shows that he has any opinion about anything

9  about the DOJ or anything else that's going to prevent him from

10 being fair about this case.

11      If there was any doubt, Mr. Schiess had a full

12 opportunity to question this juror during voir dire.  He made

13 clear that he thought most police do a good job.  He was asked

14 if he was able to judge this case on the facts, and he said of

15 course.  He was asked about some of the opinions he had of the

16 FBI, which again are -- we're talking about case, you know,

17 case-specific issues here.  He's asked if he could fair.  He

18 said he could make a fair judgment in this case.

19      He was asked -- the prosecutor went through the

20 question that a few witnesses have been asked about the box.

21 Can you decide the case based on the facts and the law and the

22 box?  The jury unequivocally said that he could.  He agreed that

23 there should be limits on the right to bear arms.  I mean, so

24 there's just nothing about this juror that shows that he has any

25 bias that's going to affect anything that he hears in this case.

1          If we're going to start striking people because they

2     indicate something on their questionnaire that they may have

3     some general political view that the Government doesn't like,

4     then there's going to be lots of people we are going to have to

5     strike.  There are lots of people that we moved for cause that

6     were denied with regards to the second panel who had expressed

7     political views that were not the types of views that our

8     clients have.  There were lots of people we didn't even seek to

9     strike because we knew that that would not equate to bias.  And

10    there's nothing with this juror that equates to bias in this

11    case.

12         THE COURT:  But his bias is to the prosecuting agency

13    and the investigative agency in this particular case.

14         MR. NORWOOD:  Absolutely nothing in this particular

15    case.  He has some concerns, which no one went into.  And,

16    again, if that were really a concern, they had the opportunity

17    to do it, you know, as to, you know, what specific things he

18    might have been referring to here.  It's very likely a political

19    concern.  Just as some people didn't like the way that the DOJ

20    was acting during the Obama administration, there were people

21    who don't like the way the DOJ is acting during the Trump

22    administration.  People are entitled to their opinions on that

23    sort of thing.  It doesn't mean that there's any issue with this

24    juror being fair to the prosecutors in this case specifically

25    when he's specifically told us that he can do that.

1          MR. WHIPPLE:  Your Honor, on behalf of Mr. Cliven Bundy

2     can I speak to this issue?

3          THE COURT:  Yes.

4          MR. WHIPPLE:  Your Honor, I want to just echo a bit

5     what Mr. Norwood said, and I think it's important to read the

6     entire jury questionnaire because, honestly, it appears to me

7     that this entire request to challenge for cause is based on his

8     questionnaire.  I do not recall any specific exchanges between

9     him and Mr. Schiess.  So if you go to the top of page 27 -- and

10    I'm not sure if you have this in front you, and I'd like to be

11    able to address you while I'm sitting because it allows me to

12    scroll through it.

13         The first question is:  Have you formulated any

14    opinions about this case based on anything that you have read,

15    seen, or heard in the media?  And the answer is no.

16         And then we come down to question 2 where there's a

17    question that Mr. Schiess referred to, and it talks about:  Do

18    you have any opinion favorable or unfavorable about the United

19    States Attorney's Office?  And that's where Mr. Schiess is

20    speaking for a reason.  He says yes, and he says he's

21    unfavorable regarding the obstruction of justice.

22         But then if you come down right below that, there's the

23    ultimate question.  It says:  Would you be able to put aside

24    your opinion and render an impartial verdict based only on the

25    evidence submitted in this case and the Court's instruction on

—2:16-cr-46-GMN-PAL—

 1   the law?  And the answer is yes.

 2        So that's the evidence that we are stuck with in this

 3   case.  There was no questioning him to go, you know, into -- if

 4   he would lean one way or another if he was seated.  There was no

 5   questioning as to how strong his opinion was.  This Court has an

 6   absence of information when it comes to bias regarding this

 7   individual.  He's answered all of the questions properly.  And

 8   when he was available for cross-examination or questions, those

 9   were not given to him.  So it would be unfair and inappropriate

10   at this time to strike him for cause.

11        MR. SCHIESS:  Your Honor, I do need to correct one

12   statement I made just so that I'm completely accurate.  I quoted

13   from this juror five answers.  The first three answers were from

14   page 27 and 29.  I quoted also from page 28, and my notes were

15   mistaken.  So any reference I made to this person about

16   believing Government agencies often act based on political gain

17   or other reasons can't be fair, yes, the opinion about DOJ, that

18   is attributed to another juror.  But my first two or three

19   answers were not mistaken.  And Mr. Whipple referred to those

20   when this person talks about opinions about DOJ and the FBI.

21        And, you know, in most cases that would be fine if you

22   have opinions, but here we're going right to who we are as

23   prosecutors and our representation of the Department of Justice

24   and who the agents are who investigated this place all during

25   the Obama administration.

———— 2:16-cr-46-GMN-PAL ————

1        MR. WHIPPLE:  And if I can respond to that.  That goes

2   to question No. 4 specifically in this case:  Do you have any

3   opinion favorable or unfavorable about the Bureau of Land

4   Management?  Answer:  No.  So I think that undermines the

5   suggestion that somehow this person has -- you know, predisposed

6   to lean one way or another because when it specifically comes

7   down to the issues of this case, he's obviously shown that he's

8   objective and unbiased.  And if there was any more information

9   to be gathered, we lost that opportunity on Monday.

10        THE COURT:  All right.  Any other defendant want to

11   comment on juror No. 3?

12        All right.  Does the Government have any other jurors

13   you would like me to consider?

14        MR. SCHIESS:  Let me double check my notes so I don't

15   misspeak, please.

16        That's all, Your Honor.  Thank you very much.

17        THE COURT:  All right.  Well, in reviewing the motions

18   to strike for cause jurors No. 4, 6, 13, 65, 40, 44, 66, and 3,

19   the Court's concern is with juror 66 and juror 3 which both

20   provide information in the questionnaire that implies there is a

21   bias that would potentially directly affect this case.  The

22   questioning was as to both of those jurors for the answers given

23   in the questionnaire, and then both of those jurors response --

24   responded at the end that they could be fair.

25        So in my eyes they're very similar.  I could either

1    excuse them both or not excuse either one.  And seeing as the

2    questionnaire was the first hint that we had that there might be

3    something to follow up on and then it was followed up upon, and

4    then the juror concluded that they could set aside their bias, I

5    don't think that provides me sufficient basis to excuse either

6    one.

7            So by that I'm not delegitimizing the concerns of both

8    parties.  If I was in your shoes, I would be concerned by the

9    two of them as well, but it's not sufficient for a cause

10   excusal.

11           All right.  So it's 4 o'clock.  We can take about a

12   10-minute bathroom break.  Aaron, do we need to address anything

13   else before we use the bathroom?

14           COURTROOM ADMINISTRATOR:  I don't think so, Your Honor.

15           THE COURT:  How are we on numbers?

16           COURTROOM ADMINISTRATOR:  Your Honor, with no jurors

17   being excused from Monday, we have 28 --

18           THE COURT:  Well, there were a lot of jurors that were

19   excused from Monday.

20           COURTROOM ADMINISTRATOR:  Correct, but none out of the

21   ones you just listed.

22           THE COURT:  None right now, yes.

23           COURTROOM ADMINISTRATOR:  We do have 28 remaining from

24   Monday and we have 21 from Tuesday which leaves us with more

25   than enough for the 44.

1          THE COURT:  All right.  So are you suggesting that we

2    let everybody go home early so they can prepare to exercise

3    their peremptory challenges tomorrow?

4          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

5          MR. NORWOOD:  Yes, please.

6          THE COURT:  All right.  I doubt there's any objection

7    to that.  So we'll have you back here -- can we do it at 9

8    instead of 8:30?  So they have a little more time or ...

9          COURTROOM ADMINISTRATOR:  That works.

10          THE COURT:  Do you think it will --

11          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

12          THE COURT:  Did we tell them to come back already at

13    8:30?

14          COURTROOM ADMINISTRATOR:  I did tell the jurors 8:30,

15    but we have to get them situated anyway.  So as long as we can

16    plan to start right at 9, we can have the jury come up right

17    when we're ready.

18          THE COURT:  Okay.  So the jury's already been told to

19    come back tomorrow at 8:30, but as you've seen, it takes a while

20    for them all to get situated and come up here.  They have to

21    check in to make sure we have everybody and so forth.  So we can

22    plan to start at 9 if that makes it a little easier for you all.

23          Mr. Ryan Bundy, I see you standing up, sir.

24          MR. RYAN BUNDY:  Yes, madam.  Considering preparing for

25    the peremptory challenges, the other Defense counsel and I need

—2:16-cr-46-GMN-PAL—

1  to meet together to be able to work together on this.  It would

2  be unfair if I were not present both for myself and for them.

3          I need to have an opportunity to have a meaningful

4  meeting with them which I don't believe it can be accommodated

5  here at this -- at the federal building right now because

6  they're going to want to transport me out.  I don't believe it

7  can be possible to have that meeting at the jail because they're

8  not going to want these guys to come in.  It's going to be very

9  difficult.

10          I suggest and ask, madam, that you release me from

11  custody just for this afternoon, meet with them, and I -- we can

12  make arrangements to either be back here in the morning and/or

13  even go back to the jail tonight if that would be the case.

14          THE COURT:  All right.

15          MR. RYAN BUNDY:  But I need to have --

16          THE COURT:  Here's what I will do.  Since we are going

17  to be quitting early anyway, I'll let you all stay here in the

18  courtroom.  And you can meet and confer and discuss until 4:40?

19  So that will give you 40 minutes to stay here and confer with

20  the computers, with your paperwork, with your files.  They're

21  all here now anyway already.

22          I just can't let you stay beyond 5.  So that's why I

23  say 4:40 because I know there's always a couple of extra

24  minutes.

25          MS. WEKSLER:  I appreciate that, Your Honor.  If we

————— 2:16-cr-46-GMN-PAL —————

1  could stay here until like 4:30 so I can be able to talk about

2  all of these challenges with Mr. Bundy in the morning as well,

3  if the Court would give us a little bit of time in the morning.

4  Because we're going to go back and continue talking about this.

5  There are going to be changes that are going to be made.  So if

6  we can have some time in the morning.

7          THE COURT:  That's fine.  So it's 4:05 now.  So I'll

8  give you until 4:40 today, and then you can come in tomorrow.

9  What time does the transport usually get into the courtroom?  I

10  know you've got things you've got to do before you actually get

11  in here, but is -- could you be here earlier than 8:30?  Because

12  8:30 is what we had planned.  So could you be here a little

13  earlier than that?

14          A MARSHAL:  Yes, sir.  8 a.m.

15          THE COURT:  8 a.m.?  All right.  So how's that?  We'll

16  open up the courtroom for you at 8 a.m., but we won't plan to

17  start until 9.

18          MS. WEKSLER:  That would be great.  Thank you, Your

19  Honor.

20          THE COURT:  Okay.  So 40 minutes tonight and an hour

21  tomorrow.  Okay.

22          MR. RYAN BUNDY:  Thank you, madam.

23          THE COURT:  All right.  Thank you.  We'll be off

24  record.

25          (Whereupon the proceedings concluded at 4:05 p.m.)

PATRICIA L. GANCI, RMR, CRR, CCR 937    (702) 385-0670

2:16-cr-46-GMN-PAL

1                              --oOo--

2                  COURT REPORTER'S CERTIFICATE

3

4        I, PATRICIA L. GANCI, Official Court Reporter, United

5   States District Court, District of Nevada, Las Vegas, Nevada,

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8

9   Date:  November 7, 2017.

10                              /s/ **Patricia L. Ganci**

11                              Patricia L. Ganci, RMR, CRR

12                              CCR #937

13

14

15

16

17

18

19

20

21

22

23

24

25