─────2:16-cr-46-GMN-PAL - November 9, 2017─────

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEVADA

3

4  UNITED STATES OF AMERICA,        )  Case No. 2:16-cr-46-GMN-PAL
                                    )
5                  Plaintiff,       )  Las Vegas, Nevada
                                    )  Thursday, November 9, 2017
6          vs.                      )  10:33 a.m.
                                    )  Courtroom 7C
7  CLIVEN D. BUNDY (1), RYAN C.     )
   BUNDY (2), AMMMON E. BUNDY       )  DETENTION HEARING
8  (3), RYAN W. PAYNE (4),          )
                                    )  *C E R T I F I E D  C O P Y*
9                  Defendants.      )
   ─────────────────────────────────)

10

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13          BEFORE THE HONORABLE GLORIA M. NAVARRO,
                   UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  For the Plaintiff:

17          STEVEN W. MYHRE, ACTING U.S. ATTORNEY
            DANIEL SCHIESS, AUSA
18          NADIA JANJUA AHMED, AUSA
            United States Attorney's Office
19          501 Las Vegas Boulevard South, Suite 1100
            Las Vegas, Nevada 89101
20          (702) 388-6336

21  Appearances continued on page 2.

22

23  Court Reporter:      Felicia Rene Zabin, FCRR, RPR, CCR 478
                         (702) 676-1087   FZ@nvd.uscourts.gov
24
    Proceedings reported by machine shorthand.  Transcript produced
25  by computer-aided transcription.

```
                      2:16-cr-46-GMN-PAL - November 9, 2017
```

 1  APPEARANCES CONTINUED:

 2  For Defendant Cliven D. Bundy:

 3          BRET O. WHIPPLE, ESQ.
            Law Office of Bret O. Whipple
 4          1100 South 10th Street
            Las Vegas, Nevada 89101
 5          (702) 257-9500

 6  For Defendant Ryan C. Bundy:

 7          RYAN C. BUNDY, PRO SE

 8          MAYSOUN FLETCHER, ESQ. (Standby)
            The Fletcher Firm, P.C.
 9          5510 South Fort Apache, Suite 5
            Las Vegas, Nevada 89148
10          (702) 835-1542

11  For Defendant Ammon E. Bundy:

12          DANIEL HILL, ESQ.
            Hill Firm
13          228 South 4th Street, 3rd Floor
            Las Vegas, Nevada 89101
14          (702) 848-5000

15          JAY MORGAN PHILPOT, ESQ.
            1063 East Alpine Drive
16          Alpine, Utah 84004
            (801) 891-4499

17

18  For Defendant Ryan W. Payne:

19          BRENDA WEKSLER, AFPD
            RYAN NORWOOD, AFPD
20          Federal Public Defender's Office
            411 East Bonneville Avenue, Suite 250
21          Las Vegas, Nevada 89101
            (702) 388-6577

22

23

24

25

2:16-cr-46-GMN-PAL - November 9, 2017

1   APPEARANCES CONTINUED:

2   Also Present:

3           Sharon Gavin, FBI Special Agent
            Joel Willis, FBI Special Agent
4           Mike Abercrombie, FBI Special Agent

5           Mamie Ott, Legal Assistant
            Michelle Blackwill, Legal Assistant
6
            Nicole Reitz, IT
7           Brian Glynn, IT

8           Tatum Wehr, paralegal

9           Lucas Gaffney, Esq.
            (For Defendant Melvin D. Bundy)
10
            Andrea Lee Leum, Esq.
11          (For Defendant Joseph D. O'Shaughnessy)

12          Erin Oliver, Pretrial Services

13          Kelly Bowen, Pretrial Services

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    Defense Witness:                                    Page

3    AMMON BUNDY
          Direct Examination by Mr. Hill               64
4         Cross-Examination by Mr. Schiess             80
          Redirect Examination by Mr. Hill            99
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    LAS VEGAS, NEVADA; THURSDAY, NOVEMBER 9, 2017; 10:33 A.M.

2                              --oOo--

3                     P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  All rise.

5          THE COURT:  Thank you.  You may be seated.

6          COURTROOM ADMINISTRATOR:  This is the time set for the

7    detention hearing in Case No. 2:16-cr-46-GMN-PAL, United States

8    of America versus Cliven Bundy, Ryan Bundy, Ammon Bundy, and

9    Ryan Payne.

10         Counsel, please make your appearances for the record.

11         MS. AHMED:  Good morning, Your Honor.  Nadia Ahmed and

12   Daniel Schiess on behalf of the United States.

13         THE COURT:  Good morning, Ms. Ahmed, Mr. Schiess.

14         MR. WHIPPLE:  Good afternoon, Your Honor.  Bret Whipple

15   on behalf of Mr. Cliven Bundy.

16         THE COURT:  Good morning, Mr. Whipple, Mr. Bundy.

17         PRO SE RYAN BUNDY:  Yes.  Ryan C. of Bundy Family here

18   by special appearance with -- with Maysoun Fletcher helping me.

19         THE COURT:  Good morning, Mr. Ryan Bundy, Ms. Fletcher.

20         MR. HILL:  Good morning, Your Honor.  Dan Hill and my

21   cocounsel, Morgan Philpot, here on behalf of Mr. Ammon Bundy.

22         THE COURT:  Good morning, Mr. Hill, Mr. Bundy,

23   Mr. Philpot.

24         MS. WEKSLER:  Good morning, Your Honor.  Brenda Weksler

25   and Ryan Norwood on behalf of Ryan Payne.

1        THE COURT:  And good morning, Ms. Weksler, Mr. Payne,

2   Mr. Norwood.

3        MR. GAFFNEY:  Good morning, Your Honor.  Lucas Gaffney

4   appearing.  I represent Melvin Bundy who is not present, but he

5   is in custody.

6        I'm also here standing in for Kristine Kuzemka, who

7   represents Jason Woods, and Lance Maningo, who represents Dave

8   Bundy.

9        We're here to orally request joinder into the motion

10  that's being heard today.

11       THE COURT:  What is the legal basis for a joinder to a

12  detention hearing for a different defendant?

13       MR. GAFFNEY:  Well, Your Honor, we believe that our

14  defendants are similarly situated in that they have been charged

15  in the same Indictment; they have been detained since March of

16  last year.  And we understand that the Court has ordered

17  Pretrial Services to issue reports to the Court; and, obviously,

18  our defendants weren't included in that request.

19       And so what we would request of the Court is that -- if

20  you're going to entertain argument as to modifying the

21  conditions of detention, we would also request a hearing and

22  maybe we could schedule it for next Friday, November the 17th,

23  in order to give Pretrial Services time to modify or to redraft

24  whatever reports are necessary.

25       THE COURT:  All right.  Well, you're requesting

1  something for which a legal procedure does not exist.  So, if

2  you want to file a motion to reopen the detention hearing, then

3  that is permitted with the Government having time to respond and

4  reply.  Mr. Woods's attorney has done that, and that motion is

5  pending and will be reviewed by the Court as soon as I possibly

6  can.  I'm aware of it and it is high up on my to-do list.  But

7  an oral motion to reopen the detention hearing --

8            MR. GAFFNEY:  Well --

9            THE COURT:  -- I don't know that that is a procedurally

10  correct vehicle for bringing this to the Court's attention.

11            MR. GAFFNEY:  So, just to give a little bit of

12  background, all of the defendants -- and I'm also here Andrea

13  Luem who represents Joseph O'Shaughnessy.

14            THE COURT:  Good morning, Ms. Luem.

15            MR. GAFFNEY:  -- all of the defendants in our group had

16  joined in the -- Mr. Payne's motion in regards to the OIG

17  disclosures; we had also joined in Mr. Cliven Bundy's motion to

18  dismiss.  And it's our understanding that it was those motions

19  and the issues raised in those motions which essentially were

20  the catalyst for the request that brings us here today.

21            And so it's our position that the issues raised in

22  those motions and the Court's consideration of the defendants'

23  detention directly impacts our clients as well because our

24  clients are also detained.  We don't even have a trial date yet.

25  And, obviously, anything regarding discovery or delay of this

─────2:16-cr-46-GMN-PAL - November 9, 2017─────

1  trial is gonna significantly impact our clients.  And so that's

2  why we're here today, to attempt, I guess, to orally join in the

3  request.

4        THE COURT:  Bless you.

5        MARSHAL:  Thank you.

6        THE COURT:  All right.  Well, this hearing really was

7  set at the convenience of Mr. Ryan Bundy who consistently has

8  requested an opportunity to address his detention.  He is -- he

9  has exercised his right to represent himself.  There has not

10  been an opportunity for him to have an attorney representing him

11  because he didn't want one, and so he's had procedural issues --

12  not unusual for someone who represents themselves -- and hasn't

13  had the same opportunity that your clients have had because you

14  have attorneys -- or you are an attorney.

15        And so this was set really for the Court's state of

16  mind to be able to feel that before we start trial that I had

17  completely looked at all the information that is available to

18  Mr. Ryan Bundy despite my telling him over and over again that

19  because he represents himself I'm not permitted to give him any

20  leniency.  But, nevertheless, I wanted to make sure that I was

21  aware of all the information.  And, since we're all going to

22  trial, I went ahead and set it for all four of 'em.  I'm not

23  even sure that Mr. Cliven Bundy or Mr. Ammon Bundy are even

24  requesting release today.  But I went ahead and set it for all

25  four of 'em because we're goin' to trial next week.

———2:16-cr-46-GMN-PAL - November 9, 2017———

1          So it wasn't based on any particular finding regarding

2    any motion or any change in circumstances that would apply to

3    other defendants.  But, to the extent that you still want to

4    assert that in a written motion, you're welcome to do that.  But

5    the oral motion is denied; it's not procedurally proper.

6          MR. GAFFNEY:  Okay.  Thank you, Your Honor.

7          THE COURT:  Without prejudice.  You can go ahead and

8    still file a motion to reopen.  And, if you meet all the

9    conditions for reopening a detention hearing, then --

10         MR. GAFFNEY:  Okay.  We will.

11         THE COURT:  -- obviously that'll be addressed.

12         MR. GAFFNEY:  Thank you, Judge.

13         THE COURT:  Thank you.

14         All right.  So before we get -- let me just make a few

15   preliminary remarks so it's clear on the record and for everyone

16   here, if there's any new faces, that during this proceeding

17   please remember that it is a courtroom and not a sporting event.

18   So no expressions of your disappointment or your approval of an

19   opinion or a statement is permitted.  That means no verbal

20   expressions, no body-language expressions; these are

21   distracting.  And outbursts are not tolerated.

22         The Marshals who are here and Court Security Officers

23   do have the authorization to remove anyone from the courtroom

24   that cannot follow the rules of decorum and provide respect to

25   all the individuals and to security as well as following the

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  procedural rules.

2         One of the rules that I need to make sure everybody

3  remembers is that there are no electronic devices permitted in

4  the courtroom, which means no cell phone; no laptop; no iPad.

5  No kind of electronic devices.  So that means if you do have one

6  please take a moment to make sure you step outside and place it

7  outside somewhere safe.  It doesn't matter.  Even if it's on

8  vibrate mode or privacy mode or turned off completely, it still

9  is just not permitted in the courtroom.  And, again, the

10 Marshals if they see any of these devices will ask you to step

11 outside and they have the right to not only remove you, but

12 advise you that you're not welcome to return.

13        The lawyers, the staff, court security is permitted to

14 have electronic devices so that we can prepare for court, review

15 notes, and present information.

16        Also, Mr. Philpot's paralegal is permitted to have a

17 electronic device.  And I'm not sure if I see him here today.

18 Oh, he is.  He's in the corner.  Good morning, sir.

19        All right.  And so he's here with an electronic device,

20 but he does have a cover over the speaker for the laptop as well

21 as for the camera lens because, again, no audio or video

22 recording is permitted.

23        Let's see.  Please remember that you need to follow the

24 Marshals' lead and the Court Security Officers' leads regarding

25 when and if you are able to say hello or wave or blow a kiss or

———2:16-cr-46-GMN-PAL - November 9, 2017———

1  something to any of the defendants if you are here to see them.

2  And there are times when that's appropriate and times when it is

3  not appropriate.  So please make sure that you follow the

4  Marshals' lead.

5          All right.  So, as far as the detention hearing goes,

6  the same requirements and burdens apply.  So I'm gonna go ahead

7  and read them once for everybody's benefit, but then we'll take

8  each individual one by one.

9          All right.  So all of these defendants have been

10  charged with offenses that create a rebuttable presumption, and

11  that is pursuant to Title 18 of the United States Code § 3142,

12  subsection (e) and (3).  And that rebuttable presumption is that

13  there are no conditions or combination of conditions that will

14  reasonably assure the appearance of the person as required and

15  the safety of the community.

16          So it's still the burden of the Government to show that

17  they're -- that these individuals should be detained.  But,

18  because there is a presumption that applies, the defense is

19  required to rebut that presumption.  So the burden of the

20  persuasion remains with the Government, but the application of

21  the presumption has the effect of shifting the burden of the

22  production to the defendant.

23          So to avoid detention, the defendants may present

24  evidence regarding four factors:

25          The first one being the nature and circumstance of the

————2:16-cr-46-GMN-PAL - November 9, 2017————

1  offense, including whether the offense is a crime of violence or

2  involves a firearm;

3         Number two, the weight of the evidence against the

4  defendant;

5         Number three, the history and characteristics of the

6  defendant, including—

7             the person's character, physical and mental condition,

8             family ties, employment, financial resources, length of

9             residence in the community, community ties, past

10            conduct, history related to drug or alcohol abuse,

11            criminal history, and a record concerning appearances

12            at court proceedings.

13        Number four is the nature and seriousness of the danger

14 to any person or the community that would be posed by the

15 person's release.

16        So the Government must establish by clear and

17 convincing evidence that the defendant presents a danger to the

18 community or by a preponderance of the evidence that the

19 defendant is a risk of nonappearance.  Those are two different

20 requirements, two different standards, and it is not necessary

21 for the Government to prove both.  Either one is sufficient for

22 a detention order.

23        I think that's all the information that basically

24 applies to everyone.

25        So let's go ahead and begin with Mr. Cliven Bundy.

2:16-cr-46-GMN-PAL - November 9, 2017

1          Mr. Whipple, I don't have an updated report for
2     Mr. Cliven Bundy.  So it doesn't appear that he's seeking
3     detention [sic].  Do you want to make a record?
4          MS. AHMED:  Your Honor, may I just first inquire as to
5     what the nature of this is?  Our understanding coming into this
6     hearing this morning was that the Court had indicated in
7     response to Mr. Ryan Bundy that it was willing to see if there
8     was any new information from the Pretrial Services.  And so
9     Pretrial Services interviewed each of these four defendants,
10    reports were generated.  They indicated basically nothing new
11    other than background information and their recommendation now
12    remains the same, as it always did, which is detention as to
13    each one of these individual defendants.
14          So, Your Honor, we're struggling right now to
15    understand are we gonna be taking argument on -- are we
16    reopening detention?  Because if that's the case, then, Your
17    Honor, the Government would ask for an opportunity to gather the
18    evidence that we know already exists that reflects that they
19    continue to pose a risk of both flight and danger and to have an
20    evidentiary hearing to that effect or at least have an
21    opportunity to be able to respond in writing to the motion that
22    was filed by Mr. Ammon Bundy which contains a number of
23    misrepresentations about what -- the facts in the case and the
24    proceedings generally.
25          And so we just wanted to understand what the Court's

———2:16-cr-46-GMN-PAL - November 9, 2017———

 1  intention is with today's presentation given that Pretrial

 2  reports remain the same.  And so our understanding was that this

 3  is just to see if anything had changed.  Nothing's changed.  And

 4  so, really, there should be anything further absent any renewed

 5  motion based on new information.

 6          THE COURT:  So which motion is it that you're referring

 7  to when you say that you want an opportunity to respond?

 8          MS. AHMED:  Mr. Ammon Bundy filed a motion last night.

 9  It's ECF 2843.  And it's a Motion to Revoke Detention Order.  So

10  that's one, Your Honor.

11          But, just generally speaking, since it doesn't appear

12  that there's really any basis to reopen anything since there's

13  no new information, we just wanted to understand what the nature

14  of the Court -- what the Court anticipated would happen today at

15  this hearing.

16          MR. WHIPPLE:  Your Honor --

17          THE COURT:  All right.  Well --

18          MR. WHIPPLE:  -- may I --

19          THE COURT:  -- I have not reviewed number 2833 [sic].

20          MS. AHMED:  Actually --

21          THE COURT:  I didn't --

22          MS. AHMED:  -- Your Honor --

23          THE COURT:  -- realize --

24          MS. AHMED:  -- it was filed --

25          THE COURT:  -- that was filed.

—2:16-cr-46-GMN-PAL - November 9, 2017—

1          MS. AHMED:  -- I believe it was filed today,

2    November 9th.

3          THE COURT:  Okay.

4          MR. WHIPPLE:  Your Honor, may I speak to that issue?

5    Because in fact on Tuesday morning, it was myself who asked

6    to -- with the Court's permission, to address the custody status

7    of all the defendants.  And my memory is on Tuesday morning it

8    appeared that because the Government had not provided

9    documentation due to my Motion to Dismiss that this trial may be

10   continued unnecessarily.  And I felt that the Court was

11   potentially -- because of the evidence that we were fleshing out

12   that occurred yesterday, the Court was giving us the opportunity

13   to revisit their detention status because of missing potential

14   evidence.

15          I saw it as a new opportunity to address the Court,

16   having two trials in the rearview mirror where the majority of

17   the individuals were either acquitted and none of them were

18   found guilty of conspiracy, so there is a change of

19   circumstance.  The Court is aware of the evidence in this case.

20   There is obviously an argument to show that the weight of

21   evidence in this case has much reduced than originally presented

22   at the initial detention hearing and give us an opportunity to

23   reevaluate anew each one of our defendants which in fact what's

24   occurred.

25          THE COURT:  All right.

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1          Well, in light of the Government's request, I may or

2   may not make a decision today depending on if there's additional

3   information that needs to be considered.  I might need to take

4   it under submission.  But I can't make that determination until

5   I know what information is being provided.

6          But, as to -- so this is why I wanted to take them

7   separately because they are not really all in the same position.

8   So, for example, Mr. Cliven Bundy was not charged in Oregon; did

9   not go to trial in Oregon; and was not acquitted of any charge

10  in Oregon.  So he's in a different position than some of the

11  other defendants.

12         And so not all the reasons are gonna apply equally to

13  everyone.  But I'm gonna take 'em one by one.  And, if there is

14  more information that I need to consider that is not available

15  today, then I'll take it under submission.  But we did set aside

16  the day today to do this so we'll do as much of it as we can.

17  The purpose for reopening the detention hearing is because these

18  individuals have been in custody for a long time.  Some, not --

19  some of 'em have had an opportunity to reopen their detention

20  hearing; some have not been able procedurally to comply with the

21  requirements to be able to do so.  There are timelines; there

22  are deadlines.

23         And so, for example, looking at Mr. Ryan Bundy's

24  history, we have his Detention Order that is the controlling

25  Detention Order in this case.  It's number 298 on the docket,

————2:16-cr-46-GMN-PAL - November 9, 2017————

1   which has now over 2800 documents.  And that Detention Order was

2   filed in April of 2016, which is almost a year and a half ago --

3   or is a year and a half ago.  Then there was a Motion to Reopen

4   which was denied.  And I have an updated Pretrial Services

5   report.  Since this April of 2016 Detention Order, there has

6   been a change in circumstances for Mr. Ryan Bundy, and so I

7   thought it appropriate to look at it.

8          And so, yes, I did go ahead and then bring in the other

9   three as well for better or for worse.  They -- you know, they

10  may or may not be in the same position.  So I understand the

11  Government's concern about what would be the basis for

12  reopening, say, for example, Mr. Cliven Bundy's detention

13  hearing when he was not in the Oregon trial and there seemingly

14  is no other information that would merit a reopening of the

15  detention hearing.

16         But a court may order a -- may reopen a detention

17  hearing anytime before the beginning of trial.  And, since trial

18  is beginning next week, this is really the last chance to do so.

19  And I want to make sure that I'm aware whether or not there are

20  still the same concerns regarding the risks and whether there

21  are any new conditions that could be fashioned that would

22  mitigate any concerns or risks that may still exist.  And, you

23  know, having reviewed the documentation, I can tell you it's

24  different for everybody because everybody's in a different

25  position; has different factors to consider.  Some are in

1  common, but there are different factors for individuals as well.

2          MS. AHMED:  Your Honor, may I just request one thing?

3  Because -- and, again, I don't want to -- I don't know if I

4  misunderstood.  But we did not understand that it was -- that

5  the Court had actually reopened detention as to all of them.

6  But if the Court -- we just thought that the Court was prepared

7  to review the new information, if any, that Pretrial Services

8  could offer based on their interviews.

9          But we would ask, then, that -- at least that if the

10  Court is going to entertain argument from the defendants

11  individually as to their positions regarding detention, we be

12  allowed an opportunity to go back and prepare to respond rather

13  than be asked to respond at this moment because we have been

14  provided information from a few different sources this morning

15  on the fly, such as the Marshal Service and other sources, that

16  indicate that -- what the continuing problems had been with

17  their compliance with court orders and orders from federal

18  officers.  And we have very, very grave concerns about the

19  safety of the community of federal officers if they are

20  released, and we really want to be able to address those

21  concerns with the Court fulsomely.  We would ask that if the

22  Court will take argument from the defense that we at least then

23  break and have an opportunity to come back at a later time with

24  our response.

25          MR. NORWOOD:  Your Honor, I'm sorry.

———2:16-cr-46-GMN-PAL - November 9, 2017———

1          The Court made perfectly clear on Tuesday that this

2     would be a detention hearing.  Mr. Myhre had asked this exact

3     point, you know, are we just gonna have the hearing if there's

4     new information.  Your Honor clarified that we would have the

5     hearing.  So they've had two days' notice that there was going

6     to be a detention hearing where the Court was gonna consider all

7     the information, which is more notice than we usually have for a

8     detention hearing; certainly more notice than we have when we

9     show up in court for a first appearance.  So I think everyone

10    should be ready to address the points today.  And I would object

11    to continuing this again so they can come in and find additional

12    things to say.

13          MS. AHMED:  Your Honor, may -- well, Your Honor --

14          THE COURT:  All right.  So the Court did raise, also,

15    at the time when I made the decision to set this hearing today

16    to reopen the detention hearing, that I was concerned that there

17    still remained many factors that need to be addressed, including

18    conduct of the defendants in and around the courtroom that I

19    myself have been witness to.  And so those concerns may or may

20    not be alleviated.  But I think that that's probably what you're

21    talking about is some other concerns that I have that I'm not

22    aware of that didn't happen here in the courtroom as far as the

23    ability of these defendants to be able to follow federal rules

24    and regulations.  And we talked about how Pretrial officers are

25    federal officers and they need to be able to perform reviews of

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  the residence and come in and check on any location monitoring

2  devices, if such is used and so forth, and that I was not sure I

3  felt comfortable that these individuals were going to permit

4  that to occur and that if there was a report from one of these

5  Pretrial officers that a violation had occurred or was suspected

6  whether these individuals would be coming -- you know, coming to

7  court or creating a dangerous situation.

8          So those are concerns.  They are different for everyone

9  because everyone has a different criminal history or past

10  history.  So we'll address them each individually.  And, as I

11  said, if I can't rule today, then I won't rule today.  But, as

12  much as we can, we're going to use our time wisely and try to at

13  least address as much information as possible.

14          So, Mr. Whipple, I'm sorry.  So did -- is Mr. Cliven

15  Bundy seeking a hearing today to consider release or not?

16  Because I do not have a report for him other than the old one

17  from February of 2016 which is the one that I reviewed in

18  preparation for the last hearing that I had with him.  And I

19  realize you weren't his counsel at the time.  But that

20  hearing . . .  Were you his counsel at the time?

21          MR. WHIPPLE:  No.

22          THE COURT:  Okay.  I didn't think you were.  Just now I

23  was thinking no.

24          And Document 4 -- let's see -- 486 on the docket is the

25  controlling Detention Order for Mr. Cliven Bundy.  And so that's

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  all that I have.

2        Judge Hoffman's order -- when there was a request to

3  reopen the detention hearing -- and he denied that in number

4  1906 on the docket.  So my Detention Order is still the

5  controlling order.

6        MR. WHIPPLE:  Yes, Your Honor.

7        So, yes, we are seeking a detention hearing and release

8  under potential terms of conditions that satisfy the conditions

9  of this Court.

10        THE COURT:  All right.

11        So what are the -- what is the material information

12  that you believe I should consider in determining whether or not

13  to release Mr. Cliven Bundy?

14        MR. WHIPPLE:  Two things, Your Honor.  The first is the

15  fact that this Court has sat through two trials of the

16  codefendants and knows, intensely, the evidence that the

17  Court -- or the Government has against them.  In both

18  occasions -- I'm not gonna repeat the results.  This Court knows

19  that there's never been a conspiracy that's been found, that

20  that conspiracy reaches out to these codefendants.  But, again,

21  the weight of that conspiracy allegation is obviously reduced

22  over the fact that we've had two trials that the Government did

23  not meet the burden.

24        I want to speak for all the defendants when we thank

25  you for the opportunity to address this issue.  I do believe

———2:16-cr-46-GMN-PAL - November 9, 2017———

1  that there is a change in circumstance because of those two

2  trials.

3          The second issue that I'd like to address to the Court

4  is my client's age.  He's 71 years of age.  He was joking with

5  me this morning -- he's a rancher, as this Court knows -- he

6  said, "If there were cows that had as few teeth as I have, I'd

7  send them off to the market."  He came in here with 20-plus

8  teeth and he's got, like, 10 or 15 left.

9          He's had health issues when he's been in the detention.

10 He has had infections and they've pulled a number of his teeth.

11 It has not been easy for my client; it's been very hard.  He's

12 older.  And it's just a tough life.  He wants to go home with

13 his family.  I know all -- anybody in his circumstance would

14 want to go home.  But he's 71 years of age.  He's never gotten

15 in trouble in his life.  This is the first time that he's ever

16 been really in a court.

17          This Court -- this Court wants to know is he gonna be a

18 risk of nonappearance.  My client, you know, he's not a wealthy

19 financial man.  But I've asked all of his daughters to -- and

20 children to walk into the courtroom today.

21          And if they just stand up very quickly.

22     (Audience members stand.)

23          MR. WHIPPLE:  This is a gentleman who has seven

24 daughters, six of 'em are here.  One of 'em is in Canada;

25 couldn't make it down.

———2:16-cr-46-GMN-PAL - November 9, 2017———

1          His report says he has six sons.  I said, "You really
2   needed another son to even it out.  Seven daughters and seven
3   sons."
4          He said:  "Well, Bret, I actually have a seventh son I
5   adopted.  Didn't formally adopt him, but I raised another boy."
6          He's got nothing but every reason in the world to be --
7   stay in this community.  And that's because the only thing
8   that's important to him is his family.  All of his kids are
9   here, all of his grandchildren are here.  The youngest son is on
10  a Mormon mission; otherwise he'd be here.  He will appear at any
11  court proceeding because he has no other place to go.
12          Now, I think the real issue to the Court is does he
13  constitute a risk to the community.  Dan Hill had the
14  opportunity to speak to that issue.  But we as a group have
15  fashioned an opportunity or what we believe is a plan -- or at
16  least an option for this Court to where they'll be supervised
17  and controlled and available to the Court at any time.  We found
18  a house here in Las Vegas where we have a retired Metro officer
19  who will essentially be their den mother or their caretaker
20  while they reside here in Las Vegas.
21          THE COURT:  Is this Mr. Gordon?
22          MR. WHIPPLE:  Yes.
23      (Pause in the proceedings.)
24          MR. WHIPPLE:  It's a four-bedroom house.  There are
25  bedrooms available for each of the codefendants and the

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

 1 defendants.  There's an individual that will have complete --

 2          THE COURT:  So it's the rental home of Keith and Joanne

 3 Gordon.  Not their residential -- not where they actually live.

 4 It's a rental home, a separate property.

 5          MR. HILL:  Where they actually live, Your Honor.

 6          THE COURT:  Oh, it is where they actually live?

 7          MR. HILL:  Yes, Your Honor.

 8          THE COURT:  All right.  Because I'm looking at the

 9 Pretrial report for Ammon Bundy that says, "Defendants' proposed

10 to live" -- or "Defendant proposes to live at the rental home of

11 Keith and Joanne Gordon."

12          MR. HILL:  I -- the Pretrial asked me whether they

13 owned or rented that home.

14          THE COURT:  Ah, right.

15     (Pause in the proceedings.)

16          THE COURT:  All right.  So they rent it from someone

17 else.

18          MR. HILL:  Correct, Your Honor.

19          THE COURT:  Okay.

20          MR. WHIPPLE:  So the option of the Court would be able

21 to control who visited 'em; who they communicated, either

22 through telephone or in person.  We would request that any

23 contact be made to immediate family members and that contact be

24 limited to their attorneys.

25          We anticipate this trial goin' forward.  We're ready to

2:16-cr-46-GMN-PAL - November 9, 2017

1  go.  We really are.  We want some resolution.  But, at the same

2  time, the change of circumstances is the fact that they have put

3  on this trial twice before and they did not get a conviction at

4  all, at any time for any Conspiracy charges.  And that's the one

5  charge that extends to our codefendants.

6       I'm not gonna take up any more of the Court's time.  I

7  appreciate the opportunity to speak to you.  But, again, I

8  believe in this case the two things that this Court can take

9  into consideration is the fact that you've already had the

10 evidence brought before a finder of fact on two different

11 occasions and the one charge that extends to our client has

12 never been found and the fact -- for my sake, my client is so

13 much -- he's -- his age.  It's been hard on him and his health

14 has really deteriorated.  And he would like to get out to see

15 his family.

16      THE COURT:  Well, the age and the health was already

17 previously addressed by Judge Hoffman in his order where he

18 stated that the -- there's no indication that the medical issues

19 are life threatening or that medical care is not available.

20      MR. WHIPPLE:  I can respond to that, Your Honor.

21      He had -- he had issues with his teeth.  And, rather

22 than treat 'em, they just pulled 'em.  That's why I kinda made

23 the joke about how many teeth he has and he refers to himself as

24 an old cow sometimes because he -- you know, in the rancher

25 world, when cattle lose their teeth, they no longer can eat

—2:16-cr-46-GMN-PAL - November 9, 2017—

1   enough to keep them in good health so you have to ship 'em to

2   the -- ship 'em off to auction.  And that's what he's making

3   reference to himself.

4          He's really aged.  He's lost his teeth.  He can no

5   longer chew because he doesn't have teeth -- enough teeth to

6   chew.  It's really been hard on him.  He's lost a lotta weight.

7   The infection did go away after they pulled his teeth.  But now

8   he still doesn't have any teeth; he doesn't have dentures.  He

9   has a few in the front.  But, at the end of the day, he still

10  cannot chew; he still has issues; and his teeth are in horrible

11  condition.  And he has no way of treatin' that at the jail -- or

12  the Detention Center other than them being pulled.  And, at the

13  rate we're going, in three months he may not have any left.

14  That's his concern.  It really comes down to his teeth and his

15  ability to -- you know, to eat.

16          THE COURT:  All right.  Thank you.

17          Mr. Schiess or Ms. Ahmed, did you want to address any

18  of those concerns?

19          MS. AHMED:  Your Honor, I'll briefly just respond.

20          If those are the two new pieces of information that

21  Mr. Bundy believes would warrant release, then we ask the Court

22  to deny on both grounds.  Essentially it's that there has been

23  two mixed-bag results in two previous trials and, therefore,

24  that means that the weight of the evidence is now diminished as

25  to Mr. Cliven Bundy.  Well, obviously Mr. Bundy is a different

—2:16-cr-46-GMN-PAL - November 9, 2017—

1   defendant; this is a different case.  The statements that he

2   makes, the actions that he took, and the evidence against him as

3   presented in this trial will differ from what was presented as

4   to the gunmen that were on the bridge on April 12th.  And so,

5   Your Honor, we would ask that that in no way be deemed as

6   diminishing the weight of the evidence or the significance of

7   his guilt.  In the first trial, one of the gunmen was convicted

8   and was -- two of the defendants were convicted.  And so it's

9   not in any way a reflection on the weight of the evidence.

10          Additionally, Your Honor, with respect to his health,

11  as the Court has already indicated, his health concerns were

12  addressed previously by the Court -- considered previously by

13  the Court.  And, in our just colloquial experience, Your Honor,

14  I know that health -- the conditions that he's raising can be

15  dealt with while he's in custody.  And certainly, at the end of

16  the day, none of what has been raised by Mr. Whipple outweighs

17  the very, very significant concern that he proposes a continuing

18  risk of nonappearance because he simply does not respect the

19  court orders that are issued by Court -- this very Court and

20  that he does not abide or consider himself to be bound to abide

21  by federal laws or that he respects federal officers.  He's

22  reflected none of that.

23          And so, while Mr. Whipple addressed things that I guess

24  suppo- -- I guess would have gone to the risk of flight, he

25  didn't even touch on the danger that Mr. Bundy continues to pose

1   to the community as a presumption that he simply cannot

2   overcome.  And so we would ask the Court to continue to hold

3   him.

4            THE COURT:  All right.  Well . . .  So I'll address

5   first the trial results.

6            So the Government is correct.  There were two

7   convictions and some acquittals as well as some hung-jury

8   counts.  All of those defendants who were tried in the first two

9   trials, however, came to Nevada from out of state within about

10  24 hours, some of them came within 4 to 6 hours, of the assault

11  on the -- underneath the bridge.

12           All of those defendants had a similar theory in that

13  they disavowed Mr. Cliven Bundy and the information that he was

14  providing.  And they explained to the jury, either by argument

15  through counsel or through their own testimony, that they came

16  for different purposes; things that they had read and seen

17  either online, through media, or heard through other folks.  And

18  the results in those trials does not necessarily mean that the

19  jury found that Mr. Cliven Bundy would be acquitted of those

20  charges because the defense of those individuals was essentially

21  to separate themselves from Mr. Cliven Bundy and not to join in

22  that conduct.

23           In the Detention Order previously, the Court found that

24  Mr. Cliven Bundy had posed a serious risk that he would not

25  appear because he had defied Federal Court orders for over

————2:16-cr-46-GMN-PAL - November 9, 2017————

1   20 years and that he only abides by laws selectively.  He shows

2   no remorse for his disobedience of the Federal Court order.  He

3   admits that he does not recognize federal jurisdiction or

4   authority which provides a basis to believe that he would not

5   willingly appear.  He resides in an isolated area.  He has

6   bodyguards willing to confront law enforcement on his behalf.

7   His family ties and letters of support that were provided do not

8   provide good-faith assurances that he will appear for court and

9   comply with the court-ordered conditions.  He was indicted on 16

10  charges, including four of the 924(c) counts, and those alone

11  present a mandatory minimum of over 80 years of incarceration if

12  he is convicted.  This lengthy possible sentence provides the

13  defendant with a strong incentive to flee.  And, additionally,

14  the overwhelming weight of the evidence, including photographs

15  and recordings, there's the indicia of reliability.

16         The defendant has consistently failed to abide by

17  numerous orders issued about this same court, from the United

18  States District Court for the District of Nevada issued by other

19  judges -- not by me but by other judges in this court -- and he

20  does not provide any good-faith assurances to the court that he

21  will respect and comply with orders of the Federal Court.

22         As far as the danger to the community, he's charged

23  with crimes of violence involving the use of weapons for which

24  the law creates the rebuttable presumption that he should be

25  detained.  The weight of the evidence in this case against him

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1  is still very strong, including the photographs and the videos.

2  He is alleged to have recruited gunmen to assault law

3  enforcement.  And we know that gunmen did respond to that call

4  and did attempt to assault law enforcement.  Not in the legal

5  sense of the word; I'm not making any factual determinations.

6  But they did arrive and they did use threats and force to

7  prevent the law enforcement officers from enforcing the order of

8  impoundment and the operation that they were forced to abandon.

9        The defendant was willing to cause injury or loss of

10  life to others for his own financial benefit.  He pledged to use

11  force and violence to prevent any future law enforcement

12  actions.  His family ties and letters of support do not mitigate

13  this threat.  This threat is to law enforcement and anyone

14  associated with law enforcement.  He is alleged to be the

15  leader, the organizer, and the primary beneficiary of the

16  conspiracy charged.  And he has demonstrated that he will do

17  whatever it takes, even at the cost of substantial injury to

18  other persons in the community, including women and children.

19        So the Court does not find that his medical condition

20  cannot be treated and that that is a material factor that would

21  overcome the presumption of detention.

22        MR. WHIPPLE:  Your Honor, we --

23        THE COURT:  The current Detention Order No. 489 is

24  still the controlling Detention Order.

25        AUDIENCE MEMBER:  Gloria Navarro, you are an evil,

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  cold-hearted woman.  And my dad is innocent.  My brothers -- I

2  don't care.  Touch me if you want.  Touch me.

3          MARSHAL:  Come on.  Come on, Miss.

4          AUDIENCE MEMBER:  Just touch me.

5          MARSHAL:  Come on.  Come one, Miss.

6          MARSHAL:  Let's go.

7          MARSHAL:  Come on.

8          AUDIENCE MEMBER:  I Love you, dad.  I probably won't be

9  comin' back.  But I know you're innocent.

10          You are a liar, Gloria Navarro.  You're evil and

11  cold-hearted.  Kill yourself.

12      (Escorted out.)

13          THE COURT:  All right.  Let's move on to Mr. Ammon

14  Bundy's detention hearing.

15      (Defense counsel and Defendant Ammon Bundy conferring.)

16          THE COURT:  Here we do have some new information.  The

17  controlling order is number -- Detention Order is number 299,

18  and this is from April of 2016 entered by Judge Foley which made

19  mention throughout about the participation in the Oregon case --

20      (Counsel conferring.)

21          THE COURT:  -- which we know the condition has since

22  changed.

23          We also have -- let's see -- the subsequent order

24  regarding a motion that was made -- actually, it wasn't a

25  motion -- it was an objection that was made to Judge Foley

2:16-cr-46-GMN-PAL - November 9, 2017

1  denying an extension of time before the detention hearing.  He

2  did grant one extension, but then there was a second extension

3  that was also requested and the second extension was not

4  granted.  But Judge Foley did say that he was entering -- he was

5  having the hearing and he was entering the Detention Order

6  without prejudice and that the defendants would have an

7  opportunity to move to reopen the detention hearing based on any

8  new and material information.  But I couldn't find anywhere on

9  the docket where that ever actually happened.

10        Let's see.  In the objection to the Magistrate Judge's

11  order, there were attachments that are several exhibits long --

12  I think there are about nine different exhibits -- that would

13  appear to be an attempt to proffer new material information.

14  But it wasn't proffered as a -- to Magistrate Judge Foley which

15  is the proper procedural vehicle.  So, in an abundance of

16  caution and an attempt to be fair, I did order a new Pretrial

17  Investigation Report to update the situation.  And that was

18  prepared and is now dated November 8th of 2017.

19        Mr. Hill, did you want to go ahead and address

20  Mr. Ammon Bundy's situation?

21        MR. HILL:  Your Honor, we -- the filing to which the

22  Government referred, which I think, I guess, would be properly

23  docketed as an objection, we couched it as a motion to revoke

24  under 3145 (b), only for the benefit of having something in

25  writing, because we echo the Federal Public Defender that we

—2:16-cr-46-GMN-PAL - November 9, 2017—

1 thought perhaps the posture of this hearing was similar to what

2 Your Honor did with Mr. Parker and Drexler which is kind of

3 address the detention as the court of original jurisdiction.

4 So, understanding, of course, that this relates back to the

5 Magistrate Judge's Detention Order, the purpose of this filing

6 was just for the benefit of having something in writing for what

7 we understood to be kind of a court of original jurisdiction

8 sua sponte addressing of the detention situation.

9       With that, I understand, of course, we had two days

10 with an evidentiary hearing in between.  We did just file it

11 late last night.  I'm happy -- if Your Honor is going to address

12 the detention situation as the court of original jurisdiction

13 under 3145 -- understanding, of course, that the Local Rules

14 have a time bar on that -- we would submit on the motion.  If

15 you'd prefer that we address this in front of the Magistrate

16 Judge in the context of a motion to reopen . . .  We understood

17 that's what was happening here today was a reopened detention

18 here.  If that's the case, we would submit on --

19       THE COURT:  And you're right.  Ordinarily it's -- this

20 hearing occurs before the Magistrate Judge.  But the Magistrate

21 Judge does not have all the information that this Court has now

22 because we've moved so close to trial.  So, even if it was held

23 correctly in front of the Magistrate Judge, you could appeal it

24 to me anyway.

25       MR. HILL:  Right.

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1    THE COURT:  So I'm just kind of cutting to the chase.

2    MR. HILL:  Of course, Your Honor.

3    So, with that, to save time -- and also I know that the

4  Government had certain concerns -- we're happy to submit on

5  Docket No. 2843 if Your Honor wanted to take it under

6  submission.

7    (Counsel conferring.)

8    THE COURT:  Okay.  And I appreciate that.  I didn't

9  have a chance to look at it.  I didn't realize that that had

10  been filed.  I was busy looking at the new Pretrial Reports that

11  were prepared.

12    But I do have some questions about the Pretrial Report.

13  So let's see if maybe we can get some of them --

14    MR. HILL:  Sure.

15    THE COURT:  -- clarified.

16    So he is now 42 years old, and the only criminal

17  history that he has is from 1998 at the age of 23, Resisting a

18  Public Officer and Obstructing a Peace Officer.  Those are two

19  arrests out of Mesquite.  Now, this says that he did go to trial

20  on those two misdemeanors and was found guilty at trial.  So I

21  just wanted to make sure that that's trial or he pled guilty

22  or . . .

23    MR. HILL:  I'm happy to go into that situation, Your

24  Honor.  I believe that --

25    THE COURT:  I just want to make sure it wasn't a

————2:16-cr-46-GMN-PAL - November 9, 2017————

1  mistake.  So its a trial, not a --

2       MR. HILL:  It is not my understanding that there was a

3  trial.

4     (Mr. Hill and Defendant Ammon Bundy conferring.)

5       MR. HILL:  I think Mr. Bundy was 21 at the time -- 23.

6  Mesquite's a small town.  He heard that -- don't worry about it.

7  I think it was just he didn't -- he thought the citation was no

8  longer a situation.  And it may have just been a guilty entered

9  in his absence, Your Honor.  I'm not . . .

10      THE COURT:  All right.

11      And then I could not find the addresses that he

12 provided.  I asked Pretrial Office to double check to see if

13 they had perhaps created a typo when they were taking notes and

14 then placing everything into a report.  But there is a

15 misspelling, apparently, for the City of Laveen, which is -- in

16 the report it says L-e-v-i-n-e as being his rental property; but

17 it's actually spelled L-a-v-e-e-n.  However, the address that is

18 provided does not return as a legitimate address at all.  So the

19 address provided is 13326 South Sagebrush -- and then I have it

20 written two different ways -- in some places is says "Trail" and

21 in some places it says "Trial."  But either way it doesn't

22 return as a correct address.  And this is the same information

23 that was provided to Oregon.

24      MR. HILL:  I'm sorry, Your Honor.  I'm having a little

25 trouble finding this on -- what page on the report is it?

—2:16-cr-46-GMN-PAL - November 9, 2017—

```
 1          THE COURT:  Page 3, under Assets.
 2      (Pause in the proceedings.)
 3          MR. HILL:  Ah.
 4          THE COURT:  And so --
 5      (Mr. Hill and Defendant Ammon Bundy conferring.)
 6          THE COURT:  -- that is their rental property.  That's a
 7  home in Arizona.  They live in Idaho, but the home in Arizona
 8  that's a rental property --
 9          MR. HILL:  Oh.
10          THE COURT:  -- does not exist on the --
11          MR. HILL:  I think -- Mr. Bundy represents that because
12  it is a rental property and it's been so many -- couple years
13  since he's dealt with it he thinks he might have the ordinal --
14  the number in correct.
15          And did Your Honor say that it was the same as provided
16  to Oregon?
17          THE COURT:  Yes.
18      (Pause in the proceedings.)
19          MR. HILL:  Oregon has it L-a-v-e-e-n.  And Your Honor
20  said you tried it both ways?
21          THE COURT:  Yes.
22      (Pause.  Mr. Hill and Defendant Ammon Bundy conferring.)
23          THE COURT:  The only --
24          MR. HILL:  So it's on --
25          THE COURT:  -- address --
```

2:16-cr-46-GMN-PAL - November 9, 2017

1           MR. HILL:  -- South -- I'm sorry, Your Honor.

2           THE COURT:  Go ahead.

3           MR. HILL:  It's on South Sagebrush Trail in Laveen,

4    Arizona, Your Honor.  But Mr. Bundy just -- he thinks he has

5    the -- that's what he remembered, at 13326; but it's possible

6    that he has the number incorrect.  Yeah.  We informed the

7    Pretrial Services officer we think it's 13326, but we're -- we

8    were unsure.

9           THE COURT:  So that address doesn't exist under the

10   Assessor's website, any of the property records.  There is -- if

11   you enter his name into the records, however, it does return an

12   address that is completely different.  Instead of 13326 South

13   Sagebrush, it's 5245 West Dobbins Road, in Laveen, Arizona.

14     (Mr. Hill and Defendant Ammon Bundy conferring.)

15          THE COURT:  And it shows that that is both the mailing

16   address and the property address --

17     (Mr. Hill and Defendant Ammon Bundy conferring.)

18          THE COURT:  -- for an Ammon and Lisa Bundy.

19     (Mr. Hill and Defendant Ammon Bundy conferring.)

20          MR. HILL:  So Mr. Bundy's clarified that that is

21   correct.  Sagebrush was in Maricopa, the address -- so they

22   lived in the Laveen address for a little bit before Ammon moved

23   to Emmett, Idaho.  Before that Laveen address, they lived for a

24   long time on the Sagebrush Trial.  So the second address that

25   Your Honor found on the Assessor is the property that he moved

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  into and then --

2      (Mr. Hill and Defendant Ammon Bundy conferring.)

3          MR. HILL:  Oh.

4          THE COURT:  He says he lived on the Sagebrush address?

5  'Cuz --

6          DEFENDANT AMMON BUNDY:  Your Honor --

7          THE COURT:  -- the address --

8          DEFENDANT AMMON BUNDY:  -- may I --

9          THE COURT:  -- doesn't even exist.

10          DEFENDANT AMMON BUNDY:  -- clarify this?

11          THE COURT:  It's up to Mr. Hill if he wants you to

12  speak on the record or not because I don't know if there's

13  anything --

14          DEFENDANT AMMON BUNDY:  Yeah.

15          THE COURT:  -- untoward going on.  I don't want you to

16  inculpate yourself on the record.

17          DEFENDANT AMMON BUNDY:  I lived in three locations in

18  Arizona.  I lived in Tempe in an apartment.  I lived in

19  Maricopa, Arizona, in a house for 3 years.  And then I moved to

20  Laveen, Arizona, and I was there for about -- a little over 10

21  years.  And the Laveen, Arizona, home is a 5245 -- and I

22  apologize --

23          THE COURT:  Dobbins Road.

24          DEFENDANT AMMON BUNDY:  -- Dobbins Road.  And so I --

25  that's -- this address here would be close to the one in

2:16-cr-46-GMN-PAL - November 9, 2017

1  Maricopa.

2          THE COURT:  The Sagebrush address?

3          DEFENDANT AMMON BUNDY:  Yes.

4          THE COURT:  But the Sagebrush address is not a home.

5  It's not . . .

6          DEFENDANT AMMON BUNDY:  It was a home; I don't own it

7  anymore.  I sold that home.  I moved to Laveen.  I lived there

8  for, like I said, about 11 years.  I still own that home and I'm

9  renting it.  And I lived there in that home for that long.

10          THE COURT:  All right.  Well, there is no address --

11  maybe I'll have the Pretrial officer -- if you want to clarify

12  your attempt to try to verify this information.

13          MS. OLIVER:  That's correct, Your Honor.  According to

14  Maricopa County Assessor records, there is no address in that

15  database of 13326 South Sagebrush Trail, not Trial.  That's a

16  typo; it should be "Trail."  However, when running his name,

17  Mr. Ammon Bundy, as a potential property owner, there was a

18  record returned and that was for the 5245 West Dobbins Road

19  address.

20          Mr. Bundy did not indicate during the interview

21  anything about a Dobbins Road address.  When asked about assets,

22  it was the Sagebrush Trail address that was provided.

23          DEFENDANT AMMON BUNDY:  Your Honor, there was no

24  attempt for deception or anything like that.  I simply did not

25  remember the address.  I've been incarcerated for 2 years.  I

———2:16-cr-46-GMN-PAL - November 9, 2017———

1  didn't live there for a year before that.  There was no -- I

2  mean, there's no -- no deception going on here if that's even

3  the question.  I've lived in that's home.  I own that home.  I

4  have hundreds of friends that know I own that home.  My family

5  knows I own that home.  To even suggest that in any way I was

6  deceiving the Pretrial, it was simply I didn't get the address

7  right.  I got it mixed up between the two addresses before.  So

8  I apologize.

9          THE COURT:  All right.  But you do -- so it is the

10  Dobbins Road address that is your rental property, not --

11          MR. HILL:  Yes, Your Honor.

12          THE COURT:  -- Sagebrush.

13          MR. HILL:  Sorry for that confusion, Your Honor.

14          THE COURT:  All right.  And so his residence where his

15  wife and his kids live is the one in Emmett, Idaho --

16          MR. HILL:  Correct, Your Honor.

17          THE COURT:  -- which returns as a 5,022-square-foot

18  home, five-bedroom, five-bath on West -- is it 1881 West

19  Slope -- no -- West -- West South Slope Road in Emmett, Idaho,

20  83617.  And so it states here that the -- in the report for

21  assets that the value of that home is $576,000.  And that only

22  $280 -- or $280,000 is owed on the mortgage, so there's an

23  equity of about 300,000 in that as well as the rental property

24  income of 5,000 per month.

25          And then there was also a question about the vehicles.

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  The wife's 2014 Nissan is not included?

2          DEFENDANT AMMON BUNDY:  Your Honor, that's been sold to

3  pay legal bills.

4          THE COURT:  All right.

5          And it looks like also the legal bills that were

6  $50,000 and the Financial Affidavit filled back in 2014 before

7  trial have now raised up to -- it says here 185,000 --

8          DEFENDANT AMMON BUNDY:  That's correct.

9          THE COURT:  -- after --

10          DEFENDANT AMMON BUNDY:  That's the amount that I still

11  owe for Oregon, 185,000, and have arrangements, you know,

12  basically.  "Arrangements" that's . . .

13          MR. HILL:  And, for the record, Your Honor, the initial

14  Financial Affidavit was before trial.

15          THE COURT:  That's -- that was my interpretation as

16  well.

17          MR. HILL:  (Nods head.)

18     (Pause in the proceedings.)

19          THE COURT:  Oh, I thought there was . . .

20          All right.  And this report doesn't cover whether he's

21  in the same situation as another defendant who was acquitted of

22  some charges but there was another charge that still remained.

23  Here it appears as if all of Mr. Ammon Bundy's charges in Oregon

24  have since been resolved.  Or are there also remaining lingering

25  charges?

———2:16-cr-46-GMN-PAL - November 9, 2017———

1          MR. HILL:  Ammon Bundy was acquitted from all charges

2   and released from any and all detainers in Oregon.

3          THE COURT:  Okay.  Thank you.

4          All right.  So does the Government wish to be heard now

5   or -- I -- you know, none of us has read the recent filing,

6   number 2833.

7          MR. HILL:  I'm happy to put some new circumstances and

8   arguments on the record.

9          THE COURT:  All right.  Go ahead.

10          MR. HILL:  We'll start with the Pretrial -- the new

11   Pretrial findings for assessment of danger and nonappearance and

12   then in relation to Magistrate Judge Foley's.

13          For the risk of nonappearance, Pretrial Services found

14   an assessment of nonappearance based on foreign travel and

15   family ties to a foreign country.  In terms of the foreign

16   travel, Mr. Bundy does not have a passport.  He has a sister who

17   married a friend up in Canada.  He hasn't been there in about

18   20 years.  He went to Mexico one time 13 years ago; has not been

19   out of the United States since then.  Does not have a passport.

20          In terms of the assessment of danger --

21          THE COURT:  Right.  So the Canada trip was 20 years ago

22   and the Mexico trip was 13 years ago.

23          MR. HILL:  Correct.

24          THE COURT:  Yeah.

25          MR. HILL:  In terms of the assessment of danger, they

2:16-cr-46-GMN-PAL - November 9, 2017

1  cite two items, the nature of the instant alleged offense -- and

2  we'll kind of get to that in a second -- and, number two, prior

3  arrests and convictions for offenses.  I just want to put on the

4  record the background, represent to the Court what the

5  background of this situation in Mesquite was.

6       Mr. Bundy was 23 years old and in the Virgin River

7  Casino in Mesquite with his brother Mel.  They were goofing

8  around, security came and took Mel; Mel came out in handcuffs.

9  Ammon asked the officers what -- asked the officers:  "What are

10  you doing?  What are you doing?  Don't take my brother."  And it

11  was a misdemeanor citation for obstruction based on an

12  interaction with the Mesquite Police over Ammon, you know,

13  almost 20 years ago goofing around with his brother.

14       So, in terms of clear and convincing evidence that

15  Mr. Ammon Bundy poses a serious danger to the community, based

16  on that conduct 18 years ago, we would certainly disagree.  It

17  was certainly never cited by Magistrate Judge Foley who, in

18  Docket No. 299, offered the following for his basis of

19  detention.  Magistrate Judge Foley said, [reading] Based on the

20  nature of the charges in the Indictment, the weight of the

21  evidence, and his alleged involvement in the subsequent events

22  in Oregon, the Court finds that there are no conditions or

23  combination of conditions [reading ended].  So Pretrial

24  Services's assessment diverts quite substantially from what was

25  entered into as Magistrate Judge Foley's bases for not being

——2:16-cr-46-GMN-PAL - November 9, 2017——

1  able to find a combination of conditions.

2       I think we've briefly talked about what Pretrial

3  Services bases for no combination of conditions, you know, a

4  20-year-old trip and a misdemeanor citation that his brother and

5  he got goofing around 20 years ago.

6       In terms of Magistrate Judge Foley's findings,

7  obviously I don't have the transcript here in front of me.  But

8  Magistrate Judge Foley was very concerned about the Detention

9  Order in Oregon and the pending charges in Oregon.  That, of

10 course, has been completely resolved in the most legally

11 sufficient and important way possible, which would be that Ammon

12 was found not guilty unanimously on all charges; released from

13 custody in Oregon; and the Oregon case is completely over for

14 Mr. Bundy.

15      In terms of Magistrate Judge Foley's findings regarding

16 the nature of the allegations and the weight of the evidence,

17 I'd like to make just a couple of preliminary points here.

18 First of all, the weight of the evidence obviously is the least

19 important factor because the Bail Reform Act doesn't require any

20 pretrial determinations of guilt.  On page 11 of that brief --

21 that I'm sure the Government will want time to address.  But, at

22 any rate -- the weight of the evidence is relevant only in terms

23 of the likelihood that the defendant will fail to appear.

24      We'll start with the nature and seriousness of the

25 offense charged.  In relation to what is new -- and Mr. Whipple

1  on behalf of Cliven went into it -- we have two previous

2  trials -- and certainly the Court understands that there was

3  theories of defense here that was unique -- you know, each

4  defendant has unique theories of defense.  Certainly I can't

5  imagine -- and having read the transcripts of that trial -- they

6  were trying to convict those defendants of conspiring with these

7  defendants.  I'm almost certain that the Government would have

8  put forth as much evidence of conspiracy as possible alleging

9  that the men sitting in this room led a conspiracy.  So we would

10  still reiterate and maintain that the failure to obtain any

11  conviction on conspiracy is a new circumstance in relation to

12  the weight of the evidence that was not available, obviously,

13  2 years ago at the initial detention hearing.

14          In terms of a proffer of evidence related to Ammon and

15  the nature and seriousness of the offense charged and the weight

16  of the evidence, Mr. Bundy never held -- and I should -- I'm

17  gonna relate this back to the Magistrate Judge's findings if I

18  can -- the Magistrate Judge found -- based on Mr. Myhre's

19  proffer at the original detention hearing -- based on the

20  proffer, Magistrate Judge Foley found in Docket No. 299,

21  [reading] The Government alleges that defendant confronted and

22  aimed firearms at federal law enforcement officers [reading

23  ended].

24          Having spent 2 years in this case and having the

25  benefit of two trials and review of the discovery, the evidence

2:16-cr-46-GMN-PAL - November 9, 2017

1   is indisputable at this point that Mr. Bundy never possessed any

2   firearm for the entirety of the protest down in Bunkerville.

3   And there are several -- five or six -- very public, very

4   conspicuous instances -- from the TV news to Facebook posts to

5   emails -- very conspicuous instances in which Ammon Bundy

6   categorically, in no uncertain terms, urged protesters coming to

7   the Bunkerville to not bring long guns and not wear camouflage.

8   To be in a situation where we're looking at the weight of an

9   evidence -- weight of the evidence in a conspiracy case, we have

10  the -- my client, Mr. Bundy, specifically urging protesters --

11  in as public a way as he can, as often as he can, up to and

12  including signs at the staging area where the flags were -- "Do

13  not bring long guns.  Do not wear camouflage."  This was said

14  over and over by Mr. Bundy.

15         So that finding by Magistrate Judge Foley, having had

16  the benefit of 2 years now, we would vehemently disagree that

17  Ammon Bundy ever pointed a firearm at anybody; in fact, took

18  very public steps to, in his own way, keep the protest which

19  Ammon felt very strongly about -- exercising his First Amendment

20  rights down there -- but he wanted it to be abundantly clear

21  that it was a protest, up to and including down in the wash.  In

22  the videos that the Government has offered as evidence, you can

23  see him waving away people who are approaching his wife and all

24  the kids and the dogs and the women -- everybody down in the

25  wash after the prayer circle -- waving away people in camouflage

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1  attempting to join that group.

2          So, in terms of the nature and seriousness of the

3  offense charged and the weight of the evidence, those

4  circumstances, in contradiction of the Government's original

5  proffer 2 years ago, have changed significantly based on

6  material that was not available to us at the time.  Just, of

7  course, with the discovery, it's kind of unique that we have

8  this hearing based on review of the discovery.

9          In terms of the nature and seriousness of danger to any

10  person in the community -- this is on page 12 of the brief.

11  And, again, Your Honor, Your Honor certainly hasn't had a chance

12  to refer to it -- but we maintain based on the authority cited

13  that -- specifically *United States v. Twine* -- the Ninth Circuit

14  said, quote, We are not persuaded that the Bail Reform Act

15  authorizes pretrial detention without bail based solely on a

16  finding of dangerousness.

17          Nevertheless, in terms of danger to the community,

18  what's left?  I mean, we can look at the Pretrial Services

19  reliance on a 20-year-old misdemeanor citation with Ammon and

20  his brother.  I'm not gonna spend much time arguing against

21  that.  But, in term of what Magistrate Judge --

22          THE COURT:  And I was just gonna say Magistrate

23  Judge Foley did not consider that --

24          MR. HILL:  Correct.

25          THE COURT:  -- to be -- weigh against release; he

1 specifically said, other than the charges discussed above, which
2 is the Nevada charge and the Oregon charge, he does not have a
3 significant prior criminal record.

4        MR. HILL:  And he also talked about -- he didn't spend
5 any time on the family ties and ties to the community.  And
6 neither am I.  I don't think there's -- I don't really think
7 that's at issue here.  What Magistrate Judge Foley did rely on
8 to find dangerousness is the instant allegations.

9        Now, I can't help but recall, first, that the Court
10 found significant disparities between the Government's initial
11 proffer as for Parker and Drexler and the evidence that was
12 adduced at trial.  On that ba- -- that was one of the bases for
13 which this Court released Parker and Drexler after the last
14 mistrial.

15        We propose now that that same disparity is coming out
16 pretty rapidly.  One example from just recent past --

17        THE COURT:  Well, let me just correct really quick.

18        So it's not my interpretation of the facts at trial.
19 I'm relying upon the jury's verdict --

20        MR. HILL:  Of course, Your Honor.

21        THE COURT:  -- in those prior trials.  I'm not
22 substituting or even attempting to make a factual determination
23 other than whether or not the charges exist and what's been --
24 what the allegations are that have been charged and viewing it
25 only in the way that is permitted by law.  But I'm not making

1  myself a factual determination.

2       MR. HILL:  And I apologize for -- maybe I was using

3  "the Court" a little too loosely, Your Honor.  I . . .  The

4  facts that were adduced at trial in this court as found by the

5  jury.  Thank you, Your Honor.

6       The same kind of thing is coming up here where a large

7  part of Government's proffer and the Government's theory today

8  is the spreading of misinformation.  I won't go too much into it

9  'cuz Your Honor has been very generous in giving us a lot of

10  time talking about that already.

11       But, as recently as a few days ago, it was the Bundys

12  were lying online about these perceived threats at the ranch to

13  get people to come.  We now see that there were at least 20

14  members of FBI SWAT out there.  Yes, tending to cameras but

15  tending to cameras in full FBI tactical gear.  So I could go on

16  for quite a while drawing -- quite a while drawing disparities

17  between what we've learned since and what the Government's

18  initial proffer was.  But, in terms of danger to the community,

19  the only thing kinda left and what Judge Foley relied on is

20  simply the unproved and presumptively false -- given the

21  presumption of evidence -- the presumption of innocence --

22  presumptively false allegations in an indictment.

23       We'd also emphasize that --

24       THE COURT:  But do you disagree that the presumption

25  applies because of the 924(c) counts?

2:16-cr-46-GMN-PAL - November 9, 2017

1           MR. HILL:  I'll -- I -- I'm gonna get to that --

2           THE COURT:  Okay.

3           MR. HILL:  -- Your Honor.

4           I'm just talking in terms of we're in a universe where

5      a lot of the times we can see gang affiliations, we see criminal

6      history, have other things to determine a defendant's

7      dangerousness to the community.  This is one of those

8      circumstances where the only thing we have is the nature of the

9      allegations.  Of course, that creates a presumption under the

10     statute, which we'll get to in a second.

11          What I wanted to emphasize in terms of the allegations

12     in the Indictment is we really needed to laser focus them on

13     Ammon for the purposes of detention hearing as opposed to the

14     allegations or the codefendants.  It's the evidence -- the

15     weight of the evidence and the nature of allegations against

16     Ammon specifically.

17          We have proffered -- and I won't re-proffer -- in terms

18     of the overall goings-on of the protest, Mr. Bundy certainly

19     took a unique and active role in broadcasting that this is a

20     protest.  In terms of just the staging area with the flags, he

21     made it very clear we don't want any long guns; we don't want

22     any camouflage.

23          In terms of the presumption in this case, the

24     rebuttable presumption, under the Ninth Circuit case law, the

25     burden of persuasion is not shifted to the defendant but the

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1  burden of production is shifted to the defendant by coming

2  forward with some evidence that he will not flee or endanger the

3  community if released.  So we don't have to eviscerate or

4  eliminate and we don't have a burden of persuasion but a

5  production of some evidence that he will not pose a danger or a

6  flight risk.

7          As for that, there's certainly the evidentiary proffers

8  that I made.  The disparities between the proffer at the initial

9  detention hearing as it relates to Magistrate Judge Foley's

10 findings which seem to indicate he believed from the proffer

11 that Mr. Bundy personally pointed firearms or possessed firearms

12 which we now know to be categorically untrue.

13         In terms of other evidence that Mr. Bundy's prepared to

14 offer to the Court -- I'm, of course, cognizant of the Court's

15 concerns about perceived behavior in the court and everything

16 like that -- Mr. Bundy is certainly a man of principle and has

17 very strong beliefs and understanding of the Bail Reform Act, in

18 part from his own research and in part in conversations with me,

19 that it's designed for the least restrictive conditions to

20 ensure he's compliant.

21         Mr. Bundy, as we learned from the Assistant Warden who

22 made representations to this Court, has been subject to the

23 exact same conditions of detention as post-trial convicted

24 detainees.  He's certainly taken issue with that.  We went into

25 detail when this Court generously gave about an hour of the

—2:16-cr-46-GMN-PAL - November 9, 2017—

 1  Court's time --

 2          THE COURT:  I don't recall the Warden saying anything

 3  like that.

 4          MR. HILL:  He said that everyone was subject to strip

 5  searches as a matter of facility-wide --

 6          THE COURT:  Because that --

 7          MR. HILL:  -- policy.

 8          THE COURT:  -- was the routine safety --

 9          MR. HILL:  Right.

10          THE COURT:  -- regulation that that -- to make sure

11  that nobody is bringing anything that's gonna be a risk to

12  either other inmates or to the guards.  But he didn't say that

13  this was a -- something that was only applied to individuals who

14  were post-trial.

15          MR. HILL:  Right.  It applies to both.

16          And I think . . .  So where Mr. Bundy's coming from

17  with regard to that, it's our perception that Mr. Bundy's belief

18  that it was crossing a line into punitive or submission

19  attempts.  The example that I gave to the Court was the strip

20  search, put in the cell, then the clothes were put in the cell,

21  and then they were demanding another strip search.

22          In terms of the elevator situation, for years

23  Mr. Bundy's been coming up and down that elevator and just kind

24  of looking away from the keypad.  And it didn't become about

25  looking away from the keypad; it was doing it in a way that made

1  the Marshals happy.  And I'm not gonna reopen that.  I only mean

2  to say that Mr. Bundy has principled perception of what the

3  Marshals were requesting as punitive and not safety-based but

4  submission-based because the end was being met, not looking at

5  the keypad, but the way in which the Marshals were going about

6  it were overly burdensome from Mr. Bundy's perspective.  Now --

7         THE COURT:  But are those principles gonna get in the

8  way of him being able to comply with rules and regulations he

9  may not agree with?  If he's on intensive supervision for

10 pretrial release, there's going to be a Pretrial Officer --

11 perhaps more than one, perhaps sometime's a different one.

12 Maybe the one that's assigned he doesn't like or maybe he really

13 likes the one that's assigned and then that person goes on

14 vacation so a different person comes in.  You know, because

15 you've had lots of clients here.  And it's --

16    (Counsel conferring.)

17        THE COURT:  -- it's a situation that will come up where

18 someone will say, oh, but my old officer was so-and-so and he

19 said I could do this.  And so there's -- it's never as smooth as

20 we would like it to be.

21        MR. HILL:  Understood.

22        THE COURT:  So is he . . .

23        MR. HILL:  Here's where we're at with that, Your Honor.

24 And I'm sorry I'm going about this circuitously.  I have a

25 couple of thoughts about that.

———2:16-cr-46-GMN-PAL - November 9, 2017———

1          Number one, in terms of as this relates back to the

2   Bail Reform Act, which is dangerousness, Mr. Bundy never got

3   physical or aggressive with these guys.

4          As a second note, from a practical standpoint, we think

5   release would greatly minimize kinda these back and forths with

6   the Marshals.

7          Lastly -- and I understand this is somewhat

8   unorthodox --

9          THE COURT:  I realize you're saying he doesn't get

10  physical.  But is he provoking physical?  Because what he does

11  is he says:  I'm not going to undress for the search; you have

12  to undress me.  Or I'm not going to turn around; you have to

13  turn me around.  So those kinda things; if I send a Pretrial

14  officer in there because the location monitoring device seems to

15  not be working properly or maybe the battery is dying or there's

16  some kind of a frequency issue --

17         MR. HILL:  So here's the conclusion there, Your

18  Honor --

19         THE COURT:  -- is he going to say, I -- you know, I'm

20  not gonna confront you.  But, if you want to come in, you're

21  gonna have to break in or something like -- you know what I'm

22  saying?

23         MR. HILL:  I under- --

24         THE COURT:  I'm just --

25         MR. HILL:  -- -stand --

—2:16-cr-46-GMN-PAL - November 9, 2017—

1          THE COURT:  -- trying to --

2          MR. HILL:  -- Your Honor.

3          THE COURT:  -- help you to give me information that

4   will assuage any of the concerns --

5          MR. HILL:  So I'll cut to the chase, Your Honor.

6          THE COURT:  -- that are obvious.

7          MR. HILL:  So he certainly has disagreements that

8   incarceration is the least restrictive means.  I think that was

9   the basis of his difficulty there.  Mr. Bundy is willing to be

10  sworn in and answer your judge's questions today.

11         THE COURT:  He's just not always gonna understand or

12  agree to every single thing that happens in pretrial

13  supervision.  He's probably not gonna be able to have any guns.

14  He's not gonna be able to have any alcohol.  He's not gonna be

15  able to have, you know, medical marijuana or, you know,

16  different kinds of things that are very routine that everybody

17  on pretrial supervision is subject to.

18         MR. HILL:  And --

19         THE COURT:  And maybe --

20         MR. HILL:  -- I --

21         THE COURT:  -- he disagrees with it because his -- you

22  know, his friend's friend comes over who happens to have

23  something that he didn't know he had on him and then, you know,

24  the situation is, like, well, did he know or did he not know or

25  was he bringing it for him -- he said/she said -- and he

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  disagrees with the result of the -- the resulting opinion of the

2  Pretrial officer.

3         MR. HILL:  Understood, Your Honor.  Excuse me.

4         I've had detailed conversations with Ammon about it.

5  Like I said, I have not heard any pushback from Ammon about --

6  that there were gonna be conditions of pretrial release,

7  including everything Your Honor just rattled off, and he said --

8  and we've talked about it -- "She can swear me in.  I'm happy to

9  answer the Court's questions about whether I'm willing to

10  comply."  And in terms of overcoming that presumption putting on

11  some --

12         THE COURT:  So does he understand that if he disagrees

13  that --

14     (Mr. Hill and Defendant Ammon Bundy conferring.)

15         THE COURT:  -- what he should do is then call his

16  attorney and have the attorney deal with it and not attempt

17  himself to do something that is gonna create a dangerous

18  situation?

19         MR. HILL:  So I have a case here, Your Honor.  I

20  apologize.  It was on page 15 of the brief.  And, the long and

21  short of it is, that was a -- that was a motorcycle gang case

22  where there was these similar concerns.  That -- and -- that

23  court found -- and, just for the record, I'll put that on -- it

24  was 209 F.Supp.3d 557 on page 15 of the brief -- that, in a

25  rebuttable presumption case, if the defendant gets sworn in and

———2:16-cr-46-GMN-PAL - November 9, 2017———

1   testifies that he intends to and will comply with any and all

2   conditions of pretrial release --

3       (Mr. Philpot and Defendant Ammon Bundy conferring.)

4           MR. HILL:  -- that that rebuts the presumption.

5           And Mr. Bundy is -- understands the Court's concerns.

6   The Court has been very thorough in explaining the Court's

7   concerns.  I understand the Court's concerns.  And that's why

8   we're taking this somewhat unorthodox step of volunteering

9   Mr. Bundy to be sworn in and simply straight up ask under oath,

10  do you -- even if you disagree conceptually, are you willing to

11  peacefully and easily comply with any conditions of pretrial

12  release?  It's my understanding that the answer to those

13  questions are yes and that Mr. Bundy's willing to be sworn in

14  and asked questions by the Court to that effect.

15          THE COURT:  And that motorcycle case that you reference

16  is in your motion?

17          MR. HILL:  It is.  It's on page 15 of the motion.

18  It's -- and it was 209 F.Supp.3d 557.  And --

19          THE COURT:  Out of which court?

20          MR. HILL:  And that was Western District of New York.

21          And the reason that we found this case is because --

22  here's the corollary --

23          THE COURT:  What was the year?

24          MR. HILL:  2016.

25          THE COURT:  Thank you.

———2:16-cr-46-GMN-PAL - November 9, 2017———

1        MR. HILL:  And this was a RICO firearms case with

2   924(c) charges and what they did there was swear in the

3   defendant to address that presumption.

4        THE COURT:  *United States v. Enix*?

5        MR. HILL:  Yes.

6        THE COURT:  Thank you.

7        All right.  So, just to be clear here, what Judge Foley

8   stated as his allegations -- or as his considerations in regards

9   to the Superseding Indictment was that, [reading] The Indictment

10  alleges that the defendant was one of the leaders involved in

11  the armed confrontation between the supporters of the defendant

12  and the fam- -- and the Bundy Family, against federal law

13  enforcement agencies at the BLM cattle impound site on

14  April 12th, 2014.  The Government alleges that defendant,

15  together with militia members who had been summonsed by the

16  Bundy Family and who were armed with assault rifles and other

17  firearms, confronted and aimed firearms at federal law

18  enforcement officers who were ultimately forced to surrender the

19  cattle and exit the area in order to avoid a potentially deadly

20  fire fight [reading ended].

21        It does note that he also has a history of regular

22  employment and involvement in business.  And that still exists

23  today.  That he does still own and operate his valet fleet

24  service in Phoenix, Arizona, as he has for 20 years, managing

25  and maintaining commercial trucks; earning funds there.  And

————2:16-cr-46-GMN-PAL - November 9, 2017————

1   also he receives the rental income.  But there was something

2   else I read about.  His wife running out and selling -- maybe it

3   wasn't him.  I thought it was -- some of the trucks that are

4   there.  Um . . .

5           MR. HILL:  I think there's a couple business -- like,

6   10-year-old business-owned vehicles.

7           THE COURT:  All right.  That's what it is, yes.

8           And -- let's see -- he provided one address which was

9   with Keith and Joanne Gordon at the 9123 Fawn Grove in

10  Las Vegas, Nevada.  But then there was another individual who

11  was a family friend here in town and that attempts to reach that

12  individual to determine if they would be suitable to be a

13  third-party custodian was not verified.  That person did not

14  return phone calls and so that was an unsuccessful effort there.

15          But, as to Keith and Joanne Gordon, so they are renting

16  the home from someone else.  Does the person who they are

17  renting home from know that they intend to have Mr. Ammon Bundy

18  living there during trial?  If that's something maybe you could

19  give us before --

20          MR. HILL:  Sure.  Mr. Gordon's here to --

21          THE COURT:  -- I make a final ruling.  I'm sorry?  This

22  is?

23          MR. HILL:  Mr. Keith Gordon is here present.

24          THE COURT:  All right.

25          And so Mr. Gordon has -- you want to talk to him and

—— 2:16-cr-46-GMN-PAL - November 9, 2017——

1   ask him if he's had the opportunity to speak to his landlord to
2   make sure that this is not gonna be a problem, you know, on day
3   two, day three, week two --
4           MR. HILL:  I can't --
5           THE COURT:  -- all of --
6           MR. HILL:  -- imagine --
7           THE COURT:  -- a sudden --
8           MR. HILL:  -- the lease --
9           THE COURT:  -- there's nowhere . . .
10          MR. HILL:  -- excluded this scenario, Your Honor.
11  Somewhat unusual.
12          THE COURT:  You know, well, this is . . .
13          MR. HILL:  But, nevertheless . . .
14          THE COURT:  Do you want to go talk to him?
15          MR. HILL:  Would you mind giving me a quick second,
16  Your Honor?
17          THE COURT:  That's fine.  Or, if he doesn't have the
18  information now, that's fine.  He can get the information to me
19  later.  But . . .
20      (Discussion between Mr. Hill and Mr. Gordon.)
21          THE COURT:  I need to have some reassurance that this
22  isn't temporary for a day or two.  That this is going to be
23  acceptable to the actual property owner.
24      (Pause in the proceedings.)
25          MR. HILL:  Your Honor, Mr. Gordon knows the landlord.

——2:16-cr-46-GMN-PAL - November 9, 2017——

1  Obviously, I just got -- I couldn't get in touch with Mr. Abbott

2  in time.  That's why that wasn't verified.  So he's only had 24

3  hours.  He knows the landlord; landlord lives in China.  His

4  preliminary thought is I know the guy; I don't think it's gonna

5  be a problem.  But --

6           THE COURT:  Go ahead --

7           MR. HILL:  -- I don't --

8           THE COURT:  -- and confirm.

9           MR. HILL:  -- have any kind of representation from the

10  landlord.  But, based on his representations of knowing the

11  landlord, says he doesn't think it'll be a problem given his

12  history with the landlord.  And the landlord's living in China.

13          THE COURT:  Okay.  Well, I'll give you time to see if

14  you can obtain some kind of reassurance.

15          MR. HILL:  I have --

16          THE COURT:  All right.

17          MR. HILL:  -- I don't know if -- I have just a couple

18  of last closing thoughts on the rebuttable presumption --

19          THE COURT:  All right.

20          MR. HILL:  -- and we can either -- I don't know if Your

21  Honor's inclined to swear Mr. Bundy in.

22          THE COURT:  Sure.  We could go ahead and do that.

23          MR. HILL:  Okay.

24          THE COURT:  But go ahead and finish up with anything

25  else you want to add.

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1         MR. HILL:  Sure.

2         I just wanted to draw some parallels with some other

3    cases in terms of how -- what it looks like when these

4    presumptions are rebutted.

5         I have *United States v. Persico*.  And, again, I

6    apologize that the Court hasn't had a chance to review this

7    brief.  It was one of those things of I'm only one man.  But it

8    was on -- again, on page 15 of the brief -- and that's

9    376 F. App'x 155.  And that was an appeal from a detention order

10   in the Second Circuit from 2010.  That was a mafia case,

11   *Persico*, back East, where there was allegations creating a

12   presumption regarding a conspiracy to do violent acts.  What the

13   Second Circuit found there was that although there is even a

14   stronger finding there by the court that the defendant had the

15   demonstrated ability to use violence, the court was persuaded

16   that the defendant produced a proffered evidence that he used

17   any influence he had in order to discourage violence.

18        So the reason that we would have cited that case should

19   be fairly obvious after the earlier proffer, that we have many

20   public and conspicuous instances where Mr. Bundy is saying this,

21   from his perspective, is a protest; this is about getting the

22   Sheriff out here to try to mitigate what's goin' on:  Don't wear

23   camouflage.  Don't bring long guns.  So that was a similar case

24   where the presumption was rebutted.

25        And then just a couple recent examples from this

——2:16-cr-46-GMN-PAL - November 9, 2017——

1  district that I just want to put on the record was -- one is

2  2:3-cr-542, which is the River Run, the Laughlin case, where we

3  had a guy there who was on camera firing a gun into a crowd --

4  and that, of course, resulted in deaths, that case -- that

5  defendant was released having rebutted the presumption.

6          And then, of course, even more recently than that --

7  and I believe it's this Court's case -- 2:16-cr-265 -- that

8  might be one of the numbers that the clerks recognize from being

9  another big case -- but, at any rate, that, of course, is the

10 Vagos case where defendants -- and -- and that's a RICO murder

11 case where defendants were released.  And I think the corollary

12 we can draw here is obviously, aside from the allega- -- there's

13 a way to rebut the presumption before the merits of serious

14 charges are litigated by a jury.  And now we've gotten to the

15 point where I think the way to do that, aside from the proffer

16 I've made about Ammon's behavior down in the protest relating to

17 long guns and camouflage, is to simply swear Mr. Bundy in and

18 ask him.

19          THE COURT:  All right.  Go ahead.

20          Aaron, could you please swear him in.

21          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

22          Please stand and raise your right hand, sir.

23          Do you solemnly swear that the testimony you shall give

24 in the cause now before this court shall be the truth, the whole

25 truth, and nothing but the truth, so help you God?

────2:16-cr-46-GMN-PAL - November 9, 2017────

1          DEFENDANT AMMON BUNDY:  Yes.

2          COURTROOM ADMINISTRATOR:  Thank you, sir.  You may be

3    seated.

4                        AMMON BUNDY,

5    the defendant herein, having been first duly affirmed, was

6    examined and testified as follows:

7          THE COURT:  Go ahead, Mr. Hill.  You may go ahead and

8    pose the questions.

9          MR. HILL:  Did you want me to ask the questions, Judge?

10         THE COURT:  Yes.

11         MR. HILL:  Okay.

12                    DIRECT EXAMINATION

13   BY MR. HILL:

14   Q.  Mr. Bundy, you are aware that --

15         MR. SCHIESS:  Your Honor --

16   BY MR. HILL:

17   Q.  -- release --

18         MR. SCHIESS:  -- may we have him up to the witness

19   stand so we could see his behavior, we can see counsel?  Right

20   now counsel's back is blocking him.

21         THE COURT:  Do you have any problem with that,

22   Mr. Hill?

23         MR. HILL:  No, Your Honor, of course not.

24         THE COURT:  All right.

25         MR. HILL:  Let me just do my thing.

2:16-cr-46-GMN-PAL - November 9, 2017

1       (Pause.  Ammon Bundy takes the witness stand.)

2   BY MR. HILL:

3   Q.  Good morning, Mr. Bundy.

4   A.  Good morning, Mr. Hill.

5   Q.  You understand the discussion that we're having here?

6   A.  Yes.

7   Q.  Okay.  If you were --

8           COURT REPORTER:  Pull the microphone closer.

9           MR. HILL:  Sorry.

10  BY MR. HILL:

11  Q.  -- that if you were to be released there would be conditions

12  of your release?

13  A.  Yes.

14  Q.  Okay.  Would you have any issue reporting as directed by the

15  U.S. Pretrial Services Office?

16  A.  No.

17  Q.  Would you have any problem maintaining full-time employment

18  with your business?

19  A.  No.

20  Q.  Would you change your place of residence without prior

21  approval by the U.S. Pretrial Services?

22  A.  No.

23  Q.  Would you limit your travel as directed by Pretrial

24  Services?

25  A.  Yes.

1  *Q.* Would you agree not to own, possess, or control any firearm
2  during the pendency of this case?
3  *A.* Well, I already own. So . . .
4  *Q.* But in your place of residence.
5  *A.* Uh, I -- so ask the question again?
6  *Q.* Would you have any problem not being around guns at all in
7  any way during the pendency of this case?
8  *A.* No.
9  *Q.* Will you have any -- will you be okay wearing a GPS
10 monitoring device?
11 *A.* I won't like it, but I will submit to that.
12 *Q.* So you don't necessarily agree with it. But you're gonna --
13 *A.* Well --
14 *Q.* -- you'll do what you have to do.
15 *A.* I don't . . . Yeah, absolutely.
16 *Q.* Okay. And you understand it's just so we know you're at
17 where you say you're at.
18 *A.* Yeah.
19 *Q.* Okay. Would you have any problem abiding by a curfew?
20 *A.* No.
21        MR. HILL: Does the Court have any other conditions the
22 Court might want to ask about?
23        THE COURT: You know, I don't have, uh --
24        MR. HILL: Oh, I have a couple more, Your Honor.
25        THE COURT: -- the conditions I ordered for Mr. Drexler

————2:16-cr-46-GMN-PAL - November 9, 2017————

 1  and Mr. Parker and I wanted to go through theirs -- those.  I

 2  wouldn't mind; but I'm not ordering you to.

 3  BY MR. HILL:

 4  *Q.*  Would you have any problem not publishing any statements

 5  that encourage unlawful activity?

 6  **A.**  No.

 7  *Q.*  Would you have any problem avoiding contact with the

 8  codefendants except when we're all present with all of our

 9  lawyers?

10  **A.**  Um, no.  If that was part of the --

11  *Q.*  Ordered by the Court?

12  **A.**  -- order, yeah.  I would think that it'd be needed though.

13  But I'm sure the Court can address that possibly.

14          MR. HILL:  I just kinda -- I -- just for the record,

15  what I went off of was the list of recommendations by the

16  District of Oregon Pretrial Services Office who recommended

17  Ammon's release.  Um . . .

18          THE COURT:  All right.  And that's different from what

19  we imposed for Parker and Drexler.

20          Do you have that, Aaron?

21          COURTROOM ADMINISTRATOR:  I do, Your Honor.  I will

22  print a copy.

23      (Pause in the proceedings.)

24          THE COURT:  While he's printing that out for you,

25  Mr. Hill, so you can look on there and --

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

```
 1          MR. HILL:  I think --

 2          THE COURT:  -- for guidance.

 3          MR. HILL:  -- Ms. Weksler has pulled them up too.

 4          THE COURT:  Oh, good.  Thank you.

 5          I wanted to ask you about the exhibits that were

 6   attached to the prior objection to the Magistrate Judge's Order

 7   Denying the Motion for Extension of Time.  This is Document 365.

 8          MR. HILL:  Yes, Your Honor.

 9          THE COURT:  And there were about nine different groups

10   of exhibits.  Are those also still --

11          MR. HILL:  So --

12          THE COURT:  -- appropriate for me to take into

13   consideration?  Or is this -- because this is pretty old.  It

14   was filed by --

15          MR. HILL:  I think --

16          THE COURT:  -- May of --

17          MR. HILL:  -- it would be --

18          THE COURT:  -- 2016.

19          MR. HILL:  -- old news to Your Honor.

20          THE COURT:  So is this something that I should still

21   consider or should I disregard this and only consider the

22   information that you're providing to me in the new motion?

23          MR. HILL:  I did incorporate those.

24          THE COURT:  You did.

25          MR. HILL:  And the only reason why is just to -- that
```

2:16-cr-46-GMN-PAL - November 9, 2017

 1  was way back when.  The initial issue I had with the detention

 2  hearing was that I knew this was a massive case and that the

 3  Government had their exhibit binder kinda organized and tabbed.

 4  And I was just trying to put together information from family.

 5          At this point, the information that I gathered from the

 6  family is mostly in discovery.  And so I did incorporate those

 7  as -- and what they show is, you know, the -- what we now know

 8  to be the FBI SWAT and just the kinda stuff we've been talking

 9  about all along.  Um . . .

10          THE COURT:  But my -- so what I'm trying to clarify is

11  do you want me to rely on the information provided in last

12  year's motion or did you already incorporate that in the new one

13  so I can just rely on the information in the new motion?

14          MR. HILL:  Understood, Your Honor.  I incorporated them

15  explicitly in the new filing.

16          THE COURT:  All right.  So I don't need to refer to the

17  old filing.

18          MR. HILL:  Correct, Your Honor.

19          And then --

20          THE COURT:  Okay.

21          MR. HILL:  -- before I forget, um . . .

22      (Mr. Hill and Defendant Ammon Bundy conferring.)

23          THE COURT:  All right.  So, for the record, my

24  Courtroom Deputy has made a copy of the Conditions of Release

25  that were ordered for either one.  I don't know which one you

1  gave him, but . . .

2          COURTROOM ADMINISTRATOR:  It was both Defendants Parker

3  and Drexler, Your Honor.

4          THE COURT:  All right.  So those conditions.

5          MR. HILL:  Okay.

6          THE COURT:  And, you know, obviously I haven't made up

7  my mind yet which conditions I would or would not apply.  But I

8  think that's a better group that -- of factors that I would

9  consider.  We don't necessarily use the ones that Oregon does

10  and Oregon doesn't necessarily use ours.  So this would be more

11  appropriate.

12     (Pause in the proceedings.)

13  BY MR. HILL:

14  Q.  Mr. Bundy, would you have any problem showing up to court as

15  required for this trial?

16  A.  No.

17  Q.  Do you fully intend on being at each and every appearance?

18  A.  Yes.

19  Q.  You'll come early and stay late?

20  A.  Excuse me?

21  Q.  You'll come early and stay late?

22  A.  If you ask, yes.

23     (Pause in the proceedings.)

24  BY MR. HILL:

25  Q.  Will you have any problem agreeing that if you violate any

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1  federal, state, or local law on release you'll be revoked and

2  put back in custody?

3  *A.*  If I go against my word, absolutely.

4  *Q.*  You understand that even the smallest violation of any

5  condition of pretrial release and they'll revoke you and put you

6  back in custody?

7  *A.*  Yeah.  It's a violation against my word to you.

8          MR. HILL:  I think those are the only ones that weren't

9  covered by the Oregon order, Judge.

10         THE COURT:  I'm not sure what he means by "if it's a

11  violation of my word."

12         DEFENDANT AMMON BUNDY:  I'm -- my -- I guess my point,

13  Your Honor, is that I'm giving my word to follow these orders

14  and I take that seriously.  And so, therefore, my answer is

15  unequivocally yes.

16         THE COURT:  All right.

17         So you're taking this seriously.  But why don't you

18  read what the actual order says because it's a pretty standard

19  order --

20         MR. SCHIESS:  Your Honor --

21         MR. HILL:  It is.

22         THE COURT:  -- consideration there.

23         MR. SCHIESS:  -- I'd like to have a copy of it to

24  follow along, please.

25         THE COURT:  Sure.

———2:16-cr-46-GMN-PAL - November 9, 2017———

1          MR. HILL:  Do you want me to just read it, Judge?

2          THE COURT:  Yeah.

3          MR. HILL:  Okay.

4          THE COURT:  Just let him know potentially -- because I

5   don't know that I'm -- but potentially that could be an order --

6          MR. HILL:  Right.

7          THE COURT:  -- of the Court, is he gonna comply with

8   it.  And read it word for word so he knows what he's --

9   BY MR. HILL:

10  Q.  So, Ammon --

11         THE COURT:  -- agreeing to or not agreeing to.

12  BY MR. HILL:

13  Q.  Ammon, I'm gonna read what the order of conditions of

14  release for Eric Parker were.  I'll read 'em all.  And then I'll

15  ask --

16         MR. SCHIESS:  I'm sorry.  All I have is

17  Mr. Drexler's --

18         MR. HILL:  I'm sorry.

19         MR. SCHIESS:  -- conditions.

20     (Counsel conferring.)

21         MR. HILL:  Mr. Schiess would like a copy of which ever

22  one I read from and I only have one copy of each.

23         COURTROOM ADMINISTRATOR:  I'm currently working on

24  that, Your Honor.

25         THE COURT:  Okay.  Thank you.  Appreciate it.

2:16-cr-46-GMN-PAL - November 9, 2017

1      (Pause in the proceedings.)

2          MS. FLETCHER:  Your Honor, may -- I apologize for the

3  interruption -- but may I step out very briefly?

4          THE COURT:  Yes.

5          MS. FLETCHER:  Thank you.

6      (Pause in the proceedings.)

7          MR. HILL:  For the record, I'm reading off of O. Scott

8  Drexler's.  So that the Government has the same one, it's

9  O. Scott Drexler's appearance bond --

10         THE COURT:  Is there --

11         MR. HILL:  -- and order --

12         THE COURT:  -- a docket number on there?

13         MR. HILL:  Pardon?

14         THE COURT:  Is there a docket number on there?

15         MR. HILL:  There --

16         THE COURT:  Did it --

17         MR. HILL:  -- is not --

18         THE COURT:  -- print out?

19         MR. HILL:  -- Judge.

20         THE COURT:  Oh, shoot.

21         Do you know what the docket number is, Aaron?

22         COURTROOM ADMINISTRATOR:  No, Your Honor.  Sorry.  My

23  settings don't print those.

24         2285 for Mr. Drexler's and 2286 for Mr. Parker's.

25         THE COURT:  Thank you.

——2:16-cr-46-GMN-PAL - November 9, 2017——

1          And so, to be fair, I tell all defendants the same

2   thing, that these are the conditions.  If there's any of these

3   conditions that cannot be complied with, either because they are

4   inconvenient or impossible to comply with, you need to bring

5   that to the attention of your attorney to request for a

6   modification which sometimes can be done very quickly through

7   the Pretrial Officer's discretion; other times it's not

8   something that the Pretrial Officer has discretion and then it

9   must be brought by way of a motion to modify conditions which

10  may take some time.  But, in the meantime, you have to comply

11  with those conditions until the Court can address them and

12  decide whether or not to modify them.

13          MR. HILL:  Okay.  And, again, for the record, this

14  is -- I believe it was 2285.  Is that right, Aaron?

15          THE COURT:  Yes.

16          COURTROOM ADMINISTRATOR:  2285 for Drexler.  Correct.

17          THE COURT:  That is Drexler.

18  BY MR. HILL:

19  Q.  So this could very well, as the Court indicated, be the

20  order setting conditions.  So I'll read it to you.

21          [Reading] It is ordered that the defendant's release is

22  subject to these conditions:

23          1.  The defendant must not violate federal, state, or

24  local law while on release.

25          2.  The defendant must cooperate in the collection of a

————2:16-cr-46-GMN-PAL - November 9, 2017————

1  DNA sample if it is authorized by 42 United States Code §

2  14135(a).

3        3.  The defendant must advise the Court or the Pretrial

4  Services Office or supervising officer in writing before making

5  any change of a residence or telephone number.

6        4.  The defendant must appear in court as required and,

7  if convicted, must surrender as directed to serve a sentence

8  that the Court may impose.  The defendant must appear at United

9  States District Court, 333 Las Vegas Boulevard, Las Vegas,

10 Nevada 89101 [reading ended].

11       They have the date on this particular example.  Of

12 course, our next date would be Friday, I think, for a hearing.

13       THE COURT:  Monday.

14       MR. HILL:  Monday for a hearing.

15 BY MR. HILL:

16 Q.  [Reading] The defendant must sign an appearance bond if

17 ordered [reading ended].

18       Would you simply follow these requests of orders

19 setting conditions of release if released, sir?

20 A.  Yes.

21 Q.  And you understand when you say "I'm gonna keep my word,"

22 you mean you understand, yes, you're agreeing and, if you vary

23 from any of those, you're gonna be revoked on pretrial release?

24 A.  Yes.

25 Q.  Okay.

———2:16-cr-46-GMN-PAL - November 9, 2017———

 1          MR. HILL:  (Nods head.)

 2          THE COURT:  Any other questions, Mr. Hill?

 3          MR. HILL:  I don't have any.  I welcome any from the

 4  Court.  I don't know if the Court would envision fashioning any

 5  special conditions.  But that's all I had, Your Honor.

 6          THE COURT:  Mr. Schiess, did you have any questions

 7  limited only to the --

 8      (Government counsel conferring.)

 9          THE COURT:  -- ability of this individual to follow the

10  court orders if he is released, the supervision conditions?

11          MR. SCHIESS:  Your Honor, thank you.  I do have a lot

12  of questions for him about that.  But I want to reserve my right

13  to cross-examine him on this.

14          The defendant filed his motion this morning.  It's a

15  18- or 20-page motion.  In that motion, his basis for seeking

16  release today is his assessment or his view of what the trial

17  is.  All he's doing is trying his case.

18          Now, I have read quickly his allegations and I don't

19  say what I'm about to say lightly because I don't make these

20  comments about defense counsel lightly.  But that document is

21  misleading.  That document that has been filed to the Court has

22  a number of half-truths.  That document contains plucked

23  statements, plucked facts, completely out of context, cobbled

24  together, conflated, wrapped together to create a story that we

25  will prove beyond a reasonable doubt is not true.

2:16-cr-46-GMN-PAL - November 9, 2017

1           Now, we want the opportunity to be able to respond to

2    that motion because Mr. Bundy has, through his counsel, among

3    other things, assented to the truthfulness of that filing.  He

4    is on the witness stand today.  Part of what I have the

5    opportunity to do is to demonstrate that his credibility is not

6    worth your relying upon.  And so my cross-examination about him

7    in part would go to that.

8           My other cross-examination would be to demonstrate the

9    number of times, including the most recent times, that his

10   principles have gotten in the way of his complying with federal

11   officers who are authorized by this court to carry out the

12   orders in this court or authorized by law to carry out the

13   detentions.  His principle is preventing him.  And so I would

14   want to demonstrate that unless he's had a complete abandonment

15   of his principles in the last 24 hours that he's not gonna obey

16   the Court's orders because his principles will stand in the way.

17          And so I can go through just part of this questioning

18   for him now.  And, if the Court is satisfied that my questioning

19   in part has demonstrated that he cannot and should not be

20   released, then we don't need to continue the hearing.  But, if

21   the Court wants me to go through now and demonstrate the false

22   information that's in the report -- I mean, that's in the

23   pleading, to demonstrate that Mr. Bundy's credibility and

24   reliance upon that is not worth his word today, I would like the

25   opportunity to do that later.  So --

————2:16-cr-46-GMN-PAL - November 9, 2017————

 1          THE COURT:  All right.  So the --

 2          MR. SCHIESS:  -- I can do part now --

 3          THE COURT:  -- request --

 4          MR. SCHIESS:  -- but I would --

 5          THE COURT:  -- to --

 6          MR. SCHIESS:  -- reserve part of my . . .

 7          THE COURT:  -- the request to cross-examine him based

 8  on the information provided in the new filing is denied.  The

 9  request to cross-examine him based on the scope of the questions

10  on direct which were limited only to whether or not he would

11  comply with the orders that might possibly be fashioned that are

12  standard conditions in the district for pretrial supervision,

13  you may question him about those --

14          MR. SCHIESS:  Well, one --

15          THE COURT:  -- but not about information that's

16  provided by his counsel that is going to have interpretations

17  and inferences that they ask the Court to make.  I'm not basing

18  this decision on the representations regarding the factual

19  accuracy of allegations; it's based on weight of evidence and

20  change of circumstances.  The prior Detention Order, almost

21  fully one third of it, was based on information about the Oregon

22  case which no longer is an issue.  So I just want to be clear

23  that I'm taking into consideration only what should be taken

24  into consideration at this point in time.

25          MR. SCHIESS:  Okay.  And my --

————2:16-cr-46-GMN-PAL - November 9, 2017————

1          THE COURT:  I'm not going to make decisions or factual

2    conclusions about whether or not the allegations in the

3    Superseding Indictment are correct or incorrect.  I'm just

4    giving you the opportunity to cross-examine him on whether or

5    not he can comply with the conditions that are standard

6    conditions in this district for pretrial supervision.

7          MR. SCHIESS:  And one of the --

8          THE COURT:  In light of the fact that there are beliefs

9    about the authority of the federal government and federal

10   employees and the official and jurisdiction of the Court.  You

11   know, those are not things we usually see with other defendants.

12   These are a little bit different kinds of concerns and unique

13   things that the Court needs to consider.

14         So the proffer by Mr. Hill has been that Mr. Ammon

15   Bundy can agree to follow those conditions, whether he agrees

16   with the conditions or not or whether he agrees with the

17   authority of the Court to impose those conditions.  Those are my

18   concerns.

19         MR. SCHIESS:  And so I'm gonna stay with what you said,

20   Mr. Hill's proffer.  Well, Mr. Hill's proffer also said that

21   Mr. Bundy was the one advocating do not carry guns, be peaceful,

22   and that there were signs.

23         THE COURT:  And you can argue that, but it's not

24   subject to cross-examination of this witness.

25         MR. SCHIESS:  So I'm going to be limited solely to the

1   subject matter of the direct examination?

2          THE COURT:  Right.

3          MR. SCHIESS:  Okay.

4                    CROSS-EXAMINATION

5   BY MR. SCHIESS:

6   *Q.*  So then, Mr. Bundy, you said that you gave the Court your

7   word that you would follow the conditions; correct?

8   *A.*  Yeah.

9   *Q.*  Okay.

10  *A.*  I believe that was my terminology, yeah.

11  *Q.*  Say that again, please.

12  *A.*  I believe that was my terminology.

13  *Q.*  All right.  And the people who would be directing you if the

14  Court were to release you to Pretrial would be the Pretrial

15  Service officers; correct?

16  *A.*  I -- I believe so, yeah.

17  *Q.*  Okay.  And you understand that those are federal officers.

18  *A.*  Yes.

19  *Q.*  Okay.  And you understand that you would have the op- --

20  that you would be required to follow the directions of federal

21  officers.

22  *A.*  Yes.

23  *Q.*  Whether you liked 'em or not.

24  *A.*  Correct.

25  *Q.*  Whether they agreed with your principles or not; correct?

———2:16-cr-46-GMN-PAL - November 9, 2017———

1  *A.*  Correct.

2  *Q.*  Mr. Bundy, you have been disciplined on a number of times

3  while out in the Pahrump facility; correct?

4  *A.*  I was told that I was not being disciplined --

5          MR. HILL:  I'm gonna --

6          DEFENDANT AMMON BUNDY:  -- because --

7          MR. HILL:  -- object --

8          DEFENDANT AMMON BUNDY:  -- I was --

9          MR. HILL:  -- to that --

10         DEFENDANT AMMON BUNDY:  -- a pretrial --

11         MR. HILL:  -- Your Honor.  That's well outside the

12  scope of where I -- of what was . . .

13         MR. SCHIESS:  Absolutely not.  And I'm gonna

14  demonstrate that he -- his principles that he says he can set

15  aside he hasn't set those aside since the entire time he's been

16  in custody; he hasn't set those aside even up as late as a

17  couple of days ago when they had to transfer him back to Pahrump

18  because --

19         THE COURT:  And so you can argue that, but those are

20  not the questions that were asked on direct examination.  The

21  questions were whether or not he could comply with the potential

22  conditions that would be placed on him if he were to be

23  released, which are the standard conditions in the district and

24  perhaps --

25         MR. SCHIESS:  Okay.

———2:16-cr-46-GMN-PAL - November 9, 2017———

 1          THE COURT:  -- some special conditions that would apply

 2   unique to his circumstance.

 3          MR. SCHIESS:  Okay.

 4   BY MR. SCHIESS:

 5   Q.  Mr. Bundy, all we have is your word that you would comply;

 6   correct?

 7   A.  Um --

 8          MR. HILL:  Objection.  Asked and answered.  And it was

 9   under oath; it's not just his word.

10          MR. SCHIESS:  Well, first of all, this is now cross.

11   It doesn't matter if he asked him.

12          THE COURT:  Go ahead and rephrase the question.  That

13   was an argumentative question --

14          DEFENDANT AMMON BUNDY:  Your Honor --

15          THE COURT:  -- so please just . . .

16   BY MR. SCHIESS:

17   Q.  Sir, you told the Court you'd give her your word; is that

18   correct?

19   A.  Yes.

20   Q.  That's all you've offered to prove that you would comply

21   with the conditions --

22          MR. HILL:  That's an --

23   BY MR. SCHIESS:

24   Q.  -- is that --

25          MR. HILL:  -- argumentative --

———2:16-cr-46-GMN-PAL - November 9, 2017———

```
 1  BY MR. SCHIESS:
 2  Q.  -- correct?
 3          THE COURT:  Sustained.
 4          MR. SCHIESS:  All right, sir.
 5          DEFENDANT AMMON BUNDY:  You know, Your Honor, I --
 6          THE COURT:  No, no, no.
 7          DEFENDANT AMMON BUNDY:  -- can't --
 8          THE COURT:  Don't --
 9          DEFENDANT AMMON BUNDY:  -- talk to my --
10          THE COURT:  -- say --
11          DEFENDANT AMMON BUNDY:  -- attorney?
12          THE COURT:  -- anything yet.
13          DEFENDANT AMMON BUNDY:  I'm --
14          THE COURT:  No, no.
15          DEFENDANT AMMON BUNDY:  -- sorry.
16          THE COURT:  Don't say anything yet.  Just let Mr. --
17          MR. SCHIESS:  Okay.
18          THE COURT:  -- Scheiss finish his --
19          DEFENDANT AMMON BUNDY:  I just can't talk to my
20  attorney.  And I would like to --
21          THE COURT:  Not while you're on the stand.  But I don't
22  think that Mr. Schiess has much more.
23          DEFENDANT AMMON BUNDY:  I just welcome any questions
24  that he wants to ask.  Any question.  I welcome that.
25          MR. SCHIESS:  All right.
```

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1          DEFENDANT AMMON BUNDY:  I would like him the oppor- --

2   to give him the opportunity to ask me any question.

3   BY MR. SCHIESS:

4   *Q.*  Mr. Bundy, you said that you would obey all the federal laws

5   that would -- that are existing; is that correct?

6   *A.*  I -- he went through the list.  I said I would obey all

7   those.  And -- and I don't know if there's other laws.  He went

8   through that list and I agreed to those.

9   *Q.*  Okay.  One of the questions and the conditions that was read

10  to you from page 3 -- well, it's probably page 2 unstapled -- is

11  [reading] It is ordered that the defendant's release is subject

12  to these conditions:  Number one, the defendant must not violate

13  federal, state, or local law while on release [reading ended].

14  That question was read to you; correct?

15  *A.*  Yes.

16  *Q.*  And you said that you would abide by that condition;

17  correct?

18  *A.*  Yes.

19  *Q.*  Mr. Bundy, what would you do if the BLM returned to the

20  ranch while you're on release and started rounding up the

21  cattle?

22          MR. HILL:  Objection, Your Honor.  This is speculative

23  and argumentive.

24          MR. SCHIESS:  This is neither.  It goes right to the

25  heart of what the federal laws are.

——————2:16-cr-46-GMN-PAL - November 9, 2017——————

1            THE COURT:  Okay.  You can re- --

2            MR. HILL:  Your Honor --

3            THE COURT:  -- phrase the --

4            MR. HILL:  -- Mr. Schiess --

5            THE COURT:  -- question --

6            MR. HILL:  -- is just --

7            THE COURT:  -- that if --

8            MR. HILL:  -- gonna go through the allegations --

9            THE COURT:  -- not what are you going to do.  But,

10   if --

11            MR. SCHIESS:  Okay.

12            THE COURT:  -- something like that were to happen, do

13   you understand that you would still be required to comply with

14   the Court order not to commit another state or local crime or

15   federal crime --

16            MR. SCHIESS:  Well --

17            THE COURT:  -- while on Pretrial supervision --

18            MR. SCHIESS:  Well --

19            THE COURT:  -- and would you abide by that.

20            DEFENDANT AMMON BUNDY:  Yes.  I --

21            MR. SCHIESS:  Okay.

22            DEFENDANT AMMON BUNDY:  -- I welcome his question, Your

23   Honor.  I know -- I know my attorney is advising me otherwise,

24   but I -- I -- I -- I would like to answer his questions.

25            MR. SCHIESS:  See . . .

2:16-cr-46-GMN-PAL - November 9, 2017

1            THE COURT:  Go ahead, Mr. Schiess.

2            MR. SCHIESS:  Thank you.

3            MR. HILL:  I'm sorry, Judge.  But Mr. Bundy's

4    represented by counsel.  So I'm going to continue to object --

5            THE COURT:  And you may.

6            MR. HILL:  -- to this line that Mr. Schiess is going

7    down.

8            THE COURT:  Understood.

9    BY MR. SCHIESS:

10   Q.  Mr. Bundy, if federal employees protected by -- or working

11   for the BLM and protected by BLM law enforcement officers went

12   to the ranch and went -- excuse me -- let's strike that -- went

13   to the public lands where the Bundy cattle are and they started

14   to round those up, would you comply with federal law and not

15   interfere with the roundup of those cattle?

16   A.  I would do as I did before, which is peacefully assemble and

17   redress my government.

18   Q.  Okay.  And, as part of your peacefully assemble, would you

19   do what you did before, and that is, drive the ATV right into a

20   moving --

21           MR. HILL:  Objection, Your Honor.  He's assuming that

22   those allegations are true.

23           THE COURT:  Sustained.

24           MR. SCHIESS:  Okay.

25   ///

AMMON BUNDY - CROSS                                                    87
————2:16-cr-46-GMN-PAL - November 9, 2017————

1   BY MR. SCHIESS:

2   Q.  Would -- all right.  If there were a convoy moving through

3   the property of public lands, would your peaceful protest

4   include --

5          MR. HILL:  Objection, Your Honor.  We're not gonna go

6   through the whole Indictment here.  The questions -- he's

7   answered unequivocally that, yes, he would follow the conditions

8   and that he would not violate federal, state, or local law.  And

9   he understands that he will be immediately revoked at the

10  slightest hint of anything to the contrary.

11         MR. SCHIESS:  Your Honor, my questions are fair

12  questions.  He has over the past parsed what he considers to be

13  the federal laws that he applies and would obey.  He has defined

14  who federal agents are.  He has used his own definitions to

15  define what laws are and where he's willing to go.  It is a fair

16  question for me and fair opportunity to demonstrate or at least

17  see what he's thinking now today about obeying the federal laws

18  completely.

19         MR. HILL:  The . . .

20         MR. SCHIESS:  And counsel cannot try and cabin in the

21  questions that go to determine his willingness to abide by

22  federal law.

23         MR. HILL:  Your Honor, I don't know --

24         THE COURT:  So if you --

25         MR. HILL:  -- Mr. Schiess --

———2:16-cr-46-GMN-PAL - November 9, 2017———

1           THE COURT:  -- rephrase the question to ask him about

2     his willingness --

3           MR. SCHIESS:  Okay.

4           THE COURT:  -- to abide by the federal laws and

5     regulations and orders --

6           MR. SCHIESS:  Okay.  If the --

7           THE COURT:  -- even if he believes they contradict

8     his --

9           MR. SCHIESS:  That's --

10          THE COURT:  -- his principles and his understanding of

11    his right to peaceably assemble, faced with that decision --

12          MR. SCHIESS:  And --

13          THE COURT:  -- is he able to still comply with the

14    Court's orders.

15          If the Court says it's home confinement, you can't go

16    peaceably assemble.  You have a curfew and you have to be there

17    between the hours of this and that.  How are you gonna deal with

18    that?  Is that something . . .  Can you . . .

19          DEFENDANT AMMON BUNDY:  I give me word, Your Honor.  I

20    will -- I would -- I would comply to that.  If it says I can't

21    peacefully assemble, I -- I disagree --

22          THE COURT:  I'm --

23          DEFENDANT AMMON BUNDY:  -- with it --

24          THE COURT:  -- not gonna say --

25          DEFENDANT AMMON BUNDY:  -- because it's --

————2:16-cr-46-GMN-PAL - November 9, 2017————

1          THE COURT:  -- you can't --

2          DEFENDANT AMMON BUNDY:  -- a First --

3          THE COURT:  -- peace- --

4          DEFENDANT AMMON BUNDY:  -- Amend- --

5          THE COURT:  -- -fully --

6          DEFENDANT AMMON BUNDY:  -- -ment --

7          THE COURT:  -- a- --

8          DEFENDANT AMMON BUNDY:  -- right.

9          THE COURT:  -- -ssemble.  But, if I say there's a

10  curfew and you have to be at home --

11          DEFENDANT AMMON BUNDY:  Yes.  I'll --

12          THE COURT:  -- and instead you want to go peaceably

13  assemble, are you gonna stay at home during that curfew like I

14  ordered or are you gonna disregard that and go peaceably

15  assemble?

16          DEFENDANT AMMON BUNDY:  I give you my word I will stay

17  at home.

18          MR. SCHIESS:  Okay.

19  BY MR. SCHIESS:

20  Q.  Sir, if you were to walk into this building while on release

21  and the Court Security Officers told you --

22          MR. HILL:  Your Honor, I object.  Are we gonna go

23  through Title 18 here or are we gonna accept Mr. Ammon's very

24  clearcut answer that, yes, he's going to abide by any and all

25  conditions of pretrial release?

2:16-cr-46-GMN-PAL - November 9, 2017

1          MR. SCHIESS:  Your Honor, am I to accept the witness's

2   just general statements and then just sit down?

3          THE COURT:  Let's do this.

4          Mr. Ammon Bundy, don't answer the question until after

5   Mr. Schiess has the opportunity to state the entirety of the

6   question.

7          MR. SCHIESS:  Okay.

8          THE COURT:  And then, if there's an objection, I'll

9   hear it because I don't really know what Mr. Schiess is going to

10  ask.  So let's let him ask the question.

11         And then, Mr. Hill, if you want to object, you may and

12  then I'll address it.  So please don't --

13         DEFENDANT AMMON BUNDY:  Okay.

14         THE COURT:  -- an- -- I know you want to, but don't

15  answer it until I've ruled if there's an objection.

16         MR. SCHIESS:  Okay.  Thank you, Your Honor.

17  BY MR. SCHIESS:

18  Q.  Mr. Bundy, if you were to come into this federal courthouse

19  and the Court Security Officers at the front gave you a

20  direction, told you to do something and you disagreed with that,

21  would you follow their directions?

22         MR. HILL:  Objection, Your Honor.  First of all, that's

23  not a violation of federal, state, or local law necessarily;

24  that has nothing to do with what the conditions read regarding

25  Scott Drexler was.  And I -- we could be here all day as the

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

 1  Government cooks -- I mean, Title 18's 3,000 pages long.  I

 2  mean, would he, you know, send -- would he send an envelope not

 3  enough postage stamps on it?  I mean, what are we doin' here,

 4  Judge?  He said very clearly that he would abide by conditions.

 5          MR. SCHIESS:  Your Honor, I do not intend to ask him

 6  about crimes on the high seas.  I asked him about crimes that

 7  may occur in the front of the courthouse, are we gonna have

 8  compliance.

 9          THE COURT:  Objection's overruled.  That is an

10  appropriate question.

11          DEFENDANT AMMON BUNDY:  Um, yes.

12  BY MR. SCHIESS:

13  *Q.*  Okay.  And would your principles stand in the way of

14  following their directions?

15  **A.**  Well, I mean, you might have to elaborate on that.  But I --

16  generally no, absolutely not unless I felt that they were doing

17  something that was illegal --

18  *Q.*  Okay.

19  **A.**  -- and that, you know.  But absolutely.  Generally, no.

20  *Q.*  And then what would you do if you sensed that they were

21  doing something illegal?

22          MR. HILL:  Your Honor, objection.  This is so

23  argumentative and speculative.  It's calling for Ammon Bundy to

24  call what's illegal and had not illegal.

25          THE COURT:  Overruled.

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

 1              MR. HILL:  Is he . . .

 2              DEFENDANT AMMON BUNDY:  Again, there -- there's so many

 3    circumstances --

 4    BY MR. SCHIESS:

 5    Q.  Okay.

 6    A.  -- I don't know.  But I would -- I would probably notify one

 7    of their --

 8    Q.  Okay.

 9    A.  -- one of their co- -- um, one of the other men and tell 'em

10    about it.  I don't -- I don't -- I don't know what the

11    circumstance would be.

12    Q.  Okay.

13    A.  It would depend on what the circumstances would be.

14    Q.  Thank you, Mr. Bundy.

15              MR. SCHIESS:  Your Honor, may I have your indulgence,

16    please?

17              THE COURT:  Yes.

18       (Government counsel conferring.)

19              MR. SCHIESS:  Your Honor, I would like -- I certainly

20    want to comply with the Court's directions for my examination

21    here so I have just a question for you at this time.

22              Am I permitted to go through the number of violations

23    that he has had out at Pahrump/Henderson Detention Centers?  Or

24    are those something you want me just to save for argument?

25              MR. HILL:  I would object --

————2:16-cr-46-GMN-PAL - November 9, 2017————

1           MR. SCHIESS:  Because I --

2           MR. HILL:  -- to that -- I'm sorry, Your Honor -- at

3    this time.  I -- Mr. Schiess raises a stink about not being able

4    to read my conditions.  He's holding something highlighted and

5    notated in his hand.  Haven't seen it.  Not aware of it.  That

6    is not what I've asked Mr. Bundy.  I conceded in my argument

7    that there was difficulties in custody because he disagreed that

8    it was the least restrictive means.  He sat there under oath and

9    said that he understands that the conditions of pretrial release

10   as fashioned by this Court would be the least restrictive means

11   to assure his appearance.  This is not --

12           MR. SCHIESS:  Well --

13           MR. HILL:  -- within the scope of direct and he's about

14   to go through something that I've never seen.

15           MR. SCHIESS:  Counsel --

16           THE COURT:  So I'm not sure if it is or is not within

17   the scope of direct.  So why don't you take a proffer.

18           MR. SCHIESS:  Okay.

19           Your Honor, I have received today from the Marshals,

20   which I intend to give a copy to defense counsel, of 11

21   violations where the defendant has been found guilty of the

22   offenses in the Pahrump Detention Center.  And then I will --

23           MR. HILL:  To be fair, Your Honor, he's --

24           MR. SCHIESS:  Your Honor --

25           MR. HILL:  -- making a proffer from something I haven't

————2:16-cr-46-GMN-PAL - November 9, 2017————

1   seen.  I'd like to see it.

2          MR. SCHIESS:  Your Honor, I realize that Mr. Hill is a

3   young lawyer.  But there is --

4          MR. WHIPPLE:  Your Honor --

5          THE COURT:  No, no, no.

6          MR. SCHIESS:  -- a level of --

7          THE COURT:  Just a minute.

8          MR. SCHIESS:  -- professionalism --

9          THE COURT:  Stop.  Stop.  Do you want me to take a

10  lunch break for an hour?  Is that we need to do --

11         MR. SCHIESS:  No.

12         THE COURT:  -- is cool --

13         MR. SCHIESS:  What I --

14         THE COURT:  -- down?

15         MR. SCHIESS:  -- really would like --

16         THE COURT:  Okay.  Then stop addressing each other.

17  You address me.

18         I asked Mr. Schiess to make a proffer.  Mr. Hill,

19  please go ahead and sit down; take a drink of water; let him

20  make his proffer.

21         MR. HILL:  Just for the record --

22         THE COURT:  I know you're not gonna like it.

23  That's . . .

24         MR. HILL:  I was interrupted when I was reading the

25  conditions of pretrial release by Mr. Schiess and I wanted to

AMMON BUNDY - CROSS

2:16-cr-46-GMN-PAL - November 9, 2017

1   see what he was reading.

2          THE COURT:  All right.  Well --

3          MR. SCHIESS:  So my --

4          THE COURT:  -- let him make his proffer and then I'll

5   let you make your objection.

6          Go ahead, Mr. Schiess.

7          MR. SCHIESS:  Now, what I was telling the Court was I

8   received this morning -- we received this morning the summary.

9   I have copies which I intend to give to the defense.  I did not

10  give it to him because we had asked the Court to be able to have

11  time, either later today or another day, to go forward and you

12  asked me to go forward with this limited scope.

13          Now, if the Court will permit me to ask him about those

14  violations, to be able to ask him whether he obeyed or didn't

15  obey the rules, to be able to demonstrate that what he tells the

16  Court if I will obey now, I would like to be able to argue that.

17  And I can give the defense counsel the copies and be able to go

18  through it.  But if you want me just to argue those for you --

19          THE COURT:  I don't want you to ask him whether he did

20  or did not do something that is alleged in the past.  But you

21  can take information -- if there's something in there that he

22  has been accused of doing that you think might occur again while

23  on pretrial supervision, you can certainly ask a question about

24  that.

25          MR. SCHIESS:  Okay.  And let --

─────2:16-cr-46-GMN-PAL - November 9, 2017─────

1           THE COURT:  And so --

2           MR. SCHIESS:  -- let me get a copy now for the defense

3    counsel --

4           THE COURT:  All right.

5           MR. SCHIESS:  -- please.

6           THE COURT:  So some hypothetical, not a question about

7    something that is a current allegation.

8           MR. SCHIESS:  I'm sorry.  I . . .

9           THE COURT:  Ask a hypothetical.  It can be based on

10   something that you have a good-faith brief he might do.  But I

11   don't want you asking him questions about whether or not he's

12   guilty of something that he's been alleged to have done.

13          MR. HILL:  For the record, Your Honor, a hypothetical

14   based on fact which extrapolates an answer from Mr. Bundy, it's

15   the same thing as asking about guilt or innocence about an

16   accusation from the United States Marshals that, incidentally, I

17   don't -- I guess they gave it to the Government, but they

18   certainly didn't provide it to the defense.  So we would object

19   to asking hypotheticals based off of certain allegations that

20   the Marshals have made that I haven't seen that's gonna

21   extract --

22          THE COURT:  Well, the whole basis --

23          MR. HILL:  -- answers --

24          THE COURT:  -- of this is a hypothetical to see if he

25   would be able to comply with these conditions depends on his

————2:16-cr-46-GMN-PAL - November 9, 2017————

1  understanding of what those conditions are.  It's like when you

2  ask someone, Can be you fair?  Everyone thinks they can be fair.

3  But then, when you start to ask questions about particular

4  things -- you know, we have individuals, unfortunately, who have

5  been victims of child abuse; right?  You start asking them can

6  you be fair if there are allegation of child abuse then the

7  answer starts changing.

8           MR. HILL:  I would propose --

9           THE COURT:  And it's just common sense is that a person

10  needs to understand what they are agreeing to before they

11  actually say they are gonna agree to it.  So, in that regard,

12  I'll let Mr. Schiess ask a hypothetical about some situation

13  that might occur during supervision that would cause Mr. Ammon

14  Bundy to question his ability to follow the Court order because

15  it contradicts something, whether it's a his principle or some

16  other belief that he has.

17           MR. HILL:  So long as it's limited to conditions of

18  pretrial release hypotheticals, and not Pahrump incarceration

19  hypotheticals, we're fine with that, Your Honor.

20           THE COURT:  All right.

21           MR. SCHIESS:  Your Honor, would --

22           THE COURT:  Go ahead --

23           MR. SCHIESS:  -- let me --

24           THE COURT:  -- Mr. Schiess.

25           MR. SCHIESS:  -- in order for me to be able to ask

2:16-cr-46-GMN-PAL - November 9, 2017

1  these questions effectively and understand the direction, would

2  now be a good time to take a lunch break and then --

3          THE COURT:  Sure.  We'll --

4          MR. SCHIESS:  Thank you.

5          THE COURT:  -- go ahead and take a --

6          MR. SCHIESS:  Thank you.

7          THE COURT:  -- our lunch break now.  It's a late lunch.

8  Hopefully they didn't run out of food downstairs.  But it's

9  12:40.  We'll go ahead and take a lunch break until -- can we --

10 can we -- oh, let's see.  1:40 -- can we try to be back at 1:30

11 and we'll finish up here with Mr. Ammon Bundy and then move on

12 to Mr. Ryan Payne and then to Mr. Ryan Bundy.

13         COURTROOM ADMINISTRATOR:  All rise.

14         THE COURT:  Off record.

15         COURTROOM ADMINISTRATOR:  Off record.

16    (Recess, 12:40 p.m.  Resumed, 1:51 p.m.  Ammon Bundy resumes

17 the witness stand.)

18         COURTROOM ADMINISTRATOR:  All rise.

19         THE COURT:  Please be seated --

20         COURT REPORTER:  I can't hear you.

21         THE COURT:  It's off.

22         All right.  So is everyone present?  Are we waiting for

23 everyone?  I think I see everyone.

24         All right.  Let's go ahead, then, and continue.

25         Thank you, Mr. Ammon Bundy, for getting back to the

————2:16-cr-46-GMN-PAL - November 9, 2017————

 1   witness stand so we don't have to wait.

 2          Mr. Schiess, did you have any other cross-examination

 3   questions at this time.

 4          MR. SCHIESS:  I do not, Your Honor.  Thank you for the

 5   time --

 6          THE COURT:  Thank you.

 7          MR. SCHIESS:  -- that I've had.

 8          THE COURT:  And, Mr. Hill, anything else that you

 9   wanted to ask on redirect?

10          MR. HILL:  One quick second if I may, Your Honor.

11          THE COURT:  Sure.

12      (Mr. Hill and Mr. Philpot conferring.)

13          MR. HILL:  Very briefly, Your Honor.

14          THE COURT:  All right.  Go ahead.

15                        REDIRECT EXAMINATION

16   BY MR. HILL:

17   Q.  Just to bring it home and summarize, if I may.

18          Mr. Bundy, you understand that if you're released

19   there's going to be conditions?

20   A.  Yes.

21   Q.  And you're going to abide by those --

22          MR. SCHIESS:  Your Honor --

23   BY MR. HILL:

24   Q.  -- conditions?

25          MR. SCHIESS:  -- these are all asked and answered,

———2:16-cr-46-GMN-PAL - November 9, 2017———

1  please.  It's cumulative.

2           THE COURT:  All right.

3           Are you laying a foundation for a different question?

4           MR. HILL:  That was it, Your Honor.

5           THE COURT:  All right.

6           Anything else, Mr. Schiess?

7           MR. SCHIESS:  No, Your Honor.  Thank you.

8           THE COURT:  Okay.

9           Thank you, Mr. Ammon Bundy.  You're excused.  Please be

10  careful on the way down with those steps.

11      (Pause in the proceedings.)

12           THE COURT:  All right.  And, Mr. Hill, anything else

13  that you wanted me to consider?

14      (Mr. Hill and Mr. Philpot conferring.)

15           MR. HILL:  There's one other thing that -- it's in the

16  motion.  I wanted to -- for a couple of reasons -- the

17  mistrials, acquittals, and then also the additional five

18  months -- I wanted, if I may -- I don't know if Your Honor would

19  prefer something in writing.  It is in the motion, Docket

20  2843 -- to renew the due process motion to dismiss, which I

21  believe was 2066, and incorporate the points of authorities

22  there.  The only new things for renewal was that came before the

23  second jury verdict.  And we were 17 months incarceration there;

24  we're currently at 22.  So, just for the record, I wanted to

25  renew and incorporate that motion.  It is part of 2843.  I can

2:16-cr-46-GMN-PAL - November 9, 2017

1  do that in a separate filing to maintain the ease of the docket

2  if the Court would prefer.

3           THE COURT:  Are you saying that you want to file a

4  motion to reconsider a prior ruling?

5           MR. HILL:  I think we're just simply renewing it.  I --

6  well, there's new circumstances.  We would renew it owing to the

7  new circumstances.  But I guess --

8           THE COURT:  Was that a ruling that was provided by

9  Judge Leen?

10          MR. HILL:  Yes, Your Honor.

11          THE COURT:  Okay.

12          So I think it would be a motion either to renew or

13  reconsider, whatever you want to style it.  But it would be

14  something that would be directed for her review.

15          MR. HILL:  Okay.  I'll do that, Your Honor.  Thank you,

16  Your Honor.

17          THE COURT:  Okay.

18          Anything else, Mr. Schiess, that you want to add?  I

19  realize you said you wanted an opportunity on Monday to

20  address --

21          MR. SCHIESS:  Well --

22          THE COURT:  -- after we all have an opportunity to read

23  the motion filed this morning, 2833.

24          MR. SCHIESS:  Your Honor, if the Court is going to at

25  least consider that motion, then we would like the opportunity

—2:16-cr-46-GMN-PAL - November 9, 2017—

1   to respond.  But I can make -- then I can come back Monday, if
2   you would like, and make the rest of the arguments to oppose
3   release.  Or I can make the arguments now and if you're not
4   going to rely upon the motion because the motion is basically
5   their -- you know, the factual portion is their view of what the
6   evidence will show.  And, of course, we will take the position
7   that it'll show something contrary.  And then we're, at this
8   point -- I'm not talkin' about, you know, the end of the
9   trial -- but, at this point, we're supported by the
10  probable-cause finding of the Grand Jury.
11          And so, you know, we can wrap this up.  If you want to
12  rule today, we can rule.  But, if you're gonna rely upon the
13  motion, then we need a fair opportunity to respond to that.
14          THE COURT:  I think it would be helpful to hear from
15  the Government -- and you don't have to do it today -- whether
16  the change in circumstances from the operating Detention Order,
17  including the fact that the Oregon conduct was included in the
18  original order and has since -- there has since been acquittal
19  and also in the original operating Detention Order was
20  information about the weight of the evidence and whether or not
21  that has changed as to Mr. Ammon Bundy as a result of the first
22  two trials or not.  Um . . .  And I think you also wanted to
23  address some concerns about the conduct of Mr. Bundy in relation
24  to whether or not he's able to follow --
25      (Mr. Hill and Defendant Ammon Bundy conferring.)

2:16-cr-46-GMN-PAL - November 9, 2017

1            THE COURT:  -- Federal Court orders or Federal

2    Regulations --

3            MR. SCHIESS:  Um-hum.

4            THE COURT:  -- in custody in Pahrump.  I think you

5    mentioned you had a list.

6            MR. SCHIESS:  Yes.

7            THE COURT:  So --

8            MR. SCHIESS:  So would you pre- --

9            THE COURT:  -- I'm less concerned with the

10   interpretation by the parties of the facts --

11           MR. SCHIESS:  Okay.

12           THE COURT:  -- in this case.  That's gonna be somethin'

13   the jury's going to decide; I'm not going to be deciding that.

14           There has been a Superseding Indictment and there was a

15   Grand Jury who found that there was probable cause to believe

16   that a crime was committed and that it was Mr. Ammon Bundy who

17   committed it and that's why the Superseding Indictment was

18   signed and filed and that's why it exists.  There's also the

19   four counts of 924(c) which are what raises the rebuttable

20   presumption.  So I don't need you to address that; that's a

21   given.

22           You know, my concern is generally with those things:

23           The change in circumstances because originally there

24   were Oregon charges that were being considered; now, those --

25   there's been acquittals.

1          Originally the weight of the evidence that was

2    presented may or may not have been affected by the fact that

3    there has been two prior trials with some convictions and some

4    acquittals.  And I believe nobody was convicted of conspiracy

5    and there are no remaining counts of conspiracy from those two

6    trials that were hung either.

7          MR. SCHIESS:  Um-hum.

8          THE COURT:  So those are --

9          MR. SCHIESS:  Okay.  I'll --

10         THE COURT:  -- those are the kinds of things.  I'm not

11   limiting to that, but those are the kinds of things.  So I don't

12   need you to waste time telling me that their interpretations of

13   the facts --

14         MR. SCHIESS:  Yes.

15         THE COURT:  -- is different than what the Government's

16   interpretation is.

17         MR. SCHIESS:  Yes.

18         THE COURT:  That's a given.

19         MR. SCHIESS:  Okay.

20         THE COURT:  I'm not gonna worry about that.

21         MR. SCHIESS:  And would you, Your Honor, like me to do

22   this in writing and then be prepared to argue it on Monday?

23         THE COURT:  It's up to you.  I don't have a

24   preference --

25         MR. SCHIESS:  Or would you just --

———2:16-cr-46-GMN-PAL - November 9, 2017———

1           THE COURT:  -- whether it's in writing or argued.

2           MR. SCHIESS:  Okay.

3           Then can I let the Court know by the end of today if

4    we're gonna submit something in writing; if not, I'll just

5    announce if we're going to argue it orally on Monday?

6           THE COURT:  That's fine.

7           MR. SCHIESS:  Okay.  Thank you.

8           THE COURT:  Okay.

9           All right.  So let's move on, then, to Mr. Ryan Payne.

10          We have starting off with -- the Detention Order that

11   is controlling is number 277 which was entered in April of 2016

12   by Judge Foley.  And there was a Motion to Reopen and an

13   Order -- the Order is number 1377 -- which also cited some

14   factors, including that Mr. Ryan Payne had pled guilty to a

15   charge of Conspiracy to Impede a Federal Officer in the District

16   of Oregon in July of 2016 and that he holds sincere beliefs that

17   the federal government has vastly overstepped its legitimate

18   authority.  And he also noted that Mr. Payne had either created

19   or was affiliated with Operation Mutual Aid, an organization for

20   recruiting and organizing the militias, the gunmen, the

21   followers to assist the Bundy family in assisting the federal

22   officers and that Mr. Bundy led the armed assault -- I'm

23   sorry -- Ryan Payne -- Mr. Ryan Payne led the assault on federal

24   officers on the impoundment site and so forth.  So the Detention

25   Order -- so the -- and the Motion to Reopen was denied as no new

1  material information was provided.

2         The Order that is the controlling order references

3  Government's proffer, Pretrial Service Reports and such.

4  Doesn't list too many specific things.

5         The updated Pretrial Service Report provides that

6  Mr. Ryan Payne has been residing at his grandmother's residence

7  and that while she's not -- I think this was -- maybe this was

8  from the Oregon Pretrial Service Report -- it said that she

9  wasn't willing to post her property as collateral to assure the

10 defendant's appearance at future court proceedings.  However,

11 there is a cousin of the defendant, Mr. Harry Ayala, who is

12 willing to have Mr. Payne stay with him here in Las Vegas at

13 6970 Mountain Moss in Las Vegas, Nevada.  And, while he does

14 have hunting rifles, he's willing to relocate the rifles

15 somewhere else so that Mr. Ryan Payne can stay with him during

16 trial and that Mr. Payne's stepfather is willing to pay for some

17 of the costs that Mr. Ayala would naturally incur having an

18 extra person living with him.

19        But then there was some concern that Mr. Ayala's wife

20 uses medical marijuana, and it's not clear in this report

21 whether she's willing to not have that in the home.

22        And then, on page 3, I wasn't sure if this was a typo;

23 maybe I should ask the Pretrial officer.  It says that Mr. Ryan

24 Payne owned the Payne Construction Service Company and that he

25 obtained government contracts for surveillance.

2:16-cr-46-GMN-PAL - November 9, 2017

1          Is that sur -- a surveyor?  Because the prior is about

2    construction and such.  So is it, like, surveying, like, when

3    you're trying to figure out the borders or how far away the

4    plumbing lines are and the electrical lines?  Could it be

5    "surveying" as opposed "surveillance"?  It doesn't really make

6    sense to me.

7          MS. OLIVER:  One moment, Your Honor.

8          THE COURT:  Sure.

9       (Pause in the proceedings.)

10          MS. OLIVER:  Your Honor, the -- I'm being told it's

11    surveillance.  And I'm looking at the notes from the interview;

12    another officer had conducted that interview.  The notes

13    indicate the word "surveillance."  That's being confirmed by

14    defense counsel --

15          COURT REPORTER:  I'm sorry.  "Defense counsel" what?

16          MS. OLIVER:  That's being confirmed by defense counsel

17    seated in front of me.

18          THE COURT:  All right.

19          And it also states that Mr. Payne was married before

20    and divorced.  He's now currently engaged to someone else and --

21    but they live out of state.  And he does have two children with

22    a third person, but they are out of state also.  So they are in

23    Montana.

24          So it looks like this person, Mr. Harry Ayala here in

25    Las Vegas, would be able to provide an appropriate residence

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  suitable for supervision and a criminal record's check was

2  conducted and he was found to be a suitable third-party

3  custodian.

4       So my concern is what about the wife with the medical

5  marijuana and I'm not sure what the surveillance contracts or

6  his surveillance.

7       MR. NORWOOD:  So . . .

8       THE COURT:  All right.  And then I think that's -- let

9  me see.  Just to give you an idea of what I'm looking at.  So we

10  don't -- oh.

11      So there's another clarification that I would

12  appreciate is whether or not he's been diagnosed with PTSD

13  because grandma seems to think that he was.  But then she

14  clarified that she only got that information -- well, she

15  doesn't say where she got the information.  But then his first

16  wife said that he was diagnosed with PTSD at a Veterans Hospital

17  and was taking medication, but then Mr. Payne's not taking

18  medication.  So does he need medication?  Do we need to -- if he

19  were to be released, would we need to order an evaluation to

20  determine whether or not it would be helpful to have counseling

21  or medication or something that would help him so that we don't

22  have any issues?

23      He said that he was employed, but it looks like it was

24  just part time.  And then was on -- and then he left the company

25  and then he returned -- no.  He was on on-call basis -- and he

—2:16-cr-46-GMN-PAL - November 9, 2017—

 1  has no assets, no money.  So the stepdad would have to provide

 2  Mr. Ay- -- I guess there was a condition precedent here -- the

 3  stepdad would have to provide Mr. Ayala some money so that

 4  Mr. Payne could stay at the residence without undue hardship to

 5  Mr. Ayala who is opening up his house to him.

 6          Trying to see if there was any other notes that I had

 7  about questions for you.

 8          There was also something in the Oregon Pretrial Service

 9  Report that said that Mr. Ryan Payne had been using medical

10  marijuana for back pain.  And so obviously he won't be able to

11  do that if he's on release.

12          And is there something else?  Let's see.  Um . . .

13          So they noted there was conflicting information

14  regarding mental health history.  And then there's the issue of

15  whether or not he's detained in Oregon.  So the Oregon court has

16  clarified that she did release Mr. Ryan Payne from detention so

17  that he could be transported here for trial here, but that the

18  condition was if this Court was to release him that he should

19  not be released until she has an opportunity to either review my

20  release conditions and maybe add something else if she wants to

21  or to file -- to enter a Detention Order so that he would still

22  be detained in her case even if he wasn't in mine.

23          MR. NORWOOD:  You're referring to the order that the

24  Court entered yesterday?

25          THE COURT:  That she entered, yes.

—2:16-cr-46-GMN-PAL - November 9, 2017—

1          MR. NORWOOD:  Okay.  Yeah, I'd be happy to address that

2    first.

3          THE COURT:  Please do.

4          MR. NORWOOD:  I mean -- you know, those --

5          THE COURT:  Whichever order.  Those are just the

6    concerns in my mind.

7          MR. NORWOOD:  Certainly.

8          THE COURT:  And I just read this report this morning

9    for the first time.  But those were the things I highlighted

10   that I wanted to give you the opportunity to address.

11         MR. NORWOOD:  And I made notes on all that.  So I'll

12   try to address all of that in the --

13         THE COURT:  If you can.

14         MR. NORWOOD:  -- context of what I have here.

15         THE COURT:  Yeah.

16         MR. NORWOOD:  But let me address the issue with Oregon

17   first.

18         Mr. Payne, a long time ago, entered a plea to the

19   Oregon Conspiracy charge.  He was actually set to go to trial

20   with Ammon and Ryan Bundy; he chose to enter a plea.  They were

21   subsequently acquitted at that trial, but that was, I think, two

22   summers ago.

23         After he entered that plea, Oregon did release him

24   there and he has not been subject to any hold there.  But, as

25   you mentioned, there was also some language in that Order that

1  basically said if you, the Nevada court, are thinking of doing

2  anything, please, give me a heads-up first.  So, when the Court

3  ordered this detention hearing on Tuesday, we immediately went

4  back to the office; we informed his lawyers in Oregon of the

5  situation; they informed the parties there, including the

6  Government; they filed something with the court; and then this

7  Order came out.

8           So what this -- what this Order is saying, basically,

9  is that Judge Brown wants a chance to look at this before

10  Mr. Payne is actually released from custody.  And I don't have a

11  problem with that.  We're here for a Detention Order hearing and

12  I would like the Court to rule on the issue of detention today.

13  But I would also like the Court, basically, to take up

14  Judge Brown on her situation that if the Court does release

15  Mr. Payne that it defer that release.

16           Then if that happens here's what I'll represent to the

17  Court what would happen next.  Through his attorneys in Oregon,

18  we would promptly seek a hearing to resolve the issue there.

19  Obviously, he's pending a sentencing in Oregon, and that's been

20  sort of set out for a while because of this case.  Judge Brown

21  is obviously in the best position there to know whether or not

22  he should be detained pending that sentencing.

23           I would note, again, the initial release order was made

24  a long time ago.  There's a -- the sentencing, Mr. Payne's

25  attorneys are able to and plan to argue for a time-served

2:16-cr-46-GMN-PAL - November 9, 2017

1  sentence.  So -- and many of -- there have been many defendants

2  sentenced up on that case and many of them have received time

3  served or something like that.  So it's not by any means a

4  foregone conclusion there that he will get -- that he will get

5  additional time.  Well, that's obviously the decision that

6  Judge Brown will make.

7          So I have no problem with the idea of, you know, we'll

8  get a hearing in Oregon.  And I will represent to the Court --

9  and Mr. Payne can state on the record if the Court would like --

10 that he is willing to waive his right to appear at any such

11 hearing because obviously we're not gonna have time to send him

12 up to Oregon and have him come back there for that hearing.

13         So, if Oregon decides to -- if Oregon decides to

14 release him, then at that point we would ask the Court to

15 release Mr. Payne subject to the conditions that both courts

16 want.  If Oregon says, no, we're not going to release you, then

17 he's gonna stay in custody.

18         So, you know, nothing -- basically, Mr. Payne would not

19 be released unless both you and Judge Brown agree that he should

20 be released.  And, because we're here with the detention hearing

21 today, you have the first shot at it.  So, if your decision is

22 that he's not released, then there's not gonna be any need for

23 any further proceeding in Oregon.  But . . .

24         So I think one thing that you've asked with respect to

25 the other defendants is sort of what's new here.  And, in

—2:16-cr-46-GMN-PAL - November 9, 2017—

1 Mr. Payne's case, that's a lot.  This is actually the first time
2 that, you know, anyone -- you know, any of his lawyers has been
3 before a court making an argument for his release.  When he was
4 brought here way back last April, he was sort of boomeranged
5 down here from Oregon where his case was still pending with the
6 understanding that he was gonna get sent right back.  So the
7 decision was made at that time, by the attorney who was handling
8 that hearing, to submit to detention because, frankly, nothing
9 was gonna change.  He was still -- he was detained in Oregon; he
10 was gonna go back there.

11        Amongst other things, Mr. Payne did not interview with
12 Pretrial Services.  He has now interviewed with Pretrial
13 Services and spoke at some length with him about who he is.  So
14 I guess that's where I wanted to start.  And I'll try to cover
15 some of the Court's questions here in the course of doing that.

16        Mr. Payne's 34 years old.  He's from San Bernardino.
17 When he was 17 years old, he signed up for the Army.  He went to
18 Iraq.  He served two tours of duty there, the first one in 2003
19 and the second one in 2004, so during the initial invasion and
20 then during the ensuing civil war.

21        He served in combat at great risk.  He served his
22 country honorably.  He was commended.  He received at least two
23 commendation medals.  I had attached them with respect to -- in
24 a prior pleading that I had done.  He received two commendation
25 medals.  I believe he was on active duty for about 5 years and

1  he was in the Reserves until 2009, I believe, when he was

2  honorably discharged.

3        The Court may have noticed some tattoos on Mr. Payne's

4  left arm.  Those are all related to his service in the Army.

5  One of them is his Army nickname.

6        THE COURT:  Says he was -- he enrolled in 2001 and he

7  was discharged in 2006 honorably.

8        MR. NORWOOD:  He was discharged from active duty in

9  2006 and then he was in the Reserves until 2009.  So I believe

10  the honorable discharge happened after the service in the

11  Reserves.

12        So he -- in 2012, Mr. Payne relocated to Montana.  He

13  has a lot of family in Montana.  I mean, when he moved to

14  Montana, he lived in a house with his grandparents.  I believe

15  the house was and still is in their name although Mr. Payne

16  basically bought it with them and has always contributed much of

17  the expenses towards that house.  He's worked regularly his

18  whole life.  Most recently, he worked as an electrician in

19  Maine -- sorry -- in Montana.

20        When I -- back in December of 2016 -- it was almost a

21  year after he was originally taken into custody in Oregon -- we

22  contacted the people who had employed him in Montana to see if

23  he would still have a job waiting for him if he were released

24  and they confirmed that he did.  And we provided two

25  declarations with an earlier motion that we filed.

2:16-cr-46-GMN-PAL - November 9, 2017

1        These people were fully aware of the fact that he was

2   charged in two different cases.  They -- and they -- they said

3   that didn't matter.  He was a good employee.  Somebody that they

4   wanted back working for them.  Um . . .

5            THE COURT:  Are we talking about Colberts Electric or

6   Anaconda Foundry Fabrication Company?

7            MR. NORWOOD:  The latter, I believe.  Um . . . AFFCO,

8   yeah, Foundry Fabrication Company.

9            THE COURT:  Okay.  Thank you.

10           MR. NORWOOD:  Now, obviously, if he were to be released

11  here during this trial, he would be in Las Vegas.  So he's not

12  going to be -- I don't think he's going to be able to work up in

13  Montana and commute from there.  But Mr. Payne has skill.  He's

14  an electrician.  That can benefit him anywhere.  Although I

15  think as a practical matter, when he's released during the

16  trial, he's going to be here during the day and he's going to

17  have to spend other time focusing on trial preparation and

18  things like that.

19           So he lived in Anaconda with his grandparents.  He had

20  two children with a woman he's now separated from.  Um . . .

21       (Document provided to Ms. Ahmed by Mr. Norwood.)

22           MR. NORWOOD:  If I may approach, Your Honor?

23           THE COURT:  Yes.

24           MR. NORWOOD:  I mean, the Court's seen a lot of

25  pictures, I think, in the prior trials of Mr. Payne when he was

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  at the Gold Butte area when he's wearing his vest and his gun.

2  That . . .  I have some pictures with me that I -- that I point

3  out something . . .

4      (Document handed to the Court.)

5          MR. NORWOOD:  These are pictures of something else that

6  is very important to Mr. Payne and that's his family.  He has

7  two children.  Even though he is now separated from their

8  mother, he remains in touch with them.  Their names are Patrick

9  and Hanna.  They actually call her "Hanna Montana" because her

10  name is Hanna and they live in Montana.

11          His family is very important to him.  He's obviously

12  been separated from them for some time now.  But, you know, when

13  we talk about Mr. Payne in court, we're obviously talking about

14  him in relation to what happened with regards to the events in

15  the Indictment and that's what we need to talk about.  But I do

16  want the Court to know that this is a person who has other

17  things going on in his life.

18          So I -- you know, his mother lives in Montana.  She

19  relocated with him.  His current fiancée, whose name is Ariel

20  Rincon, we've been in regular contact with, who couldn't make it

21  down here on short notice.  But she lives in Montana too.

22          So, as far as ties to the community, I do want to

23  clarify he does have very close ties to the community in

24  Montana.  His family is there.  His home is there.  His job is

25  there.  As it happens, he does have ties to Las Vegas too.

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

1  Mr. --

2          THE COURT:  Are they all in Anaconda or different parts

3  of Montana?

4          MR. NORWOOD:  I think . . .  Yeah, they are all in

5  Anaconda.

6          THE COURT:  Oh.

7          MR. NORWOOD:  It's a little spread out, but they are

8  all sort of in the same area.

9          He moved up there with his grandparents, the mother

10  came with him, and he later met Ms. Rincon there.  So this --

11  you know, he has -- I mean, there's a rather large community of

12  support for Mr. Payne.  You know, in our investigations, we

13  found, you know, he has a large family; we found people who

14  served with him in the military who still think very highly of

15  him.  So this is a person who has a lot of support everywhere,

16  certainly in his community in Montana.

17          Down here he has a cousin who is the person mentioned

18  in the Pretrial Report.  We had -- he's working today, so he

19  couldn't make it here today.  I know that Pretrial has had an

20  opportunity to interview with him.  The Court had raised the

21  concern about the medical marijuana.  That's something that we

22  can seek to clarify, that's not gonna be in the home.  I would

23  note that this did come up in the Pretrial Services Report and

24  that their ultimate conclusion, though, would be that, you know,

25  he's a suitable third-party custodian.  So this is a person who

1    is already willing to get the rifles out of his house.  I would

2    think that we can talk with him about other things that would

3    need to be done if that's an issue.

4          I think the Court had asked about the PTSD issue.  My

5    understanding is that the VA has diagnosed Mr. Payne with PTSD,

6    which is related to his combat service in Iraq.  It's not

7    something that Mr. Payne is always forthcoming in talking about,

8    which is true of a lot of people who have suffered PTSD.  There

9    was some mention of the medical marijuana which Mr. Payne has

10   been candid about.

11         Again --

12         THE COURT:  That was for the back pain, not the PTSD.

13         MR. NORWOOD:  I'm not -- as I stand here, I'm not --

14   I -- he had used -- yeah, he was taking medical marijuana.

15   Again, in -- it's something that's legal in many -- I think most

16   states now.  I mean -- and I know there's the issue with federal

17   law versus state law.  But what he was doing was in compliance

18   with whatever -- with the state that he was in at the time.  And

19   obviously he understands that that's not something that's going

20   to be appropriate if he is released on pretrial supervision.

21         So just going through --

22      (Ms. Weksler and Mr. Norwood conferring.)

23         MR. NORWOOD:  I think -- I was just handed a note

24   regarding that medical marijuana issue that, you know, if they

25   are going to act as his third-party custodian, they were willing

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  to lock it up in the same safe that they have the guns so

2  Mr. Payne is not going to have any access to it.  But I am

3  certain that, if the Court were to release him, one of the

4  conditions would be that he is not to use any substances,

5  including marijuana.  And he would be -- he would comply with

6  that condition.

7         You know, as far as the other concerns that are raised

8  in the Pretrial Services Report, again, I think --

9         THE COURT:  So are you saying put them in a safe in the

10  same residence or put them in somebody else's residence in a

11  safe?  Because I'm not sure that that would be compliant with

12  the conditions.

13         MS. WEKSLER:  So our investigator, Michelle Blackwill,

14  is the one who actually spoke with Harry Ayala earlier today.

15  So she can probably represent exactly what it is that he said.

16  My understanding is that she uses this at night before bedtime;

17  she's willing to lock this up, my understanding is, in the gun

18  safe at the residence.  That's what would make sense to me.  To

19  the extent that there needs to be some further clarification, we

20  can just step outside and call him right away.

21         THE COURT:  And I'll ask the Pretrial Officer Oliver,

22  on page 2 of the Pretrial Service Report where it says that

23  Mr. Ayala indicated that there are hunting rifles located at the

24  residence; but he's willing to relocate the rifles if the

25  defendant is permitted to reside with him.  Is that relocate

2:16-cr-46-GMN-PAL - November 9, 2017

1  them to another location --

2          MS. WEKSLER:  I'm sorry.  I thought --

3          THE COURT:  -- or the same --

4          MS. WEKSLER:  -- you were talking about the medical

5  marijuana, Judge.  So --

6          THE COURT:  We are.

7          MS. WEKSLER:  -- two --

8          THE COURT:  But Mr. --

9          MS. WEKSLER:  -- different --

10          THE COURT:  -- Norwood --

11          MS. WEKSLER:  -- things.

12          THE COURT:  -- said that the medical marijuana would be

13  put in the same safe as the rifles.

14          MS. WEKSLER:  So --

15          THE COURT:  So then --

16          MS. WEKSLER:  -- the rifles --

17          THE COURT:  -- that's --

18          MS. WEKSLER:  -- my under --

19          COURT REPORTER:  One at a time.

20          THE COURT:  So does that mean that the rifles are

21  staying in the house?  Because that's not the way that I read

22  it.

23          MS. OLIVER:  Your Honor, our understanding is that

24  those rifles would be removed from the home should he be

25  released there.  That would be our recommendation.  And the same

1  with the medical marijuana; our recommendation would be that

2  that be removed completely from the home.

3          THE COURT:  Okay.  Thank you.

4          MR. NORWOOD:  Your Honor, I might have been misreading

5  the note that I had here.  I mean, I think --

6          THE COURT:  Right.

7          MR. NORWOOD:  -- you know, I understand the Court's

8  concerns.  But I think Pretrial seems to be satisfied that he is

9  willing to do something that will alleviate those concerns so

10 that Mr. Payne is not going to have any access to guns or

11 marijuana.

12          With regards to the -- you know, the Pretrial, you

13 know, interview is fairly thorough on what it goes through.  I

14 just want to just respectfully note a few things about the

15 ultimate assessments here.  I mean, I sort of mentioned the

16 issue about the financial and property ties to any community.  I

17 do, respectfully, think that Mr. Payne does have ties at least

18 to the community in Montana, if not the community here.

19          They mention his lack of employment.  Obviously, he's

20 unemployed because he's been locked up for 2 years.  But he is

21 somebody who has been gainfully employed when he's not locked

22 up.  Um . . .

23          THE COURT:  But that's not what it said here about his

24 employment.  It's that his . . .  Let's see.  He was employed

25 part time beginning in August of 2013.  Then he left the company

────2:16-cr-46-GMN-PAL - November 9, 2017────

 1  and returned a couple months later on an on-call basis.  So that

 2  was his last employment or . . .

 3       MR. NORWOOD:  I'm just reading the first line here

 4  which reports that he was employed by Colberts Electric in

 5  Anaconda as a journeyman electrician earning $28 per hour from

 6  August 2013 to December 2015.  And, at that point, he had become

 7  involved in the events in Oregon and was arrested the next

 8  month.  So . . .

 9       THE COURT:  So I'm --

10       MR. NORWOOD:  -- he is --

11       THE COURT:  -- looking at the Oregon Pretrial Report,

12  which was closer in time, that stated that contact was made with

13  the person at Anaconda Foundry Fabrication Company.  Um . . .

14       Oh, I see.  Okay.  The early one.  With Colberts

15  Electric, records indicate that the defendant was employed part

16  time beginning in August of 2013 and then left the company and

17  returned a couple months later on an on-call basis.  So, at the

18  time that he's arrested, he only has on-call-basis employment.

19       MR. NORWOOD:  At the time he was arrested, he had been

20  involved in the matter in Oregon for -- I don't recall exactly

21  how long.  So he wasn't in Montana at the time.  But, again, my

22  understand -- and, you know, of course, he was in Nevada for

23  sometime too.  But, when he's in Montana, he is somebody who has

24  a skill who is able to regularly find employment and who has

25  regularly worked and who has supported his family.

1        I think at issue -- so just to cover a few other issues

2   that are raised here.  I've sort of gone through the drug-use

3   issue.  I know there are differing opinions on medical

4   marijuana.  But he's taken it for a reason.  He has a card.  He

5   went through the process you need to do that.

6        In both the assessment of nonappearance and the

7   assessment of danger, there are references to the Oregon matter.

8   And, again, I think for purposes of today, you know, Judge Brown

9   is in the situation to determine what should be done vis-à-vis

10  the Oregon matter.  So, if she determines he shouldn't be

11  released there, then he's not goin' anywhere.

12        To cover a few issues that I know have come up sort of

13  in other contexts where the Government has raised before -- here

14  and Oregon -- you know, Mr. Payne has some strongly held

15  political beliefs which he's expressed on numerous occasions and

16  some of those beliefs touch on things like what the government

17  should or usually should not be doing, what jurisdiction courts

18  have, and so forth.  And those -- and I don't deny that those

19  beliefs are deeply held.

20        I do want to draw sort of a comparison here between

21  Mr. Payne and, again, some of the other defendants in this case.

22  And I don't mean this -- I'm not doing this to disparage anybody

23  else but just to state it sort of as a fact.

24        You know, Mr. Payne feels as strongly as the other

25  defendants here about -- you can call it the injustice or

1   illegality of certain things that they are required to do during

2   their pretrial custody, including submitting to the strip

3   searches and so forth.

4           There was a time earlier this year after Mr. Payne came

5   back from Oregon in which he, along with Ammon and Ryan Bundy,

6   essentially protested and was placed in solitary for about a

7   month or so.  He has -- the record of write-ups I have all stem

8   from that area and it's basically the same thing, not -- you

9   know, not doing what the jail officials asked you to do.

10          That, of course, created some issues, one of which was

11  that it was difficult for us to meet with Mr. Payne; it was

12  difficult to consult with the case.  So, you know, Mr. Payne's

13  views about that have never changed.  But what he has done from

14  that point forward is he has been willing to comply with those

15  conditions.  And, again, that's not because he agrees that they

16  are right.  But, number one, he understands that he need -- that

17  if we're gonna have an orderly process here, if he's going to

18  assist me and the Court and what we're going through, that some

19  compromise needs to be made.  Number two, that he understands

20  that if he doesn't follow rules that, you know, bad things are

21  going to happen to him that are ultimately going to work against

22  him.

23          I think that that is equally true as far as pretrial

24  conditions goes.  I don't -- you know, Mr. Payne may have all

25  sorts of beliefs about what courts or Pretrial should or should

 1  not be doing.  But, at the end of the day, Mr. Payne has shown

 2  that he is willing to comply with rules even the ones that he

 3  doesn't agree with because, you know, it's in his best interests

 4  and because he has ultimately an interest in making sure that he

 5  is able to fully participate in this court process.

 6          That's why release is so important to him.  He's at the

 7  Henderson facility right now.  You know, at Henderson, inmates

 8  don't have the access to electronic discovery that they did in

 9  Pahrump which means that it's very difficult -- you know, the

10  voluminous discovery in this case is almost all electronic.  So

11  I can access it; but it's very difficult for me, you know, to

12  access it with Mr. Payne.  So being able to participate

13  meaningfully in his defense the way he would like to, it's

14  simply not possible for him to do that in the place that he's

15  currently in custody.  Releasing Mr. Payne with whatever

16  conditions the Court deems appropriate is a way of ensuring not

17  only that he is released but that he is able to assist his

18  attorney and participate in this trial.

19          I don't -- the other thing that the Government might

20  bring up, that has been brought up, is the same thing we've

21  discussed a few times with the prior defendants which are the

22  facts of this case.  And I don't -- based on what you've already

23  said, I'm certainly not going to belabor that point.  We're

24  about to have a rather lengthy trial on that exact issue.  So

25  I'm just gonna note one thing, I think, in relation to some

1   comments Your Honor made about Mr. Cliven Bundy.

2          You know, obviously all these cases -- all of the

3   defendants are different although they are almost -- are all

4   mostly charged with the same thing.  You know, Your Honor noted

5   some differences between Mr. Cliven Bundy and the defendants in

6   the earlier tiers who had come from out of state.  Well,

7   Mr. Payne is one of those people who came from out of state.  If

8   we're looking for a point of comparison here -- and I

9   understand, again, that each defendant is different -- Ricky

10  Lovelien who was one of the defendants in the first two trials

11  was, like Mr. Payne, from Montana.  Like Mr. Payne, he did have

12  some affiliation with the militia.  Like Mr. Payne, he came

13  down -- I believe the evidence showed that Mr. Lovelien came

14  down in August -- on April the 9th, which was three days before

15  the incident in the wash.  I believe the evidence here will show

16  that Mr. Payne came down on April 8th, which is four days

17  before.

18         You know, so -- you know, Mr. Lovelien, unlike

19  Mr. Payne, was actually present during the wash.  He was wearing

20  a uniform.  He was carrying a rifle.  There was at least one

21  witness who claimed that he -- claimed that he was acting in

22  some sort of leadership position.  Mr. Payne was not present at

23  the area.  I understand that the allegation is based on his

24  participation in a conspiracy and so forth.  But there'll be no

25  pictures of Mr. Payne at the wash area and certainly no pictures

——2:16-cr-46-GMN-PAL - November 9, 2017——

1   of him pointing a gun in anyone's direction during that

2   confrontation.

3          Mr. Lovelien was acquitted of all charges.  Since then,

4   you know, Mr. Santilli, who was right below Mr. Payne in the

5   Indictment, was released, you know, pursuant to a plea that he

6   made.  Mr. Parker and Mr. Drexler, the people who are actually

7   in those numerous pictures pointing guns, have entered pleas to

8   misdemeanors and the remaining issue is how long they are going

9   to be on probation.

10          So, again, I realize that every one of these cases is

11   different here and we could talk for hours about how they are

12   different or how they are not different.  But, at the very

13   least, at this point, it is not some sort of foregone conclusion

14   that Mr. Payne, or any other defendant, is going to be convicted

15   of these crimes.  Obviously, there's always a presumption of

16   innocence that applies.  But, as far as any presumption that

17   would apply to the 924(c) charges, I think that that's something

18   that the Court can and already has in some other instances taken

19   into account as far as an argument in favor of release.

20          So I hope I addressed all of the Court's concerns.  If

21   there's anything else that I didn't cover, though, please let me

22   know.

23          THE COURT:  One of the things that Judge Foley mentions

24   on page 2 of his Order No. 1377 is that Defendant Payne

25   allegedly provided an interview to a Missoula, Montana,

———2:16-cr-46-GMN-PAL - November 9, 2017———

1   newspaper and was quoted in an article that appeared on

2   June 12th of 2014 in which he "described himself as 'a kind of

3   on-the-ground commander' who helped organize the militia forces

4   in the [District of Nevada] standoff." And, additionally, the

5   defendant was quoted as saying:  [Reading] We had counter-sniper

6   positions on their sniper positions.  We had at least one guy-

7   sometimes two guys-per BLM agent in there.  So, it was a

8   complete tactical superiority . . .  If they made one wrong move

9   every single BLM agent in that camp would have died [reading

10  ended].  And then Defendant Payne also reportedly stated that

11  [reading] in most states you have the legal -- lawful authority

12  to kill a police officer that is unlawfully trying to arrest you

13  [reading ended].

14         And so Judge Foley notes that in his Order.  So I would

15  need to take that into consideration.  What can you tell me

16  about that that would be helpful?

17         MR. NORWOOD:  I think those two things fit into the two

18  categories I was discussing earlier which is regarding

19  Mr. Payne's political beliefs and his alleged involvement with

20  this case.  I mean, statements about killing police officers; we

21  can find -- I would agree that such statements are offensive.

22  But having beliefs doesn't mean that one acts upon them or that

23  they were -- or even that they're really being placed in the

24  proper context in an interview that Mr. Payne did that's being

25  recorded by someone else.

2:16-cr-46-GMN-PAL - November 9, 2017

1          You know, I -- what I think of is, you know, when we
2     have the jury come in and fill out those questionnaires -- you
3     know, there were questions about the Second Amendment -- and
4     more than a few of the jurors, you know, not only expressed
5     strong support for the Second Amendment but made comments to the
6     effect of, you know, the Second Amendment is there so that we
7     can resist government tyranny and fight the government if we
8     don't like what they are doing.  There are people who hold those
9     beliefs, but that doesn't mean that they are dangerous people.
10    I mean, we have a country that was, you know, founded by a
11    revolution where our Founding Fathers made all sorts of
12    statements about violence and that they sometimes come up in our
13    political rhetoric.  So I certainly don't deny that Mr. Payne
14    has made statements about things like that.  He has certainly
15    never killed a police officer or been accused of doing that.
16    What he's accused of doing of is what we're talking about here.
17          As far as his involvement, what we're talking about in
18    the article you mentioned is a description of events that he
19    gave sometime after they happened.  And I think one issue is
20    that there could be a conflation between what he did and what he
21    is describing happening there.
22          I would -- I certainly disagree with any notion that
23    Mr. Payne organized anyone for the purpose of bullying,
24    assaulting, or intimidating government officers.  And that's
25    what we intended to show at this trial here.  Mr. Payne, like a

1   lot of people who came down to Nevada, had some very real

2   concerns based on the information that they had -- and we can

3   debate whether all that information was accurate or not -- but

4   that the Bundys were in real danger because of the actions that

5   the government was doing and that their intent was to protect

6   people and not start some sort of fight with the government.

7          So, you know -- you know, what we are talk -- Mr. Payne

8   says things that are provocative.  I don't deny that.  I think

9   he knows that what he says sometimes is provocative.  He knows

10  that people are going to disagree with him.  But what somebody

11  says and what somebody does or actually did is a different

12  thing.  I think Mr. Payne has shown via what he's done through

13  the rest of his life that he is a person -- sorry -- as is

14  relevant to this hearing, is a person who -- who whatever his

15  beliefs are can comply with lawful orders.  He was in the Army

16  for 8 years and he was honorably discharged.  You're not in the

17  Army for 8 years with an honorable discharge if you're unable to

18  follow rules and regulations, even rules and regulations that

19  you might not like.

20         So I think there needs to be some separation here

21  between what is said or what is implied.  And I think part of

22  this is, you know, there's a lot out there.  Mr. Payne's made a

23  lot of statements, and we're sort of welcoming the opportunity

24  to sort of explain these things in their full context between

25  what he actually did and what is most important for this

————2:16-cr-46-GMN-PAL - November 9, 2017————

1   hearing:  Can he be released?  You know, can he follow whatever

2   rules and regulations that the Court sets for him?  And I think

3   he's shown that he can.

4           THE COURT:  All right.  Thank you, Counsel.

5           Ms. Ahmed.

6           MS. AHMED:  Thank you, Your Honor.

7           Your Honor, we're here because Mr. Payne was found to

8   be a danger to the community and a risk of nonappearance when he

9   was detained.  And what counsel was tasked with doing is

10  presenting new information that shows the Court that he is

11  neither of those things.

12          What Mr. Norwood presented was the family side of

13  Mr. Payne, which was well documented in the Pretrial Report and

14  which was known previously.  There was nothing new there.  So,

15  if the question is what do we know about Mr. Payne that's going

16  to inform the Court's decision about whether or not he's a

17  danger to the community and whether or not he'll abide by this

18  Court's orders -- orders that will include who he can talk to,

19  where he can be, what he can ingest in his body -- is he gonna

20  comply with those orders?  Well, we should look at what we know

21  about Mr. Payne.  Not just the evidence in this case specific to

22  what happened in April of 2014 but statements he's made before

23  and after and actions that he's taken before and after.

24          Now, Mr. Norwood indicated that Mr. Payne was in the

25  Army and that he was honorably discharged.  Well, Mr. Payne has

1  made statements -- or there's evidence that indicates that, once

2  he left the Army, he became disillusioned with the Army and with

3  the government.  And what did had he do in response to that?

4  What action did he take?  Well, he founded an organization

5  called Operation Mutual Aid.  And what is the purpose of that

6  organization?  It's an organization that's designed to chest up,

7  find a way to transfer with/engage with federal officers.  He

8  made a statement -- or there is a statement Operation Mutual Aid

9  released, their press release that they released in 2013.  This

10  is a June 2013 statement by Operation Mutual Aid, the

11  organization that Mr. Payne cofounded with another individual.

12          And he indicates in that press release:

13          [Reading] To Federal Agents and Operators:  Although

14  you have taken an oath to uphold and defend the Constitution

15  from all enemies, foreign and domestic, and to not follow

16  unlawful orders, your very service to many of the agencies you

17  work for is neither public service, Constitutional, nor lawful

18  [reading ended].

19          And that is lawful according to Mr. Payne, of course.

20          [Reading] Do your research.  Think about why you chose

21  to serve and who you'll be taking action against should you be

22  told by your controllers to impede, apprehend, or assault any

23  volunteers of Operation Mutual Aid at any time before, during,

24  or after an operation.  If you confront us during an operation,

25  we will make a final attempt at a reasonable resolve with your

2:16-cr-46-GMN-PAL - November 9, 2017

1  conscience, and your true duty.  However, we will not be

2  disarmed, we will achieve our goal, and we will complete our

3  mission, to the last man or woman.  If you apprehend any of us

4  at any time, we will exhaust every one of our considerable

5  resources to free that individual with all vigilance.  Know who

6  you really work for, understand who the true enemies of freedom

7  are --

8           THE COURT:  Wait.  I'm sorry.  You're --

9           MS. AHMED:  -- and stand --

10          THE COURT:  -- going to fast --

11          MS. AHMED:  -- beside us or aside from us [reading

12  ended].

13          THE COURT:  Can you just slow down.  Can you reread

14  that last part over again?

15          MS. AHMED:  [Reading] know who you really work for,

16  understand who the true enemies of freedom are, and stand --

17          THE COURT:  No, no.

18          MS. AHMED:  -- beside [reading ended] --

19          THE COURT:  Going back to "if you attempt to apprehend

20  us, we will exhaust."

21          MS. AHMED:  [Reading] If we apprehend [reading

22  ended] -- excuse me, Your Honor.  And, Your Honor, we will

23  submit these documents to the Court so the Court has the actual

24  document.  And some of these are exhibits that were submitted in

25  the first trial and that we will be using in this trial.

2:16-cr-46-GMN-PAL - November 9, 2017

1          But going back to that statement, Your Honor, he

2   said -- or the press release states:

3          [Reading] If you apprehend any of us at any time, we

4   will exhaust every one of our considerable resources to free

5   that individual with all vigilance [reading ended].

6          MR. NORWOOD:  I'd like to see a copy of the document

7   too if I could.

8          MS. AHMED:  Counsel has it.  It's Government's

9   Exhibit 12 for this coming trial.

10         MR. NORWOOD:  I don't have it in front of me right now.

11         MS. AHMED:  Your Honor, we can certainly provide it to

12   them later.

13         Additionally, Your Honor, between March and June of

14   2013, under the umbrella of Operation Mutual Aid, Mr. Payne

15   looked for an opportunity to -- in Montana --

16       (Government counsel conferring.)

17         MS. AHMED:  Excuse me.

18         -- in West Virginia to arrest public officers that they

19   had decided were acting unlawfully.  And, again, "they" is

20   Operation Mutual Aid.  What the actual loss is, is irrelevant to

21   the determinations that Mr. Payne would make on that point.

22         Then, of course, we have the efforts --

23         THE COURT:  In West Virginia tried to arrest federal

24   officers in relation to Oregon or Nevada --

25         MS. AHMED:  No, Your --

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

2:16-cr-46-GMN-PAL - November 9, 2017

1        THE COURT:  -- or --

2        MS. AHMED:  -- Honor.

3        THE COURT:  -- something --

4        MS. AHMED:  This is in 2013.  Under Operation Mutual

5   Aid, they had decided that they would undertake an operation to

6   arrest not -- excuse me -- federal officers but state officers

7   that they had deemed were acting in contravention of the

8   Constitution as they understood it.

9      (Government counsel conferring.)

10       MS. AHMED:  And the only reason that they ultimately

11  chose not to engage in that operation was because the family

12  that they were acting ostensibly in support of rejected that

13  help that they had offered.

14       Now, fast forward to April of 2014, Your Honor, and we

15  have Bunkerville, Nevada.  And what we have are emails;

16  statements by the leaders of OMA; as well as a recorded

17  interview, an audio/video interview, of Mr. Payne where they

18  discussed the objectives of what they were going to do in April

19  of 2014 -- and, of course, I know the Court has seen those

20  objectives before -- and one of those objectives included that

21  they were going to secure and return cattle confiscated by the

22  BLM.

23       And so, of course, there were court orders issued by

24  the United States District Court for the District of Nevada that

25  allowed the BLM to impound cattle that were -- allowed to

1  trespass onto public lands by the Bundy family.  And Mr. Payne

2  decided that he was going to act in contravention of those court

3  orders and take cattle that had been seized by the BLM pursuant

4  to those court orders and return it to the Bundy family.  And

5  those are objectives that he adopted both in writing and

6  verbally.

7          Then, with respect to the events that happened in April

8  of 2014, the Court, of course, knows what happened that

9  culminated in April 12th, the standoff at the BLM impoundment

10  site.  And the Court read from Judge Foley's order which

11  included highlighting an interview that Mr. Payne had given to

12  reporters.  Well, subsequent in the investigation of this case,

13  audio files were obtained via search warrants, which have been

14  provided to defense counsel, which included recorded

15  conversations that Mr. Payne had with other people that he was

16  on a member or board with that was called Operation Mutual

17  Defense.  This was the successor of Operation Mutual Aid.

18          And, in one of these recorded conversations, Mr. Payne,

19  talking about what happened in April of 2014, said about the

20  April 12th standoff:

21          [Reading] Most of the guys were either on the front

22  overpass staring directly down at the BLM or they were on the

23  side where nobody was filming anything.  And then there were

24  counter sniper positions put out on the BLM's positions.  So it

25  was a total lockdown.  But, quite honestly, it was beautiful in

1  the sense that it sure does look like a lot more of a movement

2  of peaceful citizens than it did an actual militia effort.  You

3  know, a lot of people that were there didn't understand quite

4  the extent of the effort.  But the Bundys surely knew about it

5  [reading ended].

6          And that's Mr. Payne talking.

7          So, in the very month after Bunkerville, the assault

8  at -- the ICP happens in April of 2014, Mr. Payne and Mr. Ryan

9  Bundy also then travelled to Utah to support an effort to ride

10 on ATVs through an area that the BLM had deemed closed.  And

11 that resulted -- Mr. Payne was not charged in that nor was

12 Mr. Ryan Bundy, but they were present to help other people

13 violate the BLM closure orders and they embraced doing so.  And

14 ultimately other people who actually rode their ATVs through

15 this closed area were ultimately charged and, I believe, found

16 guilty at trial.

17         MS. WEKSLER:  Your Honor --

18         THE COURT:  And what was Mr. Ryan Payne's --

19         MS. AHMED:  He traveled --

20         THE COURT:  -- participation?

21         MS. AHMED:  -- he traveled from, at the time,

22 Bunkerville to Utah to support that effort.  But ultimately they

23 decided that they were not going to have the armed militia

24 presence that had been present at Bunkerville and so Mr. Payne

25 didn't have to have a role.  They were just going to ride their

1  ATVs.  But he was present during the ride to show his support is

2  my understanding.

3         Now, I know Mr. Norwood touched upon the fact that

4  nobody was killed at Bunkerville in April of 2014, Your Honor.

5  But I think it would absolutely -- it would be remiss of the

6  Government if we did not mention the fact that people were

7  recruited by these defendants to come out and help them stand up

8  to the BLM.  Two of those people that were recruited and that

9  came out were Jared and Amanda Miller.  And those people were

10 emboldened and they were -- embraced this revolution that was

11 gonna happen.

12        PRO SE RYAN BUNDY:  Objection.

13        MS. AHMED:  And they went out and they killed two

14 police officers in the weeks afterwards.  And I'm not saying

15 that the Bundys told them to do that; I'm not saying that

16 Mr. Payne told them to do that.  But they recruited those

17 people, they spun them up, and they sent them away.  And what

18 happened is two officers were killed for no reason.

19        Now --

20        MR. PHILPOT:  Objection.

21        PRO SE RYAN BUNDY:  Again, objection.

22        MR. PHILPOT:  States facts not in evidence.  She

23 asserts --

24        MS. AHMED:  Your --

25        MR. PHILPOT:  -- facts that she's not presented to the

——2:16-cr-46-GMN-PAL - November 9, 2017——

1  Court.  This is --

2           MS. AHMED:  This is a --

3           MR. NORWOOD:  I just -- I'd like to --

4           MS. AHMED:  -- detention hearing.

5           MR. NORWOOD:  -- respond to this if we're gonna go into

6  this.

7           PRO SE RYAN BUNDY:  Use of the word "recruitment" with

8  no such --

9           THE COURT:  You'll have an opportunity to respond.

10          MR. WHIPPLE:  And, Your Honor, for the record, we have

11  a civil lawsuit pending for Cliven Bundy against the people

12  who've made those allegations.

13          THE COURT:  All right.  The objection's overruled.

14  You'll be able to comment.

15          MS. AHMED:  Your Honor, we also have statements by

16  Mr. Payne on Facebook in October of 2015 where he's talking

17  about supporting Skyler Barbeau who is an individual who had

18  been recruited to Bundy Ranch, who was standing in front of the

19  stage on April 12th, and who was arrested in Washington -- the

20  State of Washington on a gun charge.  So he was taken into

21  custody.

22          So Mr. Payne puts out statements -- this is actually --

23  excuse me, Your Honor -- from December of 2015 -- and he said on

24  Facebook:

25              [Reading] Those who were at the ranch were made a

1   promise by the leadership in their participation and that great

2   effort as long as your actions are lawful according to the

3   Constitution and upward in morality you will be protected.  We

4   must not let this promise be without conviction.  There are

5   troubled times ahead.  And men like Skyler are the leaders that

6   are needed to see us through them [reading ended] -- needed to

7   see us through them, yes -- [reading] get the word out [reading

8   ended].  And he also says that -- essentially the point of his

9   post is that they need to support Barbeau.

10          Again, going back to the Dropbox account, Your Honor,

11  there's also conversations in that Dropbox account where he's

12  discussing with other board members -- they are discussing and

13  debating breaking that individual, Skyler Barbeau, out of

14  federal custody while he's in jail pending charges in that case.

15          THE COURT:  Wait.  Who is discussing this?

16          MS. AHMED:  This is Ryan Payne and other individuals

17  who were the board members of OMD.

18          We also have a recording from Dropbox that sometime

19  between -- toward the end of 2015 -- it's a conversation between

20  Ryan Payne; Ammon Bundy; and Susan Hammond, which was the wife

21  of one of the two Hammonds that had been convicted in Oregon, on

22  federal charges and they were pending a federal sentence.

23          And so they are talking.  And in the recording --

24          THE COURT:  They are pending sentence or re-sentencing?

25          MS. AHMED:  I think they are actually pending surrender

2:16-cr-46-GMN-PAL - November 9, 2017

1  to serve their sentence, Your Honor.  They had already been

2  re-sentenced.

3       And so Ammon Bundy's saying to Mrs. Hammond -- and Ryan

4  Payne's also introducing himself -- first he introduces himself

5  in this call as "a response coordinator for an organization

6  called Operation Mutual Defense" which he describes as "a

7  network of individuals and militia units from across the union

8  who are pledged to form a defensive barrier between tyrants and

9  the oppressed."

10      And so they are talking to Mrs. Hammond.  And Ammon

11  Bundy says:

12      [Reading] One of the reasons why we're here, basically

13  we are, uh, hoping that someone in the Hammond family -- and I

14  think it would have to be Steven or Dwyatt, your husband, but

15  possibly you -- under the understanding of the corrupting and

16  the illegitimacy of the court will not report to prison to

17  fulfill his sentence.  And this will be a public thing.  He

18  will -- we will publicly make it known that he will not report

19  and why will -- he will not report.  And we will use this to

20  expose the corruption of the courts and to expose [reading

21  ended] -- [reading] and to expose the illegitimacy of the court

22  as well [reading ended].  And conversation goes on.

23      And then, of course, Your Honor, Malheur happens.  And

24  I understand that there's some discussion about whether or not

25  the weight of the evidence is diminished because the jury

2:16-cr-46-GMN-PAL - November 9, 2017

1  acquits.  But there's really no doubt about what happened in

2  Malheur.  Ammon Bundy, Ryan Bundy, Ryan Payne went to a federal

3  refuge.  They took it over.

4         PRO SE RYAN BUNDY:  Objection.

5         MS. AHMED:  They were told to leave.  They didn't

6  leave.  Federal officers told them to leave.  The FBI asked them

7  to leave.  They didn't leave.

8         PRO SE RYAN BUNDY:  Go ahead.

9         MS. AHMED:  When they eventually did leave --

10        MR. WHIPPLE:  Your Honor --

11        MS. AHMED:  -- the refuge --

12        MR. WHIPPLE:  -- Your Honor, may I interplead for a

13  second?  I'm sorry.

14        If there is an objection by a codefendant, I think we

15  have the right to at least hear that objection.  I apologize.

16  It's not my place to be doing this.  But --

17        THE COURT:  This hearing is in regards to Mr. Ryan

18  Payne.  I'm not gonna consider this as against Mr. Ryan Bundy.

19        MS. AHMED:  They went to the refuge.  They stayed

20  there.  They had firearms there.  When they ultimately left, he

21  was arrested and taken into federal custody.  He wasn't given a

22  chance to disobey.  There were two vehicles that were leaving.

23  He was gonna leave in the vehicle that stopped.  The other

24  vehicle, of course, continued to drive away and an individual

25  had to be shot and killed in that process.

1           And so, Your Honor, what we have is somebody who has

2   time and time again made statements; taken action; and done

3   basically everything they can to show that they have no respect

4   for this Court, for the court that would potentially have to

5   supervise him if he's released.  And is there a risk to life, is

6   there a risk of noncompliance, a risk of nonappearance, and a

7   danger to the community?  Absolutely, Your Honor.

8           Mr. Payne may have had a job.  He may have a family.

9   It is a very sad thing that he's not with them.  But does that

10  in any way mitigate the danger to federal emp- -- federal

11  officers who would have to either go out and get him if he

12  doesn't show up, who has to supervise him if he's released?  No,

13  it does not.

14          And so, Your Honor, we would ask that the Court

15  continue to detain him both as a danger and as a risk of

16  nonappearance.

17          THE COURT:  Mr. Norwood, do you want to respond?

18          MR. NORWOOD:  Yeah.  Just a few things here.

19          I sort of mentioned we could speak for hours here about

20  the evidence in this case.  And I think we're going into some of

21  that now.  I think part of what the Government's doing here --

22  you know, Mr. Payne has made a lot of statements over the

23  2 years between the time of the confrontation in the wash and

24  the time he was arrested.  You know, he was around for 2 years

25  and no one saw hit fit to arrest him.  He made a number of

1  statements, some of them long after the event.  What the

2  Government's doing is cherry-picking some parts from those

3  statements that they think are particularly scary, using it to

4  present Mr. Payne as a danger.  They are not presenting the

5  whole picture here.  They are not mentioning, for example, the

6  numerous times that Ryan Payne has made clear that his intent in

7  coming to Bunkerville was to make sure that everyone was safe up

8  to and including the government agents who were there as well.

9        There was some mention of some events in other states

10  including Montana, West Virginia, and Utah.  Mr. Payne has never

11  been charged with any offense in Montana, West Virginia, or

12  Utah.  He has never arrested or attempted to arrest any official

13  in Montana.  He's never even been to West Virginia.  He's not

14  accused of committing any crime in Utah.  You know, there's a

15  difference between political rhetoric and there's a difference

16  between action.  And just bringing up these incidents isn't

17  really all that relevant to what we're deciding here.

18        There was a reference to the Malheur incident in

19  Oregon, which we all have some familiarity with.  There was a

20  2-month trial on that very issue.  And the jury acquitted the

21  seven defendants in that first trial, including Ammon Bundy and

22  Ryan Bundy, when the Government had a full and fair opportunity

23  to present their case then.

24        And, finally, there's a reference to the Millers.  That

25  doesn't have anything to do with anything, Your Honor.  The

——2:16-cr-46-GMN-PAL - November 9, 2017——

1   Bundys opened their home to --

2          THE COURT:  But Mr. Payne pled guilty, right, in

3   Oregon?

4          MR. NORWOOD:  Pled guilty.  He pled guilty before the

5   trial.  Um . . .

6          THE COURT:  Conspiracy to Impede a Federal Officer.  Is

7   that the charge?

8          MR. NORWOOD:  Yeah.  It's the 372 count, the same one

9   that's Count Two in this Indictment.  He entered that plea.

10  I'll note that he actually filed a motion to withdraw it before

11  the first trial even took place, which was denied.  He's gonna

12  be sentenced on that.  That matter is in front of Judge Brown.

13  If she doesn't want to release him on that charge, she won't

14  release him.  But I'm -- you know, it seems if he had not chosen

15  to enter that plea, he would very well stand acquitted of that

16  charge right now just as Ammon and Ryan Bundy are.

17         But, I mean, the Government is now bringing up the

18  Millers.  I mean, they've agreed before that the Millers are

19  irrelevant at this trial.  My client had nothing whatsoever to

20  do with what those people did.  The Bundys opened their home to

21  many people who came.  Two of those people were the Millers.  I

22  will tell the Court that the reason the Millers didn't stay at

23  the Bundy Ranch is because they were kicked out because they

24  didn't want 'em there.  It's unfortunate that there are people

25  like that.  But the notion that my client or anyone else in this

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  courtroom has anything to do with their crimes is somewhat

2  offensive to us.  And I don't know why they are bringing it up

3  now.

4        We're gonna have a trial.  I disagree with these

5  accusations that are being made.  There's gonna be a chance for

6  both sides to present their case to the jury so the jury can

7  decide.  We've come in for other trials where there have been

8  statements made by defendants, there have been actions, and the

9  Government said they are gonna get convicted and they didn't get

10 convicted.  And the same is true with Mr. Payne.

11       So all I'm asking right now is that he be released

12 subject to a number of conditions so that he can focus on his

13 preparation for the trial, which is the only thing that he's

14 interested in over the next 4 months or so.

15       THE COURT:  All right.  Thank you.

16    (Government counsel conferring.  Ms. Weksler and Mr. Norwood

17 conferring.  Pause in the proceedings.)

18       THE COURT:  Well, this is my first time to look at this

19 information more closely.  And it certainly was not what I

20 expected that I would find.  There's not the level of change in

21 circumstances that I originally thought there might be.  This

22 defendant was not acquitted in Oregon, for example.  He has pled

23 guilty.  And, while there are some hopeful information that is

24 provided in regards to individuals who are willing to permit

25 Mr. Payne to stay in their residence, we still would have to

1   clarify the terms and conditions of those individuals and what

2   their -- how much more are they willing to do.  You know, the

3   Court appreciates that they are willing to extend that courtesy

4   to Mr. Payne.

5           And I think the mention was made that this woman takes

6   medication at night.  So it's not something that easily can be

7   placed somewhere else for her to take outside of his presence or

8   his ability to possess it.  But that's really not the most

9   pressing concern.

10          I agree with Mr. Norwood's representation that the fact

11  that Mr. Payne was honorably discharged after spending so many

12  years in the military, from 2001 to 2006 in active duty and then

13  2 years in the Reserves in the Army, does bode well for an

14  expectation that since he did receive the honorable discharge

15  he'd be able to comply with rules and regulations.

16          His earlier protesting of the jail conditions was

17  something that he was willing to put aside even though he

18  continues to agree and hold that idea and that concern about

19  those conditions and his objections to those conditions are

20  still true, that he was able to put those aside so that he could

21  continue to participate with his attorneys in his defense which,

22  likewise, would be true if we could place him into a home or

23  even -- if this particular couple is not available -- perhaps in

24  a halfway house setting.

25          So what is most concerning is the information that is

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  raised by the Government regarding the multiple statements that

2  are represented, including the Montana interview -- but that was

3  something that was known before -- the attempt to convince the

4  Hammonds to not self-surrender and not comply with the Federal

5  Court order to not surrender for that re-sentencing and to

6  declare it publicly in order to encourage more similar conduct;

7  his reported alleged attempt in 2013 to arrest officials,

8  officers, law enforcement officers, as part of the Operation

9  Mutual Defense; his statements about how beautiful it was that

10 they were able to hide the militia operation to make it look

11 more like it was a public uprising; his promises of protecting

12 individuals, including breaking out or breaking -- helping an

13 individual, Skyler Barbeau, to break out of custody.

14        So this is not just political rhetoric.  It is conduct.

15 And, unfortunately, it does not mitigate the danger that would

16 endanger the safety of people in the community.

17        I do find that the risk that the defendant will not

18 appear is not as great as I think it probably appeared at first

19 and so I am willing to reconsider that and find that this Court

20 does not find that a serious risk exists that the defendant will

21 not appear.  However, there still remains a serious risk that he

22 will endanger the safety of other people in the community and

23 the information provided to the Court by the defense, which was

24 very helpful.  And I appreciate both the Pretrial Office and

25 Mr. Norwood and the other individuals who helped to provide the

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  information, especially the cousin who was willing to make the
2  home available.  But that information does not overcome the
3  rebuttable presumption.  And the Court finds that there are
4  still no conditions or combination of conditions that would
5  assure the Court that the community would be protected against
6  any risk of danger posed by the defendant.
7           So I do find that the information provided here at the
8  hearing does establish by clear and convincing evidence that he
9  is a danger to the community but not by the preponderance of the
10 evidence that he is a flight risk.
11          All right.  So I appreciate having the opportunity to
12 address this.  I hope that that -- for what it's worth, I think
13 we gave it a good try to see if we could come up with something.
14          Let's move on to Mr. Ryan Bundy.
15          PRO SE RYAN BUNDY:  Madam, can I request just a
16 5-minute --
17          THE COURT:  Yes --
18          PRO SE RYAN BUNDY:  -- break --
19          THE COURT:  -- of course.
20          PRO SE RYAN BUNDY:  -- for restroom --
21          THE COURT:  Yes.
22          PRO SE RYAN BUNDY:  -- before we begin?
23          THE COURT:  Yes.  Let's do that.
24          Do you want me to tell you before you go what my
25 concerns are so you have some time to prepare?  Or do you want

1   to just go ahead and use the bathroom?  I don't want to keep you

2   if you're . . .

3       (Counsel conferring.)

4       PRO SE RYAN BUNDY:  Yes.  Would you tell me your

5   concerns, madam?

6       THE COURT:  All right.  So what's brought up in the

7   Pretrial Report is travel to Canada and Mexico.  But this was in

8   '91 and 10 years ago.  So, so long as there's no other travel,

9   that doesn't really bother me.

10      There's -- the residence that's provided for you to

11  reside in if you are released is in Riverside Road, Mesquite.

12  That's quite a ways away.  So, if there's not something else in

13  Las Vegas, think about how would a halfway house placement work

14  even if it's for the short term until something else is made

15  available.

16      And then there's -- at the criminal history, I had some

17  questions about -- it says here that -- so there's conflicting

18  information on page 4.  It says that you were acquitted of

19  Counts One, Two, and Three but not Count Four.  There was no

20  verdict on Count Four.  But then it says that there was no

21  verdict on Count Five.  So just an explanation there.

22      And then it also states that you have a business that

23  you run called RC Bundy, Incorporated, a construction company,

24  since 1995 and that your wife is currently renting out equipment

25  from that construction company.  But the Pretrial Office

1  conducted a business license search and found no results for a

2  business license in either Nevada or Utah for that business.

3          And I think that's --

4          PRO SE RYAN BUNDY:  I plan --

5          THE COURT:  -- those are --

6          PRO SE RYAN BUNDY:  -- to address --

7          THE COURT:  -- the main --

8          PRO SE RYAN BUNDY:  -- all those things.

9          THE COURT:  After the restroom break, yes.  Yeah.

10         All right.  So we'll go ahead and take a 10-, 15-minute

11  break.  It's 3:10 now.

12         COURTROOM ADMINISTRATOR:  All rise.

13     (Recess, 3:10 p.m.  Resumed, 3:26 p.m.)

14         THE COURT:  Thank you.  You may be seated.

15         Do we have everyone back?  It looks like Mr. Hill . . .

16         COURTROOM ADMINISTRATOR:  Yes, Your Honor.

17     (Pause in the proceedings.)

18         THE COURT:  All right.  Looks like Mr. Hill is back.

19  So let's go ahead and proceed.

20         So, Mr. Ryan Bundy, did you want to go ahead and

21  address those concerns and anything else that you want me to

22  take into consideration?

23         PRO SE RYAN BUNDY:  Yes, madam.  Thank you for the

24  opportunity.

25         I will begin by addressing those issues which you

1  brought up.  I do want to make mention that my brother Ammon and

2  I are very similarly situated.  Both our last visit to Canada

3  and to Mexico was made together.  I indicated on the Pretrial

4  Services Report that the trip to Mexico was more than 10 years;

5  my brother indicates that it was 13.  Very well could have been.

6  It was a mutual trip just to go down and see the country, farm

7  land, et cetera.  I've never been back.  It was a fun trip.

8         My sister does live in Cardston, Alberta, Canada.  We

9  do have some friends up there; she married one of those friends.

10  I have not been to her home.  I haven't been to Canada -- again,

11  I indicated '91 in there.  I got thinking that it might have

12  been a little later than that but not much.  It's been a very

13  long time since I've been there.  So I don't have any plan to go

14  there now.

15         You next mentioned my home.  I do desire to and -- be

16  with my wife and children who are in Mesquite, Riverside,

17  Nevada, Virgin Valley.  Virgin Valley is about 75 miles from

18  Vegas.  It is a bedroom community to Las Vegas.  People do

19  travel back and forth from there to here to work ever day.  It's

20  a normal occurrence as is some of these other outlying

21  communities.

22         I do have, however, several options to be able to be

23  housed in Vegas if it would more please the Court.  Tanna

24  Homestead (phonetic) has offered her home for me to say in.  And

25  she is here in the courtroom today.

—2:16-cr-46-GMN-PAL - November 9, 2017—

1          Tanna, will you stand up.

2          AUDIENCE MEMBER:  She's on her way back.

3          PRO SE RYAN BUNDY:  Oh, she's on her way back.  So she

4    was here earlier; she will be back so that she can address and

5    answer any questions that the Court or Pretrial Services have.

6    But she has offered.  And that's a solid offer.  And I have

7    several other offers also.  But that's the best one right now.

8          You mentioned you had some questions concerning

9    criminal history.  Do you want to ask those questions or do you

10   want me just to address some of these issues?

11         THE COURT:  Well, in the detention hearing before

12   Judge Foley, he stated that while the prior criminal conduct by

13   itself does not support a finding that you pose a substantial

14   risk of danger to the community, he said it does show that you

15   will not support -- that you will not follow court orders.

16         PRO SE RYAN BUNDY:  Well, is there a particular charge

17   on here you want me to address?  Or do you want me just to

18   address each one that might lend to that reasoning by

19   Judge Foley?

20         THE COURT:  And so, in 1994, the arrest for

21   Obstruction -- Obstructing Police was dismissed.

22         In '98, there's a traffic offense.  But it looks like

23   you completed probation.

24         In 2007, there were three counts.  You were arrested

25   for Carrying a Concealed Weapon, Firearm in a Vehicle, and

1  Obstructing a Police Officer, and Resisting/Interfering with

2  Arrest.  There's no disposition for the first two.  But the

3  record indicates that you were convicted of the third, the

4  Obstructing a Police Officer and Resisting and Interfering With

5  an Arrest, and were sentenced to 6 months in custody; but it was

6  suspended with 12 months of probation that I'm going to assume

7  you successfully completed because it doesn't say otherwise.

8        Then, in 2012, there's an arrest for Theft.  And it

9  says that the plea was held in abeyance, that fines and fees

10 were paid, and that the order holding the plea in abeyance was

11 signed.  So it doesn't really show what the resolution is.  But,

12 again, I'm assuming, since that was back in 2012, that it was

13 either dismissed or in some way not a conviction.

14       And then, in 2015, there's another arrest; this time in

15 Iron County, Utah, and the three charges are Failure to Appear

16 on a Citation; Interference with an Officer; and then, in

17 parentheses, it says "and animals" -- maybe it was, like, a

18 police dog?  I don't know -- and then, number three,

19 Interference with an Arresting Officer.

20       And, again, it says there's no disposition for the

21 first two counts but -- oh, I'm sorry -- for Count One or

22 Count Three but, for the middle count, the Interfering with the

23 Officer (Animal), there was a conviction and a fine.

24       And then the most recent one is out of Oregon where

25 there were not-guilty verdicts entered for some of the charges,

2:16-cr-46-GMN-PAL - November 9, 2017

1   but I'm not clear looking at this.  So, in the little boxes

2   there on page 4, it says that [reading] no verdict rendered for

3   Count Four [reading ended].  But then, on the bottom of the

4   summary, on that bottom line, it says, [reading] except for

5   Count Five in which no verdict was [reading ended] . . .  So

6   I'm . . .

7           PRO SE RYAN BUNDY:  All right.  Well, let me address

8   those one at a time.

9           THE COURT:  Go ahead.

10          PRO SE RYAN BUNDY:  First of all, the '94 is dismissed.

11  I don't know why that should even still be on the record because

12  the merits of the case were not founded and, therefore, the case

13  was dismissed.

14          Movin' down to the 2007 -- unless you want me to

15  address the traffic offense.

16          THE COURT:  No.

17          PRO SE RYAN BUNDY:  -- situation with this was, is,

18  number one, I -- I do own a construction company -- did own a

19  construction company.  I was finishing up a job.  I was workin'

20  alone that day.  Comin' home late.  My wife called me on the

21  phone and said:  Hey, kids are not feelin' well.  Stop at the

22  grocery store, pick up some stuff so we can make some soup.  I

23  did that.

24          I was on the way home doing nothing more than providing

25  for my family and caring for their immediate needs.  But I had

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  on my truck a large Ron Paul sign because it was during that

2  campaign.  I also had in the back of my truck a welder.  And I

3  was havin' troubles with my bumper so I had removed the license

4  plate and put it on the back glass.  Because the officer could

5  not see the license plate was the purpose for the stop.  When he

6  made the stop, I did have a sidearm on the passenger seat.  I

7  told him about it, and he desired to take the firearm from me.

8  I said:  "Hey, I have the right to keep and bear arms.  If you

9  take it from me, then you're depriving me of my right to keep

10  and bear arms."

11          And so I -- it was not concealed, especially where I

12  revealed it to him.  It was in the vehicle.  There's no law

13  against having a firearm in the vehicle.  And, because of that

14  resistance there, he claimed that I was obstructing.

15          Now, I pled guilty to that not because I believed I was

16  guilty but simply because it was easier.  And, in my naiveté at

17  that age, it was just easier to deal with, pay the 525; then to

18  go through court and go through all the risk and everything.  So

19  I pled on that.  Had I known it would be comin' up later, like

20  this, I would have contested that and carried that through to a

21  trial and probably won that.  But, either way, that's the way it

22  is.  And so that's where we're at.

23          The theft, that's quite a misconstrusion (phonetic) of

24  the truth of what was goin' on because that was dealing with a

25  water meter, a fire hydrant meter for the construction work I

1  was doin' that I have leased through the Cedar City Water

2  Department.  Without goin' into every detail, there was -- one

3  of the meters wasn't working; it wasn't charging me.  I was

4  honest with them and said, "Hey, you need to switch this meter

5  so that it can charge me."  But then there was another dispute

6  on amounts and so then they charged me with theft for water.

7       And so it was -- it's more of a business transaction

8  that should have been cleared up otherwise than through criminal

9  process, I do believe.  So it wasn't like I'm goin' out and

10  stealing things from people.

11       In 2015, I had bought a new horse at the Cedar

12  Livestock Market.  I placed him in a pasture which I have

13  control and use of.  I don't own it, but it's under my -- my

14  control.  I went back a day or two later to get the horse and to

15  transport him to another location and he was not in the pen.

16       Upon observation, I find that he jumped the fence; left

17  the pasture which then put him into another area that was also

18  fenced.  He had jumped a second fence which then put him to

19  where he could be on the open county roads, paved roads.  I

20  followed his tracks for a couple miles and found him in a pen.

21  I took him out, walked him home.

22       However, I found out later that the -- the animal

23  officer, the dog catcher, I guess you could say, had captured

24  him; put him in the pen; and then charged me with this

25  interfering with because I hadn't informed him or inquired of

2:16-cr-46-GMN-PAL - November 9, 2017

1  him concerning retrieving the animal which rightfully belonged

2  to me.  And so, again, I just pled; paid -- I don't know -- $50

3  or somethin' for -- they said they bought a bale of hay.  They

4  wanted to recover for the time and expenses, et cetera, and

5  cleared that up.  So, again, it's not a -- my horse jumped the

6  fence; shouldn't be hurtin' me here today.

7           Of course, Oregon.  We're well aware of what transpired

8  there, that we were not -- we were found not guilty on all

9  charges except for with me the one.  There was one juror -- 11

10  to 1 -- one juror that was hung on question of the Theft of

11  Government Property.  I'm not even sure what number four is in

12  there.  I haven't seen that charge until just now on this

13  document.  But number five is the one that I believe is in

14  question.  Without discussing the merits of the case there,

15  again, that was decided; it was not found -- I was not found

16  guilty through that trial.  No verdict.

17           Now, my understanding of the speedy trial right --

18  Speedy Trial Act that if an action is dismissed by the Court,

19  which I do believe that this is a dismissal and, if not,

20  re-brought -- motion to retry that within the allotted time

21  frame, that it can't be retried again.  It's been -- 70 days

22  from October 27th, 2016, would have put it, I believe, at about

23  January 6th, 2017, without being exact on that date and doing

24  the math right here where I'm at.  And here we are nearly a full

25  year after that and the Government has not made any motion to

FELICIA R. ZABIN, FCRR, RPR, CCR 478    (702) 676-1087

1  retry that case.

2          And so, moving over to page 5 at the top, it says that

3  this case is currently pending.  And I would contest that on

4  both speedy trial grounds and upon double jeopardy grounds that

5  there isn't anything left pending there.

6          THE COURT:  It does also say that there's no separate

7  release or detention order that has been issued out of the court

8  in Oregon.  So, unlike Mr. Ryan Payne, it looks like you are not

9  under any kind of a detention order or conditional order of any

10  kind for the court in Oregon.

11          Is that your understanding as well?

12          PRO SE RYAN BUNDY:  Yes, that is my understanding as

13  well.

14          And so, with this criminal history, which I wish I

15  would have handled each one of these things differently as far

16  as instead of making plea deals to get easily out of it thus

17  creating this record -- I wished I would have done those

18  differently -- but it is what it is.  These are not serious

19  crimes, these are not felonies, these are simply misdemeanors,

20  and I do not believe render to a dangerousness because I am not

21  dangerous.  That -- I am a kind man and I try to do good for my

22  fellow man.  I help people in need of help.  I take care of my

23  family.  I earn a honest living for them.

24          And, while we're on that subject of my family, I would

25  like my wife and children to stand up just so that you can see

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  them; know who they are:  my wife and six daughters and two

2  sons.  And I love them very much and I miss them very much.  And

3  I would like very much to go home to them.  I am innocent of

4  these charges.  And -- and -- thank you.  Thank you, kids -- and

5  I do believe that the evidence produced in trial will prove

6  such.

7          And I'm excited to go to trial to do so.  I really am.

8  And that should be evident by the other documents that I have

9  placed forward when we were being deprived of -- when I was

10 being deprived of bein' in attendance at court proceedings, I

11 threw a fit about that.  I wanted to be here.  You're very well

12 aware of that.  And so that lends to my desire to be involved in

13 the case.  And it also shows, you know, where else would I go

14 and how would it benefit me to try to dodge out of trial?  I

15 mean, that doesn't make any sense in my mind.  I -- and so I

16 have no desire to be a fugitive anywhere in the United States or

17 in the world perhaps.

18          I know that the Marshals are very proficient in their

19 job.  I know that if I were to try to ditch out of this that in

20 a short time they would have me back here and it would be a much

21 worse situation.  I have no desire to do that.  I have a desire

22 to face what I have been accused of.  I do believe that those

23 accusations are false, that an accusation is an accusation, and

24 I'm willing to meet that face on because I have no fear there.

25 And so I do . . .

1     And, on that note, I appreciate the duty that the

2  Marshals have to do.  They are charged with ensuring my presence

3  at trial and also the safety of the community.  And I appreciate

4  that.  And I am willing to work with -- with them to accomplish

5  their goals.  I -- I'm not a dangerous man, and I have no

6  intention of flight.  I do believe that those goals can be

7  accomplished without the stringent conditions that have been

8  placed upon us.  I do believe that, you know, that the

9  confinement we have been in has been unjust; it's been

10  punishment, not only to me but to my wife and children, and also

11  my community because I am a benefit to my community.

12     And so this has been very hard.  It's been very hard on

13  us all.  And I don't believe it is necessary because I'm willing

14  to cooperate, which I do take as meaning "co," "together," "to

15  operate," "to accomplish a certain operative."  I don't believe

16  that that's the same thing as complete submission.  I believe

17  that cooperation is a joint effort to accomplish a common goal.

18  And I am willing to cooperate and work with the Marshals to

19  accomplish this goal, to ensure that I am present at trial and

20  that the community is safe.  I want the community to be safe

21  too.  And I've already stated that I do want to be here.

22     Make a few mentions here, just some notes, of those who

23  were at the protest who had firearms and most of these men who

24  came to help and support, you know, I didn't know these men.

25  It's not that I -- I didn't really get to know these men until I

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  met them in jail in here, in these facilities.  Might have met

2  them briefly at the protest, but I certainly didn't call upon

3  them and instruct them.  There certainly was no conspiracy to

4  have them commit crimes.  And I do believe that the nature and,

5  you know, the weight and the evidence will -- will -- brought

6  forth will show these things.  I believe these men were good men

7  who came to do good.  They didn't come to do harm.  They came to

8  protect life and to promote liberty.

9           The nature and circumstances of the charges are, again,

10  as I said yesterday, I know that they're -- the Indictment is

11  full of false statements, false accusations.  And I was -- my

12  involvement and time there --

13           THE COURT:  I don't want you to give any testimony

14  about the offense.

15           PRO SE RYAN BUNDY:  Say that again.

16           THE COURT:  I don't want you to give any testimony

17  about your role in this offense.

18           PRO SE RYAN BUNDY:  Okay.  I thought I was --

19           THE COURT:  I don't --

20           PRO SE RYAN BUNDY:  -- just addressing the nature --

21           THE COURT:  I don't --

22           PRO SE RYAN BUNDY:  -- of the circumstances and so I

23  was trying to state some of those circumstances.  But I --

24           THE COURT:  No.  I do want -- I want to clarify.

25  Because if you look on page 5 of the report, it states five

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  different factors that the Pretrial officer finds would be a

2  reason why you would pose a risk of nonappearance.  The first

3  one is foreign travel which we addressed was a long time ago --

4  and only two different places a long time ago, more than 10

5  years ago.

6       Number two is the prior failure to appear.  That's from

7  the 2015 citation and there's no disposition for that.  That was

8  the horse -- runaway horse that was found in the pen.

9       Number three is prior arrest and convicions for

10  obstruction of jus- -- of police and resisting/interference with

11  arrest.  And so those were -- there's no disposition for those

12  except for the interfering with the police -- with the officer

13  (animal).  And you've explained that.  And there was just a

14  fine, no custody.  Just a fine.

15       But then it says "outstanding warrant."  Do you know

16  what that is referencing to?

17       PRO SE RYAN BUNDY:  I have a slight inkling.  There

18  was -- well, you know what?  There is a note in here.  Actually,

19  if you look just above and this information is incorrect but

20  it's just above that assessment.  It says --

21       THE COURT:  Driving --

22       PRO SE RYAN BUNDY:  -- driving --

23       THE COURT:  -- with a --

24       PRO SE RYAN BUNDY:  -- suspended --

25       THE COURT:  -- suspended --

2:16-cr-46-GMN-PAL - November 9, 2017

1              PRO SE RYAN BUNDY:  -- license.

2              THE COURT:  -- license.  Um-hum.

3              PRO SE RYAN BUNDY:  Yeah.  It says "Cedar City, Utah."

4         Now, like I said, that information, as far as I know,

5    is incorrect.  I was given a citation in Arizona, not Utah for a

6    suspended license.  Now, at the time I was instructed to go to

7    the court on the following Tuesday which is -- well, it's about

8    a hundred miles away.  I did make the trip.  I did show up at

9    the court.  I did check in with the clerk.  The clerk could not

10   find anything on the docket.  I went ahead into the judge --

11   into the courtroom just to make an appearance to show that I had

12   done so.  Again, there was nothing on the docket to address.  So

13   I left.

14        Now, I didn't know of any such arrest warrant until

15   Pretrial Services -- it showed up on there in Oregon when we had

16   the pretrial detention hearing in Oregon.  And that was the

17   first I knew about it.  And I only assumed that it has to do

18   with that.  And yet I met my obligation, was showing up at the

19   time and place that I was informed of.  I only suspect that

20   perhaps the citation showed up after the fact, belated, from

21   when I was instructed to be there.  And that's -- I really don't

22   know -- and, obviously, I've been incarcerated this whole time

23   so I haven't been able to address the situation.  Of course, if

24   I were out, then I would be able to do that easier.

25              THE COURT:  All right.

1          And then the next one is number five, pending federal

2    case in the District of Oregon with a Detention Order.  So the

3    remaining count is theft of government property.  Is that a

4    felony or lesser offense?

5          PRO SE RYAN BUNDY:  Well, again, that's the same one

6    that they could not find us guilty on.  I do believe it is a

7    felony.  Again, it is over a year since that jury no verdict --

8    or, you know, the hung jury took place.  It's been a long time.

9    So that's readdressing what we've already spoke about.

10          THE COURT:  And then it says, "with a Detention Order."

11    So . . .

12          PRO SE RYAN BUNDY:  And I'm not aware of a Detention

13    Order on that.  So I thought we read that just above the top of

14    this page again.  So . . .  But no separate release or detention

15    order has been issued since January 29th, 2016.

16          THE COURT:  Is that -- can we get the Pretrial

17    Office -- are we reading that correctly that he's not under a

18    current order of detention?  On page 4, third line up, it says:

19          [Reading] The defendant was ordered detained pending a

20    detention hearing set for January 29th, 2016.  At the

21    defendant's detention hearing, he was ordered detained pending

22    further proceedings [reading ended].

23          But then, in October of 2016, a jury returned a not

24    guilty verdict to all counts except for Count Five in which no

25    verdict was rendered.  And the case is currently pending and no

———2:16-cr-46-GMN-PAL - November 9, 2017———

1 separate release or detention order has been issued.  So what is
2 the current status?
3          MS. OLIVER:  Our interpretation of that, Your Honor, is
4 that his current status in Oregon would be the last-entered
5 order, which was for detention.  The officer was noting that no
6 subsequent order has been filed.  Our understanding is that
7 there is an active detention order there.
8          PRO SE RYAN BUNDY:  No such order has been issued to me
9 or I have not been informed of that.
10          THE COURT:  So that would be January 29th of 2016; is
11 that . . .
12          PRO SE RYAN BUNDY:  Well, January 29th, 2016, was
13 actually the original arrest date.  Of course, then we had
14 trial; the verdict came on October 27th, 2016.  Speedy trial
15 on -- bringing that back up -- would have ended about
16 January 6th or so, 2017.  I think we're greatly beyond speedy
17 trial parameters for recalling that charge.
18          THE COURT:  All right.
19          And then, under Assessment of Danger, there are four
20 things listed:
21          The first one is the nature of the instant offense;
22          The second one is the prior arrest for carrying a
23 concealed weapon and the firearm in a vehicle.  Those were
24 dismissed.
25          Number three, is prior arrests and convictions for

1    Obstructing Police/Resisting, Interference With Arrest.  And

2    those were either dismissed or there's no disposition to them.

3              And then the Interfering With the Officer (Animal) is

4    the only --

5              PRO SE RYAN BUNDY:  Yeah, those are --

6              THE COURT:  -- conviction.  And that was a fine.  No

7    custody.

8              And, then, number four is pending federal case in the

9    District of Oregon with similar charges.  But, like we said

10   earlier, those have been --

11             PRO SE RYAN BUNDY:  I would --

12             THE COURT:  -- almost all acquittals with just one

13   Theft of Government Property charge pending with or without a

14   detention order.  So it's substantially less.  Um . . .

15             PRO SE RYAN BUNDY:  I would like to back up to five,

16   the Assessment of Nonappearance, the prior failure to appear.

17             THE COURT:  Yes.

18             PRO SE RYAN BUNDY:  And then -- I haven't addressed

19   that.

20             Again, back in 2015, concerning the Interference With

21   the Animal Officer, a citation was not given to me.  I did not

22   sign or make any promise to appear.  The citation was actually

23   just left on the front seat of a pickup truck that I owned.  I

24   wasn't aware of it.  A couple years went by.  And then I got a

25   phone call from, I believe, the Iron County Sheriff's Department

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  and they informed me, more or less subpoenaed me.  They didn't

2  say that there was an arrest warrant.  They just simply said,

3  you know, hey, we need you to come and appear at court.  I said,

4  okay, I'll do that next time I'm in Cedar City.  At that point,

5  I was, you know, living in Nevada here.  They said:  Don't make

6  it a rush, but don't take too long.  At my earliest convenience,

7  I went there.  I appeared at court.  And that's when we did the

8  things we did with that.

9        So, again, it can't be considered a failure to appear

10 if I never made a promise to appear and it was taken care of and

11 there's no disposition on it.  So . . .  And I did appear as I

12 promised to that Sheriff's Deputy.

13   (Pause in the proceedings.)

14        THE COURT:  All right.

15        Does the Government wish to be heard?

16        PRO SE RYAN BUNDY:  Well, I'm not finished, ma'am.

17        THE COURT:  Oh.  I'm sorry.  Go ahead then.

18        PRO SE RYAN BUNDY:  I was just waiting for your

19 response.  I didn't want to overrun you.

20        You did also mention a concern concerning a business

21 license.  Um . . .

22        THE COURT:  Oh, that's right.  You're right.

23        PRO SE RYAN BUNDY:  Pretrial Services conducted a

24 business search.  No results for a business license in Nevada or

25 Utah for the defendant's alleged own business.

2:16-cr-46-GMN-PAL - November 9, 2017

1          Yes, ma'am, I have owned a business in Utah beginnin'
2   in April of 1995; I've operated it up until just the last few
3   years.
4          Now, I have been incarcerated for a couple years, and
5   so those licenses have expired which explains the result of them
6   not finding those business licenses.  Very, very easy
7   explanation there.  But I did own and operate a business, heavy
8   construction, did lots of work, built a few schools, built quite
9   a -- quite a few things.
10         THE COURT:  Did you have a business license?
11         PRO SE RYAN BUNDY:  Yes, I did.  I had a business
12  license in Cedar City, Utah, and also a state contracting
13  license in the State of Utah:  general contractor, general
14  engineering, underground utilities, structural steel erection,
15  general concrete.
16         Moving on from there, I also highlighted here that they
17  note that I have a vehicle but didn't know the make or model of
18  the vehicle.  I don't think that really is pertinent.  But they
19  didn't ask.  So, um . . .
20         I do have some, you know, particular concerns --
21         THE COURT:  So what is the make or model of your truck?
22         PRO SE RYAN BUNDY:  It is a GMC Silverado [sic].  It is
23  a 3500.  I don't know the year exactly.  But it's a cab and a
24  half and flatbed truck and Allison transmission.  Pretty good
25  truck.

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1          THE COURT:  And there was something else you wanted to

2    address?

3          PRO SE RYAN BUNDY:  Just one second, please.

4       (Mr. Ryan Bundy and Mr. Philpot conferring.)

5          PRO SE RYAN BUNDY:  Mr. Morgan Philpot's informed me

6    that there is a Motion for Acquittal on that pending charge in

7    Oregon, but it hasn't been resolved.  So that's one more thing

8    to consider.

9          Again, madam, as you know, I am *sui juris*,

10   representing -- speaking for myself in the matters of this -- of

11   this court and of this trial.  And I felt that that was the

12   right thing to do.  And I'm very glad to be here and be able to

13   do that; however, it does impose some difficulties.

14         One of the huge difficulties is, and is going to be

15   throughout this trial, is simply transportation and time to

16   prepare and to be both physically and mentally and spiritually

17   ready each day.  In the current custody situations, I am

18   approximately in transit 10 hours a day.  Now, not all of that

19   is on the road.  But, you know, they get me up at 3:30 in the

20   morning and put me in the tank.  I mean, it's cold concrete.

21   It's awful early to wake up.  Stand there for several hours.

22   Then have a car trip to Vegas.  Placed in the holding cells

23   here.  Again, they are usually cold; I get cold and shivery.

24   But not only that, I'm deprived of my legal materials.  No time

25   to read or to study or to brush up last minute to be prepared

1  for whatever we're gonna talk about that day.

2          That process, you know, from 3:30 in the morning until

3  when we start at 8:30, 9 o'clock, I mean, we're lookin' 5 hours

4  in the morning just to get here.  And goin' home is very

5  similar.  Boloney sandwich for lunch; get home -- back to the

6  jail too late for their dinner; again, another baloney sandwich

7  for dinner; again, another 5 hours plus or minus.

8          I'm literally in transit for 10 hours a day with poor

9  quality food.  And to get back to the place, I don't -- it's

10  beyond hours to be able to access computer.  Basically I make a

11  phone call to my wife and go to bed and get ready to do it

12  again.  And that's very taxing.  And I can't see how that kind

13  of stringent travel condition, travel schedule is going to be

14  conducive to or would allow for me to prepare a proper defense.

15  It just simply cannot be a fair trial under those conditions.

16          Again, I know that the law allows -- or states that the

17  least restrictive conditions necessary to reasonably ensure the

18  presence at trial or court proceedings and for the safety of the

19  community.  On that note, I also have and would like to refer

20  you to Docket No. 1459.  And there's gonna be other documents

21  associated with that document number.  But that is the minutes

22  to a detention hearing held January 31st, 2017, whereon 34

23  letters of witnesses, character witnesses, were entered onto the

24  docket.  I have those up here on the computer, and I know that I

25  can't present those here to you right now.  That's why I'm

referrin' to this document. But these are 34 letters of character witness from folks from my community who -- who will attest to my good character. And to -- that I'm not a danger to their community; in fact, that I'm a benefit to it.

Also is the sworn testimony of Mark McEwen, who is a Las Vegas Metro Police Department officer, now retired but that was with me and present with me the entire time there on April 12th, 2014. I would like you to review his testimony and also the testimony of Shem Teerlink, who is a lifelong family friend who has known me from -- from birth and is still a good friend, and also the test- -- testimony of my wife. All three of those are sworn testimonies to my character. And -- and so I do believe that my character is -- is -- is sound.

You know, just kind of a note back to the travel conditions to and from CCA within the last 48 hours from when this hearing was set, I've been in transit 20 of those hours, nearly half that time. And, you know, just being prepared for this hearing alone is pretty much do it right here at this desk because there's no other time. Again, I don't believe that a fair trial can be had under those conditions. And I do believe that conditions less than this are definitely reasonable to ensure the safety of the community and my presence at trial, being that I do want to be here and I do want the community to be safe.

And I do appreciate the Marshals and their job. I know

1    that we've clashed a little -- I've clashed a little with them.

2    But, you know, that has been mostly because I feel that my -- my

3    rights to being a free man have been violated some.  But I do

4    appreciate your job.  I really do.  That is the truth.

5            And so I am willing to comply to some conditions of

6    release to obtain the objectives desired.  And I do want those

7    defined so we can both understand so there's no confusion so

8    that we can come to an aggreeance on it.  That's also been --

9    you know, part of the problem with these places is there's not

10   been an aggreeance.  And whereas I do believe that the

11   Thirteenth Amendment prevents slavery and involuntary servitude,

12   and so that's where I believe that there needs to be an

13   agreement so that it's a voluntary agreement rather than a

14   involuntary agreement.  And, until such a time that a conviction

15   takes place, I do -- I do have that right.  But I am willing to

16   make an agreement.  I am willing to make an agreement.

17           Let's see.  Just lookin' at my notes here.

18       (Pause in the proceedings.)

19           PRO SE RYAN BUNDY:  Anyway, last thing.  I would just

20   kinda go back to appealing the -- concerning my family.  My dear

21   kids, my wife -- they've been without me a long time.  This has

22   been very hard on them.  I do believe, whether it be legal by

23   description or not, that this has been punishment and yet

24   pretrial conditions are not supposed to be punishment.  It's

25   been very hard on me.  It's been very punishing on me; it's been

1  very punishing upon my family.  And so I ask thee that thou

2  would release me.  And I promise to you, I make a commitment to

3  you right now, that I will be here to all court proceedings

4  pertaining to me.  And, barring some natural disaster that

5  prevents me, I will be here.  That is my commitment to you.  So

6  thank you for your consideration.

7           THE COURT:  I did notice -- I forgot to ask you -- I

8  have two different addresses that were provided.  So I need to

9  clarify which is the correct address.  There's an address of

10 19 West 1725 North, Cedar City, Utah, and then there's the

11 Mesquite address of Riverside Road.

12          PRO SE RYAN BUNDY:  The Cedar City address, of course,

13 is not -- I don't intend on going to Cedar City.  I do not own a

14 home in Cedar City anymore.  The home that my wife bought --

15 technically it belongs to her -- is in Mesquite on Riverside

16 Road.  Being that I've not been there, I don't know the numbers.

17          Ann?

18          MRS. RYAN BUNDY:  361 Riverside.

19          PRO SE RYAN BUNDY:  361?  361 South?

20          MRS. RYAN BUNDY:  361 Riverside.

21          PRO SE RYAN BUNDY:  361 Riverside Road.  And --

22          THE COURT:  So the other home in Cedar City, Utah?

23          MRS. RYAN BUNDY:  I sold it.

24          THE COURT:  Okay.  Thank you.

25          PRO SE RYAN BUNDY:  And, pertaining to the alternative

 1  home here in Las Vegas, Tanna is here now.

 2          Tanna, will you stand up.

 3          THE COURT:  Is that the Homestead you said?

 4          MS. HOMESTEAD:  Yes.

 5          THE COURT:  All right.

 6          So I'll ask her to -- if she's willing -- to speak to

 7  the Pretrial Office so that we can find out if there is a

 8  suitable residence that could be an option.

 9          And that's here in Las Vegas; right?

10          MS. HOMESTEAD:  It's in North Las Vegas, yes.

11          THE COURT:  All right.  Close enough.  That'll work.

12          Okay.  So I don't know -- Mr. Hill, could I bother you

13  to provide to Mr. Ryan Bundy -- because we lost Aaron -- a copy

14  of the conditions that I set for either Mr. Parker or

15  Mr. Drexler?  I think they are essentially the same.

16          MR. HILL:  And, just so the Government has it, it's

17  Scott Drexler's.

18          THE COURT:  Right.  So we can look at those.

19          So you mentioned, Mr. Ryan Bundy, the *sui juris*.  Do

20  you real- -- these are the conditions that are likely to be

21  imposed if you were to be released.  So look at them carefully;

22  tell me if you have any questions.

23     (Reviewing document.)

24          PRO SE RYAN BUNDY:  Okay.  It states here:

25          [Reading] 1.  The defendant must not violate state

2:16-cr-46-GMN-PAL - November 9, 2017

1  [reading ended] -- or [reading] federal, state, or local law

2  while on release.  The defendant [reading ended] --

3          THE COURT:  That means whether you like the law or not

4  or whether you think it's fair or not or whether you think it's

5  being correctly applied . . .

6          PRO SE RYAN BUNDY:  I will submit to that condition,

7  Your Honor, as written.

8          THE COURT:  All right.  Keep going.  Keep reading.  You

9  don't have to read out loud.  But . . .

10          MR. SCHIESS:  Your Honor, did you to intend put him

11  under oath for those questions and answers?  Or is that just the

12  inquiry through counsel?

13     (Counsel conferring.)

14          THE COURT:  I'm not going to put him under oath.

15          MR. SCHIESS:  Thank you.

16     (Pro Se Ryan Bundy and Ms. Fletcher conferring.)

17          THE COURT:  Because he did say he was willing to be on

18  release for some conditions so I want to make sure that there's

19  clarity as to which conditions they might be.

20          PRO SE RYAN BUNDY:  Yes.  There's five conditions here,

21  madam.  With the exception that the address, time, and location,

22  of course, is not the same as what's --

23          THE COURT:  Right.

24          PRO SE RYAN BUNDY:  -- written on here, yes, will agree

25  to these conditions.

———————2:16-cr-46-GMN-PAL - November 9, 2017———————

 1            THE COURT:  And you've read all of 'em?

 2            PRO SE RYAN BUNDY:  Yes, I read those five.  Yes, I

 3   read them all.

 4            THE COURT:  Well, there's more than five.

 5            PRO SE RYAN BUNDY:  Is there more on the next page?

 6     (Reviewing document.)

 7            PRO SE RYAN BUNDY:  Okay.

 8     (Pro Se Ryan Bundy conferring with Mr. Philpot and

 9   Ms. Fletcher.)

10            PRO SE RYAN BUNDY:  I will submit to all conditions

11   that the Pretrial Services and this Court imposes upon me.

12            THE COURT:  All right.

13            So have you had a chance to review all those conditions

14   there on that piece of paper --

15            PRO SE RYAN BUNDY:  Now, all --

16            THE COURT:  -- in your hand?  Take your time.

17            PRO SE RYAN BUNDY:  Okay.

18            So, now, are all of these -- they are not all marked.

19   Just the ones marked?  Or which ones are we . . .

20            THE COURT:  Those may or may not be the conditions, but

21   those are possible conditions.

22            PRO SE RYAN BUNDY:  Okay.  'Cuz there's a few things

23   here, quite a few empty --

24            THE COURT:  Right.  There's a list and some were

25   checked and some were not, but -- because they are tailored

─────2:16-cr-46-GMN-PAL - November 9, 2017─────

 1  individually to each person.

 2          PRO SE RYAN BUNDY:  Sure.

 3      (Pause in the proceedings.)

 4          MR. PHILPOT:  May I, Your Honor?

 5          THE COURT:  Yes.

 6          MR. PHILPOT:  I think the misunderstanding is we used a

 7  list prepared for the Oregon pretrial detention.  His does not

 8  have that same list.

 9          THE COURT:  Right.  This is --

10          MR. PHILPOT:  And so I don't --

11          THE COURT:  -- these are --

12          MR. PHILPOT:  -- he --

13          THE COURT:  -- the Nevada -- these are the standard

14  Nevada conditions of supervised release.

15          MR. PHILPOT:  Let me see that.

16      (Pro Se Ryan Bundy and Mr. Philpot conferring.)

17          PRO SE RYAN BUNDY:  Bear with me, madam.  I'm still

18  reading these, making sure I understand them correctly.

19          THE COURT:  That's fine.

20      (Reviewing document.)

21          PRO SE RYAN BUNDY:  I don't see anything on here that

22  is egregious.  There are quite a few of them that, of course,

23  you know, I'd have to -- you know, just like there's one here

24  without warrant, I would have to check into that.  I know it's

25  got -- of course, that one's not checked, but it may be -- that

1  if it is resolved in a certain amount of days, I'd certainly be

2  willing to, you know, try to accomplish such a thing.  And so

3  there's a lot of open spaces on here.  But I don't see anything

4  on here that is egregious.  So yes, I could -- I could work with

5  any of those and abide by any of those conditions.

6          THE COURT:  All right.

7          And so you understand that if I were to release you and

8  it turns out that Oregon does have a detention order that is

9  still valid and has not been withdrawn or vacated that means you

10  would not be released because that hold would need to be

11  addressed first?

12          PRO SE RYAN BUNDY:  And would you allow me leave of

13  court to address that?

14          THE COURT:  Yes.

15          PRO SE RYAN BUNDY:  Thank you.

16          THE COURT:  And if Ms. -- if the Homestead residence is

17  appropriate or if time is needed to make it appropriate and you

18  were placed in a halfway house, do you understand that you would

19  have to abide by the rules and regulation of that halfway house

20  as part of your supervised release conditions?

21          PRO SE RYAN BUNDY:  Yes, ma'am.  And also, in that

22  case, there are several others who would be willing to offer me

23  room and -- at a house.  And so, if Tanna's is not available,

24  then I would ask that we consider one of those others.  Jim --

25  Jim Abbott is one name also.  And I've heard of six or seven

1  others who are also willing to offer their home to my stay.

2          THE COURT:  And this is the same Mr. Abbott from

3  before, I think?  Didn't we hear his name from before?  Same

4  person?

5          MR. HILL:  Yes, Judge.

6          THE COURT:  Thank you.

7          And do you understand that during -- for example, we're

8  gonna be in trial Monday through Thursday, so we're off Friday,

9  Saturday, and Sunday -- if a condition was fashioned that would

10 permit you to go and stay in Mesquite with your family during

11 those three days that that means that residence would also have

12 to be approved by the Pretrial Office first?  So if it was --

13 for example, Thanksgiving week I think we're off four or five

14 days --

15         PRO SE RYAN BUNDY:  Yes.  And I --

16         THE COURT:  -- or Christmas and then there's a week off

17 at some point also at some other part in the calendar.  So, if I

18 was to agree that you could reside -- you know, with the same

19 conditions of, you know, maybe house arrest or location

20 monitoring, something like that -- at the Mesquite home that

21 that Mesquite home would still have to pass the same

22 requirements as far as no gun, no drugs, and so forth.  And the

23 Probation Office would have to be able to visit that home and

24 determine whether or not it was appropriate?

25         PRO SE RYAN BUNDY:  Yes, I am aware of that.  And I do

—————2:16-cr-46-GMN-PAL - November 9, 2017—————

1    appreciate that.

2            And I do ask thee that thou would make that possible as

3    I know that we only -- right now we only have nine days of

4    scheduled trial time in December.  And so I would like to be

5    able to be with my wife and children and in my own home.  In

6    fact, I ask, you know, based upon your decision today, that thou

7    would let me to go there tonight and -- while we look into Tanna

8    Homestead's home for trial and the court proceedings next week.

9            THE COURT:  All right.

10           Mr. Schiess, did you want to address the Court?

11           MR. SCHIESS:  I do, Your Honor.  May I use the lectern,

12   please?

13           THE COURT:  Yes, you may.

14           MR. SCHIESS:  Thank you.

15      (Government counsel conferring.)

16           MR. SCHIESS:  (To Mr. Whipple) Would you pass that to

17   Mr. Bundy, please.

18      (Pause in the proceedings.)

19           MR. SCHIESS:  Your Honor, I know it's been the end of a

20   long day, and I'll try and not stretch it out much longer.  But

21   I do want to make a few points that we strongly oppose his

22   release from the conditions that he's in.

23           First of all, this is a situation where after Mr. Bundy

24   was tried in Oregon that he then came to Las Vegas and he

25   requested a full detention hearing.  The court in -- the

————2:16-cr-46-GMN-PAL - November 9, 2017————

1  Magistrate Court, Judge Foley, in January 9th, 2017, provided a

2  20-page order addressing whether he could reopen it.  The

3  detention hearing was reopened.

4       And, as a result of that detention hearing, the

5  defendant presented all the evidence that we believe that he

6  felt like he had to.  The court denied his release, found that

7  he was both a risk of nonappearance and a risk of danger to the

8  community.

9       He then, in June, sought to reopen that detention

10  hearing again arguing that new evidence existed.  In Document

11  2969, he submitted a 31-page document arguing why he should be

12  released, including that would be any submission of new

13  information.

14       He then -- the Government replied.  And then he filed

15  on July the 10th, 2017, in Document 2143, a 19-page reply

16  supplementing that.

17       The court -- the Magistrate Court on July 19th, 2017,

18  in Document 2182, denied his Motion to Reopen; ruled that he had

19  not presented any new evidence that went to either risk of

20  nonappearance or danger to the community and --

21       THE COURT:  [Reading] That the information provided did

22  not have a material bearing on the issue of detention --

23       MR. SCHIESS:  Yes.

24       THE COURT:  -- on whether conditions of pretrial

25  release could be fashioned [reading ended].

1          MR. SCHIESS:  Yes.  And the court, on the bottom of

2   page 2, wrote -- I'm starting in the beginning of the

3   sentence -- [reading] The BLM's and the FBI's or the Clark

4   County Sheriff's assessment of danger of violence posed by

5   Defendant Ryan Bundy, or other defendants prior to the event

6   charged in the Indictment, while relevant does not materially

7   affect this court's determination that the defendant poses a

8   substantial risk of nonappearance and danger to the community

9   and that there are no conditions or combination of conditions

10  that can reasonably assure his future appearance or to protect

11  the community against the risk of danger posed by the defendant.

12  Accordingly, the court denies his motion [reading ended].

13          On September 20th, 2017, less than 2 months ago, in

14  Document 2493, this Court reviewed Mr. Ryan Bundy's objections

15  to the Magistrate's Order, which was in 2182, and the Court

16  ruled that the Magistrate -- you said, [reading] The Court finds

17  [reading ended] -- I'm on page 3 of 3 on line -- starting on

18  line 10 -- [reading] The Court finds that Judge Foley did not

19  clearly err in concluding that the defendant failed to meet the

20  standard of demonstrating that his new evidence is material and,

21  therefore, the Court overrules the defendant's objections

22  [reading ended].  And that was just September the 20th.

23          I've been listening to -- today very carefully to

24  identify what new evidence he has presented that he's obtained

25  since September the 20th, 2017.  The only thing that I have

 1  heard him say is that his travel conditions presently are

 2  onerous, that he's in transit about 10 hours a day, and that it

 3  makes it difficult for him to prepare for trial.  So I would

 4  like to start with that point.

 5          The defendant is being transported to and from Pahrump.

 6  As you recall, you refashioned orders that were special orders

 7  for them so that the Pahrump did not have to apply its normal

 8  rules so that they could be transported to Henderson.  And, in

 9  Henderson just recently, they have -- Mr. Ryan --

10          THE COURT:  The order prevented the routine strip

11  search --

12          MR. SCHIESS:  Yes.

13          THE COURT:  -- without any security concern.

14          MR. SCHIESS:  Yes.  So you ordered that would be --

15          THE COURT:  Because --

16          MR. SCHIESS:  -- done.

17          THE COURT:  -- the explanation provided was that strip

18  searches were being done when a person left the jail.

19          MR. SCHIESS:  Yes.  And I believe you -- my

20  interpretation was you did that so that they could get him out

21  of the jail so that it would just simply facilitate his

22  transportation to, um --

23          THE COURT:  It didn't prevent a search if there was an

24  actual security concern.  If they saw --

25          MR. SCHIESS:  No.

1           THE COURT:  -- him --

2           MR. SCHIESS:  -- and I'm not --

3           THE COURT:  -- take a razor and smuggle it, then

4  obviously they'd be able to still search him.  But the routine

5  searches that were described leaving the facility as opposed to

6  coming into the facility.  As it was explained to me when

7  they're, for example, here and they are in the area where other

8  individuals who are not in custody are sitting or other things,

9  like pens and other things can be left hanging around, then

10 there's a legitimate concern --

11          MR. SCHIESS:  Yeah.

12          THE COURT:  -- for the facility to make sure that

13 nothing is brought into the facility that could be used as a

14 dangerous weapon against another inmate or a guard.  But, on the

15 way out, the order was that no routine strip searches should be

16 performed and that the searches would be -- I think it was with

17 a wand or through some electronic device --

18          MR. SCHIESS:  Um-hum.

19          THE COURT:  -- and it listed the --

20          MR. SCHIESS:  Yes.

21          THE COURT:  -- alternatives that were provided that

22 would be available.

23          MR. SCHIESS:  Thank you.  I didn't mean -- by my

24 presentation, I wasn't suggesting otherwise.  I was gonna be

25 addressing it that way for the Court.

1          But the Court gave them the opportunity to go to

2   Henderson so that there would be different conditions there that

3   would help them.  Mr. Ryan Bundy has violated those conditions

4   just recently.  And I don't have the details.  But I understand,

5   again, it has to do with searches.  And so, because of that,

6   Henderson says we're not takin' him.  And so he's been taken

7   back to Pahrump.

8          So any extended travel that he -- or transit that he

9   has to go through during the day is of his own making.  This

10  Court accommodated and did everything it could with -- I

11  shouldn't say everything.  You had other tools -- but you

12  accommodated him to be able to meet his needs -- or his wishes,

13  I should say.  So he is now in a situation of his own making.

14         Nobody's responsible for his travel time but himself.

15  And you canvassed him very carefully -- I should say -- I

16  apologize -- the Court canvassed him very carefully when you did

17  the last *Ferreta* canvassing and told him that there would be no

18  special circumstances made for him, that he would have to be

19  treated like everybody else, and he understood that that would

20  not be altered because he was in confinement.  And now he's come

21  back to the Court and asked -- that is the only new basis is

22  that it takes longer to travel.

23         I submit that that is a problem that's of his own

24  making.  It's not one that the Court should accommodate.  It is

25  a string of actions of failure to comply with people charged

1  with a law enforcement authority.

2       I gave just a moment ago Mr. Ryan Bundy the

3  disciplinary summary that I received this morning on his matters

4  while he's been in detention.  And these arise out of his time

5  in the -- or Nevada Southern Detention Center for Pahrump.  So

6  there are, by my count, 12 violations that occurred between

7  March the 3rd, 2017, and August the 18th, 2017.

8       THE COURT:  How many?  How many violations --

9       MR. SCHIESS:  12.

10       THE COURT:  -- did you say?  12?

11       MR. SCHIESS:  And I will --

12       THE COURT:  So a dozen.

13       PRO SE RYAN BUNDY:  Your Honor.  I make an objection to

14  bringing those in.

15       THE COURT:  I'll give you an opportunity to respond

16  and . . .

17       MR. SCHIESS:  Your Honor, I have a copy that I would

18  like to submit to the Court and the Court can -- ask it in

19  evidence, please.

20       THE COURT:  And you said you've already provided this

21  to Mr. Ryan Bundy.

22       MR. SCHIESS:  I have gotten a copy.

23       THE COURT:  All right.

24       MR. SCHIESS:  Would you like me to show --

25       THE COURT:  All right.

2:16-cr-46-GMN-PAL - November 9, 2017

1          MR. SCHIESS:  -- him again?

2          THE COURT:  -- you may approach so we can . . .

3     (Document handed to the Court.)

4          MR. SCHIESS:  Your Honor, as the Court can see, almost

5     half of those violations for which he has been -- the

6     disposition has been, quote, guilty and for which sanctions have

7     been implied have been for failure to follow verbal or posted

8     rules and/or orders.

9          And then there are some -- there's one on page 3 of 6

10    for hindering an employee in the performance of his duties.

11         There is -- there are two more on the following page

12    for the failure to follow the verbal or posted orders.

13         Then, on page 5, there's two for assault.  And I

14    understand that one of those assaults is when food was being

15    pushed through his tray -- or through the passageway he

16    intentionally knocked the door closed and knocked the tray back

17    out.  And the other was in some situation -- I don't know the

18    details -- other than he grabbed a law enforcement officer's

19    arm.

20         And then, on the last page, as late -- there's two more

21    failures to follow verbal or posted rules and/or orders.  And

22    the last is dated August the 18th, 2017.  And, again, he was put

23    in as a -- sanctioned 7 days of disciplinary sanction -- or

24    segregation.

25         Now, that's not all though.  The Court is --

————2:16-cr-46-GMN-PAL - November 9, 2017————

1          THE COURT:  To be clear, all 12 are guilty.  I thought
2   you said half of them are.  But --
3          MR. SCHIESS:  Did I --
4          THE COURT:  -- all 12 are guilty; half of them are
5   failure to follow verbal or posted rules and/or orders.
6          MR. SCHIESS:  Yes.
7          THE COURT:  Three, four, five . . .  Actually, seven --
8   eight -- no nine.  Nine of them are failure --
9          MR. SCHIESS:  Yeah.
10          THE COURT:  -- to follow verbal or posted rules and/or
11   orders.
12          MR. SCHIESS:  And my comment was at least half are that
13   way.  I didn't take the time to count up exactly --
14          THE COURT:  Yeah --
15          MR. SCHIESS:  -- how many.
16          THE COURT:  -- there was more.  Okay.
17          MR. SCHIESS:  Then he -- the Court is aware of the
18   situation that occurred in the holding cell on October the
19   27th -- 24th, 2017, when the Marshals were attempting to get
20   Mr. Bundy to -- as well as his brother and his father -- to turn
21   around and face the rear wall of the cell so the Marshals could
22   enter in the code.  I have received the printout of the report
23   of the event -- or a report of the event.  I gave Mr. Bundy a
24   copy of that.  And I have a copy for the Court if I may pass it
25   up.

2:16-cr-46-GMN-PAL - November 9, 2017

1          THE COURT:  Yes, you may.

2      (Document handed to the Court.)

3          THE COURT:  Thank you.

4      (Pause in the proceedings.)

5          MR. SCHIESS:  Okay.  Thank you, Your Honor.

6          As you've read in the report documents, that, during

7  this encounter in the jail, Mr. Ryan Bundy both actively and

8  passively resisted and that part of his active resistance was

9  when they attempted to reposition him he at one point tried to

10 lock his legs on the Deputy Marshal's leg in an attempt to

11 resist being repositioned.

12         In addition to that, the information we have also

13 received from the Marshals is when -- and I don't know the exact

14 date, but my belief is it was in -- very recently -- is when,

15 after a court proceeding, the Marshals had directed the -- or

16 Mr. Bundy to leave the courtroom, he became angry and verbally

17 aggressive and he said, quote, you have no f-ing authority over

18 me, end quote.

19         Now, those are the matters that have occurred since the

20 Court's detention hearings -- excuse me -- since the Court has

21 reviewed the Motion to Reopen; Judge Foley has worked diligently

22 and conducted lengthy hearings.  So the only new evidence now is

23 the inconvenience.  And, again, that's of the defendant's own

24 making.

25         But what goes against him are those number of -- a

1 pattern of noncompliance. And so I sit back and say what -- why

2 do we think that he's going to change overnight? Why do we

3 think he's going to change since October 24th when he wouldn't

4 comply with the Marshals or when he's telling the Marshals you

5 have no f-in' authority over me? There's nothing to undermine

6 or to -- as a basis for this Court to reverse both the findings

7 by this Court and the other court, Magistrate Court, that he

8 presents a risk of danger and a risk of nonappearance.

9          Now, I don't know that I need to go through the lengthy

10 history of why he presents those two dangers -- I can -- with

11 the Court. And there is substantial amount of evidence to

12 demonstrate that. I can give the Court a few points if you

13 would like. But let me -- before I do that, let me go to the

14 defendant's criminal history which you spent some time with him

15 on -- which the Court spent time with him.

16          The 1994 obstruction charge of police that occurred in

17 the Kane County, Utah, area, the information we have, which has

18 been pretty detailed, is that --

19          PRO SE RYAN BUNDY: Or objection, madam. That --

20 that -- that's been dismissed. There's a finding -- there's no

21 findings. There's no trial. There's no -- it's just dropped.

22 There's no reason for him to be bringin' up additional

23 information to a situation that is dismissed.

24          MR. SCHIESS: And, Your Honor, we're entitled to bring

25 it up even if it's dismissed. The Court can give as much or

———2:16-cr-46-GMN-PAL - November 9, 2017———

1  little weight to it as the Court wishes to do so.  But it's the

2  beginning --

3          THE COURT:  That's --

4          MR. SCHIESS:  -- of a --

5          THE COURT:  -- correct.

6          MR. SCHIESS:  -- document that --

7          THE COURT:  But I do take into consideration also that

8  it was dismissed.

9          MR. SCHIESS:  Yes.

10          The information is, is that Mr. Bundy was driving into

11  the Zions National Park at the pay station and he refused to

12  recognize the park as lawful authority so he drove through.  And

13  there was a lengthy chase of many, many miles as he went outside

14  the other -- out the other side of the park.  And, finally, the

15  law enforcement had to put down, as I understand, those tire

16  nails or whatever they do to -- the tire strips -- to cause him

17  to stop.  And he did.  Why there was no disposition after that,

18  I don't know.  But I understand there's no dispute as to that --

19  those fact pattern.

20          With respect to the 1998 -- and I only bring this up in

21  part, Your Honor, because it's just a pattern that has been

22  going on for more than two decades -- in 1998, the traffic

23  offense, I just note that most times in a traffic offense you

24  get a ticket.  But Mr. Bundy was convicted and ordered to spend

25  20 days in custody and that was suspended with 12 months'

1  probation and a fine indicating that there's something more

2  there then just a speeding or a failure to stop or something of

3  that nature.

4       With respect to the December 28th, 2007, date of arrest

5  in Cedar City, while he's been convicted of obstruction of the

6  police and resisting and interfering, the information that we

7  had was that he had to be tased at that time to be subdued to be

8  able to be taken into custody.

9       In -- with respect to the March 19th, 2012, situation

10 also in Cedar City, he explains that away as a -- the theft

11 situation.  He gives his version of the story.  We don't have

12 the opportunity yet, if we needed to, to demonstrate or to

13 explore whether he's telling just his side of the story and

14 leaving out critical information.  With respect to the -- and

15 that, also, our failure -- or inability at this time simply

16 because of the notice situation and the timing we've had to be

17 able to determine the circumstances about his interfering with

18 an officer.

19       Again, now we're up to 2015.  So his run-ins with the

20 law enforcement, his disagreement with the law enforcement, his

21 obstruction of police, and interference with officers which have

22 begun in '94, continued all the way through, and picked up again

23 in the violations in the jail, and goes up to this day.  So

24 there's more than a two-decade pattern here which gives

25 substantial concern.

1        Now, I haven't even mentioned the facts yet about the

2   instance in this case and the -- these will not -- cannot

3   reasonably be disputed because they are recorded -- some of them

4   are recorded.  The very first one that I can tell the Court --

5   and there's more.  I'm just gonna give the Court a highlight --

6   is that in February of 2014, Sheriff Gillespie and then -- now

7   Sheriff Lombardo and I believe it was also Undersheriff Tom

8   Roberts went to meet with Mr. Bundy just before the 2014 impound

9   to be able to assess the situation to see if they would present

10  a risk of confrontation or conflict and to see if they could

11  mitigate any concerns that they had.

12        Mr. Ryan Bundy was there and Mr. Bundy expressly told

13  Sheriff Gillespie that he did not recognize the federal

14  authorities and sent the clear message that they would continue

15  to do, quote, whatever it takes to -- end quote -- to stop the

16  impoundment which is what Mr. Cliven Bundy has been saying for

17  20 years.  Mr. Gillespie was so concerned about that situation

18  that he walked out of that meeting and decided that Las Vegas

19  Metropolitan Police Department would not be supporting the

20  impoundment in 2014 because of the potential for conflict or

21  violation.

22        So then less than a month later, the BLM -- two BLM

23  officers -- or one of 'em contacted Mr. Ryan Bundy on the

24  phone -- and this was on March the 17th, 2014.  If you can

25  excuse me I can grab my . . .

1          This is recorded in which -- this conversation is

2   recorded which we intend to bring into trial.  Defense counsel

3   and defendant has it as an exhibit.  I apologize.  I don't have

4   the exhibit number right now.  But the Court has our exhibits.

5          So, on the recorded conversation, Special Agent Michael

6   Johnson spoke with Mr. Bundy by phone for about 45 minutes.  And

7   he informed Ryan of the impound.  And Ryan became angry and

8   demanded that BLM not take a single cattle -- cow.  And, after a

9   long conversation and I think what could be accurately described

10  as a diatribe about the Constitution and the power of the

11  federal government, Mr. Bundy stated that the Bundy family was

12  going to stop the impound and, quote -- he said, quote:  We are

13  going to stop your gather.  We will do whatever it takes.

14  That's what we've always said and that's what we will continue

15  to say.  We will do whatever it takes.  I will not tell you what

16  we will do or what we won't do.  We have always said that for

17  the past 20 years.  We will do whatever it takes.

18          And, in response to the question posed by Special Agent

19  Johnson which the question was, Is there any way we can avoid a

20  conflict in this situation?  Ryan Bundy responded, quote:  There

21  is a way.  There is one way.  You don't come to gather our

22  cattle and you will not take one single cow that belongs to us.

23  You understand that?  I will do whatever it takes.  And I will

24  have several hundred with me to help.

25          And then Johnson -- Special Agent Johnson asked him

─────2:16-cr-46-GMN-PAL - November 9, 2017─────

1   whether "whatever it takes" means "use of violence."  And Ryan

2   responded, quote:  I will do whatever it takes.  You interpret

3   that the way you want.

4           And then -- and that was March the 17th.

5           On February -- or excuse me -- April the 2nd, Mr. Bundy

6   went to the livestock auction site that BLM had contracted to be

7   able to take the impounded cattle into Utah, up in the Richfield

8   Monroe area, to this cattle auction where the auction was gonna

9   sell the cattle.  Mr. Bundy went there with others.  And it was

10  such a confrontation and a situation that the livestock auction

11  called the police.  And the Deputies came and then the Sheriff

12  came.

13          And the Sheriff is prepared to testify at trial that

14  Mr. Bundy told him, "We will stop the impound by force."  That

15  so concerned the Sheriff that he then wrote a letter to the Utah

16  Governor saying, "Because of the potential of violence in the

17  State of Utah, will you please use all of your powers as the

18  Governor to stop the cattle from being brought into Utah as a

19  matter of public safety."

20          Well, Mr. Bundy's comments go on.  But those

21  demonstrate that this pattern of unwillingness to follow any

22  federal law or any law that he doesn't agree with between 1994,

23  that we have record of, and 2017, just two months ago, is almost

24  virtually an unbroken pattern.

25          So I believe that the Court can give no weight to his

1  representation to the Court that he will comply.  And I think

2  if -- what I thought was interesting is that when he was

3  reviewing those conditions a few minutes ago and you asked him

4  if there's anything in there that he won't comply with his

5  response wasn't an unequivocal no, there's nothing I won't

6  comply with.  He said, "I don't see anything in here egregious,"

7  which goes back to the Bundys' pattern.  They interpret the law

8  the way they believe --

9          MR. WHIPPLE:  Judge, I'm gonna object to "the Bundys."

10  He's talking --

11          THE COURT:  Sustained.

12          MR. WHIPPLE:  -- about one individual --

13          MR. SCHIESS:  Let me --

14          MR. WHIPPLE:  -- and I represent another one.  And it's

15  inappropriate.

16          THE COURT:  Sustained.

17          MR. SCHIESS:  Let me --

18          MR. WHIPPLE:  Thank you.

19          MR. SCHIESS:  I will confine it, please, to Mr. Bundy,

20  Ryan Bundy here.

21          The issue is clearly demonstrated that they comply when

22  the law -- when they choose to or whatever law they want to or

23  however they interpret it.  So given all of those reasons --

24          MR. WHIPPLE:  And, again --

25          MR. SCHIESS:  -- may have --

———2:16-cr-46-GMN-PAL - November 9, 2017———

1          MR. WHIPPLE:  I'm sorry.  I'm sorry.

2          Again, the pronoun of "they" I think is inappropriate.

3          MR. SCHIESS:  Oh, I'm --

4          MR. WHIPPLE:  This is a discussion of one individual

5  and the grouping of it is --

6          MR. SCHIESS:  Please --

7          MR. WHIPPLE:  -- inappropriate and unnecessary.

8          MR. SCHIESS:  Okay.  Please correct my pronoun to

9  "he" --

10          THE COURT:  Yes.

11          MR. SCHIESS:  -- if you will, please.

12          May I have your indulgence, please?

13          THE COURT:  Yes.

14     (Government counsel conferring.)

15          MR. SCHIESS:  Your Honor, finally, Ms. Ahmed points out

16  that her review of the Oregon docket in Mr. Ryan Bundy's case

17  there's no entry in the docket to reflect that his order of

18  detention has been revoked.  And so it appears that he still has

19  his order there.

20          Your Honor, unless you have any questions, I will sit

21  down at this time.

22          THE COURT:  That's fine.  Thank you.

23          Mr. Ryan Bundy, you want to address any of the new

24  information brought by the Government this afternoon?

25          PRO SE RYAN BUNDY:  Yes, ma'am.

2:16-cr-46-GMN-PAL - November 9, 2017

1          Pertaining to new information for those detention
2  hearing requests and so forth this summer, we had several items
3  of new information listed in those that the Government did not
4  address in their response.  They simply ignored them.  And then
5  those were -- those -- depending upon that -- ignoring them
6  Judge Foley made a decision.
7          But some of those included -- and I don't have them all
8  with me 'cuz I don't have that motion with me -- but this was
9  done after the first trial wherein we were supposed to go to
10 trial 30 days after.  And there was a prior determination on the
11 hearing January 31st, 2017, that as long -- now, and I may be
12 miscorrect on there -- we made a motion concerning speedy trial
13 issues and that they stated as long as I went to trial 30 days
14 after that first trial that there won't be a speedy trial
15 violation.  And yet here we are 6 months down the road from
16 there.  That is one of the new conditions there, that there's --
17 we've simply been here a very long time.  Incarceration has been
18 very long pretrial when and in fact the law lends to release of
19 pretrial.
20         Other new things were -- well, even since then we have
21 had another trial wherein there was not guilties found and hung
22 juries and no determination of any conspiracy existing.  Anyway,
23 there's certainly new things.  Even now we're comin' up with new
24 things, such as this misinformation or missing information
25 concerning these -- these cameras and so forth.  There --

—2:16-cr-46-GMN-PAL - November 9, 2017—

1  there's -- there's plenty of new things that would justify this

2  hearing here today and consideration for release.

3        Concerning transportation, that the time to Henderson

4  for -- to get back into the rooms there is no less than what it

5  is to CCA.  We could ask my father or Ryan Payne.  I know I

6  spoke with them.  Both of them have stated that they don't --

7  they are not back into their cell, into their room, you know,

8  prior to 9 o'clock at night.  They may obtain to the actual

9  jailhouse sooner than that, but they spend hours handcuffed to a

10  bench.  For what purpose that is -- processing, gettin' 'em back

11  in, et cetera.  I don't know why Henderson is so bad about

12  that -- but they seriously do spend hours tied to the bench

13  before they are ever back in their room.  Again, they are away

14  from their materials.  If I were there, it would be the same.

15  And so the conditions in this transportation issue is -- is --

16  is the same either way.  It's just terrible.

17        And I do want to refer back to my original *Faretta*

18  hearing in April of 2016 where we spoke about the conditions of

19  preparing a trial.  And the Government at that point stated that

20  they didn't want me to have any special conditions.  And, again,

21  I agreed to that because I don't want any special conditions

22  either.  I want the same conditions that the prosecution has --

23  all their tools, all their time, all their equipment, et cetera,

24  et cetera -- to be able to prepare my case.  They have all these

25  many tools; they didn't want me to have anything different.

—2:16-cr-46-GMN-PAL - November 9, 2017—

1 They stated so forth and I agreed to that.  And yet now they are
2 trying to state that, oh, it's my own decision; it's my own
3 fault that I have these terrible conditions.  And to me it seems
4 like they are trying to create a situation where I cannot
5 prepare, cannot be equal in preparation to them so as to -- they
6 would have a prejudicial advantage over me.  It's just not --
7 just not just.  And so I'm asking for justice in the matter of a
8 fair trial.  I -- I have a right to a fair trial and I need to
9 be afforded that right and I can't be afforded that right under
10 these type of conditions.

11      I want to bring up -- they went back over some of these
12 criminal history.  That speeding event was at Flagstaff, the
13 highway comin' into Flagstaff.  There's an intersecting road off
14 of -- there's a major highway there, like three lanes one
15 direction.  It's pretty wide.  There's lots of room.  Lots of
16 space -- but there's an intersecting road off of that.  They
17 dropped the traffic -- the speed down for just a few hundred
18 yards for that intersection.

19      I simply did not see that drop.  Nice open freeway, but
20 there happened to be a Highway Patrol there making a previous
21 stop.  He stopped me 10 miles over or whatever it was.  I wasn't
22 speeding in the regular zone.  And that's all that is.  I just
23 ended up payin' it.

24      He mentioned that I was tased on the 2007 incident.
25 That's not true.  Anyway, so he's makin' up stories there.  I

1  don't know where he gets that.

2        Concerning these offenses supposably made at CCA,

3  there's a lot of frivolity here.  You know, the issue of liberty

4  is an important one.  And, over and over again with CCA, I said,

5  hey, let's meet together and come to an agreement.  Again, under

6  the Thirteen Amendment, I am protected from slavery or

7  involuntary servitude as no -- it's not supposed to exist in the

8  United States or anyplace that's subject to its jurisdiction

9  unless a person has been duly convicted of a crime.  Once a

10  person is duly convicted of a crime, then legally he can be

11  involuntary associated; he can be involuntary servitude.  He can

12  be a slave at that point.  But that's not me.  I'm not a slave.

13  I am not a convicted criminal.  I do not have a conviction.

14  And, therefore, I asked CCA, over and over again, let's come to

15  an agreement so that I am not being forced into involuntary

16  association.  You know, we did come to some agreements later on;

17  but there was a little bit of conflict in there.

18        But there is some false accusations here.  Not all of

19  them are false.  I mean, I'll admit I didn't follow their verbal

20  orders because I didn't have an agreement with them to do such.

21  But anything I did make an agreement with I adhered to those

22  agreements.  We did make a couple of agreements.  And I never

23  faltered on those.  And so anyway . . .

24        But there's -- the other thing concerning these is

25  they've got, you know, I'm guilty, disposition guilt,

1  disposition guilty.  They do not have a justice system over

2  there that allows for a fair tribunal.  They denied my

3  appearance at their hearing done by their in-house officer, not

4  a impartial.  It's -- it's their officer.  Of course, they are

5  going to lean towards their direction.  And so there wasn't --

6  there's not a due process of law goin' on over there to

7  determine these.  They charge you with somethin'; they convict

8  you of it.  And -- and that's -- anyway, again, a lot of

9  frivolity goin' on there.

10          Again, concerning the incident in the elevator, again,

11  liberty is a precious thing and being pushed around and told

12  what to do -- like -- like I'm just a dog, like just I'm an

13  animal -- is egregious.  And, again, I value the necessity and

14  the purpose for safety.  I value the purpose for the security of

15  their keypad.  I don't have a problem not seein' it.  I'm not

16  interested in it.  But to be instructed to "face the wall, face

17  the wall" it's demeaning behavior, it's demeaning action that

18  lends to guilt rather than innocence until proven guilty.  And

19  the story that goes on here how I'm so violent that I wouldn't

20  face and put my nose to the wall, there's -- there's some

21  exaggeration that goes on here.  I will admit I did not desire

22  to face the wall and I didn't face the wall and they did try to

23  turn me around and -- but I never did try to make any

24  aggressions towards them as what was indicated.  So that goes

25  beyond what the truth is here.

1          And, again, I will make a commitment and I've already

2    done so.  So there's really no need for me to reverb that.  But

3    we make an agreement which is what this is all about,

4    conditions, which I agree to, which we agree to, to accomplish

5    the design; to make sure the community's safe; and to make sure

6    that my presence at trial can be met.  And I will keep my

7    obligations.  I'm a man of my word.  You won't find anybody who

8    will testify otherwise.

9          I'd like to talk a little bit about Sevier County;

10   Monroe, Utah; Richfield up there at the livestock auction.

11   There's a great misrepresentation that Mr. Schiess spoke about

12   because I do have some photographs here; they are from

13   discovery.  I don't know if you want to put them up.  Maybe I

14   can give them to you.  Can I --

15             THE COURT:  You can use --

16             PRO SE RYAN BUNDY:  -- may I --

17             THE COURT:  -- the ELMO.

18             PRO SE RYAN BUNDY:  -- approach?

19             THE COURT:  Yes, you may.  Do you want to use the ELMO

20   to put them on the --

21             PRO SE RYAN BUNDY:  I can either hand them to you or

22   put them on the ELMO.

23             THE COURT:  All right.

24             MR. SCHIESS:  Your Honor, can I see 'em real quick

25   first?

2:16-cr-46-GMN-PAL - November 9, 2017

1          THE COURT:  Yes, you may.

2          If it's easier to put them on the screen, we can do

3    that so that everybody can see them at the same -- let's just

4    put them on the screen so everybody can see them since we only

5    have the one copy.  If there's a glare, you might need to pull

6    it out of the sheet.  But . . .

7          COURT REPORTER:  Pull the microphone closer while

8    you're up there.  Thank you.

9          PRO SE RYAN BUNDY:  There's many more pictures than

10   these.  So these are just a small representation of what was

11   goin' on up there.

12         Again, in that pretrial detention hearing that I had on

13   January 31st, 2017, I had actually summonsed Sheriff Nathan

14   Curtis to come.  That was denied by the court to allow him to

15   come and testify.  Also, I had a few others that are willing to

16   come and testify.

17         My wife was one.  And she is here.  And, if need be, I

18   will put her on the stand to testify.  My daughter also --

19   Jerusha was also there.  I can put her on the stand also

20   concerning these things.  But either way, um . . .

21      (Photograph displayed in open court.)

22         PRO SE RYAN BUNDY:  This is -- this is one picture

23   there.  You can see this sign up here (pointing), Richfield

24   Monroe.  This is right in front of the livestock auction which

25   is off to the -- to the right of this picture.  You can see

1  people here just peacefully assembled.  You know, we -- we do

2  have some signs.

3      (Photograph displayed in open court.)

4          PRO SE RYAN BUNDY:  Again, another picture.

5          The truth of the matter is, is that when I went to

6  Richfield I contacted the Sheriff.  I called him.

7      (Photograph displayed in open court.)

8          PRO SE RYAN BUNDY:  The auction was never shut down as

9  is reported in the Indictment.  Peaceful protests goin' on.

10     (Photograph displayed in open court.)

11         PRO SE RYAN BUNDY:  And, by the way, I mean, that's my

12 young son there, Moroni.  It was his birthday that day, and yet

13 I'm havin' to be there.

14     (Photograph displayed in open court.)

15         PRO SE RYAN BUNDY:  Children were there.  This was not

16 a violent event where we are all there tryin' to be malicious.

17 No.  It's a protest.

18         I did -- on April 2nd, I did not actually make

19 contact -- I did make contact with the Sheriff by the phone.  I

20 wanted to visit him -- with him face to face and was not able to

21 do so because he was out of town.  I did make an arraignment and

22 I visited with him face to face in his office at a later date.

23 He did not have to come and put down a revolution or whatever

24 you want to call it.  There was another Deputy there who talked

25 with us peacefully and calmly and he was mostly concerned that

1  no one got hit on the road there where we were protesting.

2  There was never any incident at the -- inside the livestock

3  facility at all.  Totally peaceful.

4          And, again, if you desire, I'll call a witness right

5  now to that -- to that effect.

6          THE COURT:  That's fine.  I'll accept your

7  representation.

8          PRO SE RYAN BUNDY:  Okay.  Thank you.

9          MR. SCHIESS:  Your Honor, may I be heard on that

10  because there's quite a different set of facts.

11         Mr. Bundy went there twice on April the 2nd, 2014, at

12  which time the Sheriff -- he did go into the livestock ring.

13  And, according to the owner, he did disrupt the events.   I

14  didn't say that there was violence outside.  I said he caused a

15  ruckus; he disrupted it.

16         The Sheriff has told us that he in fact then spoke with

17  Mr. Bundy on the 2nd and that Mr. Bundy did tell him he would

18  stop the cattle transportation to Utah by force.  And, in fact,

19  at about that same time, maybe a couple days earlier, he and his

20  father were at the port -- port of entry between the Utah

21  Arizona border --

22         PRO SE RYAN BUNDY:  I'm gonna object at this point.

23  He's had his opportunity to speak.  It's been turned over to me.

24  Unless you're wantin' to give him extra time, I think he's out

25  of place, speaking out of turn.

 1          MR. SCHIESS:  So my point -- continuing on, Your

 2    Honor -- is that he went back --

 3          THE COURT:  Well, I think we're just getting back into

 4    the facts of the case.  I'm not gonna be making any decision

 5    about the facts in the case.  That's why we're here is to have a

 6    trial so that the jury can decide --

 7       (Ms. Fletcher and Pro Se Ryan Bundy conferring.)

 8          THE COURT:  -- which version or interpretation of the

 9    case and which facts and which inferences to draw are most

10    appropriate.  So I don't want to get into the facts of the case.

11          Was there anything else, Mr. Bundy, you wanted to add?

12          PRO SE RYAN BUNDY:  Yeah.

13          THE COURT:  Separated from the facts.  I don't want to

14    try the case here today.

15          PRO SE RYAN BUNDY:  All right.  We -- okay.  Fine.

16          We did go to -- we did go there twice.  Neither time

17    was there -- it was just a protest both times.

18          Back to speaking with the Marshals here, it was

19    mentioned that I said they don't have any f-ing authority, that

20    is just not how I speak, madam.  You won't find anybody who

21    knows me who has ever heard me speak in that manner.  In fact, I

22    have here a copy of the actual statements or -- this is the

23    written -- I don't know where Mr. Schiess was getting his

24    information.  But this is a statement from David Wilkinson.  I

25    believe he's one of the Marshals.  And he stated that throughout

1  this event -- their statements were "We are innocent and free

2  men.  We are not prisoners.  We are not slaves."  Nothing to the

3  effect that there was a f-ing this or f-ing that.  That's just

4  not who I am, madam.

5          Whatever it takes is not a --

6          THE COURT:  I think you're talking about two different

7  things.  So the Tuesday, October 24th, event regarding the

8  elevator is where it's represented that you said, "We are free

9  men and not slaves and we are not turning around."

10         The other statement that he attributed to you was after

11 court.  So the elevator incident was before court and then this

12 incident, the other . . .

13         PRO SE RYAN BUNDY:  I haven't read the second one all

14 the way through.  But I still hold to the fact that I -- I -- I

15 don't speak that way and never have.  You will not find a

16 witness that will say that I truly did.  And then -- hang on

17 one . . .

18    (Ms. Fletcher and Defendant Ammon Bundy conferring.)

19         PRO SE RYAN BUNDY:  Oh.  And that's -- point of

20 clarification.  It wasn't me that was kicked out; it was my

21 brother Ammon.  And so I believe that the report is -- is

22 actually referring to him and not to me.

23         THE COURT:  Which report?

24         PRO SE RYAN BUNDY:  Well . . .

25    (Ms. Fletcher and Pro Se Ryan Bundy conferring.)

—2:16-cr-46-GMN-PAL - November 9, 2017—

1          PRO SE RYAN BUNDY:  The October 24th report.  Um . . .

2          THE COURT:  The written report that we were provided

3  about --

4          PRO SE RYAN BUNDY:  Again, I --

5          THE COURT:  -- the elevator incident?

6          PRO SE RYAN BUNDY:  -- haven't read this.  It was

7  handed to me, and I haven't read through it yet where they're

8  talkin' about havin' takin' him out.

9      (Ms. Fletcher and Pro Se Ryan Bundy conferring.)

10          PRO SE RYAN BUNDY:  Um . . .  My children were -- well,

11  I don't know if we need to say anything more about -- about that

12  event there.  I just -- again, liberty is important.  Liberty is

13  important.  And we're not -- we're not guilty.  And we should

14  certainly -- the law holds that we are innocent until proven

15  guilty, and yet we haven't been treated as though we're innocent

16  until proven guilty.  This treatment of incarceration, this

17  treatment of puttin' our nose to the wall, treatment of chains

18  and shackles and -- this isn't treatment conducive to innocence.

19          And all we are wanting is a little bit of treatment as

20  innocent.  We're not violent men.  We're not feisty.  But -- but

21  we get tired of -- of this type of treatment.  And so putting

22  our foot down a little bit, resisting a little bit, trying to

23  gain a little more liberty, gain a little more respect in a

24  manner which we feel is deserving of an innocent man is not --

25  does not lend to that we're dangerous and can't be in society.

1  Each time we petition -- and these might be considered petitions

2  or whatnot for a little more liberty -- each time instead of

3  being granted a little more liberty, more is taken away which is

4  opposite of what should be bein' done.  Instead of bein' heard

5  that there's atrocities goin' on, they just say, oh, you're not

6  compliant and add more atrocities.

7        I can get along with these men.  I can get along with

8  any of these men.  But I -- I -- I deserve some respect as an

9  innocent man.  And we all do.  And all we want is some liberty

10 and some respect to that degree.  And we will in turn give

11 respect.  When we're disrespected, then sometimes we act in a

12 like manner.

13       But, again, agreements and commitments that I make I

14 will keep.  And, um -- and we do hundreds of things each day to

15 comply.  It's not like, you know -- we teach correct principles;

16 we try to govern our lives according to correct principles.

17 We're good men.

18       And I have a good family.  I have, again, a beautiful

19 wife; beautiful children.  And I miss them greatly, and they

20 miss me greatly.  I call 'em on the phone and they cry often

21 because of their dad not bein' there.  I haven't been able to

22 earn a living for them because I've been gone.  We've been

23 lucky.  We've been to live and survive.  Our community has

24 donated and given them so many things to keep them in survival.

25 But that's my job as a father to provide for them.  And yet I'm

———2:16-cr-46-GMN-PAL - November 9, 2017———

1   not able to do that.  And that's not my fault.  I have not

2   committed a crime.  I have not committed these crimes deserving

3   of this type of treatment.  And it certainly hasn't been proven

4   so yet.  And yet I am being prevented from accomplishing my duty

5   as a husband and a father to provide for them and to care for

6   their physical and emotional and spiritual needs.  And I want to

7   be a father.  I want to be able to do my duty to them.  And

8   they're deserving of it.  This is punishment to them that is

9   not -- that they don't deserve.  Even if I did deserve it, they

10  don't deserve it.

11          And I just ask -- ask thee, madam, to please release me

12  today.  Again, I give my commitment that -- that I will be

13  present at all court proceedings that -- pertaining to me.  And

14  I will be -- I've never been a danger to the community and I'm

15  not going to be.  I will be a benefit to the community.  And I

16  will work with the Marshals and/or Pretrial Services to

17  accomplish that task and that goal and that design.  And I look

18  forward to coming here to trial to resolve these accusations

19  against me.  Thank you.

20          THE COURT:  Thank you, Mr. Ryan Bundy.

21          I do agree with you.  You do have a beautiful family

22  and beautiful wife.  And, even if they weren't beautiful, they

23  are very valuable.  And I do believe that you value them

24  incredibly and that, if given the choice, you would rather be

25  with them than in custody.  I think that is the same for all of

————2:16-cr-46-GMN-PAL - November 9, 2017————

1  the defendants here and in other cases as well.

2        It is always an incredibly difficult thing for any

3  judge, for any person, to have to make these decisions.  The

4  Magistrate Judges do it all the time.  And I don't know how they

5  do it, but they do.  But I know that it's incredibly troubling

6  and difficult to make these decisions in light of all the

7  families that are affected.  And often for sentencing purposes

8  we have the same problem in having to tell a defendant that the

9  risk that they took in completing a crime and running at the

10  risk of not being able to be with their family.

11        But here the presumption of innocence does apply.

12  There's also a presumption of risk of nonappearance and danger

13  to the community, but it is a rebuttable one.  And the Court

14  does find that the risk that the defendant will not appear has

15  been rebutted, and I do not think that there is a serious risk

16  that he will not appear.

17        As to the danger of the safety of another person or of

18  the community, some of the factors that were listed in the

19  original controlling Order of Detention from April of 2016,

20  which is Document No. 298 on the docket, those do not apply any

21  longer regarding the offenses that were charged in Oregon.  And,

22  in this particular order, the outcome was yet not known.  And we

23  do know now that there were acquittals for Mr. Ryan Bundy to all

24  except for the one charge which I think we agreed was the theft

25  and not the -- in any case, it's one of the two charges and it's

—2:16-cr-46-GMN-PAL - November 9, 2017—

 1  one that does not appear to be one that is as serious as the

 2  other charges certainly were.

 3          There is still the question of whether or not he is

 4  still under an order of detention from the Oregon court.  But,

 5  notwithstanding that, I think that some of these incidents in

 6  the criminal history have been addressed adequately for the

 7  Court to find that they are not a significant indicator of any

 8  flight risk.

 9          There is still remaining the indication that the

10  defendant will not obey Federal Court orders or federal

11  authority or federal rules and regulations.  What was brought up

12  was the refusal for transportation which happened on a number of

13  times to the court.  I did provide phone access for Mr. Ryan

14  Bundy so that we could still have a hearing and move the case

15  forward towards trial.  Sometimes he did come to the phone;

16  sometimes he didn't.  One time he came to the phone.  But then

17  he -- after we spoke for a while and he didn't -- he hung up the

18  phone and so he was no longer present at the hearing.

19          Eventually I did provide an order -- which I've already

20  explained on the record and is part of the record.  It is on the

21  docket -- so that routine searches would not be performed in the

22  hopes of enabling everyone to be in court.  So my understanding

23  is -- or the representation is that regardless of that order

24  Mr. Ryan Bundy did not comply with rules in the Henderson jail

25  and is now back at the Pahrump jail.

1          Then we have the report, the printout, of the

2    disciplinary summary.

3          PRO SE RYAN BUNDY:  May I address the issue with the

4    Pahrump -- the Henderson jail, ma'am?

5          THE COURT:  No.  I gave you the opportunity to speak

6    for quite some time.  And it's past 5:20 now which we talked

7    about this before; I do have staff here that needs to get home.

8          But the failure to follow verbal and posted rules

9    and/or orders, there's at least nine of those violations between

10   March of 2017 and August of 2017 with a finding of guilty and

11   the severity is stated to be major on some of those, two

12   assaults with the disposition of guilty.  And so those are

13   concerning to the Court; I can't disregard them.

14         There's also the issue about -- the elevator incident

15   and the representations there which I addressed in court right

16   after it happened and I did find that it was a very reasonable

17   request to not look at the password keypad and that the failure

18   to follow that request to turn around was not a reasonable

19   refusal.

20         Not familiar with the statement after court, because

21   I'm not here, about whether or not Mr. Ryan Bundy said you have

22   no f-in' authority over me or not.  So I'm not gonna consider

23   that for this hearing.  But there is a pattern, as Mr. Schiess

24   said, of noncompliance, not just with the Detention Center here

25   and not just with the event that forms the subject of the

————2:16-cr-46-GMN-PAL - November 9, 2017————

1  Superseding Indictment or the events in Oregon but also the 1994

2  Failure to Stop and Pay at the Zion park; in 2007, it's alleged

3  that he had to be tased; and the interference -- I'm not gonna

4  consider the interference with the animal.  I don't think

5  there's sufficient information there for me to take that into

6  consideration in -- as a negative.

7          I did hear testimony in one of the previous trials

8  about a phone call made by Johnson on March of 2014 to Mr. Ryan

9  Bundy in an effort to discuss the impound operation and how to

10 organize it in such a way to prevent confrontation or minimize

11 the likelihood of any injury or violence or disruption.  And I

12 do recall him stating on the phone call that he would take -- do

13 whatever it takes.  And, when asked how to avoid the conflict,

14 he stated not to take the cattle.  But, you know, that's not as

15 much as a concern for me as it is the totality of the

16 circumstances of the continuing pattern of whether it's little

17 things.  It does add concerns and makes me pause when I've got

18 my mind made up that maybe we can work this out and put him in a

19 halfway house for a few days or a weekend until we have the

20 Homestead residence safety check and maybe even some visits.

21 And I want to be able to provide this opportunity.  But the

22 facts just don't permit it.

23         So I agree with you that liberty is important.  That is

24 why we have these hearings.  That's why I think it was important

25 to have these hearings.  I know there's a lot of tired faces out

—2:16-cr-46-GMN-PAL - November 9, 2017—

1   there in the audience.  And I appreciate your patience.  But it
2   is important that we have these hearings.  I am glad we had the
3   opportunity to hear from both sides so that the defendants had
4   their opportunity to present their best foot forward.  Of
5   course, that also means that the Government has an opportunity
6   to present their information as well.
7          So, even though there is a different posture at this
8   point, it's still not sufficient for the Court to be able to
9   find that the rebuttable presumption regarding danger to the
10  community has been overcome.  Based on all the information
11  that's been presented to the Court, the presumption has not been
12  rebutted and there are no conditions or combination of
13  conditions that the Court finds at this time could be fashioned
14  to reasonably assure the defendant's -- or to protect the
15  community against the risk of danger posed by the defendant.
16         PRO SE RYAN BUNDY:  Madam --
17         THE COURT:  So the order of detention pending trial
18  still stands.
19         The --
20     (Mr. Whipple and Pro Se Ryan Bundy conferring.)
21         THE COURT:  -- but the risk of nonappearance I do not
22  find to be an issue and the rebuttable presumption has been
23  overcome in that regard.
24         All right.  So we do have the one matter of Mr. Ammon
25  Bundy's detention outstanding.  So we will address that on

1  Monday which is --

2      (Pro Se Ryan Bundy and Ms. Fletcher conferring.)

3          THE COURT:  -- scheduled for -- let's see.  What did

4  he -- I think it's scheduled for 8:30 a.m. on Monday the 13th if

5  I'm looking at this right.  Yes.  And then we also have the

6  matter of Ryan Payne's motion, number 2727, that the Government

7  had wanted time to respond to that so that we can address it

8  also on Monday.  And then trial will begin on Tuesday, the 14th,

9  at 8:30 a.m.

10         So thank you, everybody, for your patience and for the

11 respect and the decorum.  We'll go ahead and see you then on

12 Monday morning.  Have a good weekend.

13         We're off record.

14         COURTROOM ADMINISTRATOR:  All rise.

15     (Proceedings adjourned at 5:27 p.m.  Proceeding to resume on

16 Monday, November 13, 2017, at 8:30 a.m.)

17                         --oOo--

18             COURT REPORTER'S CERTIFICATE

19     I, FELICIA RENE ZABIN, Official Court Reporter, United

20 States District Court, District of Nevada, Las Vegas, Nevada, do

21 hereby certify that pursuant to 28 U.S.C. § 753 the foregoing is

22 a true, complete, and correct transcript of the proceedings had

23 in connection with the above-entitled matter.

24 DATED:  November 29, 2017

25                      /s/ **Felicia Rene Zabin**
                     FELICIA RENE ZABIN, RPR, CCR NO. 478